IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Harrisonburg Division

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU; COMMONWEALTH OF MASSACHUSETTS; THE PEOPLE OF THE STATE OF NEW YORK, by LETITIA JAMES, Attorney General of the State of New York; and COMMONWEALTH OF VIRGINIA, *EX REL*. MARK R. HERRING, ATTORNEY GENERAL,<br><br>    Plaintiffs,<br><br>v.<br><br>NEXUS SERVICES, INC.; LIBRE BY NEXUS, INC.; MICHEAL DONOVAN; RICHARD MOORE; and EVAN AJIN,<br><br>    Defendants. | Case No.: **5:21-cv-00016** |

## COMPLAINT

The Consumer Financial Protection Bureau (Bureau), the Commonwealth of Massachusetts (Massachusetts), the People of the State of New York by Letitia James, Attorney General of the State of New York (New York), and the Commonwealth of Virginia (alone Virginia, together with Massachusetts and New York, the States), allege the following against Nexus Services, Inc., Libre by Nexus, Inc. (collectively Nexus), Micheal Donovan, Richard Moore, and Evan Ajin.

## Introduction

1.      Nexus Services, Inc. (Nexus Services), through its subsidiary Libre by Nexus, Inc. (Libre), preys on consumers held in federal detention centers by offering to

1

pay for consumers' immigration bonds to secure their release. In exchange, Libre demands large upfront fees and hefty monthly payments while concealing or misrepresenting the true costs of its services.

2.    Libre's potential clients are detainees in the custody of U.S. Immigration and Customs Enforcement (ICE) and those detainees' friends and family members. Detainees who are deemed to not pose a flight risk or a threat to public safety are afforded the opportunity to post bond. Detainees without the ability to pay cash for their bond—averaging $7,500 nationally—must obtain third-party financing to pay for the bond in cash, get bonded by a surety company, or remain in detention.

3.    Libre offers to "securitize" immigration bonds for these cash-strapped consumers. The "securitization" service requires consumers to wear bulky GPS-tracking devices and pay monthly fees for those devices for years.

4.    Libre creates the reasonable impression in consumers' minds at the time they sign up for its service that Libre has paid cash for their bond, creating a debt that must be repaid to Libre through an upfront fee and subsequent monthly payments.

5.    Once consumers sign written agreements, Libre's efforts to collect monthly payments include making false threats to take legal action, sell accounts into collection, and report consumers to credit bureaus. Libre also threatens to re-detain or deport consumers for non-payment.

6.    Defendants Micheal Donovan, Richard Moore, and Evan Ajin (Individual Defendants) devised this business model, implemented it, directed its operation, and knew the details of its workings.

7.    The Bureau and the States bring this action against Nexus Services, Libre, Donovan, Moore, and Ajin (collectively, Defendants) under §§ 1042 and 1054 of the

Consumer Financial Protection Act of 2010 (CFPA), 12 U.S.C. §§ 5552 and 5564. Defendants engaged in deceptive and abusive acts or practices in connection with Libre's offer of credit to consumers for their immigration bonds. *See* 12 U.S.C. §§ 5531, 5536(a). And Nexus Services, Donovan, Moore, and Ajin knowingly or recklessly provided substantial assistance to Libre in its deceptive and abusive acts or practices, in violation of the CFPA. *See* 12 U.S.C. § 5536(a)(3).

8.      The States also bring related claims against Defendants for violating their respective consumer-protection laws.

## Jurisdiction and Venue

9.      The Bureau brings this action under §§ 1031, 1036, and 1054 of the CFPA, 12 U.S.C. §§ 5531, 5536, 5564. The States bring this action under § 1042 of the CFPA, 12 U.S.C. § 5552, which authorizes state attorneys general to bring civil actions to enforce provisions of the CFPA, based on Defendants' deceptive and abusive practices in violation of §§ 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531, 5536.

10.      This Court has subject-matter jurisdiction over this action because it is brought under "Federal consumer financial law," 12 U.S.C. § 5565(a)(1), presents a federal question, 28 U.S.C. § 1331, and is brought by an agency of the United States, 28 U.S.C. § 1345.

11.      This Court has supplemental jurisdiction over the state-law claims asserted by Massachusetts, New York, and Virginia because they are so related to the federal claims that they form part of the same case or controversy. 28 U.S.C. § 1367(a).

12.      This Court has personal jurisdiction over Defendants and venue is proper in this district and in this division because Defendants are located, reside, and do business here. 12 U.S.C. § 5564(f); 28 U.S.C. § 1391(b)-(c); W.D. Va. Civ. R. 2(b).

**Parties**

13.     The Bureau is an agency of the United States created by the CFPA and charged with regulating the offering and providing of consumer-financial products and services under federal consumer-financial laws. 12 U.S.C. § 5491(a). The Bureau has independent litigating authority. 12 U.S.C. § 5564(a)-(b).

14.     Massachusetts, represented by and through its Attorney General, is a sovereign state. The Attorney General is authorized to bring this action in the public interest by Massachusetts General Laws chapter 12, §§ 3 and 10, and chapter 93A, § 4, Mass. Gen. Laws (M.G.L.) ch. 12, §§ 3, 10; ch. 93A, § 4.

15.     New York, by its Attorney General (NYAG), is authorized to take action to enjoin (i) repeated and persistent fraudulent and illegal conduct under New York Executive Law § 63(12) and (ii) deceptive business practices under New York General Business Law (NY GBL) § 349.

16.     Virginia, by, through, and at the relation of its Attorney General, Mark R. Herring, has authority to bring this suit, and brings this suit, to enforce the Virginia Consumer Protection Act (VCPA), Virginia Code §§ 59.1-196 through 59.1-207, under Virginia Code §§ 59.1-203, 59.1-205, and 59.1-206.

17.     Nexus Services was incorporated in 2013 in Virginia. It was redomiciled in 2019 as a Georgia corporation, but its principal place of business is in Verona, Virginia, and it continues to do business in Virginia as a foreign corporation.

18.     Libre, a wholly owned subsidiary of Nexus Services, was incorporated in 2014 in Virginia. Libre was redomiciled in 2019 as a Georgia corporation, but its principal place of business is in Verona, Virginia, and it continues to do business in Virginia as a foreign corporation.

19.     As described herein, Libre creates the reasonable impression in consumers' minds that it is offering or providing extensions of credit to pay for consumers' immigration bonds. These transactions are therefore consumer-financial products or services under the CFPA. 12 U.S.C. § 5481(5), (7), (15)(A)(i). Libre therefore is a "covered person" under the CFPA. 12 U.S.C. § 5481(6)(A).

20.     Donovan is a Virginia resident, a co-founder and a majority owner, officer, and director of Nexus Services, and the Chief Executive Officer of Libre. At all times relevant to this Complaint, Donovan has exercised managerial responsibility for Libre and Nexus Services and has materially participated in the conduct of each company's affairs. Donovan is therefore a "related person" under the CFPA, 12 U.S.C. § 5481(C)(i), (ii), and thus deemed a "covered person" under the CFPA, 12 U.S.C. § 5481(25)(B).

21.     Moore is a Virginia resident, a co-founder and part owner of Nexus Services, the Chief Financial Officer of Libre, and the Executive Vice President of Libre and Nexus Services. At all times relevant to this Complaint, Moore has exercised managerial responsibility for Libre and Nexus Services and has materially participated in the conduct of each company's affairs. Moore is therefore a "related person," 12 U.S.C. § 5481(C)(i), (ii), and thus deemed a "covered person" under the CFPA, 12 U.S.C. § 5481(25)(B).

22.     Ajin is a Virginia resident, part owner of Nexus Services, a Director of Nexus Services, and a Vice President of Libre. Since at least 2016, Ajin has exercised managerial responsibility for Libre and Nexus Services and materially participated in the conduct of each company's affairs. Ajin is therefore a "related person," 12 U.S.C. § 5481(C)(i), (ii), and thus deemed a "covered person" under the CFPA, 12 U.S.C. § 5481(25)(B).

5

## Facts

### *Through false and misleading statements and omissions, Libre targets detainees who are desperate to be released.*

23.     Libre operates a business aimed at immigrants held in federal detention. The detainees and their families are typically desperate to get the detainees—who have typically been held in jails or detention centers for months—out of detention, but they cannot afford the bond.

24.     Libre markets, offers, and provides its services nationwide and has done business with consumers in Massachusetts, New York, Virginia, and elsewhere.

25.     ICE may release non-citizens held in its custody if an immigration judge has set a bond.

26.     Immigration bonds may be secured by a cash deposit in the full amount of the bond to ICE (cash bonds). Cash bonds are refundable when the consumer's immigration proceedings are finally resolved.

27.     Immigration bonds also may be guaranteed by a surety company certified by the U.S. Treasury under 31 U.S.C. §§ 9304-9308. The Treasury publishes a list of certified companies on its website.

28.     As of the date of this filing, neither Nexus Services nor Libre appears on the Treasury's list of certified companies.

29.     Neither Nexus Services nor Libre is a licensed bail-bond agent in any state.

30.     Detainees frequently lack the funds to obtain their release. In 2018, the median immigration bond cost $7,500, up 50% since 2013.

31.     Libre markets and describes its services to consumers as an easy and affordable alternative method of securing the release of detainees from federal custody.

6

32.     The vast majority of Libre's clients and their co-signers are Spanish speakers, most of whom do not read or write English and many of whom cannot read or write in any language.

33.     Libre markets to consumers with Spanish-language advertisements.

34.     From at least 2014 until at least late 2017, Libre used a multi-part, written client agreement of over 20 pages, all written in English except for a single page written in Spanish (Original Agreement). Thousands of active Libre clients signed the Original Agreement.

35.     Typically, either an immigrant in detention or a spouse, partner, or relative contacts Libre, and a Libre representative, over the phone, purports to explain the terms of the agreement. Libre then faxes a written agreement to the spouse, partner, or relative and requires that individual to co-sign the agreement and submit a substantial, non-refundable upfront payment.

36.     After receiving the upfront, non-refundable payment and signed written agreement from the co-signer, Libre obtains the detainee's release by instructing a bond agent to post the bond.

37.     Libre acts as an intermediary between the detainees and the sureties and their bond agents. Libre requires detainees to execute an agreement with certain obligations and, in exchange, it agrees to indemnify the sureties and their bond agents for any losses in connection with the immigration bonds. The sureties then post and issue immigration bonds to ensure the detainee's release.

38.     When the immigration bond is processed, the detainee is released from ICE custody. A Libre representative picks up the freed detainee at the detention center, then takes the freed detainee to a fast-food restaurant and then to a Libre office or a

hotel. At this point, having just been released from immigration detention—in many cases having never been in the United States—and without any ability to contact a friend or family member, the freed detainee relies entirely on Libre for food, transportation, and guidance on how to reunite with their family.

39.    At Libre's office or a hotel, often arriving after hours of driving and in the middle of the night, Libre presents the consumer with a written agreement.

40.    Libre instructs the newly released detainee that their co-signer has already executed the agreement and that they must do so as well. Libre sometimes represents that if the released detainee does not execute the agreement, they will be returned to detention, and their co-signer will forfeit the upfront payments they have made and may also be subject to additional liability for costs, losses, and interest on the bond under the Original Agreement.

41.    The consumer then signs the written agreement, thus becoming a Libre client and, under the Original Agreement, is obligated to wear a GPS ankle monitor and to pay a monthly fee of $420 until the immigration proceeding before ICE is resolved. Consumers rarely have access to a lawyer to represent their interests at this time.

42.    Released detainees are placed on ICE's "non-detained" docket to await an immigration hearing. Immigrants on the non-detained docket typically wait about three years for a hearing, meaning that Libre's clients may have to make $420 monthly payments for that long, or longer. Thus, for instance, under the Original Agreement, a Libre client with a $10,000 bond whose immigration case took three years to resolve could expect to make nonrefundable payments to Libre in excess of $17,000.

43.    Freed detainees and co-signers typically rely exclusively on Libre's oral representations to understand the terms of the agreement.

44.     But Libre misrepresents, conceals, or fails to explain many of the material terms. For example, Libre has omitted that monthly payments go to the GPS-device lease, not the bond, and are nonrefundable.

45.     Libre also misrepresents that it has paid the bond and that consumers need to make monthly payments to Libre without explaining that the purpose of the monthly payments is leasing the GPS device, leading consumers to reasonably believe that they owe a debt to Libre.

### Libre's written agreements contain misrepresentations designed to deceive and intimidate consumers.

46.     Since 2014, Libre has used at least two different written agreements.

47.     The Original Agreement requires consumers to make upfront payments in the amount of 20% of the bond, a $420 "advance payment," and an "activation fee" up to $460.

48.     The Original Agreement requires consumers to wear a bulky GPS ankle monitor and make monthly payments of $420 until: (1) a consumer's immigration proceedings are finally resolved; or (2) the consumer makes supplemental "collateral" payments—in addition to the $420 monthly payments—that add up to 80% of the amount of the bond, at which time the ankle monitor is removed, and the consumer agrees to pay the remaining 20% over a specified time.

49.     Under the Original Agreement, monthly "lease" payments are not refundable.

50.     Under the Original Agreement, "collateral" payments are refundable once consumers' proceedings are resolved.

51.     Libre told consumers that collateral payments are refundable once consumers' proceedings are resolved.

52.     Libre did not properly track consumers' payments in its systems, resulting in some collateral payments not being recorded.

53.     In many cases, Libre did not refund or took months to refund consumers' collateral payments.

54.     In some instances, Libre also did not refund or took months to provide refunds to consumers who had made an initial payment but did not actually use Libre's services.

55.     The Original Agreement includes a "Lease Agreement" between three parties: Libre, the consumer (Lessee), and "Agency." The Lease Agreement states that "Agency has an interest in electronically monitoring individuals." Under a section labeled "Agency Provisions," Libre agrees to provide "Agency" access to the tracking device to "facilitate Agency's monitoring of Lessee." A section labeled "General Provisions Applicable to Both Lessee and Agency" states that "[t]he parties acknowledge that the tracking and monitoring which is contemplated hereunder by the Agency may be undertaken in conjunction with criminal process against Lessee, or that Lessee has voluntarily undertaken to use the Equipment in order to satisfy a criminal conviction or plea agreement, or to avoid incarceration by Agency."

56.     The purported involvement of an "Agency" in the Original Agreement gives consumers the false impression that noncompliance with the terms of the written agreement may lead to action by a governmental "Agency," such as re-arrest, re-detention, or negative consequences to their immigration case.

57.     Even though the agency name is left blank in the agreement, consumers may reasonably infer that "Agency" means ICE, because ICE detained them, their immigration bond is with ICE, and upon their release, ICE gave them a date to appear before an immigration judge.

58.     Libre reinforced this false impression by representing to consumers that non-compliance with Libre's agreement could lead to negative consequences in the consumer's immigration case, as if Libre's agreements with consumers were linked or connected to their immigration cases.

59.     In fact, neither ICE nor any other agency is a party to Libre's agreement, has "an interest" in monitoring the consumer, is monitoring the consumer through Libre's GPS device, or is compelling or allowing the consumer to use Libre's GPS device to avoid incarceration or to satisfy a criminal conviction or plea agreement.

60.     Libre's Original Agreement states: "I understand that any alteration, damage, or destruction of the GPS device or band WILL RESULT in felony criminal prosecution against the respondent." In fact, Libre has no authority to prosecute crimes. Moreover, in most jurisdictions where Libre operates, "alteration, damage, or destruction of the GPS device or band" would not be a felony.

61.     The Original Agreement contains a "Risk Assessment Instrument" (RAI), designed to calculate a "score" and determine whether a consumer was approved for entry into the Libre "program" and, if so, whether an ankle monitor was required. Quite similar to the software system employed by ICE and the Department of Homeland Security to determine the amount of an immigration bond, the RAI scoring categories include information about the consumer's living arrangements, criminal history,

employment, whether the consumer has a phone number, and the consumer's mental health and substance abuse treatment.

62.     Notably, the RAI assigns 22 points if the "current offense [is] a presumption charge," while mandating that "22+ points" means "GPS REQUIRED FOR APPROVAL." Libre assigned every consumer that executed the Original Agreement 22 points for a "presumption charge." Therefore, according to the RAI, every consumer was required to wear a GPS device, and the rest of the scoring system was irrelevant. Moreover, given the detainees' circumstances at the time they signed an agreement with Libre, and that they very likely were unemployed, living with friends or family, and did not have a phone, these consumers were subject to an even higher RAI "score."

63.     The Original Agreement contains a "Conditions of Monitoring" section that purports to impose certain obligations on consumers. Libre represented through these "Conditions" that the "Bail Bondsman" had imposed certain conditions as part of the "bail," including: GPS monitoring; a curfew; abstaining from alcohol; and reporting "as required." None of these conditions were imposed by the licensed surety or its agents as a condition to posting the immigration bond.

64.     Libre also represented through its "Conditions of Monitoring" that it was imposing its own conditions on the consumer as part of this agreement, including: maintain or seek employment; make payments to bondsman, as required by bondsman; make program participation payments of $420; and, mental health treatment plan. Libre did not condition any consumer's eligibility to obtain an immigration bond through its services on the referenced conditions other than making participation payments. Libre also did not provide "mental health treatment plans" to consumers, nor did it screen for, recommend, or provide any such treatment.

12

65.     The Original Agreement contains a "Payment Schedule – GPS Lease," which states: "You are required to make payments for the lease of the GPS equipment and for the GPS monitoring service. The amount of the monthly lease payments [is] $420.00. These payments are due on the 1st of each month, for as long as you wear the GPS bracelet." The "Nexus Securitization Contract – GPS Addendum" in the Original Agreement requires that co-signers place their initials next to the statement: "I understand that the respondent will be responsible for a monthly rental payment for the GPS device, in the amount of $420." Libre also has told consumers at the time that Libre put on the device that consumers would be monitored.

66.     Thousands of consumers wear GPS devices required by Libre and make monthly payments purportedly for the devices and for the "GPS monitoring service." But many devices did not properly function, and since at least February 2018, Libre could not provide any monitoring service for thousands of devices.

67.     Since at least February 2018, Libre has not provided any GPS monitoring service to thousands of consumers who wear GPS devices because Libre's GPS vendor cut off Libre's remote access to the monitoring software at that time. A month later, Libre's vendor decommissioned all of Libre's devices from that vendor, rendering them useless as monitoring devices.

68.     The Original Agreement includes provisions in which the co-signer agrees to indemnify Libre against losses. Libre has also frequently required co-signers to execute a promissory note under which they are obligated to repay the face amount of the immigration bond plus interest at a rate of 20% in the event of a bond breach.

69.     The Original Agreement is about 21 pages, only one of which is in Spanish. The Spanish-language page of the Original Agreement fails to convey all the material terms of the agreement, including the amount of the required monthly "lease" payment.

70.     Thousands of consumers who signed the Original Agreement continue to wear the GPS and make monthly "lease" payments under it.

71.     In late 2017 or early 2018, Libre revised its written client agreement (New Agreement).

72.     Among other changes, the New Agreement did not require GPS monthly lease payments, but it instituted a new monthly payment called "Program Fees." "Program Fees" are "recurring monthly charges by Libre that You must pay," and they vary according to the bond amount. Libre's New Agreement requires either Program Fees according to the following schedule or supplemental "Bond Collateralization Payments" that add up to the full amount of the bond:

| Amount of Bond | Monthly Program Fees | Number of Payments | Total |
|---|---|---|---|
| Up to $4,999 | $250 | 22 | $5,500 |
| $5,000 - $7,499 | $350 | 22 | $7,700 |
| $7,500 - $9,999 | $375 | 24 | $9,000 |
| $10,000 - $14,999 | $450 | 34 | $15,300 |
| $15,000 - $19,999 | $450 | 40 | $18,000 |
| $20,000 and Up | $475 | 60 | $28,500 |

73.     After a consumer has either paid all of the Program Fee installments or made Bond Collateralization Payments in the full amount of the bond, the New Agreement requires a monthly Maintenance Fee of $50 until the bond is canceled.

74.     Similar to the Original Agreement, collateral payments are also refundable under the New Agreement.

75.     Unlike the Original Agreement, the New Agreement does not require all consumers to wear a GPS device. Consumers with bond amounts of $5,000 or greater are required to wear a GPS device; consumers with bond amounts of $4,999 or less are not required to wear a GPS device.

76.     Libre's Original Agreement does not provide for any way to remove the GPS device in cases of injury, pregnancy, or illness. And the New Agreement only allows for its removal in certain circumstances and at Libre's "sole discretion."

77.     Libre represents to consumers that it offers a "program" that includes more than the financial services relating to consumers' immigration bonds. Libre boasts that its "program" includes "wraparound services," such as access to medical services, guidance to consumers obtaining government assistance, relief during "natural disasters," and access to medical providers.

78.      As part of its marketing and sales pitch, Libre also represents or creates the false impression that it will provide a free, full-service lawyer to help its clients with their immigration cases. Libre has described itself to consumers as "Immigration Legal Aid."

79.     But Libre only provides referrals to purportedly independent, affiliate law firms Nexus Caridades, Inc. and Nexus Caridades Attorneys, Inc. These entities are not obligated to take a Libre client's case and often do not take these cases.

### Libre uses non-functioning GPS ankle monitors.

80.     Libre has contracted with three GPS providers since 2014, including Omnilink Systems, Inc. (Omnilink), Attenti US, Inc. (3M/Attenti), and Buddi US, LLC (Buddi).

81.     Libre contracted with Omnilink from November 2013 until about June 15, 2017, to lease GPS-enabled ankle monitors and provide GPS-location data about the wearers of the monitors. Omnilink terminated Libre's access to its GPS-location software in September 2015 for nonpayment.

82.     Starting in September 2015, Libre did not have access to Omnilink's GPS-location data. Despite this, Libre continued to collect and receive payments from consumers wearing the Omnilink ankle monitors and continued to admonish consumers to charge their ankle monitors.

83.     Consumers continued to wear the Omnilink ankle monitors well after September 2015. Libre did not advise these consumers that the Omnilink ankle monitors were nonfunctional or that Libre was required to return the monitors to Omnilink when its contract was terminated.

84.     Libre contracted with 3M/Attenti on June 8, 2015, to lease GPS-enabled ankle monitors and provide GPS-location data about the wearers of the monitors. 3M/Attenti terminated Libre's access to its GPS-location software and monitoring services on February 19, 2018, for nonpayment.

85.     After February 2018, Libre did not have access to 3M/Attenti GPS-location data. Despite this, Libre continued to collect and receive payments from thousands of consumers wearing the 3M/Attenti ankle monitors and continued to admonish consumers to charge their 3M/Attenti ankle monitors.

86.     Consumers continued to wear the 3M/Attenti ankle monitors well after February 2018. Libre did not advise these consumers that the 3M/Attenti ankle monitors were nonfunctional or that Libre was required to return the monitors to 3M/Attenti when its contract was terminated.

87.     Finally, Libre contracted with Buddi on October 10, 2017. Buddi terminated Libre's access to its GPS-location software on May 20, 2020, for nonpayment. Buddi demanded that Libre return all of its GPS monitors. Upon information and belief, Libre continues to accept payments from consumers for the Buddi monitors. Upon information and belief, Libre has not advised these consumers that the Buddi monitors are nonfunctional or that Libre is required to return the monitors to Buddi.

88.     Libre has stated publicly that it has decided to stop requiring GPS ankle monitors altogether as a sign of good faith. In truth, Libre has been forced to stop requiring these monitors because its contracts for them have been terminated.

89.     Libre experienced many functional problems with the GPS ankle monitors. Notably, the Omnilink and 3M/Attenti ankle monitors were large, cumbersome, and difficult for a consumer to wear twenty-four hours a day and seven days a week.

90.     Consumers frequently were not able to charge the ankle monitors, and the monitors frequently made sounds, noises, or alerts that consumers did not understand. Some consumers suffered injuries caused by the ankle monitors, including rashes, irritation, and burns. Libre was often slow to respond to and fix these problems, triggering follow-up phone calls from increasingly frustrated consumers.

91.     Additionally, given Libre's multiple and overlapping contracts with its GPS providers, Libre on occasion had to switch the consumers' ankle monitors for a different provider's unit. This proved extraordinarily difficult for Libre, as it was required to locate a consumer, have them agree to come into its office or set up a time to go visit the consumer, obtain the old monitor and replace it with a new monitor. As a result, many consumers kept, wore, and paid for ankle monitors that did not work at all.

92.     Libre also created guises to solicit consumers to come in and switch their GPS monitors, such as a "pizza party," a "promotion," or some type of special deal offering to "upgrade" their ankle monitors. Libre did not tell these consumers that it was delinquent in its payments to the GPS provider, causing the GPS provider to terminate Libre's access to location-monitoring services.

### *Libre encourages its representatives to mislead clients and co-signers about what its written agreement requires.*

93.     Libre's incentive-compensation program rewards representatives for each new agreement signed or payment collected. As a result, call-center representatives can receive commissions many times their base salary.

94.     The financial rewards for Libre's representatives provide incentives for them to rush through the intake process, to omit or misrepresent consumers' obligations when they sign up with Libre, or to make false threats to consumers to collect payments.

95.     Libre lacks effective controls for the risks its incentive-compensation program may pose to consumers, including oversight of representatives to ensure that representatives do not earn financial rewards by means of deception.

96.     Libre's policy directs its representatives speaking with prospective clients to make "a minimum of" four intake calls per hour, making it difficult or impossible to fully explain the material terms of Libre's client agreement to a prospective co-signer or client.

97.     As of 2019, Libre had no call scripts or talking points relating to marketing and signing up customers.

18

98.     During at least 2014 and 2015, Libre provided its representatives no scripts or checklists to use as guidance about which key terms in the written agreement they should convey to consumers.

99.     Until mid-2015, Libre did not review the mainly English written agreement with its call-center representatives. As a result, call-center representatives, including those who spoke only Spanish, did not have a full understanding of the written agreement to be able to review it with consumers.

100.    Libre failed to implement any training for its representatives until mid-2015, and the training it eventually put in place does not provide adequate guidance on what to say to consumers, and it does not ensure that call-center representatives are able to explain key terms in the written agreement to consumers.

### Libre makes false threats about the purported consequences of nonpayment or noncompliance.

101.    Libre regularly makes false and misleading threats to clients and co-signers in an attempt to secure their compliance with the company's agreement.

102.    Libre aggressively attempts to collect debts allegedly owed by clients and co-signers. Libre contends that, on average, its clients owe substantial debts to the company, including thousands of dollars in delinquent monthly payments.

103.    Since at least 2014, Libre has repeatedly threatened clients and co-signers that they are at risk of re-arrest, detention, deportation, or other negative outcomes in their immigration case if they fail to pay monthly fees or they remove their GPS device.

104.    Libre has no legal or contractual authority to cause any person to be deported or to negatively impact the outcome of someone's immigration case.

105.    Since at least 2014, Libre has repeatedly threatened co-signers that they may be required to wear GPS devices if they fail to make payments.

106.    Libre has no legal or contractual authority to make a co-signer wear a GPS device.

107.    Since at least 2018, call-center representatives have repeatedly threatened clients that their accounts might be sold to a debt buyer or collection agency for nonpayment. But Libre has not and does not sell debts or refer them to collection agencies.

108.    Since at least 2018, call-center representatives have repeatedly threatened clients and co-signers that their credit would be harmed if they do not pay amounts owed. But Libre has never furnished information to credit-reporting agencies.

109.    Since at least 2018, call-center representatives have repeatedly threatened clients and co-signers that Libre would sue them for nonpayment. But Libre has not and does not sue clients or co-signers for nonpayment.

110.    Libre has also demanded payments from clients and co-signers based on incomplete or inaccurate accounting records for amounts that were not due.

111.    For payments to be recorded in Libre's payments system, consumers must send Libre a photograph of a deposit receipt. This requirement is not in Libre's agreement, and many consumers are not told about the requirement when they sign up with Libre and do not send photographs of their deposit receipts. As a result of this and other slipshod recordkeeping processes, Libre has not accurately recorded payments made by consumers.

112.    The systemic failure to accurately record payments causes Libre to regularly make false statements to consumers about what they owe, such as by calling or texting consumers to demand a payment that they do not in fact owe.

113.    Even when consumers have objected and raised disputes concerning debts, Libre has refused to acknowledge or respond to them and has persisted with collection activities without validating those debts.

### Consumers reasonably believe that Libre has paid consumers' bonds and that their monthly payments pay down the bond.

114.    Libre has falsely told consumers that Libre paid the full amount of the consumer's bond to ICE to secure the consumer's release.

115.    Libre has falsely told consumers that the $420 monthly payments were repayments to Libre for the bond it paid, or they have failed to explain that the monthly payments go to the GPS-device lease, leading consumers to reasonably believe that the monthly payments were repayments to Libre for the bond it claimed to have paid.

116.    Under Libre's New Agreement, the Program Fees constitute a payment plan with a set term and a total amount that is about equal to the amount of the consumer's bond. Libre expressly or implicitly represented to consumers that these monthly payments, which consumers were required to repay over a term of months, were payments toward a loan.

117.    Consumers routinely told call-center employees that they thought their monthly payments were going toward paying down their bond. Libre has long known that consumers routinely and materially misunderstand Libre's offerings but has not implemented policies and procedures to ensure that employees provide accurate information about Libre's program to consumers.

21

118.    Libre knows or should have known that consumers depend entirely on its oral representations for key agreement terms because Libre knows that the vast majority of co-signers and clients do not read or speak English and therefore cannot understand its Original Agreement that is almost entirely in English.

119.    Libre understands that its prospective clients are in detention and that they and their family members are typically desperate for their release.

120.    Libre's misrepresentations lead consumers to reasonably believe that Libre has paid cash bonds, that consumers owe a debt to Libre in the amount of the cash bonds, and that monthly payments pay down that debt. Thus, consumers reasonably believe that Libre offers or provides a credit transaction in which consumers incur a debt and defer the right to repay.

### The Individual Defendants know about or actively direct Libre's misrepresentations and omissions to consumers.

121.    Nexus Services, which owns Libre, has three shareholders: Individual Defendants Donovan, Moore, and Ajin.

122.    The Individual Defendants have had the authority and responsibility to approve Libre, or Nexus Services on behalf of Libre, entering into agreements with clients.

123.    The Individual Defendants knew or should have known that the vast majority of Libre's consumers cannot read or understand English and that these consumers rely on Libre to verbally represent the material terms of its written agreements to them. The Individual Defendants knew or should have known that Libre's representatives habitually omit or misrepresent material terms to consumers.

124.    The Individual Defendants have authority and responsibility over the call center and knew or should have known of representations made to consumers, including those reviewed in internal quality assurance reports. The Individual Defendants knew or should have known that Libre's representatives misrepresent that Libre has paid consumers' bonds and that monthly payments pay down the bond.

125.    The Individual Defendants have authority and responsibility over consumer complaints, and they knew or should have known of consumer complaints, including those about monthly payments, terms of consumer agreements, GPS devices, and threats of re-arrest, detention, and deportation. The Individual Defendants at times have responded directly to consumers regarding their complaints.

126.    The Individual Defendants have had substantial control over Libre's operations, including approval of representatives' training and compensation structure. The Individual Defendants knew or should have known that since at least 2018, Libre could not monitor thousands of GPS devices.

127.    Donovan owns a controlling 51% share of Nexus Services.

128.    Donovan has the authority and responsibility to approve Nexus Services's and Libre's policies and practices, including the content of agreements with consumers.

129.    Donovan has actively managed Nexus Services and Libre since their founding. Donovan actively directs Libre's day-to-day activities, including approving posting of new clients' bonds and approving modifications to clients' payment plans or other contractual obligations. Donovan receives regular updates on problems associated with GPS devices.

130.    Donovan's name appears on all of the immigration bonds that Libre provides. Donovan's name and signature appear on Libre's agreements with its GPS vendors, agreements with sureties, and agreements with bond agents.

131.    Donovan was directly involved in the management of the call center, and its representatives and field representatives, including troubleshooting issues and interacting directly with clients.

132.    Moore has the authority and responsibility to approve Nexus Services's and Libre's policies and practices, including the content of agreements with consumers.

133.    Moore has actively managed Nexus Services and Libre since their founding. Moore controls all external payments by Libre, approves posting new clients' bonds, approves modifications to clients' payment plans or other contractual obligations, and sometimes directly interacts with Libre's clients.

134.    Moore has supervised Libre's customer-service personnel and managers of Libre's call center.

135.    Moore has the authority and responsibility to refund consumers' collateral payments and knew that some consumers were owed refunds of thousands of dollars. Moore did not refund consumers' collateral payments or took many months to refund the payments.

136.    Since at least 2015, Ajin has had the authority and responsibility to approve Libre's policies and practices relating to the call center.

137.    Ajin has actively managed Nexus Services and Libre since at least 2015. Ajin approves posting new clients' bonds, approves modifications to clients' payment plans or other contractual obligations, and sometimes directly interacts with Libre's

clients. Ajin receives regular updates on problems associated with GPS devices. Ajin also directly supervises Libre's call center.

### *Nexus Services substantially assisted Libre's business operations.*

138.    Nexus Services has been directly involved in establishing Libre's policies and business operations, including hiring Libre's employees, signing vendor contracts, and developing internal policies and consumer agreements. The entities commingle corporate funds and share common employees, officers, ownership, addresses, and office space. In communications to consumers, the entities interchangeably represented themselves as "Libre by Nexus" and "Nexus Services."

139.    Many of the representatives who engaged with consumers on behalf of Libre were employed by Nexus Services. Training manuals for Libre's representatives were marked "Nexus Services." Nexus Services, and not Libre, entered into business contracts for products and services that were used exclusively by Libre, including multimillion-dollar contracts with GPS service providers and with bond agents.

140.    Nexus Services entered into certain parts of Libre's Original Agreement. For example, Nexus Services, not Libre, is a party to the GPS Monitoring Agreement. Similarly, the Client Information Sheet mentions Nexus Programs, which is defined as Nexus Services elsewhere in the agreement.

141.    The Individual Defendants are officers and directors of Nexus Services and Libre. Nexus Services wholly owns Libre. Nexus Services knew or should have known of Libre's misconduct to the extent that the Individual Defendants knew or should have known of Libre's misconduct as described in paragraphs 121–137.

**The CFPA**

142.    Under the CFPA, it is unlawful for any covered person to engage in a deceptive or abusive act or practice in connection with any transaction with a consumer for a consumer-financial product or service or the offering of a consumer-financial product or service. 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

143.    It is also unlawful for any person to knowingly or recklessly provide substantial assistance to a covered person in violation of § 1031 of the CFPA, and the provider of such substantial assistance is in violation of that section to the same extent as the person to whom such assistance is provided. 12 U.S.C. § 5536(a)(3).

144.    An act or practice is deceptive if it involves a material misrepresentation or omission that is likely to mislead a consumer acting reasonably under the circumstances. An act or practice is abusive if, among other things, it "materially interferes with the ability of a consumer to understand a term or condition of a consumer financial product or service." 12 U.S.C. § 5531(d).

**Count One:**
**Deceptive Statements Regarding Monthly Payments**
**(Asserted by the Bureau and the States Against**
**Libre and the Individual Defendants)**

145.    The Bureau and the States reallege and incorporate by reference paragraphs 1–144.

146.    In numerous instances, Libre represented that it has paid consumers' bonds and that consumers' monthly payments are to repay Libre for doing so.

147.    In fact, Libre does not pay consumers' bonds, and consumers' monthly payments are rental fees for a GPS device that do not go to repaying consumers' bonds.

148.   Libre's representations were false or misleading, were material because they were likely to affect consumers' decisions to make payments to Libre, and constituted deceptive acts or practices, in violation of the CFPA. 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

149.   The Individual Defendants also violated the CFPA because they engaged in these deceptive acts or practices. 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

### Count Two:
### Deceptive Threats of Deportation
### (Asserted by the Bureau and the States Against
### Libre and the Individual Defendants)

150.   The Bureau and the States reallege and incorporate by reference paragraphs 1–144.

151.   In numerous instances, Libre has threatened consumers with re-arrest, detention, or deportation if they fail to make monthly payments or if they remove Libre's GPS device.

152.   But Libre cannot and does not arrest, detain, or deport a consumer for failing to make a payment or removing their GPS device.

153.   In numerous instances, Libre also has threatened to place GPS devices on co-signers for failing to make payments.

154.   Libre also has no legal or contractual authority to make a co-signer wear a GPS device for failing to make a payment.

155.   Libre's threats were false or misleading, were material because they were likely to affect consumers' decisions to make payments to Libre and to wear a GPS device, and constituted deceptive acts or practices in violation of the CFPA. 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

156.    The Individual Defendants also violated the CFPA because they engaged in these deceptive acts or practices. 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

**Count Three:**
**Deceptive Threats to Sell Accounts into Collections or**
**Place Them with Debt Collectors**
**(Asserted by the Bureau and the States Against**
**Libre and the Individual Defendants)**

157.    The Bureau and the States reallege and incorporate by reference paragraphs 1–144.

158.    In numerous instances, Libre has threatened consumers that their accounts would be turned over to a debt buyer or collection agency.

159.    But Libre has never sold a debt or referred a debt to a collection agency.

160.    Libre's representations were false or misleading, were material because they were likely to affect consumers' decisions to make payments to Libre, and constituted deceptive acts or practices in violation of the CFPA. 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

161.    The Individual Defendants also violated the CFPA because they engaged in these deceptive acts or practices. 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

**Count Four:**
**Deceptive Threats to Harm Consumers' Credit**
**(Asserted by the Bureau and the States Against**
**Libre and the Individual Defendants)**

162.    The Bureau and the States reallege and incorporate by reference paragraphs 1–144.

163.    In numerous instances, Libre has threatened consumers that failing to make payments to Libre could harm their credit.

164.    But Libre does not furnish information to credit-reporting agencies. Thus, a failure to pay Libre does not result in Libre reporting information to consumer-reporting agencies that could have an adverse effect on the ability of consumers to obtain credit.

165.    Libre's representations were false or misleading, were material because they were likely to affect consumers' decisions to make payments to Libre, and constituted deceptive acts or practices in violation of the CFPA. 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

166.    The Individual Defendants also violated the CFPA because they engaged in these deceptive acts or practices. 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

**Count Five:**
**Deceptive Threats to Sue for Collection**
**(Asserted by the Bureau and the States Against**
**Libre and the Individual Defendants)**

167.    The Bureau and the States reallege and incorporate by reference paragraphs 1–144.

168.    In numerous instances, Libre has threatened to sue consumers for non-payment.

169.    But Libre has never filed a collection lawsuit against a consumer.

170.    Libre's representations were false or misleading, were material because they were likely to affect consumers' decisions to make payments to Libre, and constituted deceptive acts or practices in violation of the CFPA. 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

171.    The Individual Defendants also violated the CFPA because they engaged in these deceptive acts or practices. 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

**Count Six:**
**Deceptive Statements Regarding GPS Monitoring**
**(Asserted by the Bureau and the States Against**
**Libre and the Individual Defendants)**

172.   The Bureau and the States reallege and incorporate by reference

paragraphs 1–144.

173.   In numerous instances, Libre has represented that it monitors consumers

by GPS and collects monthly payments from consumers to "lease" the GPS devices.

174.   In fact, many of the GPS devices did not work, and since at least February

2018, Libre could not monitor thousands of devices.

175.   Libre's representations were false or misleading, were material because

they were likely to affect consumers' decisions to continue wearing the GPS device and

to make payments to Libre, and constituted deceptive acts or practices in violation of the

CFPA. 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

176.   The Individual Defendants also violated the CFPA because they engaged in

these deceptive acts or practices. 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

**Count Seven:**
**Deceptive Statements Regarding Refunding Collateral Payments**
**(Asserted by the Bureau and the States Against**
**Libre and the Individual Defendants)**

177.   The Bureau and the States reallege and incorporate by reference

paragraphs 1–144.

178.   Libre has represented that collateral payments are refundable once

consumers' proceedings are resolved.

179.   In many cases, Libre did not refund or took months to refund consumers'

collateral payments.

180.    Libre's representations were false or misleading, were material because they were likely to affect consumers' decisions to make payments to Libre, and constituted deceptive acts or practices in violation of the CFPA. 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

181.    The Individual Defendants also violated the CFPA because they engaged in these deceptive acts or practices. 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

### Count Eight:
### Deceptive Statements Regarding Legal Representation
### (Asserted by the Bureau and the States Against
### Libre and the Individual Defendants)

182.    The Bureau and the States reallege and incorporate by reference paragraphs 1–144.

183.    Libre has repeatedly told or intimated to its clients that Libre will provide a free, full-service lawyer to help clients with their immigration cases or that clients were likely to obtain legal representation *pro bono publico* through one of Libre's affiliated law firms. Libre has described itself to consumers as "Immigration Legal Aid."

184.    In truth, Libre's affiliated law firms are not obligated to take a Libre client's case and often do not take these cases.

185.    Libre's representations were false or misleading, were material because they were likely to affect consumers' decisions to make payments to Libre, and constituted deceptive acts or practices in violation of the CFPA. 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

186.    The Individual Defendants also violated the CFPA because they engaged in these deceptive acts or practices. 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

**Count Nine:**
**Abusive Use of English-Language Documents**
**to Bind Monolingual Non-English-Speaking Consumers**
**(Asserted by the Bureau and the States Against**
**Libre and the Individual Defendants)**

187.    The Bureau and the States reallege and incorporate by reference paragraphs 1–144.

188.    From 2014 to at least late 2017, Libre used predominantly English-language agreements to enroll clients. Libre knew that many of its clients and co-signers did not understand English and that some were unable to read in any language. Libre rushed through the enrollment process and omitted or misrepresented material terms of Libre's written agreement to clients and co-signers before they were enrolled.

189.    Libre therefore materially interfered with consumers' ability to understand the terms and conditions of Libre's offers of credit.

190.    Libre engaged in abusive acts or practices in violation of the CFPA. 12 U.S.C. §§ 5531(d)(1), 5536(a)(1)(B).

191.    The Individual Defendants also violated the CFPA because they engaged in these abusive acts or practices. 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

**Count Ten:**
**Unlawful Substantial Assistance**
**(Asserted by the Bureau and the States Against**
**Nexus and the Individual Defendants)**

192.    The Bureau and the States reallege and incorporate by reference paragraphs 1–144.

193.    Libre is a covered person engaging in deceptive and abusive acts or practices in violation of § 1031 of the CFPA.

194.    The Individual Defendants provided substantial assistance to Libre's deceptive and abusive acts or practices by, among other things, approving Libre's policies and practices, exercising authority over Libre's call center and field representatives, reviewing quality assurance reports, overseeing the training of Libre's representatives and their compensation structure, overseeing the handling of consumer complaints, and approving new clients. Defendants Moore and Donovan also approved the content of Libre's consumer agreements.

195.    Nexus Services, through the management and control of the Individual Defendants, provided substantial assistance to Libre's deceptive and abusive acts or practices by, among other things, employing Libre's representatives, entering into contracts related to Libre's use of GPS monitoring devices, and as a party to the GPS Monitoring Agreement signed by Libre's consumers.

196.    Nexus Services and the Individual Defendants knowingly or recklessly provided this substantial assistance. Nexus Services and the Individual Defendants were aware that the vast majority of Libre's consumers cannot read or understand English and that these consumers relied on Libre to verbally represent the material terms of its written agreements to them. Nexus Services and the Individual Defendants were aware that Libre's representatives habitually either omit or misrepresent material terms to consumers. The Individual Defendants, who managed and controlled Nexus Services, were aware of consumer complaints, including those about monthly payments and terms of consumer agreements. Nexus Services and the Individual Defendants were aware that since at least early 2018, Libre could not monitor thousands of GPS devices.

197.    Therefore, Nexus Services and the Individual Defendants substantially assisted Libre's deceptive and abusive acts or practices in violation of the CFPA. 12 U.S.C. § 5536(a)(3).

**Count Eleven:
Violations of Virginia Consumer Protection Act
(Asserted by Virginia Against Nexus Services and Libre)**

198.    Virginia realleges and incorporates by reference paragraphs 1–141.

199.    Pursuant to Virginia Code § 59.1-197, the VCPA is to be applied as remedial legislation to promote fair and ethical standards of dealing between suppliers and the consuming public.

200.    Before commencing this action, Virginia gave Nexus Services and Libre written notice that these proceedings were contemplated and a reasonable opportunity to appear before the Office of the Attorney General to demonstrate that no violations of the VCPA had occurred, or, in the alternative, to execute an appropriate Assurance of Voluntary Compliance that is acceptable to Virginia.

201.    Nexus Services and Libre failed to demonstrate that no violations had occurred and did not agree to execute an Assurance of Voluntary Compliance that was acceptable to Virginia.

202.    In connection with consumer transactions, the VCPA prohibits suppliers from, among other things:

>    a.    misrepresenting the source, sponsorship, approval, or certification of goods or services pursuant to Virginia Code § 59.1-200(A)(2);

>    b.    misrepresenting the affiliation, connection, or association of the supplier, or of the goods or services, with another pursuant to Virginia Code § 59.1-200(A)(3);

34

      c.      misrepresenting that goods or services have certain quantities, characteristics, ingredients, uses, or benefits pursuant to Virginia Code § 59.1-200(A)(5); and

      d.      using any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction pursuant to Virginia Code § 59.1-200(A)(14).

203.    During all relevant times, Nexus Services and Libre were "suppliers" of "goods" or "services" in connection with "consumer transactions," as those terms are defined in Virginia Code § 59.1-198, by advertising and offering immigration bond financial services to Virginians for personal, family, or household purposes.

204.    Nexus Services and Libre violated the VCPA through the acts and practices described in this Complaint, including without limitation:

      a.      engaging in deceptive conduct by providing the Original Agreement in English, when the vast majority of its customers could not read or write in English, in violation of Virginia Code § 59.1-200(A)(14);

      b.      engaging in deceptive conduct by using and providing sham documents in the Original Agreement, which had no meaning or effect, in violation of Virginia Code § 59.1-200(A)(14);

      c.      misrepresenting their affiliation with immigration authorities, in violation of Virginia Code § 59.1-200(A)(3);

      d.      misrepresenting their ability to influence or affect the outcome of a consumer's immigration bond case, in violation of Virginia Code § 59.1-200(A)(3);

e.   misrepresenting that the GPS ankle monitors they required consumers to wear were functional, in violation of Virginia Code § 59.1 -200(A)(14);

f.   engaging in deceptive conduct by requiring consumers to wear, maintain, charge, and pay for GPS ankle monitors that did not function properly, were not functional at all, or did not provide location monitoring services, in violation of Virginia Code § 59.1-200(A)(14);

g.   misrepresenting that they would take certain debt-collection activity, in violation of Virginia Code § 59.1-200(A)(14);

h.   misrepresenting their status as an immigration-bond company or provider, in violation of Virginia Code § 59.1-200(A)(14); and

i.   misrepresenting the nature of the services they provided to consumers, in violation of Virginia Code § 59.1-200(A)(5).

205.   Nexus Services and Libre willfully engaged in the acts and practices described in this Complaint in violation of the VCPA.

206.   Individual consumers have suffered losses as a result of the aforesaid violations of the VCPA by Nexus Services and Libre.

**Count Twelve:**
**Violations of Massachusetts Consumer Protection Law (M.G.L. ch. 93A, § 2)**
**Deceptive Acts and Practices**
**(Asserted by Massachusetts Against All Defendants)**

207.   Massachusetts realleges and incorporates by reference paragraphs 1–141.

208.   Libre is engaged in trade or commerce in Massachusetts and is subject to the Massachusetts Consumer Protection Law.

209.    At least five days before commencing this action, Massachusetts provided Defendants with notice of its intent to file claims under the Consumer Protection Law, and provided them an opportunity to confer with the Office of the Attorney General concerning its proposed action as required by M.G.L. ch. 93A, § 4. Notice was provided to Defendants by postage-paid mail at their usual place of business and last known address.

210.    Libre has engaged, and continues to engage, in unfair and deceptive acts and practices in violation of the Consumer Protection Law.

211.    Without limiting the foregoing, Libre misrepresents the nature, terms, and costs of its services to Massachusetts consumers and engages in other deceptive practices in connection with the marketing, sale, and administration of its bond-securitization program. This conduct includes:

a.    misrepresenting that it has paid consumers' bonds and that consumers' monthly payments are to reimburse the company for doing so—and are therefore capped at or about the face amount of the bond;

b.    misrepresenting its relationship with federal immigration authorities;

c.    misrepresenting that the GPS tracking component of its program is required by federal immigration authorities, bond agents, or other third parties;

d.    misrepresenting that it can affect the outcome of consumers' immigration cases and that non-compliance with its agreement would lead to arrest, criminal prosecution, detention, deportation, or other negative consequences;

e.  misrepresenting that it would provide consumers with a free lawyer or free legal services;

f.  misrepresenting that it is monitoring consumers' use of GPS devices while concealing that those devices have been deactivated or are otherwise not operational;

g.  failing to refund collateral payments that it represents are refundable at the conclusion of consumers' immigration proceedings; and

h.  failing to refund initial payments that it represents will be used to pay or post an immigration bond when a consumer does not use the company's services.

212.  Nexus Services and the Individual Defendants are liable for this unlawful conduct because they participated in the conduct or exercised control over Libre and had knowledge of the conduct.

213.  Defendants knew, or should have known, that their conduct violated the Consumer Protection Law, and Defendants are therefore subject to the imposition of civil penalties, costs, and attorney's fees.

**Count Thirteen:**
**Violations of Massachusetts Consumer Protection Law (M.G.L. ch. 93A, § 2)**
**Unfair Acts and Practices**
**(Asserted by Massachusetts Against All Defendants)**

214.  Massachusetts realleges and incorporates by reference paragraphs 1–141 and 207–213.

215.  Libre has also violated, and continues to violate, the Massachusetts Consumer Protection Law by taking advantage of severe imbalances in bargaining

power, and using deceptive and abusive tactics, to impose unfair agreements and obligations on Massachusetts consumers.

216.   Without limiting the foregoing, Libre offers its services to consumers it knows are in a desperate situation and have no meaningful ability, or opportunity, to negotiate with the company.

217.   Libre requires these consumers to enter into complicated and confusing agreements that it knows they do not understand. In many cases, Libre has used agreements that were written in a language it knew consumers could not understand.

218.   Despite knowing that consumers rely upon it for information, Libre misrepresents and conceals material terms of its services.

219.   As a result, consumers have an incomplete and inaccurate understanding of the terms of their agreements with Libre.

220.   Libre's agreements include terms that are oppressive and surprising to consumers or that the company administers in a manner that is unfair under the circumstances. For example:

      a.    Libre charges consumers unfair and excessive fees, including non-refundable monthly payments that in total exceed the face amount of consumers' bonds; and

      b.    Libre requires consumers to wear, maintain, and pay for GPS devices that frequently malfunction, disrupt everyday activities, and cause physical discomfort and injury. Libre fails to timely respond to complaints about these devices from consumers. And it requires consumers to continue to wear, maintain, and pay for, devices that have been deactivated or are otherwise not operational.

39

221.    Libre makes false and misleading threats to consumers to secure their compliance with its agreements.

222.    Nexus Services and the Individual Defendants are liable for this unlawful conduct because they participated in the conduct or exercised control over Libre and had knowledge of the conduct.

223.    Defendants knew, or should have known, that their conduct violated the Consumer Protection Law and are therefore subject to the imposition of civil penalties, costs, and attorney's fees.

### Count Fourteen:
### Violations of Massachusetts Fair Debt Collection Practices Act (M.G.L. ch. 93, § 49) and Consumer Protection Law (M.G.L. ch. 93A, § 2)
### Unfair and Deceptive Debt Collection Practices
### (Asserted by Massachusetts Against All Defendants)

224.    Massachusetts realleges and incorporates by reference paragraphs 1–141 and 207–223.

225.    Libre is a creditor and is subject to the Massachusetts Fair Debt Collection Practices Act in addition to the Consumer Protection Law.

226.    Libre has used, and continues to use, unfair, deceptive, and unreasonable methods to collect debts from Massachusetts consumers in violation of the Fair Debt Collection Practices Act and Consumer Protection Law.

227.    Without limiting the foregoing, Libre has attempted to collect debts from alleged debtors based upon records it had notice were incomplete and inaccurate.

228.    Libre has failed to acknowledge or respond to consumer disputes concerning alleged debts and has continued collection activities without validating those debts.

229.    Libre has repeatedly demanded payment of debts that are not due.

230.    Libre has threatened to take action against alleged debtors that it cannot and does not take in the usual course of its business.

231.    Nexus Services and the Individual Defendants are liable for this unlawful conduct because they participated in the conduct or because they exercised control over Libre and had knowledge of the conduct.

232.    Defendants knew, or should have known, that their conduct violated the Consumer Protection Law, and Defendants are therefore subject to the imposition of civil penalties, costs, and attorney's fees.

### Count Fifteen:
### Violation of New York Executive Law § 63(12)
### Repeated and Persistent Fraudulent Conduct
### (Asserted by New York Against All Defendants)

233.    New York realleges and incorporates by reference paragraphs 1–141.

234.    NY Executive Law § 63(12) authorizes the NYAG to bring an action to enjoin repeated or persistent fraudulent conduct.

235.    The statute defines fraud to include "any device, scheme or artifice to defraud and any deception, misrepresentation, concealment, suppression, false pretense, [or] false promise."

236.    As set forth above, Defendants have engaged in repeated and persistent fraudulent acts, including but not limited to:

    a.    misrepresenting that Libre has paid consumers' bonds and that consumers' monthly payments are to repay Libre for doing so;

    b.    falsely threatening consumers with re-arrest, detention, or deportation if they fail to make monthly payments or if they remove Libre's GPS device;

c.     falsely threatening to place GPS devices on co-signers when Libre has no legal or contractual authority to make a co-signer wear a GPS device for failing to make a payment;

d.     falsely threatening consumers that their accounts would be turned over to a debt buyer or collection agency;

e.     falsely threatening consumers that failing to make payments to Libre could harm their credit when Libre does not report any information to credit-reporting agencies;

f.     threatening to sue consumers for non-payment when Libre has never filed a collection lawsuit against a consumer;

g.     mispresenting that Libre monitors consumers by GPS and collecting monthly payments for "leases" for those GPS devices;

h.     misrepresenting that Libre customers would get a free lawyer to represent them in their immigration case, when Libre only provides referrals;

i.     falsely threatening criminal prosecution for tampering with a GPS device, when Libre has no authority to prosecute crimes;

j.     failing to refund collateral payments to consumers, once their immigration proceedings are resolved, and failing to refund initial payments when a consumer does not end up using Libre's services; and

k.     demanding payments from consumers who do not owe money, because Libre systemically fails to accurately record consumer payments.

42

237.    The Individual Defendants have knowledge of or participated in the above repeated fraudulent acts.

238.    By these actions, Defendants have engaged in repeated and persistent fraudulent conduct in violation of Executive Law § 63(12).

**Count Sixteen:**
**Violation of New York Executive Law § 63(12)**
**Unconscionable Contract Provisions**
**(Asserted by New York Against All Defendants)**

239.    New York realleges and incorporates by reference paragraphs 1–141.

240.    New York Executive Law § 63(12) authorizes the NYAG to bring an action to enjoin repeated or persistent fraudulent conduct.

241.    The statute defines fraud to include "any . . . unconscionable contractual provisions."

242.    As set forth above, Defendants have used procedurally unconscionable tactics, including by preying on vulnerable consumers when they are detained and desperate to get out of detention; using lengthy and complicated contracts written in English when most consumers do not understand English; and presenting contracts to detainees for signature only after they have been released from detention.

243.    As set forth above, Defendants have required consumers to agree to substantively unconscionable contractual provisions, including provisions setting excessive fees; provisions that do not allow for removal of the GPS device, even for medical or health reasons; and provisions that threaten criminal prosecution in various circumstances.

244.    The Individual Defendants have knowledge of or participated in the above acts.

245. By these actions, Defendants have used unconscionable contract provisions and, therefore, have engaged in repeated and persistent fraudulent conduct in violation of Executive Law § 63(12).

**Count Seventeen:**
**Violation of NY GBL § 349**
**Deceptive Acts and Practices**
**(Asserted by New York Against All Defendants)**

246. New York realleges and incorporates by reference paragraphs 1–141.

247. NY GBL § 349 prohibits deceptive acts and practices in the conduct of any business, trade, or commerce or in the furnishing of any service in New York State.

248. NY GBL § 349(b) authorizes the NYAG to enjoin such deceptive acts and practices and to obtain "restitution of any moneys or property obtained directly or indirectly" by any such acts or practices.

249. As set forth above, Defendants have engaged in deceptive acts that violate NY GBL § 349, including but not limited to:

    a.    misrepresenting that Libre has paid consumers' bonds and that consumers' monthly payments are to repay Libre for doing so;

    b.    falsely threatening consumers with re-arrest, detention, or deportation if they fail to make monthly payments or if they remove Libre's GPS device;

    c.    falsely threatening to place GPS devices on co-signers when Libre has no legal or contractual authority to make a co-signer wear a GPS device;

    d.    falsely threatening consumers that their accounts would be turned over to a debt buyer or collection agency;

e.    falsely threatening consumers that failing to make payments to Libre could harm their credit when Libre does not report any information to credit-reporting agencies;

f.    threatening to sue consumers for non-payment when Libre has never filed a collection lawsuit against a consumer;

g.    mispresenting that Libre monitors consumers by GPS and collecting monthly payments for "leases" for those GPS devices;

h.    misrepresenting that Libre customers would get a free lawyer to represent them in their immigration case, when Libre only provides referrals;

i.    falsely threatening criminal prosecution for tampering with a GPS device, when Libre has no authority to prosecute crimes;

j.    failing to refund collateral payments to consumers, once their immigration proceedings are resolved, and failing to refund initial payments when a consumer does not end up using Libre's services; and

k.    demanding payments from consumers who do not owe money, because Libre systemically fails to accurately record consumer payments.

250.    The Individual Defendants have knowledge of or participated in the above deceptive acts and practices.

251.    By these actions, Defendants have engaged in deceptive acts and practices in violation of NY GBL § 349.

**Demand for Relief**

Wherefore, the Bureau and the States request that the Court:

1.      enjoin Defendants from making material misrepresentations, omitting material terms in representations to consumers, materially interfering with consumers' ability to understand terms or conditions of their offers of credit, and engaging in all other deceptive, abusive, and unlawful conduct alleged in the Complaint;

2.      order Defendants to pay damages, restitution, or other monetary relief;

3.      order disgorgement of or compensation for unjust enrichment;

4.      impose on Defendants civil money penalties under 12 U.S.C. § 5565(c);

5.      order Defendants to pay costs under 12 U.S.C. § 5565(b);

6.      grant judgment against Nexus Services and Libre, jointly and severally, and award to Virginia civil penalties of up to $2,500.00 per violation for each willful violation of § 59.1-200 of the VCPA pursuant to Virginia Code § 59.1-206(A), the exact number of violations to be proven at trial, as well as its costs, reasonable expenses incurred in investigating and preparing the case up to $1,000.00 per violation of the VCPA, and its attorneys' fees, pursuant to Virginia Code § 59.1-206(C);

7.      award Massachusetts civil penalties of up to $5,000 for each unfair and deceptive act or practice as found by the Court pursuant to M.G.L. ch. 93A, § 4;

8.      award Massachusetts attorney's fees and costs pursuant to M.G.L. ch. 93A;

9.      award Massachusetts damages sufficient to compensate any person who suffered a loss as a result of any unfair or deceptive method, act, or practice pursuant to M.G.L. ch. 93A, § 4;

10.      impose on Defendants civil money penalties under NY GBL § 350-d;

11.      order Defendants to pay costs under NY CPLR § 8303(a)(6);

12.    order Defendants to produce an accounting of monies collected from New York consumers pursuant to the fraudulent, deceptive, and unlawful conduct alleged in the Complaint; and

13.    award additional relief as the Court may determine to be just and proper.


Respectfully submitted,

*Attorneys for the Consumer Financial Protection Bureau*

Cara M. Petersen
    *Acting Enforcement Director*
Jeffrey Paul Ehrlich
    *Deputy Enforcement Director*
Kara K. Miller
    *Assistant Litigation Deputy*

**Hai Binh T. Nguyen**
California Bar Number: 313503
Donald R. Gordon
District of Columbia Bar Number: 482384
Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552
Telephone (Nguyen): (202) 435-7251
Telephone (Gordon): (212) 328-7011
Email: haibinh.nguyen@cfpb.gov
Email: donald.gordon@cfpb.gov


*Attorneys for the Commonwealth of Virginia, ex rel. Mark R. Herring, Attorney General*

Mark R. Herring
    *Attorney General*
Erin B. Ashwell
    *Chief Deputy Attorney General*
Samuel T. Towell
    *Deputy Attorney General*
Richard S. Schweiker, Jr.
    *Chief and Senior Assistant Attorney General*

**David B. Irvin**
Virginia Bar Number: 23927
Unit Manager and Senior Assistant Attorney General
Erin E. Witte
Virginia Bar Number: 81096
Stephen J. Sovinsky
Virginia Bar Number: 85637
Assistant Attorneys General
Office of the Attorney General
Consumer Protection Section
202 North Ninth Street
Richmond, VA 23219
Telephone (Irvin): (804) 786-4047
Telephone (Witte): (703) 359-6716
Telephone (Sovinsky): (804) 823-6341
Fax: (804) 786-0122
Email: dirvin@oag.state.va.us
Email: ewitte@oag.state.va.us
Email: ssovinsky@oag.state.va.us


*Attorneys for the Commonwealth of Massachusetts*

Maura Healy
    *Attorney General*

**Jon Burke**
Massachusetts Bar Number: 673472
Assistant Attorney General
Office of the Attorney General
10 Mechanic Street
Worcester, MA 01608
Telephone: (774) 214-4416
Fax: (508) 795-1991
Email: Jonathan.burke@mass.gov


*Attorneys for the People of the State of New York*

LETITIA JAMES
    *Attorney General*
Jane Azia (New York Bar Number: 1539600)
    *Bureau Chief for the Bureau of Consumer Frauds and
    Protection*
Laura Levine (New York Bar Number: 2337368)
    *Deputy Bureau Chief for the Bureau of Consumer
    Frauds and Protection*

**Joseph P. Mueller**
New York Bar Number: 5079389
Stewart Dearing
New York Bar Number: 5108444
Assistant Attorney General
Office of the Attorney General
28 Liberty Street
New York, NY 10005
Telephone (Mueller): (212) 416-8321
Telephone (Dearing): (212) 416-8320
Fax: (212) 416-6003
Email: Joseph.Mueller@ag.ny.gov
Email: Stewart.Dearing@ag.ny.gov