**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**HARRISONBURG DIVISION**

| | |
|---|---|
| **CONSUMER FINANCIAL PROTECTION BUREAU,** *et al.,* | |
| **Plaintiff,** | **No.: 5:21-cv-00016-EKD-JCH** |
| **v.** | |
| **NEXUS SERVICES, INC.,** *et al.,* | |
| **Defendants.** | |

<u>**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION**</u>
<u>**FOR JUDGMENT ON THE PLEADINGS**</u>

<u>**INTRODUCTION**</u>

The CFPB is unique and that is its problem. *See Selia Law LLC v. Consumer Financial Protection Bureau*, ---U.S.---, 140 S.Ct. 2183, 2201 (2020) ("Perhaps the most telling indication of a severe problem with an executive entity is a lack of historical precedent to support it.") (quoting *Free Enterprise Fund v. Public Company Accounting Oversight Bd.*, 561 U.S. 447, 505 (2010) (internal brackets and quotation marks omitted)); Conrad Z. Zhong, *A New Way to Fund the Consumer*

*Financial Protection Bureau*, 18 U.C. Davis Bus.L.J. 1 (2017).[1]

As has been recognized by the Fifth Circuit, in *Community Financial Services Association of America, Limited v. Consumer Financial Protection Bureau*, 51 F.4th 616, 638-39 (5th Cir. 2022) (hereinafter "*Community*"), and in many *amici* briefs supporting the granting of *certiorari* on that case to the United States Supreme Court, *see, e.g.*, Brief of Amici Curiae of West Virginia and 15 Other States in Support of Granting the Petition, *Consumer Financial Protection Bureau, et al. v. Community Financial Services Association of America, Limited, et al.*, No. 22-448, 2022 WL 17811351, at *9 (U.S. Dec. 14, 2022),[2] the funding mechanism of the CFPB is highly unique: it involves "double-insulation" and pursuant to statute the funds (or at least funds unilaterally demanded from the Federal Reserve compromising up to twelve percent of the Federal Reserve's budget) "shall not be construed to be Government funds or appropriated monies." 12 U.S.C. § 5497(c)(2).

Should this Court adopt the position of Plaintiff, the State of Virginia, that the

---

[1] *See also* Markham S. Chenoweth & Michael P. DeGrandis, *Out of the Separation-of-Powers Frying Pan and into the Nondelegation Fire: How the Court's Decision in Seila Law Makes CFPB's Unlawful Structure Even Worse,* 8/27/2020 U.Chi.L.Rev. Online 55, 60 (Aug. 27, 2020); Lee A. Deneen, *Defeating a Wolf Clad as a Wolf: Formalism and Functionalism in Separation-of-Powers Suits Against the Consumer Financial Protection Bureau*, 48 Ga. L. Rev. 579, 599 (2014).

[2] It would be almost shocking if Virginia were to take a different position in this matter given the *strident* language contained in the Amici Brief that it joined with West Virginia and fourteen other states.

funding mechanism, 12 U.S.C. § 5497(a), of the CFPB is unconstitutional and that the Fifth Circuit's detailed analysis is correct, then there is little choice but to dismiss all claims brought by the CFPB: absent funds it is impossible to litigate, hire lawyers, investigate purported wrong doing, draft papers, file motions, research legal arguments, closely coordinate with attorneys general, or file press releases publicizing suit. Indeed, literally every action taken by the CFPB in this case, from appearing at hearings, to clicking a computer mouse, would have been impossible absent the unconstitutional funding on which it relies; given such the only question remaining is, what is an appropriate remedy to be afforded Defendants. *See generally Community*, 51 F.4th at 638-44.

Here, it seems that the *only* method which can place Defendants in the same position they would have been in but for the unconstitutional funding is to dismiss the proceedings in the entirety: it is almost impossible to imagine that Co-Plaintiffs[3] can unlearn what they have learned, whether it be the knowledge gleaned of the CFPB's unconstitutionally funded legal research and analysis or the fruits of an investigation which was tainted by unconstitutional funding. Furthermore, it seems this result is demanded by CITATION, which notes the importance of maintaining

---

[3] Defendants refer to the States of Virginia, Massachusetts, and New York, throughout as "Co-Plaintiffs."

incentives for litigants to continue to undertake separation-of-powers defenses in order to ensure constitutionality and prevent abusive over-reach. *CITATION* (PARENTHETICAL).

## STATEMENT OF FACTS

The CFPB closely coordinated with multiple States' attorneys general in investigating, preparing, and initiating the instant action against Defendants. Throughout this action, the CFPB has filed numerous papers, participated in hearings, and on information and belief closely coordinated with Co-Plaintiffs.[4] The Court has considered the same papers and work-product in making and entering various orders and decisions.

As a result of the above, Defendants, collectively, have been forced to participate and continue to participate in litigation. Further, Defendants' injuries continue day-by-day due to the complex and contentious nature of this on-going litigation; the acts of the CFPB have proximately caused, and continue to cause, these ever-accruing injuries in the form of ongoing litigation arising from a complaint filed by the CFPB. But for the unconstitutional funding of the CFPB none of these injuries would have occurred. While hypothetically possible that each Co-Plaintiff would have independently brought suit under 12 U.S.C. § 5552(a)(1), it is clear that the

---

[4] *See* Exhibit A-B.

instant matter—even prior to it being brought by the CFPB—has been based upon an investigation undertaken by the CFPB, which naturally required the lay out of significant funds which were "double insulated" and were never constitutionally appropriated by the Legislature. *See* Exhibits A-B. Further, even from a casual perusal of the docket, it is absolutely clear the CFPB has participated in foundational aspects of the instant litigation; all of this was done with unconstitutional funding and Co-Plaintiffs now enjoy the fruits ripened, grown fat, and watered on unconstitutional "off-books" funds.

Moreover, currently no trial is incipient, and this Court will have ample time to decide this matter prior to the commencement of any trial.

## **ARGUMENT**

### I.   **STANDARDS & JUDICIAL NOTICE**

Pursuant to Federal Rule of Civil Procedure 12(c), "[a]fter the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings."

Judgment on the pleadings should be granted when the moving party establishes that no material fact remains and judgment may simply be entered as matter of law. *See Drager v. PLIVA USA, Inc..,* 741 F.3d 470, 474 (4th Cir. 2014) (citing *Edwards v. City of Goldsboro*, 178 F.3dd 231, 244 (4th Cir. 1999). A motion

for judgment on the pleadings is identical to a motion to dismiss for failure to state a claim. *See Butler v. U.S.*, 702 F.3d 749, 751-52 (4th Cir. 2012). The standard of a 12(b)(6) and 12(c) motion are exceedingly familiar. *See generally Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)*.* All well-pleaded allegations contained in the complaint will be considered true and construed in the light most favorable by the plaintiff, *Edwards*, 178 F.3d at 244, however, mechanical conclusions and mere recitals are insufficient. *Iqbal*, 556 U.S. at 678-79. The purpose of a 12(b)(6) or a 12(c) is simply to determine if there is any chance of success and these motions should not be granted unless "it appears to a certainty that the plaintiff would not be entitled to relief under any legal theory which might plausibly be suggested by the facts alleged." *Id.* (quoting *Harrison v. United States Postal Serv.*, 840 F.3d 1149, 1152 (4th Cir. 1979). Under a *Twombly-Iqbal* style analysis, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

The principles of these decisions boils down to certain tenants:

First, the tenet that a court must accept as true all of the allegations contained in a complaint *is inapplicable to legal conclusions*. *Threadbare recitals of the*

*elements of a cause of action, supported by mere conclusory statements, do not suffice*. [*Twombly*, 550 U.S.] at 555 . . . Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions. Second, only a complaint that states *a plausible claim for relief survives a motion to dismiss. Id*., at 556, 127 S.Ct. 1955. Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. 490 F.3d, at 157–158. But where the well-pleaded facts *do not permit the court to infer more than the mere possibility* of misconduct, the complaint has alleged—but it has not "show[n]"—"that the pleader is entitled to relief." Fed. Rule Civ. Proc. 8(a)(2).

*Iqbal*, 556 U.S. at 678-79.

On a motion for  judgment on the pleadings a court may consider facts and documents subject to judicial notice, provided that the court construe such facts in the light most favorable to the non-moving party. *Zak v. Chelsea Therapeutics Int'l, Ltd*., 780 F.3d 597, 607 (4th Cir. 2015). Courts may take judicial notice of materials that are not reasonably susceptible to dispute because the facts "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." F.R.E, Rule 201(b)(2).  Courts regularly take judicial notice of publications of government agencies, because the sources are considered sources which cannot be reasonably questioned. *See, e.g.*, *United States v. Freeman*, 992 F.3d 268, 279, n. 7 (4th Cir. 2021) (taking judicial notice of a report of U.S. Sentencing Commission). *Davis v. Nationwide Mut. Fire Ins. Co.*, 811 F.Supp.2d 1240, 1250, n. 9 (E.D.Va. 2011) (collecting cases and noting that such government

publications are both self-authenticating and subject to judicial notice). This practice today often involves publicly available publications which are published online. *See, e.g.*, *Standing Akimbo LLC v. United States through I.R.S.*, 955 F.3d 1146, 1151-52 (10th Cir. 2020) (taking notice of various online IRS publications even where no party supplied the same to appellate court).

Here, the only facts Defendants wish for the court to notice is that the CFPB investigated Defendants and that the investigation occurred in "partnership" with or with "coordination" of Co-Plaintiffs prior to the initiation of the instant litigation.

The publications here are official releases from the CFPB, which were published on February 22, 2021, each can be independently authenticated as they remain available online and remain available at the web addresses noted in the exhibits and reproduced here for ease of access.[5],[6] There can be no serious dispute that the CFPB investigated the matters described in these publication while

---

[5] https://www.consumerfinance.gov/enforcement/actions/nexus-services-inc-et-al/ (last accessed May 1, 2023).

[6] https://www.consumerfinance.gov/about-us/newsroom/consumer-financial-protection-bureau-and-virginia-massachusetts-and-new-york-attorneys-general-sue-libre-for-predatory-immigrant-services-scam/ (last accessed May 1, 2023).

coordinating with Co-Plaintiffs and that the parties conferred prior to filing. *See generally* Ex. A-B; *see also* 12 U.S.C. §§ 5495, 5552(b)

## II.     THE CFPB'S FUNDING MECHANISM IS UNCONSTITUTIONAL.

The CFPB from its inception has aimed to be insulated from the vagaries of our democratic system, one governed by basic tenants set forth in the Constitution. *Cf. Morrison v. Olson*, 487 U.S. 654, 693 (1988) ("Time and again we have reaffirmed the importance in our constitutional scheme of the separation of governmental powers into three coordinate branches") (citing *Bowsher v. Synar*, 478 U.S. 714, 725 (1986)). This separation of powers is no unintended consequence or unfortunate friction, but foundational: "the system of separated powers and checks and balances established in the Constitution was regarded by the Framers as 'a self-executing safeguard against the encroachment or aggrandizement of one branch at the expense of the other.'" *Morrison v. Olson*, 487 U.S. at 693 (quoting *Buckley v. Valeo*, 424 U.S. 1, 122 (1976)). These inherent safeguards are not to be respected when convenient, bowing to whatever modish political exigency is then-believed important, but rather a constitutional imperative: the Supreme Court, and courts in general, should not "hesitate[] to invalidate provisions of law which violate this[, separation of powers,] principle." *Id.* (citing *Buckley*, 424 U.S. at 123).

The Legislature's power over purse, U.S. Const. Art. I § 9, cl. 7, of course is

of critical importance: "the powers of the sword and the purse should never be placed in either the Legislative or Executive, singly; neither one nor the other shall have both; *because this would destroy that division of powers on which political liberty is founded, and would furnish one body with all the means of tyranny*. But when the purse is lodged in one branch, and the sword in another, there can be no danger." *Community*, 51 F.4th at 635, n. 8 (quoting 2 THE WORKS OF ALEXANDER HAMILTON 61 (Henry Cabot Lodge ed., 1904)) (cleaned up with emphasis added). This foundational desire to separate the purse from the sword prevents, even when completely consensual, the provision to the executive—or an agency insulated from the executive—a proverbial blank check. *See A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 542 (1935); *West Virginia v. EPA*, ---U.S.---, 142 S. Ct. 2587 (2022); *Gundy v. United States*, ---U.S.---,139 S. Ct. 2116, 2133-38 (2019) (Gorsuch, J., dissenting). Congress certainly can permissibly design legislation which funds executive agencies, *see Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 635 (1952),[7] but it can only do so when meaningful limitations are placed on *time*, *amount*, *object. See* Joseph Story, 2 COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 1348 (3d ed. 1858) (Congress "possess[es] the power

---

[7] *Id.* (concurring opinion noting the inherent friction and inconvenience built into constitutional scheme) ("While the Constitution diffuses power the better to secure liberty, it also contemplates that practice will integrate the dispersed powers into a workable government. It enjoins upon its branches separateness but interdependence, autonomy but reciprocity.")

to decide *how* and *when* any money should be applied.")[8] (emphasis added).

It is important to note that the appropriations clause, U.S. Const. art. I, § 9, cl. 7. ("No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."), is not a straight forward power, one contained in the enumerated powers of Congress,[9] but is rather a limitation[10] both on Executive and an obligation on the Congress, *i.e.*, should the Congress wish for the executive to be able to act, it must do so by "[c]onsequence of [a]ppropriations made by [l]aw." *Id.* Indeed, Congress simply cannot abdicate this obligation and duty. *See Community*, 51 F.4th at 637-38 (cting *NLRB v. Noel Canning*, 573 U.S. 513, 601-02 (2014) (Scalia, J., concurring)).  This arrangement represents a choice by the Framers to opt for a lesser evil; while it may be "clumsy," or "inefficient," it "reflect[s] 'hard choices . . . consciously made by men who had lived under a form of government that permitted arbitrary governmental acts to go unchecked.'" *NLRB v. Noel Canning*, 573 U.S. at 601-02 (Scalia, J., concurring) (quoting *INS v. Chadha*, 462 U.S. 919,

---

[8] *See also*, *CFPB v. All Am. Check Cashing, Inc.*, 33 F.4th 218, 232 (5th Cir. 2022) (Jones, J., concurring) (hereinafter "*All American*").

[9] These are contained within Article I, Section 8.

[10] Alexander Hamilton "Appropriations," in this way: "no money can be expended, but for an object, to an extent, and out of a fund, which the laws have prescribed." "Explanation," Nov. 11, 1795, in ALEXANDER HAMILTON, 8 WORKS 122, 128 (H.C. Lodge ed. 1885) (emphasis in original).

959 (1983)).

This power over appropriation is no small matter: the framers of the constitution "generally embraced the maxim that the power which holds the purse strings absolutely will rule." (cleaned up). "*Any exercise of* [] *power* granted by the Constitution to one of the other branches of Government is limited by a valid reservation of congressional control over funds in the Treasury." *Office of Personnel Management v. Richmond*, 496 U.S. 414, 425 (1990) (emphasis added). In short, the Appropriations Clause expressly "was intended as a restriction upon the disbursing authority of the Executive department." *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937).

In order for this "restrictive" obligation to function properly, Congress must ensure that each appropriation balances the tripartite factors—amount, object, and duration—in order to continue to exercise its appropriations duty; there must be a continual positive reassessment of the exercise of powers, which typically occurs in a familiar: "funding [of] executive departments through an annual appropriations process—a practice that exists to this day." *All American*, 33 F.4th at 230 (Jones, J., concurring). There is simply no question that the CFPB's funding mechanism is not temporally limited, it is designed to be perpetual. *See* 12 U.S.C. §5497(a)(2)(A)(iii). While the perpetuity of the agency funding "raises an eyebrow," it is not necessarily dispositive, certain agencies enjoy perpetual funding, such as the Post Office, the

Office of the Comptroller of the Currency, the Federal Deposit Insurance Corporation, and the Federal Reserve Board; however, these particular agencies have a very narrow and targeted mandate—"the mission and corresponding authority of those agencies is more targeted[,]" *All American*, 33 F.4th at 235 (Jones, J., concurring)—and do not act as mini-legislatures coupled with close to unfettered discretion: the CFPB, "acts as a mini legislature, prosecutor, and court, responsible for creating substantive rules for a wide swath of industries, prosecuting violations, and *levying knee-buckling penalties against private citizens*." *Seila Law LLC*, ---U.S.---, 140 S. Ct. at  2202, n.8 ("*Selia*"); *accord All American*, 33 F.4th at 235 (Jones, J., concurring). In a more blunt assessment the CFPB is "in an entirely different league[.]" *Seila*, ---U.S.---, 140 S. Ct. at 2202, n.8.

Congress did everything, acting beyond any power it may constitutionally and legitimately exercise, to cede its duty to continually appropriate funding: the CFPB does not hold a Treasury account, but rather has an off-books "separate fund, . . . the 'Bureau of Consumer Financial Protection Fund,'" which "shall be maintained and established at a Federal [R]eserve bank." 12 U.S.C. § 5497(b)(1).[11] This fund is "under the control of the Director," and the monies on deposit are permanently available to him without any further act of Congress. *Id*. § 5497(c)(1). Thus, unlike

---

[11] The CFPB functions in real life in the manner television portrays CIA "off-book, black ops."

the Federal Reserve, *id.* § 289(a)(3)(B), or other agencies that are not subject to strict temporal funding limitations, the Director of the CFPB may simply continue to "roll over" the funds which the Director self-determined were appropriate to arrogate to the CFPB, and continue to draw and accrue fund *ad infinitum* in an independent fund, which is in no way subject to congress or an appropriation—this is not hyperbole, but literally the statutory design. *See, e.g.*, 12 U.S.C. § 5497(d).

This was not accidental, but rather considered "absolutely essential"; purposefully, the CFPB is removed from the continual appropriations process and made immune from the democratic process and elected officials' volition:

> Congress also severed any line of accountability between it and the CFPB by giving the CFPB a perpetual source of funding outside the appropriations process. Rather than plead with Congress for funds, the CFPB Director simply requisitions from the Federal Reserve "the amount determined by the Director to be reasonably necessary," subject to a cap of twelve percent of the Federal Reserve's budget. 12 U.S.C. § 5497(a)(1). In fiscal year 2021, for example, the CFPB Director could demand up to $717.5 million, without justifying the amount or use of those funds in any way. The CFPB can further supplement that largesse with civil penalties recovered through enforcement actions. 12 U.S.C. § 5497(d).

> Congress does not even retain indirect control over the agency's funding because the Federal Reserve's budget is based on semiannual levies on banks within the Federal Reserve System, 12 U.S.C. § 243; and the Director's collection and use of funds is not subject to review by congressional appropriations committees, 12 U.S.C. § 5497(d).

> In the eyes of the agency's architects, self-funding was "absolutely essential" to prevent future congresses from influencing the CFPB. S. Rep. No. 111-176, at 163 (2010); see also 156 Cong. Rec. 8931 (statement of Sen. Dodd) ("[T]he [CFPB's] funding will be independent and reliable so that its mission cannot

be compromised by political maneuvering."). Self-funding would ensure that future congresses could not use budget cuts to stymie the CFPB, unlike its administrative progenitor, the Consumer Product Safety Commission. *See* Elizabeth Warren, Unsafe at Any Rate: If It's Good Enough for Microwaves, It's Good Enough for Mortgages. Why We Need a Financial Product Safety Commission, Democracy: A Journal of Ideas, Summer 2007, https://democracyjournal.org/magazine/5/unsafe-at-any-rate/; Rachel E. Barkow, *Insulating Agencies: Avoiding Capture Through Institutional Design,* 89 Tex. L. Rev. 15, 66-67, 78 (2010) (reporting that sixty-percent budget cuts left the CPSC "if not a do-nothing, a do-very-little agency" and that the CFPB's architects learned an important lesson from the CPSC's downfall). The CFPB agreed, as it stressed in an early report that its entitlement to "funding outside the congressional appropriations process" ensures "full independence" from Congress. CFPB, *The CFPB Strategic Plan, Budget, and Performance plan and Report* 81 (Apr. 2013).

*All American*, 33 F.4th at 223-224 (Jones, J., concurring) (footnotes omitted).

To be blunt, from its inception, the CFPB was meant to be a "rogue" actor granted insulation from both executive and congressional oversight—this was specific to its design in order to prevent future legislators from stymying the agency through diminished appropriations. *Id.* at 223. As later crystalized by the Fifth Circuit in the *Community* decision:

So the Bureau's funding is double-insulated on the front end from Congress's appropriations power. And Congress relinquished its jurisdiction to review agency funding on the back end. In between, Congress gave the Director its purse containing an off-books charge card that rings up "[un]appropriated monies." Wherever the line between a constitutionally and unconstitutionally funded agency may be, this unprecedented arrangement crosses it. The Bureau's perpetual insulation from Congress's appropriations power, including the express exemption from congressional review of its funding, renders the Bureau "no longer dependent and, as a result, no longer accountable" to Congress and, ultimately, to the people. *All Am. Check Cashing,* 33 F.4th at 232 (Jones, J., concurring); *see id.* at 234 (detailing examples showing that the Bureau's "lack of accountability is not just a theoretical worry"). By

abandoning its "most complete and effectual" check on "the overgrown prerogatives of the other branches of the government"—indeed, by enabling them in the Bureau's case—Congress ran afoul of the separation of powers embodied in the Appropriations Clause. See The Federalist No. 58 (J. Madison).

The constitutional problem is more acute because of the Bureau's capacious portfolio of authority. "It acts as a mini legislature, prosecutor, and court, responsible for creating substantive rules for a wide swath of industries, prosecuting violations, and levying knee-buckling penalties against private citizens." *Seila Law*, 140 S. Ct. at 2202 n.8. And the "Director's newfound presidential subservience exacerbates the constitutional problem[ ] arising from the [Bureau's] budgetary independence." *All Am. Check Cashing*, 33 F.4th at 234 (Jones, J., concurring). An expansive executive agency insulated (no, double-insulated) from Congress's purse strings, expressly exempt from budgetary review, and headed by a single Director removable at the President's pleasure is the epitome of the unification of the purse and the sword in the executive—an abomination the Framers warned "would destroy that division of powers on which political liberty is founded." 2 The Works of Alexander Hamilton 61 (Henry Cabot Lodge ed., 1904).

*Community*, 51 F.4th at 640-41.

This Court certainly can choose to disagree with the analysis of the Fifth Circuit, other courts have as the Fifth Circuit itself notes. *See id.* at 641 (citing *PHH Corp. v. CFPB*, 881 F.3d 75, 158 (D.C. Cir. 2018) (*en banc*) (Henderson, J., dissenting) ("[A]n otherwise invalid agency is no less invalid merely because the Congress can fix it at some undetermined point in the future.") (abrogated on other grounds by *Seila*, ---U.S.--- 140 S. Ct. 2183)). If this Court, however, were to agree

with the Fifth Circuit, or Justice Jones,[12] or Virginia itself, then a judgment on the pleadings becomes wholly appropriate. *See Community*, 51 F.4th at 643-44.

### III.   VOIDING THE ACTIONS UNDERTAKEN UTILIZING UNCONSTITUTIONAL FUNDING IS THE APPROPRIATE RETROACTIVE REMEDY.

Without delving deeply into the matter, it would appear that under a *Collins* and *Community* framework the actions taken here by the CFPB are not *per se* invalid. *See id.* (utilizing the *Collins* framework to determine whether the promulgation of rules is void or voidable); *see also Collins*, ---U.S.---, 141 S.Ct. 1761, 1787-89 (rejecting that the actions were void *ab initio* and requiring demonstration of harm of the unconstitutional provision).

> Congress plainly (and properly) authorized the Bureau to promulgate the Payday Lending Rule, see 12 U.S.C. §§ 5511(a), 5512(b), as discussed supra in II.A–C. But the agency lacked the wherewithal to exercise that power via constitutionally appropriated funds. Framed that way, the Bureau's unconstitutional funding mechanism "[did] not strip the [Director] of the power to undertake the other responsibilities of his office," *Collins*, 141 S. Ct. at 1788 & n.23, but it deprived the Bureau of the lawful money necessary to

---

[12] [T]he [Bureau]'s argument for upholding its funding mechanism admits no limiting principle. Indeed, if the [Bureau]'s funding mechanism is constitutional, then what would stop Congress from similarly divorcing other agencies from the hurly burly of the appropriations process? . . . [T]he general threat to the Constitution's separation of powers and the particular threat to Congress's supremacy over fiscal matters are obvious. Congress may no more lawfully chip away at its own obligation to regularly appropriate money than it may abdicate that obligation entirely. If the [Bureau]'s funding mechanism survives this litigation, the camel's nose is in the tent. When conditions are right, the rest will follow.

*All Am. Check Cashing*, 33 F.4th at 241 (Jones, J., concurring).

fulfill those responsibilities. This is a distinction with more than a semantical difference, as it leads us to conclude that, consistent with Collins, the Plaintiffs are not entitled to *per se* invalidation of the Payday Lending Rule, but rather must show that "the unconstitutional ... [funding] provision inflicted harm." *Id.* at 1788–89.

*Community*, 51 F.4th at 643 (brackets and italics original).

Here, Defendants do not question whether the CFPB has a right to sue or investigate—Congress without question can create agencies that undertake both activities—but rather whether they have the "financial wherewithal" to undertake these actions absent funding. *See id.* (holding, as it related to the promulgation of regulations that "agency lacked the wherewithal to exercise that power via constitutionally appropriated funds").

While certainly the unconstitutional funding does not make all actions undertaken by the CFPB *de jure* void, it comes close given the importance in funding vis-à-vis undertaking virtually any action. *See id. Community*'s analysis is extremely straight forward:

> [M]aking that showing[, of harm,] is straightforward in this case. Because the funding employed by the Bureau to promulgate the Payday Lending Rule was wholly drawn through the agency's unconstitutional funding scheme, there is a linear nexus between the infirm provision (the Bureau's funding mechanism) and the challenged action (promulgation of the rule). *In other words, without its unconstitutional funding, the Bureau lacked any other means to promulgate the rule. Plaintiffs were thus harmed by the Bureau's improper use of unappropriated funds to engage in the rulemaking at issue.* Indeed, the Bureau's unconstitutional funding structure not only "affected the complained-of decision," id. at 1801 (Kagan, J., concurring in part), it literally effected the promulgation of the rule. Plaintiffs are therefore entitled to "a rewinding of [the Bureau's] action." Id.

51 F.4th at 37 (emphasis added; footnote omitted).

Here there is little question that the actions undertaken by the CFPB have caused and continue to cause Defendants harm; moreover, it is clear that the actions taken were taken utilizing unconstitutional funding and were invalid. Given that these acts violated the separations of powers doctrine, the acts should be held void in line with Supreme Court precedent. *See, e.g.*, *Lucia v. SEC*, ---U.S.---, 138 S. Ct. 2044, 2055 & nn.5-6 (2018) (vacating unconstitutional ALJ's adjudication despite attempted ratification); *NLRB v. Noel Canning*, 573 U.S. 513, 557 (2014) (affirming that "order under review is void *ab initio*"); *Stern v. Marshall*, 564 U.S. 462, 503 (2011) (affirming dismissal of claim decided by unconstitutional Bankruptcy Court).

The final question is how the harm can be undone. Given the CFPB's inescapable involvement in the matter—from first-instance investigation, to the filing of the complaint, to the participation in litigation—it seems clear that the *only* equitable remedy is to dismiss the action in its entirety, while this may seem a harsh remedy, it is the only manner in which to ensure that investigatory or legal work (*all undertaken with unconstitutional funding*) does not continue to cause Defendants harm.

Dismissing a void action is especially important in separation-of-powers cases. "Any other rule would create a disincentive to raise" these issues, *Ryder v. United States*, 515 U.S. 177, 183 (1995); no "rational litigant" would "bother to assert

[their] interest[s]," K. Barnett, *To the Victor Goes the Toil - Remedies for Regulated Parties in Separation-of-Powers Litigatio*n, 92 N.C. L. Rev. 481, 509 (2014), absent real and meaningful relief being offered. *Id.* ("Meaningful remedies should provide wronged parties with incentives to enforce their interests because otherwise the underlying norm has no traction in the real world. In one of its more recent structural-defect decisions, the Supreme Court recognized that a remedy must provide sufficient incentive to litigate structural challenges. Without such an incentive, the wronged party will be unlikely to seek to vindicate the interest that the Court seeks to safeguard.") (footnotes omitted).   Why would litigants undertake the significant effort to make such a challenge, after all, if the case went on as if nothing wrong happened? *See Lucia*, 138 S. Ct. at 2055 & n.5. Violations going unchallenged would, in turn, allow separation-of-powers violations to go unchecked. *See Free Enter. Fund*, 561 U.S. at 497.

Here, as Defendants see it, there is little that can be done to remove influence of unconstitutional funding from this litigation: even if the CFPB is dismissed from this case Co-Plaintiffs cannot forget what they have learned from communications with CFPB's counsel, unconstitutionally funded; they cannot unlearn the facts uncovered in a CFPB investigation, again unconstitutionally funded; they cannot forget the arguments made by the CFPB lawyers, based on research conducted by CFPB lawyers—again all funded in violation of the appropriations clause.

Because it is simply impossible to separate the current case and claims from the vast amount of labor, argument, and work which could not have occurred but for unconstitutional funding, it seems the only remedy which may ensure Defendants do not continue to suffer injuries from the unconstitutional funding mechanism is to dismiss this action in full.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request this Court grant Defendants request and dismiss the action *in toto* with prejudice or in the alternative vacate all orders based on pleadings, papers, or hearings in which the CFPB participated, hold void all papers filed by the CFPB, or which the CFPB filed jointly with Co-Plaintiffs, or which may have been tainted by unconstitutional funds, and require the filing of an amended Complaint in this action. Defendants further request for all other relief which the Court finds just and proper.

Dated: <u>May 1, 2023</u>

*Respectfully Submitted:*

_____
Amina Matheny-Willard, Esquire
Amina Matheny-Willard, PLLC
999 Waterside Drive, Suite 2525
Norfolk, Virginia 23510

Firm Tel.: 757-777-3441
Firm Fax: 757-282-7808
Email: amina@aminalaw.com
VSB: #43566
***Counsel for Defendants***

**/s/Zachary Lawrence, Esquire**
Lawrence Law Firm PLLC
598 E Main Street
Little Falls, NY 13365
Tel.: 202-468-9486
Email: zach@zlawpllc.com
*Pro Hac Vice*
NYS Bar: 5798202
**Counsel for Defendants**

## CERTIFICATE OF SERVICE

I, <u>Amina Matheny-Willard</u>, Counsel for Defendants in this matter, hereby certify, under penalty of perjury, that on <u>May 1, 2023</u>, I filed the foregoing <u>Memorandum in Support of Motion for Judgment on the Pleadings</u> electronically through this Court's CM-ECF electronic filing system, and that the system will send a copy to all counsel of record and unrepresented parties.

Date: **<u>May 1, 2023</u>**.

**Certifying Party:**

_____
Amina Matheny-Willard, *Counsel for Plaintiffs (VSB #43566)*