IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Harrisonburg Division

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU, et al., | |
| Plaintiffs, | |
| v. | Case No.:  5:21-cv-00016-EKD-JCH |
| NEXUS SERVICES, INC., et al., | |
| Defendants. | |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR REQUEST FOR EVIDENTIARY SANCTIONS, INJUNCTIVE RELIEF, CONSUMER REDRESS, AND CIVIL MONEY PENALTIES**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

FACTS ............................................................................................................................... 1

   I.  Defendants' deceptive, abusive, and unfair acts and practices induced consumers to enter into agreements. ...........................................................................................................3

   II.  Libre made false threats and other misrepresentations to its clients....................................6

ARGUMENT ...................................................................................................................... 8

   I.  Legal Standards...........................................................................................................8

     A.  Default judgment and Rule 12(b)(6)......................................................................... 8

     B.  Evidentiary sanctions under Rule 37 ........................................................................ 9

       1.  Sanctions are appropriate under Rule 37(b)(2)(A)(i) to prevent Defendants from profiting from their Discovery Order violations....................................................... 10

       2.  Rules 37(b)(2)(A)(ii) and 37(c)(1) prevent Defendants from offering any evidence that should have been produced.................................................................................. 11

   II.  Plaintiffs' well-pleaded allegations set forth claims for which relief can be granted under the CFPA and state consumer protection statutes.............................................................13

     A.  Claims under the CFPA ......................................................................................... 13

       1.  Libre and Individual Defendants are covered persons under the CFPA.................... 13

       2.  Libre engaged in a practice of deception in violation of the CFPA, as alleged in Counts 1 through 8.................................................................................................. 15

         a.  Libre engaged in a practice of deceptive representations regarding the nature of the payments that consumers were making and the functionality of the GPS devices for which consumers were paying (Counts 1 and 6).............................. 16

         b.  Libre engaged in a practice of making deceptive threats to consumers to intimidate them into making payments and wearing the GPS device (Counts 2, 3, 4, and 5). ......................................................................................................... 18

         c.  Libre engaged in a practice of making deceptive statements regarding refunding collateral payments and the legal representation services that it provided (Counts 7 and 8). ......................................................................................................... 20

3.  Libre engaged in abusive acts and practices in violation of the CFPA, as alleged in Count 9. ................................................................................................ 21

4.  Individual Defendants engaged in deceptive and abusive acts and practices and substantially assisted Libre in its violations of the CFPA, as alleged in Counts 1 through 10. ............................................................................................... 22

5.  Nexus Services substantially assisted Libre in its violations of the CFPA, as alleged in Count 10. ....................................................................................... 23

B.  Claims under state laws ......................................................................................... 24

1.  Entity Defendants violated the Virginia Consumer Protection Act, as alleged in Count 11. ................................................................................................................ 24

a.  ¶ 204(c) and (d) of Plaintiffs' Complaint - § 59.1-200(A)(3) .............................. 25

b.  ¶ 204(i) of Plaintiffs' Complaint - § 59.1-200(A)(5) ........................................... 25

c.  ¶ 204(a),(b), and (e) to (h) of Plaintiffs' Complaint - § 59.1-200(A)(14) ........... 26

2.  Defendants engaged in unfair and deceptive conduct in violation of the Massachusetts Consumer Protection Act, as alleged in Counts 12, 13, and 14. ................................. 28

3.  Defendants engaged in conduct violating the New York Executive Law and General Business Law, as alleged in Counts 15, 16, and 17. .................................................... 30

a.  Defendants violated New York Executive Law by engaging in repeated and persistent fraudulent conduct and using unconscionable contract provisions (Counts 15 and 16). ................................................................................................ 30

b.  Defendants violated the New York General Business Law by engaging in deceptive acts and practices (Count 17). ............................................................... 32

III. The Court should grant Plaintiffs' proposed relief. ......................................................... 33

A.  The proposed injunctive relief is appropriate. ............................................................ 34

B.  The Court should award redress to consumers. .......................................................... 37

1.  The CFPA provides for restitution to consumers. ...................................................... 37

2.  The state consumer protection statutes provide an alternative basis for the same restitution award.................................................................................................... 40

C.  The Court should impose civil money penalties.......................................................... 41

1.  Civil money penalty under the CFPA ........................................................................ 41

2.  Civil money penalties under state laws..................................................................... 45

a.  The Court should award civil penalties under the Virginia Consumer Protection Act.......................................................................................................... 46

b.  The Court should impose civil penalties under the Massachusetts Consumer Protection Law. ..................................................................................... 49

c.  The Court should award penalties under the New York General Business Law.. 50

D.  Defendants are jointly and severally liable................................................................. 51

CONCLUSION.................................................................................................................... 52

## INTRODUCTION

After entry of default judgment, Plaintiffs Consumer Financial Protection Bureau (Bureau), the Commonwealths of Massachusetts and Virginia, and the State of New York seek relief that holds Defendants accountable for the harm that their illegal conduct has caused to tens of thousands of consumers. Defendants own and operate a nationwide business targeting immigrants held in the custody of U.S. Immigration and Customs Enforcement (ICE), using deceptive, abusive, and unfair practices to induce consumers to sign contracts and pay thousands of dollars in exchange for release. As set forth herein, Plaintiffs' 17-count Complaint sufficiently states claims on which relief can be granted under the Consumer Financial Protection Act of 2010 (CFPA) and consumer-protection statutes of Virginia, Massachusetts, and New York. Appropriate relief includes refunds of consumer payments in the amount of $████████████; injunctive relief that prevents Defendants from continuing to operate unlawfully; and civil money penalties of up to $111,135,620 per defendant for violations of the CFPA and up to $24,390,000 for violations of the state statutes. And Defendants should be prevented from introducing evidence that they failed to produce in discovery to belatedly attempt to avoid or reduce their liability for their unlawful conduct.

## FACTS

This lawsuit arose out of Defendants' deceptive, abusive, and unfair business practices, which have harmed thousands of consumers who contracted with Defendant Libre by Nexus, Inc. (Libre) to secure their release from federal immigration detention. Libre is a wholly owned subsidiary of Nexus Services, Inc. (Nexus Services) (collectively, Entity Defendants); both

Entity Defendants are owned and managed by Micheal Donovan, Richard Moore, and Evan Ajin (collectively, Individual Defendants).[1]

Most Libre consumers are eligible for release because they do not pose a risk to public safety.[2] In substance, Libre acts as an intermediary between the detainees and sureties and their bond agents.[3] Libre requires detainees and their co-signers to execute agreements with certain obligations and, in exchange, Libre agrees to indemnify the sureties and their bond agents for any losses in connection with immigration bonds.[4] The sureties then post and issue immigration bonds to ensure the consumers' release from detention.[5]

Despite not being certified to issue surety bonds or licensed as a bail-bond agent in any state, Libre markets itself to immigrant-detainee consumers as an easy and affordable method of securing their release from federal custody.[6] Libre makes these representations despite knowing that they are false and misleading, that consumers routinely do not understand the core terms of its program, and that Libre's own records indicate that consumers cannot afford Libre's large fees.[7]

Libre routinely engaged in deceptive, abusive, and unfair misconduct throughout the course of its relationships with consumers, including: making misrepresentations to create the impression that Libre paid cash for their immigration bond and that the consumers' payments to Libre were repayment for this debt; failing to provide consumers with contracts in a language they could read; using deceptive and abusive terms in the contracts; making demands for

---

[1] Compl. ¶¶ 17-22, ECF No. 1.
[2] *Id.* ¶¶ 2, 23.
[3] *Id.* ¶ 37.
[4] *Id.*
[5] *Id.*
[6] *Id.* ¶¶ 26-31.
[7] *Id.* ¶¶ 102, 117.

payments not owed; and making false threats about the consequences to consumers of failing to comply with the agreements.[8]

I.      **Defendants' deceptive, abusive, and unfair acts and practices induced consumers to enter into agreements.**

Libre engages in unfair, abusive, and deceptive misconduct at each stage of the client enrollment process. Before Libre will arrange to have a detainee released, the company requires a family member to co-sign a service agreement and to make a large, non-refundable payment.[9] After a detainee is released, Libre representatives routinely tell the detainee-consumers that if they do not also sign the agreement, their co-signor would forfeit the fee and other costs and they would be returned to detention— despite the fact that Libre has no authority or ability to return consumer detainees to custody.[10] Libre routinely pressured both family members and detainees to sign agreements without having a full opportunity to read or understand the terms.[11]

During the enrollment process, Libre representatives routinely mislead consumers concerning the core terms of the company's services. In particular, representatives mislead consumers to believe that they are entering into a financial arrangement in which the company pays money toward a detainee's refundable bond in order to secure their release, and then the detainee repays the bond payment in monthly installments.[12] In reality, the fees consumers paid to Libre were non-refundable and were not allocated to paying back the bond. Libre knew or should have known that consumers do not understand the written agreements they are asked to sign and that they rely upon these misrepresentations concerning the company's services. In fact, in thousands of cases, the written agreements Libre used were written in a language that the

---

[8] *Id.* ¶¶ 4-5, 23-120.
[9] *Id.* ¶¶ 35-37.
[10] *Id.* ¶¶ 38-40.
[11] *Id.* ¶¶ 35-40.
[12] *Id.* ¶¶ 3, 4, 115-118.

company knew the consumers did not speak or understand; the vast majority of Libre's clients and their co-signers are monolingual Spanish speakers, and Libre marketed its services to consumers with Spanish-language advertisements.[13] However, from at least 2014 until at least late 2017, Libre used a multi-part, written client agreement of over 20 pages, all written in English except for a single page written in Spanish (Original Agreement).[14]

In the Original Agreement, including in the portion that was in Spanish, Libre told consumers that it would "post the bond" and "provide collateral for the respondent's immigration bond" in the full amount of the bond.[15] Elsewhere in the Original Agreement, Libre used the term "collateral" to refer to cash payments consumers made toward the bond, creating the reasonable impression that the monthly payments made by consumers were reimbursing Libre by paying down the bond over time.[16] But the consumers' payments did not go toward their bond. Rather, under the terms in the Original Agreement provided to consumers only in English, the non-refundable monthly fee of $420 went to lease a GPS ankle monitor that Libre required the consumer to wear until the immigration proceedings were resolved. This amounted to tens of thousands of dollars for released detainees whose cases remained pending for years.[17] Libre also frequently required the co-signers of these agreements to execute a promissory note under which they were obligated to repay the face amount of the immigration bond plus interest at a rate of 20% in the event of a breach of the agreement.[18]

In late 2017 or early 2018, Libre revised its written client agreement (New Agreement).[19] Among other changes, the New Agreement does not require GPS-device monthly lease

---

[13] *Id.* ¶¶ 32-33.
[14] *Id.* ¶ 34.
[15] Decl. of Franklin Romeo, Ex. 1 (hereinafter Original Agreement) at 5-6, 10-11.
[16] *See id.* at 10; Compl. ¶¶ 4, 19, ECF No. 1.
[17] Compl. ¶¶ 41-42, ECF No. 1.
[18] *Id.* ¶ 68.
[19] *Id.* ¶ 71.

payments, but does require a new monthly payment called "Program Fees."[20] These fees vary from $250 to $475 per month for a term of 22 to 60 months, depending on the size of the released detainee's bond, and are also non-refundable.[21] Consumers who successfully make all of their scheduled Payment Fees continue to be charged a monthly Maintenance Fee of $50 until their bond is canceled.[22]

Libre representatives also make oral representations that Libre pays the full amount of the consumers' immigration bonds to secure the consumers' release and that the monthly payments or Program Fees are repayments to Libre for the bond it paid, when in reality, the payments are non-refundable and not applied to the consumers' immigration bonds.[23] To pay down the bond owed, Libre's written agreements provide that consumers are required to make additional "collateral" payments on top of the required monthly payments. Libre tells consumers that when they make sufficient collateral payments to equal 80% of their initial bonds, they are no longer required to wear the GPS monitor.[24] The agreements further provide that the collateral payments would be refundable after the immigration proceedings are resolved.[25] However, Libre does not properly track consumers' payments in its systems, resulting in some collateral payments not being recorded.[26]

Libre is aware that its representations cause consumers to be misled. Consumers routinely told Libre call-center employees that they thought their monthly payments went toward paying down their bond.[27] Despite that knowledge, Libre did not provide adequate training to its

---

[20] *Id.* ¶ 72.
[21] *Id.* ¶ 72.
[22] *Id.* ¶ 73.
[23] *Id.* ¶¶ 114-118.
[24] *Id.* ¶ 48.
[25] *Id.* ¶¶ 48, 50, 72.
[26] *Id.* ¶¶ 52, 111.
[27] *Id.* ¶ 117.

employees on how to explain the agreements to consumers, and failed to implement procedures to ensure that employees provided consumers with accurate information.[28] Libre did not offer its employees scripts or talking points or implement effective training, oversight, and other controls.[29] At the same time, Libre's financial rewards and policy of requiring employees to handle four intake calls each hour incentivized its employees to rush through the approval process without explaining the terms of Libre's agreements.[30]

## II.     Libre made false threats and other misrepresentations to its clients.

Libre also regularly made false and misleading threats to its clients and co-signers in an attempt to secure their compliance with the company's agreement.[31] For example, Libre representatives repeatedly threatened clients and co-signers that they were at risk of re-arrest, detention, deportation, or other negative outcomes in their immigration cases if they failed to pay monthly fees or removed their GPS device, despite the fact that Libre had no legal or contractual authority to negatively impact the outcome of immigration cases or cause any person to be detained or deported.[32] Libre representatives also repeatedly threatened co-signers that they may be required to wear GPS devices if they failed to make payments, despite having no legal or contractual authority to do so.[33] Libre representatives further routinely made false threats to sell their clients' accounts to collection agencies, to report negative information about clients and co-signers to credit reporting agencies, and to sue clients and co-signers for nonpayment.[34]

Libre made further misrepresentations to their clients about the GPS devices required under the agreements. Between 2014 and 2020, Libre contracted with at least three companies to

---

[28] *Id.* ¶¶ 97-100, 117.
[29] *Id.* ¶¶ 93-96, 117.
[30] *Id.* ¶¶ 93-96.
[31] *Id.* ¶¶ 101-113.
[32] *Id.* ¶¶ 103-104.
[33] *Id.* ¶ 105.
[34] *Id.* ¶¶ 107-109.

provide GPS devices and software to track locations of the devices.[35] Each GPS provider terminated its services due to Libre's nonpayment of fees.[36] Rather than inform consumers that their GPS devices were no longer functional, Libre misrepresented to consumers that the devices were active, admonished them to continue to charge the devices, and continued to charge fees for the now-useless devices.[37] These GPS devices provided by Libre caused burns, skin irritation, and other injuries to consumers.[38] Despite these problems, Libre's Original Agreement did not allow consumers to remove the devices even in cases of injury, pregnancy, or illness.[39] The New Agreement allows for removal of a GPS device in certain circumstances, but only at Libre's "sole discretion."[40]

Libre also repeatedly demanded payments from consumers that were not due.[41] For payments to be recorded in Libre's payments system, consumers were required to send Libre a photograph of a deposit receipt.[42] As a result of this and other slipshod recordkeeping processes, numerous consumer payments were not accurately recorded.[43] Libre's systemic failure to accurately record payments caused Libre to regularly call and text consumers to demand payments that they did not in fact owe.[44]

Finally, Libre mischaracterized its services as a "program" offering "wraparound services," such as access to medical services, guidance to consumers obtaining government

---

[35] *Id.* ¶¶ 80-92.
[36] *Id.* ¶¶ 80-88.
[37] *Id.* ¶¶ 80-92.
[38] *Id.* ¶ 90.
[39] *Id.* ¶ 76.
[40] *Id.*
[41] *Id.* ¶¶ 110-113.
[42] *Id.* ¶ 111.
[43] *Id.*
[44] *Id.* ¶ 112.

assistance, relief during natural disasters, and free "Immigration Legal Aid," when it in fact did

not provide any of these services.[45]

## ARGUMENT

## I.    Legal Standards

### A.    Default judgment and Rule 12(b)(6)

When a defendant defaults, the complaint's well-pleaded allegations relating to the

defendant's liability are taken as true, with the exception of the allegations relating to the amount

of damages.[46] The court then analyzes "whether or not the face of the pleadings supports the

default judgment and the causes of action therein"[47] using a standard of review similar to that

applicable to a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).[48] Under the

12(b)(6) standard, the complaint must "contain sufficient factual matter" to "state a claim that is

plausible on its face" and from which the court can draw the "reasonable inference" that the

defendant is "liable for the misconduct alleged."[49] In its analysis, the court should draw "all

reasonable factual inferences" in a plaintiff's favor."[50] The court then determines "whether the

well-pleaded allegations . . . in [the] complaint support the relief sought,"[51] and the court may

decide damages without an evidentiary hearing "if the record contains sufficient evidence to

support the award."[52]

---

[45] *Id.* ¶¶ 77-79.

[46] *See* Fed. R. Civ. P. 8(b)(6); *see also Ryan v. Homecomings Fin. Network*, 253 F.3d 778, 780 (4th Cir. 2001).

[47] *ME2 Prods., Inc. v. Ahmed*, 289 F. Supp. 3d 760, 762 (W.D. Va. 2018) (quoting *Anderson v. Found. for Advancement, Educ. & Emp't of Am. Indians*, 187 F.3d 628 (4th Cir. Aug. 10, 1999) (unpublished table opinion)).

[48] *See, e.g., Diaz v. Naylor*, No. 1:18-cv-1274, 2019 WL 1375593, at *3 (E.D. Va. Feb. 7, 2019).

[49] *Paradise Wire & Cable Defined Ben. Pension Plan v. Weil*, 918 F.3d 312, 315 (4th Cir. 2019).

[50] *Id.* at 317-18; *see also Wells Fargo Bank, N.A. v. Oceana Sensor Techs., Inc.*, No. 2:11-cv-258, 2012 WL 12895556, at *2 (E.D. Va. Aug. 31, 2012) (holding that in determining liability on default "the Court will assume all reasonable inferences" that may be drawn from the complaint).

[51] *Ryan*, 253 F.3d at 780.

[52] *ME2 Prods.*, 289 F. Supp. 3d at 762-63 (citing *Anderson v. Found. for Advancement, Educ. & Employment of Am. Indians*, 155 F.3d 500, 507 (4th Cir. 1998)).

Plaintiffs' well-pleaded allegations, along with reasonable factual inferences drawn therefrom, support default judgment and Plaintiffs' requested relief.

**B.      Evidentiary sanctions under Rule 37**

The Court is keenly aware of "defendants' abject failure to timely comply with several of the court's discovery mandates" set forth in the Discovery Order, which resulted in the Court entering default against all Defendants.[53]   Rule 37 now prevents Defendants' discovery misconduct from hindering Plaintiffs' case on remedies and damages. Rule 37(b) enables the Court to "prevent [Defendants] from being able to profit from [their] own failure to comply"[54] by "directing that the matters embraced in the [Discovery Order] or other designated facts be taken as established"[55] in Plaintiffs' favor. Additionally, Rules 37(b)(2)(A)(ii) and 37(c)(1) preclude Defendants from disputing Plaintiffs' case by relying on documents that should have been produced under the Discovery Order or Rule 26(e). Accordingly, as explained below, Plaintiffs respectfully request that the Court narrow the evidentiary issues for the August hearing by: (1) sanctioning Defendants under Rule 37(b)(2)(A)(i) by deciding all evidentiary disputes relevant to remedies and damages in Plaintiffs' favor, to the extent that Defendants withheld evidence relevant to those disputes in violation of the Discovery Order; (2) sanctioning Defendants under Rule 37(b)(2)(A)(ii) by precluding them from offering any evidence that should have been produced under the Discovery Order; and (3) sanctioning Defendants under Rule 37(c)(1) by excluding evidence offered by Defendants that should have been produced as supplemental responses to Plaintiffs' discovery requests.

---

[53] Mem. Op. at 5 (Sanctions Op.), ECF No. 201.
[54] *Davis v. Uhh Wee, We Care Inc.*, No. ELH-17-494, 2019 WL 3457609, at *6 (D. Md. July 31, 2019) (quoting *United States v. Sumitomo Marine & Fire Ins. Co.*, 617 F.2d 1365, 1369 (9th Cir. 1980)).
[55] Fed. R. Civ. P. 37(b)(2)(A)(i).

      **1.**     **Sanctions are appropriate under Rule 37(b)(2)(A)(i) to prevent Defendants from profiting from their Discovery Order violations.**

Rule 37(b)(2)(A)(i) permits the Court to issue an order "directing that the matters embraced in the [Discovery Order] or other designated facts be taken as established for purposes of the action, as the prevailing party claims[.]" To prevent Defendants from profiting from their violations of the Discovery Order, in the determination of appropriate remedies and damages, the Court should deem established as facts all evidentiary matters stemming from Defendants' Discovery Order violations in favor of Plaintiffs.

Case law supports this result. For example, the district court in *Qwest Communications International, Inc. v. Oneqwest, LLC*, considered a similar procedural posture—the entry of default judgment as a dispositive sanction based on violations of a discovery order, and a plaintiff seeking evidentiary sanctions in connection with proving damages.[56] In *Qwest*, the plaintiff alleged trademark infringement and sought "lost profits caused by . . . [defendant's] multi-level marketing scheme employing . . . [plaintiff's] famous marks."[57] Those lost profits equaled a $1,300 "membership fee" that the defendant charged its 90,000 customers.[58] Defendant attempted to claim that "not all of its 90,000 members paid the [membership fee]," but the court countered that defendant "failed to provide the underlying financial data that would corroborate or refute this assertion."[59] Accordingly, under Rule 37, the court determined that it was "entirely appropriate to have, as a discovery sanction, the fact deemed established that the 90,000 customers paid $1,300 each to defendant."[60]

---

[56] No. CO2-829R, 2002 U.S. Dist. LEXIS 25469 (W.D. Wash. Nov. 11, 2002).
[57] *Id*. at *32.
[58] *Id*.
[59] *Id*. at *16.
[60] *Id*. at *32; *see also Flame S.A. v. Indus. Carriers, Inc.*, 39 F. Supp. 3d 752, 766 (E.D. Va. 2014) (adopting 37(b)(2)(A)(i) sanction recommendation of deeming litigants to be alter egos where discovery order violations made it "that much more difficult for Plaintiffs to prove their alter ego theory").

The same calculus applies here. Plaintiffs allege that Defendants engaged in deceptive, abusive, and unfair misconduct that they knew, or should have known, was unlawful. Yet despite their obligations to disclose material relevant to these claims, Defendants withheld evidence of their communications with consumers, internal audits and reviews of consumer interactions, and internal emails, texts, and other communications concerning the allegations in the Complaint.[61] While the allegations in the Complaint are more than sufficient to establish Defendants' liability for their deceptive, abusive, and unfair acts, Defendants' withholding of direct evidence of their consumer communications has hindered Plaintiffs' ability to demonstrate: (1) which individual consumers were harmed by which individual acts of unlawful misconduct; and (2) how and when Defendants gained knowledge of that misconduct.[62]

As in *Qwest*, it is "entirely appropriate" to deem established as a fact that the evidence Defendants withheld would have shown that Defendants engaged in misconduct that each Defendant knew, or should have known, was unlawful, and that their deceptive, abusive, and unfair misconduct was part of a pattern such that all consumers—at least in the aggregate—were harmed. Accordingly, under Rule 37(b)(2)(A)(i), Plaintiffs respectfully ask that the Court deem all evidentiary matters relevant to remedies and damages established as facts in their favor.

### 2.    Rules 37(b)(2)(A)(ii) and 37(c)(1) prevent Defendants from offering any evidence that should have been produced.

Rule 37 also allows the Court to prevent Defendants from using material that should have been produced under the Discovery Order or Rule 26(e). First, Rule 37(b)(2)(A)(ii) permits the Court to issue an order "prohibiting the disobedient party from supporting or opposing

---

[61] *See* Sanctions Op. at 3-4 and 7 (discussing discovery misconduct).
[62] *Id*. at 13-14 (finding that "defendants' persistent noncompliance" with discovery obligations left Plaintiffs "without meaningful discovery…[including] large swaths of responsive ESI" and prevented plaintiffs from conducting depositions).

designated claims or defenses, or from introducing designated matters in evidence." Based on this subpart of Rule 37, the Court should prohibit Defendants from relying on material that they failed to produce as required by the Discovery Order to support any arguments they may make opposing Plaintiffs' remedy requests and damages calculations.[63]

Second, Rule 37(c)(1) specifies the sanction for failing to supplement discovery responses as required by Rule 26(e): the non-disclosing party "is not allowed to use that information or witness to supply evidence . . . at a hearing."[64] "Rule 37(c)(1) provides a self-executing sanction" where a litigant fails, for example, "to supplement the written response to the Rule 34 request for production."[65] This sanction is consistent with the purpose of Rule 37(c)(1), which is "preventing surprise and prejudice" by "excluding evidence that a party seeks to offer [but] has failed to properly disclose" under Rule 26.[66]

Here, Plaintiffs would certainly be surprised and prejudiced by Defendants' attempt to dispute their request for remedies or their damages calculations with evidence that should have been produced in connection with discovery requests issued two years ago. Allowing Defendants to rely on such evidence ignores the main goal of Rules 37(c)(1) and 26(e)—"to avoid surprise or trial by ambush."[67] Accordingly, the Court should exclude any such evidence that Defendants attempt to offer.

---

[63] *See, e.g., Glob. Dig. Sols., Inc. v. Grupo Rontan Electro Metalurgica*, S.A., No. 18-80106-CV, 2020 U.S. Dist. LEXIS 251765, at *11-13 (S.D. Fla. Nov. 30, 2020) (precluding documents and testimony under Rule 37(b)(2)(A)(ii) in the context of a Rule 37 default judgment damages hearing).
[64] Fed. R. Civ. P. 37(c)(1).
[65] *Beach Mart, Inc. v. L&L Wings, Inc.*, 302 F.R.D. 396, 409 (E.D.N.C. 2014).
[66] *S. States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 596 (4th Cir. 2003).
[67] *AMEX v. Mopex, Inc.*, 215 F.R.D. 87, 93 (S.D.N.Y. 2002) (cleaned up).

II.     **Plaintiffs' well-pleaded allegations set forth claims for which relief can be granted under the CFPA and state consumer protection statutes.**

A.     **Claims under the CFPA**

The Complaint sufficiently alleges that Defendants violated the CFPA insofar as: (1) Libre and Individual Defendants engaged in a practice of deceptive representations and omissions regarding the nature of the payments, the functionality of the GPS devices, threats to intimidate consumers to make payments and wear the GPS devices, refund of collateral payments, and legal representation; (2) Libre and Individual Defendants engaged in abusive acts or practices when they used a predominantly English-language agreement to enroll consumers who did not understand English or read in any language; and (3) Nexus and Individual Defendants substantially assisted Libre in these violations.

1.     **Libre and Individual Defendants are covered persons under the CFPA.**

The CFPA prohibits "covered person[s]" from engaging in "any unfair, deceptive, or abusive act or practice."[68] "Covered person[s]" include individuals and corporations that engage "in offering or providing a consumer financial product or service."[69] A "consumer financial product or service" includes "extending credit and servicing loans."[70] In addition, "covered person[s]" also include "related person[s]."[71] A "related person" is a "director, officer, or employee charged with managerial responsibility for, or controlling shareholder of"[72] the company or "any shareholder . . . who materially participates in the conduct of [its] affairs."[73]

---

[68] 12 U.S.C. § 5536(a)(1)(B).
[69] *Id.* § 5481(6)(A), (19).
[70] *Id.* § 5481(5), (15)(A)(i).
[71] *Id.* § 5481(25)(B).
[72] *Id.* § 5481(25)(C)(i).
[73] *Id.* § 5481(25)(C)(ii).

Here, Libre offers or provides extensions of credit. As the Complaint alleges, Libre "creates the reasonable impression in consumers' minds that it is offering or providing extensions of credit to pay for consumers' immigration bonds," which renders these transactions "consumer-financial products or services under the CFPA."[74]

The Complaint further supplies specific facts in support of this allegation:

- Libre "falsely told consumers that Libre paid the full amount of the consumer's bond to ICE to secure the consumer's release";[75]

- Libre "falsely told consumers that the $420 monthly payments were repayments to Libre for the bond it paid" or "failed to explain that the monthly payments go to the GPS-device lease, leading consumers to reasonably believe that the monthly payments were repayments to Libre for the bond it claimed to have paid";[76]

- "Libre expressly or implicitly represented to consumers that . . . monthly payments, which consumers were required to repay over a term of months, were payments toward a loan";[77] and

- consumers "thought their monthly payments were going toward paying down their bond"—a misunderstanding of which Libre was aware but failed to correct.[78]

Thus, the alleged facts, taken as true, state that Libre is a "covered person" under the CFPA.

Donovan, Moore, and Ajin are "related persons" to Libre because they are directors, officers, or employees charged with managerial responsibility for the company and shareholders

---

[74] Compl. ¶ 19, ECF No. 1.
[75] *Id.* ¶ 114.
[76] *Id.* ¶ 115.
[77] *Id.* ¶ 116.
[78] *Id.* ¶ 117.

who materially participated in the conduct of its affairs.[79] Therefore, they are also "covered persons" under the CFPA.

### 2.    Libre engaged in a practice of deception in violation of the CFPA, as alleged in Counts 1 through 8.

An act or practice is deceptive under the CFPA if: (1) "there is a representation, omission, or practice that," (2) "is likely to mislead consumers acting reasonably under the circumstances," and (3) "the representation, omission, or practice is material."[80] A representation, omission, or practice is considered material when it "involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding a product."[81] Materiality is presumed for "at least four types of claims," including "express" claims and "claims pertaining to a central characteristic of the product about which reasonable consumers would be concerned."[82]

The facts alleged in the Complaint sufficiently state a claim that Libre engaged in deception in violation of the CFPA. Given the entry of default judgment against all Defendants, the Court should take the Complaint's allegations as true.[83] Libre's deceptive representations fall into several types of misconduct.

---

[79] *Id.* ¶¶ 20-22, 121-137.
[80] *CFPB v. Gordon*, 819 F.3d 1179, 1192-93 (9th Cir. 2016) (internal quotation marks omitted); *CFPB v. Access Funding, LLC*, No. CV ELH-16-3759, 2021 WL 2915118, at *22 (D. Md. July 12, 2021); *CFPB v. Future Income Payments, LLC*, No. CV 8:19-2950-BHH-KFM, 2020 WL 6162947, at *4 (D.S.C. May 21, 2020); *see also FTC v. Pukke*, 53 F.4th 80, 104 (4th Cir. 2022) (applying same standard when analyzing deception claims under the FTC Act).
[81] *Fanning v. FTC*, 821 F.3d 164, 172 (1st Cir. 2016) (quoting *Kraft, Inc. v. FTC*, 970 F.2d 311, 322 (7th Cir. 1992)).
[82] *Fanning*, 821 F.3d at 172-73 (internal quotation marks omitted).
[83] *DIRECTV, Inc. v. Rawlins*, 523 F.3d 318, 322 n.2.

a.    **Libre engaged in a practice of deceptive representations regarding the nature of the payments that consumers were making and the functionality of the GPS devices for which consumers were paying (Counts 1 and 6).**

Libre made misrepresentations regarding the core services that it claimed to provide to consumers. Libre falsely represented to consumers that it paid the full amount of an immigration bond to secure an individual's release from detention.[84] These oral representations created the reasonable impression in consumers' minds that at sign-up, Libre was extending credit to the consumers to compensate Libre for paying the immigration bond, which the consumer would pay back through an upfront fee and subsequent monthly payments.[85] Contrary to these express representations, Libre did not pay the immigration bonds, and consumers' monthly payments were nonrefundable rental fees for a GPS device.[86]

Consumers reasonably relied on the false oral representations from Libre that they were paying Libre back for the bond amount, including because the vast majority of Libre's consumers could not read or speak English, and the material terms of the Original Agreement were only provided to Libre's consumers in English.[87] Further, even if consumers could understand the terms of the Libre's agreements, the agreements themselves were misleading. By telling consumers in the Original Agreement that it was "provid[ing] collateral for the respondent's immigration bond" in the full amount of the bond and tying the consumer's monthly payments to the bond amount, Libre was creating the reasonable impression that the monthly payments made by consumers were reimbursing Libre for paying down the bond.[88] The New Agreement does not fix these problems; instead, it specifically structures "program

---

[84] Compl. ¶¶ 45, 114, 146, ECF No. 1.
[85] *Id.* ¶¶ 1, 4, 19, 45, 115-16, 120.
[86] *Id.* ¶¶ 44, 115, 147.
[87] *Id.* ¶¶ 34, 43, 69, 118; *see generally* Original Agreement.
[88] *E.g.*, Original Agreement 10-11; Compl. ¶¶ 4, 19, ECF No. 1.

payments" like monthly loan payments that are tied to the amount of the bond, reinforcing the impression that consumers are making payments toward their bond.[89]

All of these misrepresentations—whether oral or written—have been prevalent throughout Libre's operating period.[90] Moreover, although Libre knew that consumers routinely told its call-center employees that they thought their monthly payments were going toward paying down their bond, throughout the entire period, Libre failed to provide adequate training or guidance to its employees on how to explain the agreements to consumers, failed to implement policies and procedures to ensure that employees provided consumers with accurate information about Libre's services, and incentivized employees with financial rewards (without imposing effective controls) to rush consumers through the approval process, which resulted in employees omitting or misrepresenting consumers' obligations.[91]

In the limited cases where consumers were able to ascertain that the monthly payments were to lease a GPS device,[92] consumers were still misled into believing that they were paying for a GPS device that functioned to monitor their location after release, when in reality, the GPS devices often did not work.[93] This deception was prevalent since at least 2015: (a) starting in September 2015, Libre continued to collect and receive payments from consumers wearing Omnilink ankle monitors even though Omnilink had terminated Libre's access to GPS data due to non-payment; (b) starting in February 2018, Libre continued to collect and receive payments from consumers wearing 3M/Attenti ankle monitors even though 3M/Attenti had terminated Libre's access to GPS data due to non-payment; and (c) starting in May 2020, Libre continued to

---

[89] Compl. ¶¶ 72, 116; New Agreement §§ 2.8.1-2.8.6.
[90] Compl. ¶¶ 34. 40, 44-45, 51-54, 58, 64-66, 77-79, 82, 85, 101-125, ECF No. 1.
[91] Id. ¶¶ 93-100, 117.
[92] Id. ¶¶ 65-66, 173.
[93] Id. ¶¶ 66-67, 81-87, 90-91, 174.

collect and receive payments from consumers wearing Buddi monitors even though Buddi had terminated Libre's access to GPS data due to non-payment.[94] At no point did Libre inform consumers that their GPS devices were nonfunctional.[95]

These express misrepresentations—both regarding what consumers' payments were for and the functionality of the GPS devices—mischaracterized the nature and central characteristics of the product that Libre purported to offer. Libre's misrepresentations were, thus, likely to mislead reasonable consumers and were material to its consumers, as the misrepresentations likely affected consumers' decisions to make payments to Libre and wear the GPS devices.[96] Accordingly, Libre's misrepresentations constitute deception in violation of the CFPA.[97]

> **b.**   **Libre engaged in a practice of making deceptive threats to consumers to intimidate them into making payments and wearing the GPS device (Counts 2, 3, 4, and 5).**

Libre threatened consumers with false information to intimidate them into making monthly payments to Libre and wearing GPS devices. For instance, Libre repeatedly threatened consumers that they risked re-arrest, detention, and deportation if they failed to pay monthly fees or removed their GPS device.[98] Libre's agreements reinforced this impression by representing that Libre would provide an undefined "Agency"—that consumers could have reasonably understood to be ICE—with access to GPS data "in order to satisfy a criminal conviction or plea agreement, or to avoid incarceration by Agency"[99] and that "any alteration, damage, or destruction of the GPS device or band WILL RESULT in felony prosecution against the

---

[94] *Id.* ¶¶ 81-87.
[95] *Id.* ¶¶ 83, 86-87.
[96] *Id.* ¶¶ 148, 175; *see Fanning*, 821 F.3d at 172-73 (materiality is presumed where the presentations are "express" or "pertain[] to a central characteristic of the product").
[97] 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).
[98] Compl. ¶¶ 5, 58, 103, 151, ECF No. 1.
[99] *Id.* ¶¶ 55-57; Original Agreement 7-8

respondent."[100] Contrary to Libre's representations: (a) Libre cannot and does not arrest, detain, or deport consumers for failing to make a payment or removing their GPS devices; (b) ICE is not monitoring consumers through Libre's GPS devices, nor is ICE compelling or allowing consumers to be released subject to wearing a GPS device to avoid incarceration or to satisfy a criminal conviction or plea agreement; and (c) Libre never had the authority to prosecute consumers for any alterations, damage, or destruction of GPS devices.[101] Libre also repeatedly threatened to place GPS devices on co-signers for failing to make payments, although Libre had no legal or contractual authority to require a co-signer to wear a GPS device for failing to make a monthly payment.[102]

Besides the threats of deportation, rearrest, and redetention, Libre call-center representatives also repeatedly threatened consumers that their accounts would be turned over to a debt buyer or collection agency, that failing to make payments could harm their credit, and that Libre would take legal action against the consumers.[103] Libre, however, never sold a debt or referred a debt to a collection agency, furnished information to a credit reporting agency, or initiated a lawsuit against a consumer.[104]

All of Libre's threats were false and likely to mislead. These misrepresentations also were material to consumers, including because threats that they or their family members could be arrested, detained, or deported, or subject to collection, adverse credit reporting, or legal actions were likely to affect consumers' decisions to make payments to Libre and wear the GPS devices.[105] Libre's threats that clients would be re-arrested, detained, or deported if they did not

---

[100] Compl. ¶ 60, ECF No. 1; Original Agreement 21.
[101] Compl. ¶¶ 55, 59, 60, 104, 152, ECF No. 1.
[102] Id. ¶¶ 105-06, 153-54.
[103] Id. ¶¶ 5, 107-09, 158, 163, 168.
[104] Id. ¶¶ 107-09, 159, 164, 169.
[105] Id. ¶¶ 148, 175; see Fanning, 821 F.3d at 172-73 (materiality is presumed where the presentations are "express").

make their monthly payments or wear their GPS device were additionally material because such threats were tethered to the core purpose of the product offered by Libre, which was to keep consumers out of immigration detention.[106] These "repeated[]" threats were pervasive,[107] and Libre incentivized its representatives to make false threats to consumers through its financial rewards without putting in place effective controls.[108] For these reasons, Libre's threats to consumers are deceptive in violation of the CFPA.[109]

        **c.**    **Libre engaged in a practice of making deceptive statements regarding refunding collateral payments and the legal representation services that it provided (Counts 7 and 8).**

Finally, Libre made two other types of deceptive representations. As alleged in Count Seven, Libre represented to consumers that collateral payments were refundable once consumers' proceedings are resolved,[110] although, due to Libre's systemic failures in tracking consumers' payments, in many cases, Libre did not provide a refund.[111] As alleged in Count Eight, Libre has marketed itself as "Immigration Legal Aid" and represented to consumers as part of its marketing and sales pitch that it would provide a free, full-service lawyer to help their clients with their immigration cases or that consumers were likely obtain *pro bono* legal representation through one of Libre's affiliated law firms.[112] In fact, Libre only provides referrals to purportedly independent, affiliate law firms, and affiliated law firms are not obligated to take a case from one of Libre's consumers, and often have not.[113] These representations by Libre were false, likely to mislead, and material to consumers, as Libre's express representations were likely

---

[106] *See* Compl. ¶ 1, ECF No. 1; *see also Fanning*, 821 F.3d at 172-73 (materiality is presumed where the presentations "pertain[] to a central characteristic of the product").
[107] Compl. ¶¶ 103, 105, 107-09, ECF No. 1.
[108] *Id.* ¶¶ 94-95.
[109] 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).
[110] Compl. ¶¶ 50-51, 74, 178, ECF No. 1.
[111] *Id.* ¶¶ 52-53, 179.
[112] *Id.* ¶¶ 78, 183.
[113] *Id.* ¶¶ 79, 184.

to affect consumers' decisions to make payments to Libre and sign-up for its services.[114] These reoccurring misrepresentations were either due to systemic failures by Libre or were part of Libre's standard marketing or sales pitch.[115] These misrepresentations, therefore, constitute a deceptive practice in violation of the CFPA.[116]

### 3. Libre engaged in abusive acts and practices in violation of the CFPA, as alleged in Count 9.

Libre's conduct also violates the CFPA's prohibition on abusive acts and practices. An act or practice is abusive if, among other things, it "materially interferes with the ability of a consumer to understand a term or condition of a consumer financial product or service."[117] Libre's actions did exactly that: from 2014 to late 2017, Libre used predominantly English-language agreements to enroll clients.[118] Libre knew that many of its clients and co-signers did not understand English and that some were unable to read in any language, and that clients and co-signers were dependent on Libre and its employees to explain the bond securitization program and the agreements.[119] Yet Libre failed to provide adequate training or guidance to its employees on how to explain the contract to consumers.[120] Libre's employees omitted, concealed, and misrepresented core terms of the program while enrolling consumers into its program.[121] By rushing consumers through the enrollment process and omitting or misrepresenting material terms of Libre's written agreement to clients and co-signers before they were enrolled, Libre materially interfered with the consumers' ability to understand the terms and conditions of the

---

[114] *Id.* ¶¶ 180, 185; *see Fanning*, 821 F.3d at 172-73 (materiality is presumed where the presentations are "express").
[115] Compl. ¶¶ 52, 78.
[116] 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).
[117] 12 U.S.C. § 5531(d)(1).
[118] Compl. ¶ 188, ECF No. 1.
[119] *Id.* ¶¶ 32, 34, 69, 118, 188.
[120] *Id.* ¶¶ 98-100.
[121] *Id.* ¶¶ 44, 45, 115.

agreements and the program.[122] Libre's conduct, therefore, violates the CFPA's prohibition on abusive acts and practices.

### 4. Individual Defendants engaged in deceptive and abusive acts and practices and substantially assisted Libre in its violations of the CFPA, as alleged in Counts 1 through 10.

As set forth above and detailed in the Complaint, Individual Defendants Donovan, Moore, and Ajin are the three shareholders of Libre's parent company, Defendant Nexus, and they control Nexus and Libre. They have the authority and responsibility to approve Libre, or Nexus Services on behalf of Libre, entering into agreements with clients.[123] Because they are controlling shareholders, they are "covered persons" under the CFPA, and are subject to the CFPA's prohibitions on deceptive and abusive conduct.[124]

In addition to overseeing the agreements with consumers, each Individual Defendant has authority over and responsibility for the call center, consumer complaints, and all aspects of Libre's operations, including training and compensation of employees.[125] As such, Individual Defendants knew or should have known that employees were misrepresenting the material terms of the program to consumers and were materially interfering with the consumers' ability to understand the terms and conditions of the agreements and the program, in violation of the CFPA. By directly participating in the deception and the abusive acts and practices, or having the authority to control the conduct, each Individual Defendant has violated the CFPA.[126]

---

[122] *Id.* ¶¶ 58-70, 99, 118.

[123] *Id.* ¶¶ 121-122.

[124] 12 U.S.C. § 5481(25)(B), (25)(C)(i).

[125] Compl. ¶¶ 124-126, ECF No. 1.

[126] *Id.* ¶¶ 124-137; *see also CFPB v. 1st Alliance Lending, LLC,* No. 3:21-cv-55(RNC), 2022 WL 993582, at *7 (D. Conn. Mar. 31, 2022) ("[A] defendant acting with knowledge of deception who either directly participates in that deception or has the authority to control the deceptive practice of another, but allows the deception to proceed, engages, <u>through its own actions</u>, in a deceptive act or practice that causes harm to consumers.") (quoting *FTC v. LeadClick Media LLC,* 838 F.3d 158, 170 (2d Cir. 2016)) (emphasis in original).

The Individual Defendants also substantially assisted in Libre's violations of the CFPA. Under the CFPA, it is unlawful for any person to knowingly or recklessly provide substantial assistance to a covered person in violation of the provisions of § 1031 of the CFPA, and the provider of such substantial assistance is in violation of that section to the same extent as the person to whom such assistance is provided.[127] As the Complaint makes clear, Individual Defendants had "more than mere casual or incidental dealing[s] with"[128] Libre and its operations by: approving Libre's policies and practices, exercising authority over Libre's call center and field representatives, reviewing quality assurance reports, overseeing the training of Libre's representatives and their compensation structure, overseeing the handling of consumer complaints, and approving new clients.[129] Defendants Moore and Donovan also approved the content of Libre's consumer agreements.[130] Accordingly, the Complaint alleges ample facts to show Individual Defendants' substantial assistance to Libre's CFPA violations.

### 5. Nexus Services substantially assisted Libre in its violations of the CFPA, as alleged in Count 10.

Similarly, Defendant Nexus Services, as Libre's parent company, substantially assisted Libre in its violations of the CFPA.[131] Nexus Services established Libre's policies and business operations, hired employees, signed vendor contracts, and developed consumer agreements.[132] The entities operated together, sharing funds and ownership as well as employees, officers, and office space.[133] Nexus Services was also a party to some of Libre's contracts, including the GPS Monitoring Agreement signed by Libre's consumers, and knew or should have known about

---

[127] 12 U.S.C. § 5536(a)(3).
[128] *CFPB v. D and D Mktg.,* CV 15–9692, 2016 WL 8849698, at *12-13 (C.D. Cal. Nov. 17, 2016)
[129] Compl. ¶ 194-195, ECF No. 1.
[130] *Id.*
[131] 12 U.S.C. § 5536(a)(3).
[132] Compl. ¶¶ 138-141, ECF No. 1.
[133] *Id.*

Libre's deceptive and abusive acts and practices, including misrepresentations made to consumers and material interference with consumers' ability to understand the terms or conditions of the programs.[134] Accordingly, the Complaint also alleges ample facts to show that Nexus Services provided substantial assistance to Libre's CFPA violations.

### B.   Claims under state laws

In addition to violating the CFPA, Defendants' conduct violated state consumer protection laws that likewise prohibit deceptive, abusive, and unfair practices. The state law claims asserted by Virginia, Massachusetts, and New York provide alternative bases for the court to enter judgment and award relief.

### 1.   Entity Defendants violated the Virginia Consumer Protection Act, as alleged in Count 11.

To state a claim for relief under § 59.1-200 of the Virginia Consumer Protection Act[135] (VCPA), the Commonwealth of Virginia must allege the following statutory elements: (1) that Entity Defendants were "supplier[s]" subject to the prohibitions of § 59.1-200(A); (2) that Entity Defendants engaged in "consumer transaction[s]" with Virginians; and (3) that Entity Defendants committed one or more "unlawful" "acts or practices" identified in § 59.1-200(A) in connection with a "consumer transaction[.]"[136] Plaintiffs' Complaint alleges sufficient facts

---

[134] *Id.* ¶ 141, 195-196; *see CFPB v. D and D Mtg.*, 2016 WL 8849698 at *12-13 (denying motion to dismiss, finding the Bureau stated a claim for substantial assistance of CFPA violations where defendants owned and operated the company that violated the law, had authority and responsibility to make decisions, and otherwise participated in the business).

[135] Va. Code Ann. §§ 59.1-196 to 59.1-207 (VCPA).

[136] *Id.* §§ 59.1-198 and 59.1-200. The elements of a VCPA claim are statutory and distinct from those of common law fraud. *See Ballagh v. Fauber Enters.*, 290 Va. 120, 124 (2015); *Owens v. DRS Auto. Fantomworks, Inc.*, 288 Va. 489, 497 (2014). Further, unlike private litigants who must prove reliance and damages to recover under the private right of action provided in § 59.1-204(A), Virginia has no such requirement. *Compare* Va. Code Ann. § 59.1-204(A) ("Any person *who suffers loss as a result* of a violation of this chapter") (emphasis added), *with* Va. Code Ann. § 59.1-203 (in a VCPA enforcement action brought by Virginia's Attorney General, "it shall not be necessary that damages be proved."), and § 59.1-205 (authorizing court to make additional orders "as are necessary to restore to

---

supporting these statutory elements, in addition to facts demonstrating an entitlement to each category of relief available to Virginia under the VCPA.

Because Entity Defendants admitted the factual allegations of the Complaint by defaulting, Entity Defendants are deemed to be "supplier[s]" because they engaged in "consumer transactions" with Virginia consumers as alleged in ¶¶ 24 and 31 of the Complaint.[137] Entity Defendants are therefore subject to, and liable for violations of, the prohibitions against deceptive conduct set forth in § 59.1-200(A). Entity Defendants violated § 59.1-200(A) as explained below.

a.      ¶ 204(c) and (d) of Plaintiffs' Complaint - § 59.1-200(A)(3)

Section 59.1-200(A)(3) prohibited Entity Defendants from misrepresenting their "affiliation, connection, or association" with a third party. The Complaint alleges that Entity Defendants misrepresented their affiliation with immigration authorities, namely ICE, and that Entity Defendants misled consumers to believe that Entity Defendants could influence the outcome of their immigrant bond cases based on such affiliation.[138]

b.      ¶ 204(i) of Plaintiffs' Complaint - § 59.1-200(A)(5)

Section 59.1-200(A)(5) prohibited Entity Defendants from misrepresenting that their immigration bond services have "certain quantities, characteristics, ingredients, uses, or benefits." The Complaint alleges that Entity Defendants misled consumers to believe that a

---

any identifiable person any money or property . . . which *may* have been acquired from such person by means of any act or practice declared to be unlawful in § 59.1-200") (emphasis added). *See also NC Fin. Sols. of Utah, LLC v. Commonwealth ex rel. Herring*, 299 Va. 452, 463 (2021) ("[Sections 59.1-203 and 59.1-205] implicitly authorize the Attorney General to request an award of restitution when pursuing a VCPA enforcement action on behalf of the Commonwealth [of Virginia].").

[137] *See* Va. Code Ann. § 59.1-198 (defining a "supplier" as any "seller" who "engages in consumer transactions" and "consumer transactions" to include the "advertisement" or "sale" of "goods or services to be used primarily for personal, family, or household purposes).

[138] *See, e.g.*, Compl. ¶¶ 2, 25-26, 38, 41, 55-59, ECF No. 1.

"characteristic[]" or "benefit[]" of the services they purportedly provided was that Entity

Defendants were paying for the consumers' bonds.[139]

       **c.**       **¶ 204(a),(b), and (e) to (h) of Plaintiffs' Complaint - § 59.1-200(A)(14)**

Section 59.1-200(A)(14) is the VCPA's "catch-all" provision and generally prohibited

Entity Defendants from using "any other deception, fraud, false pretense, false promise, or

misrepresentation in connection with a consumer transaction."

Paragraph 204(a) of the Complaint claims that Entity Defendants engaged in deceptive

conduct in connection with providing the Original Agreement in English to consumers who

could neither read nor speak English. The Complaint alleges that Entity Defendants knew that

their customers depended entirely on them for an explanation of the immigration bond

securitization process, but that, nonetheless, Entity Defendants explained that process and their

services in a deceptive manner (i.e., in a language that they knew consumers could not

understand) in violation of § 59.1-200(A)(14).[140]

Paragraph 204(b) of the Complaint claims that Entity Defendants used and provided

sham documents related to the Original Agreement to consumers. The Complaint alleges that

multiple sections of the Original Agreement had no meaning or purpose aside from deceiving

consumers, all which violated the general prohibition against deceptive conduct embodied in §

59.1-200(A)(14).[141] For example, Entity Defendants used a "Condition of Monitoring" section in

the Original Agreement to give the false impression to consumers that a "Bail Bondsman" was

involved in the agreement and "required" certain conditions.[142]

---

[139] *Id*. ¶¶ 114-20.
[140] *Id*. ¶¶ 24, 32, 69, 118.
[141] *Id*. ¶¶ 46-65.
[142] *Id*. ¶ 63.

Paragraphs 204(e) and (f) of the Complaint claim that Entity Defendants violated § 59.1-200(A)(14) by falsely claiming that the GPS ankle monitors were functional (when they were not) and by requiring consumers to wear and to pay for nonfunctional monitors. The Complaint sufficiently alleges facts supporting these claims.[143]

Paragraph 204(g) of the Complaint claims that Entity Defendants violated § 59.1-200(A)(14) by misrepresenting to consumers that they would take certain debt-collection activities against such consumers. The Complaint alleges that Entity Defendants' "call-center representatives . . . repeatedly threatened clients that their accounts might be sold to a debt buyer or collection agency for nonpayment" but Entity Defendants "ha[ve] not and do[] not sell debts or refer them to collection agencies."[144]

Finally, ¶ 204(h) of the Complaint claims that Entity Defendants violated § 59.1-200(A)(14) by misrepresenting to consumers that they are an immigration bond company. The Complaint alleges that Entity Defendants misled consumers to believe that they "paid the full amount of the consumer's bond to ICE to secure the consumer's release" and that consumers' "monthly payments were repayments to [Entity Defendants] for the bond [they] claimed to have paid."[145] None of that was true. In fact, Entity Defendants "act[ed] as an intermediary between the detainees and the sureties[,]" and the sureties "post[ed] and issue[ed] immigration bonds" to secure the consumers release from detention.[146]

---

[143] *Id.* ¶¶ 80-92.
[144] *Id.* ¶¶ 5, 107..
[145] *Id.* ¶¶ 114-15, 117.
[146] *Id.* ¶ 37.

2.     **Defendants engaged in unfair and deceptive conduct in violation of the Massachusetts Consumer Protection Act, as alleged in Counts 12, 13, and 14.**

The allegations in the Complaint also establish that Defendants engaged in unfair and deceptive conduct in violation of the Massachusetts Consumer Protection Act[147] (hereafter "Consumer Protection Act" or "Chapter 93A"). The Consumer Protection Act prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce" that directly or indirectly affects Massachusetts consumers.[148] Conduct is unfair within the meaning of Chapter 93A if it (a) falls within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (b) is immoral, unethical, oppressive or unscrupulous; or (c) causes substantial injury to consumers.[149] Conduct is deceptive if it has "the capacity to mislead consumers, acting reasonably under the circumstances."[150] These protections are substantially similar to, though do not completely overlap with, those provided under the CFPA.[151] As a rule, conduct that is unfair, abusive, or deceptive under the CFPA also violates the Consumer Protection Act.[152]

Defendants engaged in unfair and deceptive misconduct in the course of marketing, offering, and providing their bond securitization services to Massachusetts consumers. In

---

[147] Mass. Gen. Laws Ann. ch. 93A §§ 1-2 (West 2023). The Office of the Attorney General is authorized to bring an enforcement action in the name of the Commonwealth of Massachusetts against any person or entity that has violated the Consumer Protection Act. *See id.* at § 4.

[148] *Id.* §§ 1, 2 and 4.

[149] *See PMP Assoc., Inc. v. Globe Newspaper Co.*, 366 Mass. 593, 596 (1975); *see also Gossels v. Fleet Nat. Bank*, 453 Mass. 366, 373 (2009).

[150] *See Aspinall v. Phillip Morris Cos., Inc.*, 442 Mass. 381, 96 (2004).

[151] *See supra* Argument §§ II(A)(2)-(3). The protections provided under t(he CFPA and Chapter 93A are both patterned on the prohibition against unfair and deceptive misconduct in the FTC Act. *See* Mass. Gen. Laws Ann. ch. 93A, § 2 (West 2023) (directing courts to look to the FTC Act in interpreting the Consumer Protection Act); *see also CFPB v. Gordon*, 819 F.3d at 1192-93 n. 7 (noting similarity between FTC Act and CFPA). Massachusetts state courts have effectively incorporated the FTC Act into Chapter 93A. *See Slaney v. Westwood Auto, Inc.*, 366 Mass. 688, 694 n. 8 (1975).

[152] *See supra* n.150; *see also* 940 Mass. Code Regs. § 3.16(4) (2023) (state regulation implementing Chapter 93A and providing that a violations of either the FTC Act or the CFPA are per se violations of the Consumer Protection Act).

summary, Massachusetts alleges that Defendants systematically and intentionally misrepresented the core terms of their bond securitization program to vulnerable Massachusetts consumers (Count 12)[153]; leveraged those misrepresentations, and a severe imbalance in bargaining power, to impose agreements on consumers that contained oppressive and surprising terms (Count 13);[154] and then attempted to enforce those agreements through the use of abusive and unreasonable debt collection practices (Count 14)[155]. This is archetypical unfair and deceptive misconduct that sounds in fraud, misrepresentation, and unconscionability.

Individual Defendants are liable for the misconduct alleged in the complaint. Under the Consumer Protection Act, a corporate officer may be held individually liable for the conduct of a corporation if they: (a) participated in the unlawful misconduct; or (b) had the authority to control the operation of the corporation and knew, or should have known, of the unlawful acts.[156] The Complaint alleges in detail that Individual Defendants exercised effective control over the Corporate Defendants and knew, or should have known, of the unfair and deceptive conduct at issue.[157]

---

[153] *See supra* at 3-4.

[154] *See supra* at 4-7.

[155] *See supra* at 7-8. Count 14 also alleges violations of the Massachusetts Consumer Protection Act, Mass. Gen. Laws Ann. ch. 93, § 49 (West 2023) (MFDCPA). The MFDCPA, and its implementing regulations, *see* 940 CMR 7.00-7.10, generally impose restrictions and requirements primary creditors that are similar to those imposed on debt collectors under the federal Fair Debt Collection Practices Act, 15 U.S.C. § 1692-1692p. By statute, violations of the MFDCPA are per se violations of the Consumer Protection Act. *See* Mass. Gen. Laws Ann. ch. 93, § 49 (West 2023).

[156] *See FTC v. Ross,* 743 F.3d 886, 892 (4th Cir. 2014) (setting out standard for individual liability under FTC Act); *see also Nader v. Citron*, 372 Mass. 96, 103 (1977) (adopting FTC Act standard for Chapter 93A cases) *abrogated on other grounds by Iannacchino v. Ford Motor Co*., 372 Mass. 96 (1977).

[157] *See supra* Argument § II(A)(4); *see also* Compl. at ¶¶ 20-22, 121-37, 212, 222, 231, ECF No. 1.

3.      **Defendants engaged in conduct violating the New York Executive Law and General Business Law, as alleged in Counts 15, 16, and 17.**

a.      **Defendants violated New York Executive Law by engaging in repeated and persistent fraudulent conduct and using unconscionable contract provisions (Counts 15 and 16).**

Fraud under the New York Executive Law includes "any device, scheme or artifice to defraud and any deception, misrepresentation, concealment, suppression, false pretense, false promise or unconscionable contractual provisions."[158] This definition has been "been liberally construed to defeat all unsubstantial and visionary schemes . . . whereby the public is fraudulently exploited,'"[159] and prohibits a broad range of deceptive and abusive behavior.[160]

Establishing fraud under the New York Executive Law requires a showing only that "the targeted act has the capacity or tendency to deceive, or creates an atmosphere conducive to fraud."[161] Indeed, acts can be found fraudulent under the New York Executive Law even if a savvy or reasonable consumer would not be deceived by the conduct, as the statute was "meant to protect not only the average consumer, but also the 'ignorant, the unthinking and the credulous.'"[162]

As detailed above, Defendants in this case have engaged in multiple acts that have the capacity or tendency to deceive.[163] Further, they have done so repeatedly and persistently,[164]

---

[158] N.Y. Exec. Law § 63(12).

[159] *People ex rel. Cuomo v. Greenberg*, 95 A.D.3d 474, 483 (1st Dep't 2012), (alteration in original) (quoting *People v. Federated Radio Corp.*, 244 N.Y. 33, 38 (1926)).

[160] *See People v Lexington Sixty-First Assocs.*, 38 N.Y.2d 588, 595 (1976) ("[T]he terms 'fraud' and 'fraudulent practices' [are] to be given a wide meaning so as to embrace all deceitful practices contrary to the plain rules of common honesty, including all acts, even though not originating in any actual evil design to perpetrate fraud or injury upon others, which do tend to deceive or mislead the purchasing public").

[161] *People v Gen. Elec. Co.*, 302 A.D.2d 314, 314 (1st Dep't 2003); *see also In re People v. Applied Card Sys., Inc.*, 27 A.D.3d 104, 106 (3rd Dep't 2005).

[162] *General Elec. Co.*, 302 A.D.2d at 314 (1st Dep't 2003) (*quoting Guggenheimer v. Ginzburg*, 43 N.Y.2d 268, 314 (1977)); *see also Applied Card Sys.*, 27 A.D.3d at 106.

[163] *See supra* Argument § II(A)(2).

[164] "[R]epeated fraudulent or illegal acts" refer to the "repetition of any separate and distinct fraudulent or illegal act, or conduct which affects more than one person," while "persistent fraud" is defined as the "continuance or carrying on of any fraudulent or illegal act or conduct." N.Y. Exec. Law § 63(12).

30

against vulnerable consumers seeking release from immigration detention. Without doubt, Defendants' persistent misrepresentations of the terms of its contracts and repeated deceptive threats against consumers, among other acts, had the capacity and tendency to deceive consumers.

Defendants further violated the New York Executive Law by entering into and enforcing unconscionable contracts.[165] For a contract to be found so grossly unreasonable that is deemed unenforceable, it must be both procedurally and substantively unconscionable.[166]

Procedural unconscionability exists if one party lacked meaningful choice in the contract formation and can be demonstrated by establishing, among other factors, that deceptive tactics were used, that the contracts included fine print, or that a disparity in experience, education, or bargaining power existed between the parties.[167] Here, Defendants preyed on unsophisticated consumers desperate to get out of immigration detention; used lengthy and complicated contracts written in English when most consumers did not understand English; and misrepresented to consumers that they could be detained again or deported if they did not sign the contracts upon their release from immigration custody.[168] Thus, the contracts were procedurally unconscionable because the consumer detainees had significantly less experience and bargaining power than the Defendants, were unable to read the terms of the contract before signing it, and reasonably believed that they could be detained again if they did not sign the contracts.[169]

Substantive unconscionability can be established under the New York Executive Law by a showing that the contract provisions, as enforced, were unreasonably favorable to one side.[170]

---

[165] *See id.* (defining fraud as including "unconscionable contract provisions").
[166] *Gillman v Chase Manhattan Bank*, 73 N.Y.2d 1, 10 (1988).
[167] *Id.* at 10-11
[168] *See supra* at 3-7.
[169] *See id.*
[170] *Gillman*, 534 N.Y.2d at 10 (quoting *In re State v. Avco Fin. Serv. of New York*, 50 N.Y.2d 383, 389 (1980)).

The contracts at issue in this action included excessive fees; provisions that did not allow for removal of the GPS device, even for medical or health reasons; and provisions that threatened criminal prosecution in various circumstances.[171] Thus, the contracts enforced by Defendants were both procedurally and substantively unconscionable, in further violation of New York Executive Law § 63(12).

Finally, individuals are liable for the fraudulent conduct of a corporate entity if they participated or had actual knowledge of the conduct.[172] Thus, as each Individual Defendant in this case had managerial responsibilities and participated materially in the conduct of Entity Defendants,[173] all Defendants are liable under the New York Executive Law.

### b. Defendants violated the New York General Business Law by engaging in deceptive acts and practices (Count 17).

New York General Business Law prohibits deceptive acts and practices in the conduct of any business, trade, or commerce or in the furnishing of any service in New York State.[174] This prohibition is "intended to be broadly applicable, extending beyond the reach of common law fraud."[175]

An act or omission violates the New York General Business Law if it is consumer-oriented and likely to mislead a reasonable consumer in a material way.[176] Here, Defendants' acts were indisputably oriented toward consumers, as they marketed their services and entered

---

[171] *See supra* at 5-8, 19.
[172] *People v. Apple Health & Sports Clubs, Ltd.*, 80 N.Y.2d 803, 807 (1992); *see also In re People v. Orbital Publ'g Grp., Inc.*, 169 A.D.3d 564, 566 (2019); *In re People v. N. Leasing Sys., Inc.*, 169 A.D.3d 527, 530-31 (2019).
[173] *See supra* Argument § II(A)(4).
[174] N.Y. Gen. Bus. Law § 349(a) ("Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful.").
[175] *State v. Feldman*, 210 F. Supp. 2d 294, 301 (S.D.N.Y. 2002).
[176] *Oswego Laborers Local 214 Pension Fund v. Marine Midland Bank*, 85 N.Y.2d 20, 25 (1995). *Oswego* also holds that a plaintiff must allege an injury to plead a claim under N.Y. Gen. Bus. § 349, *see id.*, but the New York Attorney General may secure relief under the statute without a showing of injury. *See Goshen v. Mutual Life Ins. Co.*, 98 N.Y.2d 314, 324 (2002).

into contracts with thousands of consumers.[177] And as detailed above—analyzing the nearly identical standard for deceptive acts and practices under the CFPA—Defendants' misrepresentations regarding the nature of the consumers' payments, the functionality of the GPS devices, the provisions of legal representation, refund of collateral payments, and threats to intimidate consumers to make payments were highly likely to mislead reasonable consumers.[178]

Similar to the Executive Law, an individual defendant is liable under the New York General Business Law if the defendant "participates in a deceptive scheme or has the authority to control the deceptive content at issue."[179] Thus, because the Individual Defendants were managers who participated materially in the conduct of the Entity Defendants,[180] New York's well-pleaded allegations establish that all Defendants violated New York General Business Law § 349.

## III.   The Court should grant Plaintiffs' proposed relief.

Plaintiffs' well-pleaded claims give rise to three forms of relief: injunctive relief to prevent Defendants from further harming consumers; restitution to redress the damages suffered by consumers as a result of Defendants' acts; and penalties to sanction Defendants and deter similar conduct in the future. Each of these forms of relief are authorized by the CFPA and state consumer protection statutes and are appropriate given Defendants' deceptive, abusive, and unfair conduct. Because the Individual Defendants have responsibility and authority to manage the Entity Defendants, judgment for restitution should be entered jointly and severally against all Defendants.

---

[177] *See* Romeo Decl. ¶ 7 & Ex. 4.
[178] *See supra* Argument § II(A)(2)
[179] *People v. Debt Resolve, Inc.*, 387 F. Supp. 3d 358, 369 (S.D.N.Y. 2019) (quoting *LeadClick Media,* 838 F.3d at 168).
[180] *See supra* Argument § II(A)(2)

### A.      The proposed injunctive relief is appropriate.

The Court should grant injunctive relief as a necessary and appropriate remedy to prevent Defendants from further harming consumers by continuing to engage in deceptive, unfair, and abusive practices. The CFPA specifically authorizes the Bureau to seek "equitable relief including a permanent or temporary injunction"[181] and allows courts to place "limits on the activities or functions"[182] of a defendant as a remedy for unfair, deceptive, and abusive acts that contravene the statute. Likewise, injunctive relief is available under the Virginia Consumer Protection Act,[183] the Massachusetts Consumer Protection Act,[184] the New York Executive Law,[185] and the New York General Business Law.[186]

A permanent injunction is justified under the CFPA where there is "some reasonable likelihood of future violations."[187] The state consumer protection statutes invoked by Virginia, Massachusetts, and New York also provide for injunctive relief in such circumstances.[188] As in numerous other cases where courts have granted injunctive relief under consumer protection

---

[181] 12 U.S.C. § 5564(a).

[182] *Id.* § 5565(a)(2)(G).

[183] Va. Code Ann. § 59.1-203(A).

[184] Mass. Gen. Laws Ann. ch. 93A § 4 (West 2023).

[185] N.Y. Exec. Law § 63(12) ("Whenever any person shall engage in repeated fraudulent or illegal acts . . . the attorney general may apply . . . for an order enjoining the continuance of such business activity . . .").

[186] N.Y. Gen. Bus. Law § 349(a) (prohibiting "[d]eceptive acts or practices in the conduct of any business" and authorizing the attorney general to bring an action to "enjoin such unlawful acts").

[187] *See CFPB v. Chou Team Realty LLC*, No. 8:20- cv-00043-SB-ADS, 2021 WL 4077110, at *5 n.6 (C.D. Cal. Aug. 10, 2021), *aff'd sub nom. CFPB v. Nesheiwat*, No. 21-56052, 2022 WL 17958636 (9th Cir. Dec. 27, 2022).

[188] The standards for injunctive relief under the state statutes are, if anything, more favorable to Plaintiffs. In Virginia, the only "proof" necessary for an injunction is a showing of a statutory violation. *See Carbaugh v. Solem*, 225 Va. 310, 315 (Va. 1983). For Massachusetts, the Consumer Protection Act grants courts broad, flexible authority to grant equitable relief, *see Kattar v. Demoulas*, 433 Mass. 1, 17 (2000), even when the practices are alleged to have been abandoned, *see Lowell Gas Co. v. Att'y Gen.*, 377 Mass. 37, 47 (1979); entry of an injunction is proper so long as it is in the public interest, *see Commonwealth v. Mass. CRINC*, 392 Mass. 79, 88-89 (1984). Likewise, the New York Executive Law and General Business Law likewise provide courts wide latitude to enter injunctions to protect consumers against future harm. *People v. Greenberg*, 27 N.Y.3d 490, 497 (2016) ("[T]he standards of the public interest and not the requirements of private litigation measure the propriety and need for injunctive relief.") (alteration in original) (quoting *SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d 801, 808 (2nd Cir. 1975)); *see also, e.g., Applied Card Sys.*, 27 A.D.3d at 109 (3d Dep't 2005) ("voluntary discontinuance of fraudulent or deceptive practices will not bar the issuance of an injunction to prevent future practices").

statutes, a permanent injunction here would serve to appropriately "fence in" Defendants and stop them from subjecting consumers to further harm.[189]

Here, the injunctive relief sought by Plaintiffs is appropriately tailored to the specific deceptive, abusive, and unfair acts of Defendants that give rise to Plaintiffs' claims on behalf of consumers. In particular, Plaintiffs request that the Court:

- Enjoin Defendants from making material misrepresentations or omissions with respect to the nature and scope of the services provided by Defendant Libre, including misrepresentations regarding whether payments are applied to the consumers' immigration bonds, Libre's affiliation with ICE, and the provision of legal services to consumers. Defendants' misrepresentations form the factual basis for Counts 1, 2, 8, 9, 10, 11, 12, 13, 15, and 17 of the Complaint.

- Require Defendants to provide all consumers and prospective consumers with clear and accurate contracts, presented in a language accessible to the consumer, that include conspicuous disclosures of the fees charged by Libre and advising consumers that Libre will not report consumers to law enforcement for non-payment of fees or non-compliance with the contract. These requirements would

---

[189] *FTC v. Colgate-Palmolive Co.*, 380 U.S. 374, 394-95 (1965) (recognizing in upholding the FTC's injunction, "respondents must expect some fencing in.") (citation and internal quotation marks omitted); *FTC v. Tel. Prot. Agency, Inc.*, No. 5:04-CV-49, 2005 WL 8175124, at *7 (W.D.N.C. Aug. 29, 2005) ("The FTC is entitled to issue and obtain orders against defendants that effectively fence them in to prevent future law violations."); *see, e.g., Gordon*, 819 F.3d at 1197 (9th Cir. 2016) (finding injunctive relief appropriate where the defendant "was continually willing to evade and complicate the investigatory process in ways that undermined his 'sincere assurances' against future violations"); *Gen. Elec. Co.*, 302 A.D.2d at 316-17 (1st Dep't 2003) (granting injunctive relief under New York statute consumer protection statutes); *Commonwealth v. Smoky Mountain Secrets, Inc.*, 41 Va. Cir. 564, 564 (1997) (granting injunctive relief under the VCPA); *see also CFPB v. Future Income Payments, LLC*, No. 8:19-2950, 2020 WL 6162947 at *7 (D.S.C. May 21, 2020) (collecting cases) (finding injunctive relief appropriate under the CFPA to prevent future harm to consumers), *report and recommendation adopted*, 2021 WL 672928 (D.S.C. Feb. 22, 2021); *CFPB v. Siringoringo*, No. SACV 14–01155, 2016 WL 102435, at *6 (C.D. Cal. Jan. 7, 2016) (finding injunctive relief appropriate where "[i]f Defendants were to renew these activities, other potential victims could suffer similar harm. Considering the multitude of victims ensnared in the original scheme, future victims (were Defendants free to return to their old ways) may receive only a fraction of monetary damages to compensate them for injuries.").

prevent Defendants from harming consumers through misleading and abusive contract terms as set forth in Counts 1, 2, 9, 10, 11, 12, 13, 15, 16, and 17.

- Enjoin Defendants from requiring GPS monitors as a term of any consumer contract. Defendants' deceptive and abusive use of GPS devices is detailed in Counts 2, 6, 10, 11, 12, 13, 15, 16, and 17.

- Enjoin Defendants from collecting any payments related to GPS monitors. Defendants' deceptive and abusive use of GPS devices is detailed in Counts 2, 6, 10, 11, 12, 13, 15, 16, and 17.

- Enjoin Defendants from collecting monies in connection with the Original Agreement, from collecting monies not owed, and from retaining money owed to consumers, as set forth in Counts 1, 7, 9, 10, 11, 12, 13, 14, 15, and 17.

- Enjoin Defendants from making material misrepresentations with respect to non-payment of fees or non-compliance with the contract, including misrepresentations regarding selling consumers' debt, as set forth in Counts 3, 10, 11, 12, 14, 15, and 17; misrepresentations regarding providing negative information to credit reporting agencies, as set forth in Counts 4, 10, 11, 14, 15, and 17; and misrepresentations regarding bringing debt collection actions against consumers, as set forth in Counts 5, 10, 11, 14, 15, and 17.

- Enjoin Defendants Nexus Services, Inc., Micheal Donovan, Richard Moore, and Evan Ajin from engaging in or providing substantial assistance to any deceptive or abusive acts or practices by Defendant Libre, as set forth in Count 10.

36

**B.     The Court should award redress to consumers.**

Plaintiffs seek a total judgment of $ ███████████ for nationwide consumer redress, of

which $ █████████ is due to Virginia consumers, $ ███████████ is due to Massachusetts

consumers, and $ █████████ is due to New York consumers. This judgment for consumer

redress should be entered jointly and severally against all Defendants.[190]

**1.     The CFPA provides for restitution to consumers.**

The CFPA authorizes this Court to grant "any appropriate legal or equitable relief,"[191]

including a refund of moneys, damages, restitution, or other monetary relief.[192] Restitution

"serves to ensure that consumers are made whole when they have suffered a violation of the

statute."[193] Restitution may be measured by the "full amount lost by consumers rather than

limiting damages to a defendant's profits."[194] The Bureau seeks consumer redress in the form of

legal restitution[195] or the refund of moneys[196] for Defendants' violations of the CFPA.

---

[190] *See infra* Argument § III(D).
[191] 12 U.S.C. § 5565(a)(1).
[192] *Id.* § 5565(a)(2).
[193] *CFPB v. CashCall, Inc.*, 35 F.4th 734, 750 (9th Cir. 2022); *see also CFPB v. CashCall, Inc.*, No. CV15-7522-JFW(RAOx), 2023 WL 2009938, at *7-9 (C.D. Cal. Feb. 10, 2023) (rejecting on remand argument that restitution should be limited to defendants' net profits and instead awarding legal restitution to "return consumers to their status quo before entering into the [unenforceable] loans"); *FTC v. Ross*, 897 F. Supp. 2d 369, 387 (D. Md. 2012) ("restitution is the amount that will restore the victims to the status quo ante") (internal quotation marks and citation omitted), *aff'd*, 743 F.3d 886 (4th Cir. 2014).
[194] *Gordon*, 819 F.3d at 1195 (internal citation and quotation marks omitted); *Ross*, 897 F. Supp. 2d at ("The proper measure of consumer restitution is the amount that will restore the victims to the status quo ante, not what defendants received as profit.") (internal citation and quotation marks omitted).
[195] Restitution is legal in nature where it imposes personal liability on a defendant "to pay a sum of money," but equitable in nature if it seeks "to restore to the plaintiff particular funds or property in the defendant's possession." *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 213-14 (2002) (citations omitted*); accord CashCall*, 35 F.4th at 750; *Admin. Comm. of Wal-Mart Assocs. Health and Welfare Plan v. Willard*, 393 F.3d 1119, 1121-22 (10th Cir. 2004). Here, Plaintiffs seek a judgment requiring Defendants to pay a sum of money, i.e., legal restitution.
[196] *See* 12 U.S.C. § 5565(a)(2)(B) (authorizing the "refund of moneys"); *see also FTC v. Elegant Sols., Inc.*, No. 20-55766, 2022 WL 2072735, at *3 (9th Cir. June 9, 2022) (approving "monetary relief based on a calculation of consumer loss"—i.e., amounts wrongfully taken from consumers—that was awarded under FTC's similar authority in 15 U.S.C. § 57b(b) to secure "the refund of money").

In calculating consumer redress, the Bureau bears the initial burden of "proving that the amount it seeks in restitution reasonably approximates the defendant's unjust gains."[197] The Bureau meets that burden by establishing Defendants' "net revenues"—that is, "the amount consumers paid for the product or service minus refunds and chargebacks."[198] Then, "the burden shifts to [Defendants] to demonstrate that the net revenues figure overstates [Defendants'] unjust gains."[199] The risk of any uncertainty in the calculation falls on them.[200]

The Bureau has met its initial burden by establishing Entity Defendants' net revenue—that is, the total amount of money that they wrongfully took from consumers, minus any refunds they previously provided.[201] Defendants produced data and information sufficient to calculate those net revenues through June 2022.[202]

---

[197] *CashCall*, 35 F.4th at 751 (internal citation and quotation marks omitted); *see also FTC v. Kuykendall*, 371 F.3d 745, 764-66 (10th Cir. 2004) (en banc) (Plaintiff bears the burden to reasonably approximate the "baseline" amount that is "necessary to compensate injured consumers.").

[198] *CashCall*, 35 F.4th at 751 (internal citation and quotation marks omitted); *see also, e.g., FTC v. Wash. Data Res.*, 704 F.3d 1323, 1327 (11th Cir. 2013) (per curiam) ("net revenue (gross receipts minus refunds) … is the correct measure," not the defendant's profits); *CFPB v. Morgan Drexen, Inc.*, No. SACV13-1267-JLS(JEMx), 2016 WL 6601650, at *2 (C.D. Cal. Mar. 16, 2016) (awarding as restitution full amount of unlawful upfront fees charged to consumers under the Telemarketing Sales Rule); *FTC v. E.M.A. Nationwide, Inc.*, No. 1:12-CV-2394, 2013 WL 4545143, at *8 (N.D. Ohio Aug. 27, 2013) ("Generally, the appropriate amount of restitution in consumer redress cases is the full purchase price of the product, less refunds paid."), *aff'd*, 767 F.3d 611 (6th Cir. 2014); *cf. Kuykendall*, 371 F.3d at 766 (explaining that "allowing a damages determination based on gross receipts in a case arising directly under the FTC Act furthers the FTC's ability to carry out its statutory purpose").

[199] *CashCall*, 35 F.4th at 751 (internal citation and quotation marks omitted); *see also Kuykendall*, 371 F.3d at 766 (The burden shifts to Defendants "to put forth evidence showing that certain amounts should offset the [award] assessed against them."); *Ross*, 897 F. Supp. 2d at 388 ("Once the FTC has satisfied its burden, it is up to the defendant to show that the calculations are not accurate.").

[200] *See Kuykendall*, 371 F.3d at 765; *Tel. Prot. Agency,* 2005 WL 8175124, at *6 ("Since the records maintained by [defendant] make it impossible to determine with reasonable certainty the full amount of injury suffered by consumers, the risk of uncertainty should fall on the defendants who failed to keep complete and accurate billing records[.]").

[201] *See Gordon*, 819 F.3d at 1195; *see also FTC v. Gill,* 265 F.3d 944, 958 (9th Cir. 2001) ("In the absence of proof of 'actual damages,' the court properly used the amounts consumers paid as the basis for the amount Defendants should be ordered to pay for their wrongdoing."); *Ross*, 897 F. Supp. at 388.

[202] It is well established that "a just and reasonable estimate of the damage based on relevant data" will suffice because "[t]he most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created." *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264-65 (1946).

Entity Defendants' net revenues for the period from December 2013 to October 2021 are undisputed. Based on Entity Defendants' response to the Commonwealth of Virginia's interrogatory requesting the amount of money that Defendants received from consumers by month, the Bureau calculated that Entity Defendants received $███████ during that period.[203]

For the period from November 2021 to June 2022, the Bureau used records that Defendants produced of their payment system, Lightspeed, to estimate that Entity Defendants received $9,753,430.31 from consumers.[204] Defendants produced to Plaintiffs various types of monthly Lightspeed reports for February 2021 to June 2022.[205] The reports labeled "Payments" summarize the total dollar amount of consumer payments received in a month as well as all refunds issued in a month.[206] The Bureau determined that the "Payments – Refunds" total figure in these "Payments" reports equals the total amount of payments minus the total amount of refunds.[207] The Bureau also compared monthly totals of "Payments – Refunds" to monthly totals given in Entity Defendants' interrogatory response for the overlapping months of February to October 2021 and determined that "Payments – Refunds" figures either matched or closely approximated the figures in the interrogatory response for seven of the nine months.[208] The Bureau used "Payment – Refunds" monthly totals—and two proxies from other reports for the months in which Defendants did not provide "Payments" reports[209]—to determine that Defendants received $9,753,430.31 from consumers for the period from November 2021 to June

---

[203] Decl. of Patrick Callahan ¶¶ 5-6 & Ex. A (Entity Defs.' Suppl. Resp. to Interrogatory No. 7).
[204] *Id.* ¶¶ 8-18.
[205] *See id.* ¶ 9.
[206] *Id.* ¶ 11.
[207] *Id.*
[208] *Id.* ¶¶ 11-12. Furthermore, because "Payment – Refunds" totals are consumer payments less refunds, and "Payments – Refunds" totals closely approximate monthly totals in the interrogatory response,  monthly totals in the interrogatory response are also consumer payments less refunds.
[209] *Id.* ¶¶ 13-16.

2022.[210] Summing Entity Defendants' net revenues over the entire time period, Plaintiffs

estimate that Entity Defendants collected $█████████.[211]

### 2.     The state consumer protection statutes provide an alternative basis for the same restitution award.

State consumer protection statutes provide an alternative basis for the Court to order

Defendants to pay full restitution to their respective state's consumers. Virginia,[212]

Massachusetts,[213] and New York[214] (the State Plaintiffs) are authorized to seek a refund of

monies to make consumers in their states whole. Here, the Company collected $████████

from Virginia consumers, $██████████ from Massachusetts consumers, and $██████████

from New York consumers.

Because Defendants failed to produce the detailed financial records necessary to identify

and calculate the actual amount paid by consumers by state,[215] the States have based their

calculations on Defendants' estimate of the "proportionate share" of its consumers who have

resided in Virginia, Massachusetts, and New York as set out in Defendants' Class Action

Fairness Act (CAFA) notice from *Vasquez v. Libre by Nexus, Inc.*[216] Defendants' CAFA notice

indicates that approximately 6.07%, 1.45%, 5.94% of consumers affected by Defendants'

---

[210] *Id.* ¶ 18.

[211] *Id.* ¶ 19.

[212] *See NC Fin. Sols.*, 299 Va. at 463 (restitution available as a remedy under §§ 59.1-203 and 59.1-205 of the VCPA in enforcement actions).

[213] *See* Mass. Gen. Laws Ann. ch. 93A § 4 (West 2023) (authorizing entry of judgment for restitution in amount sufficient to restore "any moneys…acquired by means of" an unlawful or deceptive practice); *Commonwealth v. DeCotis*, 366 Mass. 234, 244-45 (1974) (recognizing that Chapter 93A "expressly empowered courts" to order restitution and holding that Attorney General may recover restitution on behalf of all consumers whether or not named in complaint or not).

[214] *See, e.g.*, *People v. One Source Networking, Inc.*, 125 A.D.3d 1354 (4th Dep't 2015) ("It is well settled that a court may order restitution whether consumers, including those not identified by name in the petition, and the decision to award restitution lies within the court's discretion.") (internal citations omitted); *State v. Ford Motor Co.*, 136 A.D.2d 154, 158 (3d Dep't 1988), aff'd, 74 N.Y.2d 495 (1989) (holding that restitution is "a vehicle by which aggrieved consumers could recover the money which is due them without resorting to costly litigation" and remanding to the trial court to "fashion an appropriate restitution procedure.").

[215] Compl. ¶ 111, ECF No. 1.

[216] Decl. of Franklin Romeo ¶ 6 & Ex. 4.

unlawful practices resided in Virginia, Massachusetts, and New York, respectively. Each state-requested restitution amount is the respective percentage of the total restitution amount identified for nationwide redress.

To be clear, redress for harmed consumers in Virginia, Massachusetts, and New York is subsumed into the amount sought by the Bureau under the CFPA and the States are not seeking double recovery. Rather, each state consumer protection statute provides an alternative basis for the Court to enter judgment for $██████ as restitution due to Virginia consumers, $██████ as restitution due to Massachusetts consumers, and $██████ as restitution due to New York consumers.

### C.   The Court should impose civil money penalties.

Plaintiffs seek a judgment for civil money penalties of up to $111,135,620 per Defendant for violations of the CFPA; a penalty of $7,100,000 under Virginia Consumer Protection Act; a penalty of $3,400,000 under the Massachusetts Consumer Protection Act; and a penalty of $13,890,000 under the New York General Business Law. For Massachusetts and New York, these penalties should be entered jointly and severally against all Defendants.[217] For Virginia, the penalty should be entered jointly and severally against the Entity Defendants.[218]

### 1.   Civil money penalty under the CFPA

Under the CFPA, "[a]ny person [including individuals and entities] that violates, through any act or omission, any provision of Federal consumer financial law shall forfeit and pay a civil penalty."[219] The CFPA provides three tiers of penalties, based on the subject's degree of scienter: up to $6,813 per day for any violation; up to $34,065 per day for each reckless violation; and up

---

[217] *See infra* Argument § III(D).
[218] *See id.*
[219] 12 U.S.C. § 5565(a)(2)(H), (c)(1).

to $1,362,567 per day for each knowing violation.[220] For violations occurring before November 2, 2015, those amounts were $5,000 for Tier 1 violations, $25,000 for Tier 2 violations, and $1,000,000 for Tier 3 violations.[221]

The amount assessed within these tiers should be determined after considering various statutory factors, including the "gravity of the violation;" "severity of the risks to or losses of the consumer;" and "such other matters as justice may require."[222] Here, the Bureau seeks a civil money penalty of up to $111,135,620, and at least of $22,227,124, against each Defendant. Such a civil penalty is appropriate given Defendants' conduct, which is at least reckless; would deter the Defendants from committing future violations; and would deter others from committing similar violations in the future.

The well-pleaded allegations support a finding that Defendants acted at least recklessly. Generally, "[a] person acts recklessly . . . when he consciously disregards a substantial and unjustifiable risk attached to his conduct, in gross deviation from accepted standards."[223] Defendants charged over 46,000 desperate and vulnerable consumers hundreds of millions of dollars over more than a decade using deceptive and abusive tactics, including by making threats to them of deportation or detention while trying to collect payment for the program.[224]

The Court could therefore award penalties of up to $25,000 per defendant "for each day during which such violation or failure to pay continues" before November 2, 2015, and $29,416 for each day for violations on or after November 2, 2015. Defendants engaged in this illegal conduct from December 1, 2013, through the entry of default in this case on May 11, 2023.[225]

---

[220] *Id.* § 5565(c)(2)(A)-(C); 12 C.F.R. § 1083.1.
[221] 12 U.S.C. § 5565(c)(2)(A)-(C).
[222] *Id.* § 5565(c)(3).
[223] *CashCall*, 35 F.4th at 748 (citing *Borden v. United States*, ⎯⎯ U.S. ⎯⎯, 141 S. Ct. 1817, 1824 (2021)).
[224] Compl. ¶¶ 5, ECF No. 1.
[225] *See* Romeo Decl., Ex. 4.

Defendants were in violation of Federal consumer financial laws—thousands of violations per day—every day on and after December 2013 that they were operating. Calculating even one violation per consumer, putting aside the number of days, would render a penalty over $1.1 billion for each Defendant. Instead, calculating penalties on a per-day basis, and considering only one violation per day, amounts to a civil money penalty of up to $111,135,620, or $25,000 per day for 701 days from December 1, 2013 through November 1, 2015 ($17,525,000), and $34,065 per day for 2,748 days from November 2, 2015 through May 11, 2023 ($93,610,620). Awarding such a penalty is appropriate here.

The allegations support a finding of recklessness for each Defendant, including the Individuals, who oversaw and participated in Libre's reckless conduct.[226] Each of the Individual Defendants knew or recklessly ignored that Libre was misrepresenting to consumers material aspects of the program and otherwise failing to disclose material terms of the program to consumers at the outset, and threatening consumers to collect payment.[227] And Nexus, the parent company of Libre and operating as a common enterprise, substantially assisted Libre and the Individual Defendants in their unlawful conduct.[228]

The Court must consider certain statutory factors when determining the amount of any penalty, including the size of financial resources and good faith of Defendants; the gravity of the violations; the severity of the risks to or losses of the consumer, including the number of

---

[226] *See FTC v. Nudge, LLC*, No. 2:19-cv-00867-DBB-DAO, 2021 WL 3145700, at *5 (D. Utah July 26, 2021) (deliberately avoiding information to ensure ignorance of TSR violations is ineffective for avoiding liability and "[k]nowledge or conscious avoidance of knowledge may be inferred when the person providing assistance receives complaints about violations."); *FTC v. Consumer Health Benefits Ass'n*, No. 10 Civ. 3551 (ILG) (RLM), 2011 WL 13254502, at *4 (E.D.N.Y. Oct. 12, 2011) (recklessness may be found when individuals oversee activities like reviewing consumer complaints, cancellation and refund practices, and training); *CFPB v. D & D Mktg.*, No. CV 15-9692, 2016 WL 8849698, at *11-14 (C.D. Cal. Nov. 17, 2016) (claim for substantial assistance liability survived motion to dismiss by several defendants based on their roles and authority).
[227] *See infra* § III(D); Compl. ¶¶ 121-137, ECF No. 1.
[228] Compl. ¶¶ 138-141, ECF No. 1.

products or services sold or provided; the history of previous violations; and such other matters as justice may require.[229] Here, those factors support an award of the requested penalty amount.[230]

As set forth above, the gravity of the violations, the severity of the risks to or losses of the consumers, and the sheer number of consumers impacted, and amount of money taken, by Defendants' conduct all support a maximum penalty. In addition, Defendants' discovery misconduct prevented Plaintiffs from probing their financial condition, despite Plaintiffs' repeated attempts to gather that information.[231] Defendants should not benefit from their obstructive behavior by having a penalty against them reduced based on information Plaintiffs have not had the benefit of reviewing and testing before now.[232] The CFPA does not define the term "financial resources" or limit consideration of this factor to any specific point in time.[233] In ordering penalties under other statutory schemes, such as securities laws, courts consider both the current and future financial condition of the defendant.[234] And where a defendant claims current poverty, courts have taken into account the amount of money gained from the unlawful conduct.[235] The Court here can similarly look to the hundreds of millions of dollars that Defendants took from consumers through their illegal tactics to support a Tier 2 penalty.[236]

A court may also consider a history of previous violations in assessing a penalty.[237] Libre

---

[229] 12 U.S.C. § 5565(c)(3).

[230] *See* 12 U.S.C. § 5565(c)(3)(B)-(D).

[231] *See* Sanctions Op. 3 n.5.

[232] *See supra* Argument § 1(B).

[233] *See* 12 U.S.C. § 5565(c)(3).

[234] *SEC v. GenAudio, Inc.*, 32 F.4th 902, 964 (10th Cir. 2022); *SEC v. Harkins*, No. 19-cv-02418-PAB-MDB, 2022 WL 3597453, at *14-15 (D. Colo. Aug. 23, 2022).

[235] *E.g.*, *SEC v. Aletheia Research & Mgmt. Inc.*, No. CV-12-10692-JFW, 2015 WL 13404306, at *5 (C.D. Cal. May 11, 2015) (imposing highest level of penalties despite claim of poor financial condition, given that defendant made almost $3 million from company prior to its bankruptcy), *aff'd*, 689 F. App'x 512 (9th Cir. 2017).

[236] If the Court disagrees with the Bureau and finds that Defendants' violations were not reckless, or if the Court determines that the statutory maximum is not appropriate for each Defendant after considering the statutory factors, the Court could consider an award at the statutory maximum for the Tier 1 level: $22,227,124.

[237] 12 U.S.C. § 5565(c)(3)(D).

previously settled with Washington's attorney general and several states' insurance regulators for unlawful conduct[238] and has faced legal proceedings from its surety company and a class of consumers, both of which resulted in contempt findings.[239] Finally, and importantly, there is no evidence that Defendants have acted in good faith in conducting their business operations.[240]

## 2. Civil money penalties under state laws

The Court should also award civil penalties to Virginia, Massachusetts, and New York (State Plaintiffs) on their state law claims. Each State Plaintiff is authorized by statute to recover civil penalties on a per violation basis.[241] As further discussed below, the State Plaintiffs are each seeking an award of penalties based upon a conservative calculation that Defendants engaged in one violation of state law per consumer, using Defendants' estimates of the number of consumers in each state.[242] This calculation is supported by the Rule 37 evidentiary sanctions Plaintiffs are seeking above.[243] But even in the absence of such sanctions, the award the State Plaintiffs are seeking is supported by the allegations in the Complaint.

---

[238] *See In re Nexus Services, Inc.,* No. 19-2-22351-1SEA (Wash. Sup. Ct. Aug. 26, 2019) (Assurance of Discontinuance), https://agportal-s3bucket.s3.amazonaws.com/2019_08_26AOD.pdf; *In the Matter of the Cease and Desist Order Against Libre by Nexus, Inc.,* File No. IE201800349 (Cal. Ins. Comm'r. July 15, 2020) (Order Adopting Stip. and Waiver), https://www.insurance.ca.gov/0400-news/0100-press-releases/2020/upload/nr065LibreOrder07152020.pdf; *see also* Commonwealth of Va. ex rel. State Corp. Comm'n v. Nexus Services, Inc., et al., INS-2018-00069 (Va. State Corp. Comm'n Nov. 23, 2020) (Settlement Order), https://www.scc.virginia.gov/docketsearch/DOCS/4qck01!.PDF.

[239] *See* Order on Mot. to Grant Receiver, *RLI Insurance Co. v. Nexus Services, Inc., et al.,* 5:18cv00066-MFU-JCH, ECF No. 721 (W.D. Va. Aug. 12, 2021) (finding Nexus in civil contempt); Order Granting Mot. for Civil Contempt, ECF No. 797 (W.D. Va. July 8, 2022) (holding Nexus defendants, entities, and Moore in civil contempt and imposing sanctions)*; see also* Order on Motion for Order to Show Cause, Order, *Vasquez et al. v. Libre by Nexus, Inc., et al.,* 4:17-cv-00755, ECF Nos. 224, 225 (N.D. Cal. Oct. 3, 2022) (holding defendant Libre by Nexus in civil contempt and imposing sanctions), Order on Motion for Sanctions, Order, ECF Nos. 246, 247 (N.D. Cal. Jan. 23, 2023) (holding Libre officers and principals Donovan, Ajin, and Moore in civil contempt and imposing sanctions).

[240] 12 U.S.C. § 5565(c)(3)(A).

[241] *See* Mass. Gen. Laws Ann. ch. 93A, § 4 (authorizing civil penalties of $5,000 for each unfair or deceptive act or practice); N.Y. Gen. Bus. Law § 350-d (authorizing civil penalties of up to $5,000 for each deceptive act in violation of the New York General Business Law); and Va. Code Ann. 59.1-206(A) (authorizing civil penalty of up to $2,500 for each willful violation of the VCPA).

[242] *See* Romeo Decl., Ex. 4.

[243] *See supra* Argument § I.B.

Plaintiffs allege that Defendants engaged in pervasive unfair, abusive, and deceptive misconduct that infected virtually every aspect of their relationship with consumers over a period of nearly a decade.[244] The Complaint fairly supports the conclusion that, in many cases, Defendants committed more than one violation per consumer. For example, Plaintiffs allege that Defendants used agreements that contained unfair and deceptive terms; and made unfair and deceptive statements to consumers related to those contracts.[245] The States may recover for each unfair or deceptive term in each agreement distributed to each consumer – and for each oral unfair or deceptive statement made to each consumer.[246] At a minimum, the Court should make a reasonable inference that the total number of violations at issue averages out to at least one per consumer, and award penalties on this basis.[247]

> **a.    The Court should award civil penalties under the Virginia Consumer Protection Act.**

Under § 59.1-206(A), Virginia seeks civil money penalties of $7,100,000 for Entity Defendants' willful violations of the VCPA.[248] The Commonwealth's calculation of the monetary amounts (both restitution and civil penalties) required to redress Entity Defendants' violations of the VCPA begins with determining *which* consumers were harmed by *which* VCPA violations. A merits-based determination of that issue was, of course, prevented by Entity Defendants' utter failure to engage in discovery. Nonetheless, the Court can and should

---

[244] *See supra* Argument §§ I-III.

[245] *See id.*

[246] *See Commonwealth v. Chatham Dev. Co., Inc.*, 49 Mass.App.Ct. 525, 529 (App. Ct. 2000); *Meyers Bros. Parking Sys. v. Sherman*, 87 A.D.2d 562, 563 (1st Dep't 1982), aff'd, 57 N.Y.2d 653 (1982); *Commonwealth v. Future Income Payments, LLC, et al.*, No. CL18-527-00 (Va. Cir. Ct. Nov. 4, 2018) (entering VCPA civil penalty award of $31.7 million based on multiple deceptive contractual provisions).

[247] *See supra* Argument §§ I-III. Under Massachusetts law, in situations where a defendant's failure to produce information makes calculation of the exact number of violations impractical or impossible, a court may base an award of civil penalties on an approximate calculation or reasonable estimate. *See Com. v. AmCan Enterprises, Inc.*, 47 Mass. App. Ct. 330, 33 (1999).

[248] Subsection (C) of § 59.1-206 also allows Virginia to seek costs and fees, which will be calculated in a post-hearing petition.

46

determine that all consumers who contracted with Entity Defendants for immigration bond services were harmed by, at a minimum, one of the VCPA violations described above. Three separate bases support this determination.

First, as described in Argument § I.B. of this memorandum, the Court can employ Rule 37 to prevent further prejudice to Plaintiffs from Defendants' discovery misconduct. To that end, the Court can deem established as a fact that all Virginia consumers were harmed by one or more of Entity Defendants' VCPA violations to the extent that such violations would have been evidenced by discovery materials withheld by Entity Defendants. Specifically, it is clear from the Discovery Order, Order to Show Cause, and Sanctions Opinion that Entity Defendants prevented Plaintiffs from reviewing any direct evidence of consumer communications (e.g., call logs, emails, text messages, etc.) and from taking effective depositions of any of Entity Defendants' employees about such communications, and from relying upon the communications as direct evidence of written misrepresentations.

Accordingly, it is appropriate for the Court to remedy the lack of any discovery about consumer communications by establishing as a fact that those discovery materials, if properly disclosed, would have supported all of the Commonwealth's VCPA claims that are based on misrepresentations made in the course of the Entity Defendants' communications with the consumers. Those VCPA claims include ¶ 204(c)-(i), which are described in Argument § II.B.1 of this memorandum. Based on the allegations of the Complaint and evidentiary sanctions under Rule 37, the Court can determine that all Virginia consumers were harmed by at least one, if not all, of those claims.

Second, and again under Rule 37, the Court can determine that every consumer was harmed by the foregoing VCPA violations to the extent that evidence withheld by Entity

Defendants in discovery would have established a "pattern and practice" of deceptive conduct supporting those violations. Virginia recognizes "pattern and practice" as a proper vehicle for proving VCPA violations without a requirement for individualized proof for each affected consumer.[249] At least three of the Commonwealth's VCPA claims fit this category—¶ 204(c), (d), and (h) of the Complaint concern VCPA claims based on how Entity Defendants generally misrepresented themselves to their customers as an immigration bond company affiliated with ICE. To the extent that Entity Defendants withheld evidence that would have established a "pattern and practice" of making those misrepresentations, the Court can determine that all consumers were likewise harmed by those VCPA violations.

Finally, without regard to Rule 37, the Court can determine that all Virginia consumers were harmed by at least one of the VCPA violations described above, based on Entity Defendants' "pattern and practice" of engaging in systematic, deceptive conduct as alleged in the Complaint. For example, ¶ 204(h) of the Complaint claims that Entity Defendants violated § 59.1-200(A)(14) by misrepresenting to consumers that they are an immigration bond company. The allegations supporting this claim describe not individual misrepresentations made to specific consumers, but generalized business practices that violated § 59.1-200(A)(14) across the board.

Accordingly, the Court has multiple bases for determining that all consumers were harmed by, at the very least, one of the VCPA violations asserted by the Commonwealth in Count 11.

Based on the analysis above, Virginia seeks an award of $7,100,000 as a civil money penalty. This is a conservative estimate of the number of violations per consumer for purposes of calculating civil penalties under § 59.1-206(A)—again, only *one* violation per consumer.

---

[249] *Smoky Mountain Secrets*, 41 Va. Cir. 564 (awarding civil penalties for 19,433 VCPA violations proven by "pattern and practice").

According to the *Vasquez* CAFA notice, approximately 2,840 Virginia consumers were harmed

by the VCPA violations, and, importantly, Virginia alleged that Entity Defendants willfully

violated the VCPA.[250] For willful violations of the VCPA, the Court can award Virginia $2,500

per violation. Accordingly, Virginia seeks a total civil penalty award of $7,100,000.

**b.      The Court should impose civil penalties under the Massachusetts Consumer Protection Law.**

Massachusetts seeks a judgment for $3,400,000 in civil penalties to be entered jointly and

severally against Defendants. The Consumer Protection Law authorizes courts to award

Massachusetts a civil penalty of up to $5,000 whenever a person or entity engages in any act or

practice that they "knew or should have known" was unfair or deceptive.[251] Here, the Complaint

alleges in detail that Defendants engaged in systemic and pervasive misconduct that – at a

minimum – they should have known was unfair or deceptive.[252] As discussed above,

Massachusetts is requesting an award based upon a calculation of a single violation, and $5,000

penalty, for each of the estimated 680 Massachusetts consumers impacted by Defendants'

misconduct.[253]

An award of $3,400,000 in penalties is appropriate given the severity of this case.[254] For

nearly a decade, Defendants engaged in reprehensible, self-evidently unfair and deceptive

misconduct targeting some of the most vulnerable residents of Massachusetts. While the court

has substantial discretion over the amount of a penalty to impose under the Consumer Protection

Act, the amount awarded should be sufficient to both vindicate the public interest in punishing

---

[250] Compl. ¶ 205, ECF No. 1.
[251] Mass. Gen. Laws Ann. ch. 93A, § 4.
[252] *See supra* Argument § II; *see also* Compl. ¶ 228, ECF No. 1 (alleging that Defendants knew or should have known that their conduct was unfair and deceptive).
[253] *See* Romeo Decl., Ex. 4.
[254] *See Commonwealth v. Fall River Motor Sales*, 409 Mass. 302, 311 (1991) (discussing factors that courts may consider in exercising their discretion to award civil penalties under Chapter 93A).

defendants for their unlawful behavior,[255] and to deter others from engaging from similar misconduct in the future.[256]

>        c.        **The Court should award penalties under the New York General Business Law.**

The New York General Business Law provides for civil penalties of up to $5,000 for each deceptive act in violation of Section 349 of the statute.[257] The Court has broad discretion to determine the appropriate penalty to deter future violations and to punish illegal conduct, so long as its choice is explained and the award is "not disproportionate to the offense.[258]  While courts have measured the number of violations giving rise to penalties in numerous ways depending on the nature of the deceptive acts at issue,[259] basing penalties on the number of consumers affected is a common and established method of calculating penalties.[260]

Here, New York requests penalties in the amount of $13,890,000, to be entered jointly and severally against all Defendants. The amount represents one $5,000 penalty for each of the 2,778 consumers that Defendants estimate reside in New York.[261]

---

[255] *See Laramie v. Philip Morris USA Inc.*, 488 Mass. 399, 408-09 (2021) ("Civil penalties under G.L. c. 93A . . . serve the public's interest in punishing a defendant for violating the State's consumer protection act.").

[256] *Fall River,* 409 Mass. at 313 (civil penalty should "vindicate the authority of the Commonwealth [of Massachusetts] by deterring future violations by this defendant and others").

[257] N.Y. Gen. Bus. Law. § 350-d.

[258] *People v. Applied Card Sys., Inc.*, 41 A.D.3d 4, 10 (3rd Dep't 2007) (internal citation omitted); *Meyers Bros. Parking Sys. v. Sherman*, 87 A.D.2d 562, 563 (1st Dep't 1982), *aff'd*, 57 N.Y.2d 653 (1982).

[259] *See, e.g., People v. Home Affordable Direct, Inc.*, No. 451942/2014, Doc. No. 48 (Sup. Ct. N.Y. Cnty. Oct. 23, 2014) (imposing a $2,535,000 penalty based on $5,000 per each airing of deceptive radio advertisements).

[260] *See People v. Image Plastic Surgery*, 210 A.D.3d 444, 445 (1st Dep't 2022) (finding the number of consumers affected to be the appropriate method of calculating penalties than the number of days defendant's website was operable.); *People v. Nationwide Asset Servs., Inc.*, 26 Misc.3d 258, 284, (Sup. Ct., Erie Cnty, Oct. 9, 2009) (basing penalties on the number of consumers affected).

[261] *See* Romeo Decl., Ex. 4. Because Defendants' have stymied Plaintiff's repeated efforts to obtain information through discovery, the Court should again rely on a reasonably certain and reliable estimate in determining the number of consumers affected, as it does when calculating damages. *See Orbital Publ. Group,* 193 A.D.3d at 661 (citing *Tobin v. Union News Co.*, 18 A.D.2d 243, 245-46 (4th Dep't 1963) ("Uncertainty as to amount does not preclude recovery. Mathematical certitude is unnecessary. A reasonable basis for the computation of approximate result is the only requisite.") (internal citations omitted).

An award of the full $5,000 per violation is appropriate because of Defendants' pervasive misrepresentations, their targeting of a particularly vulnerable population, and the ongoing nature of Defendants' deceptive acts over a period of multiple years.[262] Particularly given the conservative estimate of the number of violations for which New York seeks to impose penalties, a total award of $13,890,000 in civil penalties is not excessive to sanction Defendants for their years-long practice of deceptive conduct. A lesser penalty would be insufficient to deter future wrongdoing and protect New York consumers.

### D.       Defendants are jointly and severally liable.

Judgment for restitution under the CFPA and Massachusetts and New York state-consumer-protection laws and civil penalties under Massachusetts and New York state-consumer-protection laws should enter jointly and severally against all Defendants. Judgment entered under the VCPA should be entered jointly and severally as to the Entity Defendants.[263] Controlling persons can be jointly and severally liable.[264] Nexus Services wholly owns Libre.[265] Each of the Individual Defendants are shareholders of Nexus Services.[266] Donovan is a co-founder and a majority owner, officer, and director of Nexus, and the Chief Executive Officer of Libre.[267] Moore is a co-founder and part owner of Nexus Services, the Chief Financial Officer of Libre, and the Executive Vice President of Libre and Nexus Services.[268] Ajin is a part owner of Nexus Services, a Director of Nexus Services, and a Vice President of Libre.[269] Each Individual

---

[262] *See Applied Card Sys.,* 41 A.D.3d at 11 (upholding the maximum penalty provided under General Business Law 350 where the trial court found the misrepresentations made "particularly abhorrent").
[263] Virginia asserts VCPA claims only as to the Entity Defendants. Compl. ¶¶ 198-206, ECF No. 1.
[264] *SEC v. Johnson,* 43 F.4th 382, 390 (4th Cir. 2022).
[265] Compl. ¶ 18, ECF No. 1.
[266] *Id.* ¶ 121.
[267] *Id.* ¶ 20.
[268] *Id.* ¶ 21.
[269] *Id.* ¶ 22.

Defendant has responsibility and authority to approve the Entity Defendants' affairs.[270] And as discussed *supra* at Argument § II(A)(4), each of the Individual Defendants actively exercised their authority to approve Libre's policies and practices, including its training and compensation structure, and oversee Libre's call center in a manner that resulted in the deceptive, abusive, and otherwise unlawful actions that harmed consumers—all while failing to change the practices that they knew were causing consumers to be deceived and were materially interfering with consumers' ability to understand the terms and conditions of the agreements. Therefore, Defendants are jointly and severally liable for the redress under the CFPA and state-consumer-protection laws, as well as for civil penalties under state-consumer-protection laws.[271]

## **CONCLUSION**

For these reasons, Plaintiffs request that the Court award the requested relief against Defendants.

Dated: June 23, 2023                        Respectfully submitted,

*Attorneys for the Consumer Financial Protection Bureau*

Eric Halperin
   *Enforcement Director*
Alusheyi J. Wheeler
   *Deputy Enforcement Director*
Kara K. Miller
   *Assistant Litigation Deputy*

**Leanne E. Hartmann**
California Bar Number: 264787
Hai Binh T. Nguyen
California Bar Number: 313503

---

[270] *Id.* ¶¶ 127-137.
[271] Because the Individual Defendants failed to produce updated financial records, despite being ordered to do so, *see* Order to Show Cause at 25, for the reasons discussed *supra* Argument § I(B), the Individual Defendants are precluded from introducing any evidence regarding their current financial condition in connection with the Court's assessment of civil penalties.

Lee I. Sherman
California Bar Number: 272271
Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552
Telephone (Nguyen): (202) 435-7251
Telephone (Hartmann): (415) 844-9787
Telephone (Sherman): (202) 374-4575
Email: haibinh.nguyen@cfpb.gov
Email: leanne.hartmann@cfpb.gov
Email: lee.sherman@cfpb.gov


*Attorneys for the Commonwealth of Virginia, ex rel. Jason S.
  Miyares, Attorney General*

Jason S. Miyares
    *Attorney General*
Charles H. Slemp, III
    *Chief Deputy Attorney General*
Steven G. Popps
    *Deputy Attorney General*
Richard S. Schweiker, Jr.
    *Chief and Senior Assistant Attorney General*

**James E. Scott**
Assistant Attorney General
Virginia Bar Number: 88882
David B. Irvin
Virginia Bar Number: 23927
Unit Manager and Senior Assistant Attorney General
Office of the Attorney General
Consumer Protection Section
202 North Ninth Street
Richmond, VA 23219
Telephone (Irvin): (804) 786-4047
Telephone (Scott): (804) 225-4778
Fax: (804) 786-0122
Email: dirvin@oag.state.va.us
Email: jscott@oag.state.va.us


*Attorneys for the Commonwealth of Massachusetts*

Andrea Campbell
    *Attorney General*

**Jon Burke**
Massachusetts Bar Number: 673472
Assistant Attorney General
Office of the Attorney General
10 Mechanic Street
Worcester, MA 01608
Telephone: (774) 214-4416
Fax: (508) 795-1991
Email: Jonathan.burke@mass.gov


*Attorneys for the People of the State of New York*

LETITIA JAMES
    *Attorney General*

Jane Azia (New York Bar Number: 1539600)
    *Bureau Chief for the Bureau of Consumer Frauds and
    Protection*
Laura Levine (New York Bar Number: 2337368)
    *Deputy Bureau Chief for the Bureau of Consumer Frauds
    and Protection*

**Franklin H. Romeo**
New York Bar Number: 4422051
Assistant Attorney General
Office of the Attorney General
28 Liberty Street
New York, NY 10005
Telephone: (212) 416-8320
Fax: (212) 416-6003
Email: franklin.romeo@ag.ny.gov

54