UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

|  |  |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU, *et al.*, <br><br> Plaintiff, <br><br> v. <br><br> NEXUS SERVICES, INC., *et al*., <br><br> Defendants. | No.: 5:21-cv-00016-EKD-JCH |

## DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR REQUEST FOR EVIDENTIARY SANCTIONS, INJUNCTIVE RELIEF, CONSUMER REDRESS, AND CIVIL MONEY PENALTIES

## **INTRODUCTION**

Defendants seek over half-a-billion dollars in damages relating to certain practices which Nexus Services, Inc., Libre by Nexus, Inc., Micheal Donovan, Richard Moore, and Evan Ajin (hereinafter collectively "Nexus") were alleged to have taken. *See generally* ECF Doc. No. 216 at 1.[1] Nexus cannot dispute the factual allegations set forth in the underlying complaint as the Court previously has entered a default judgment against Nexus as a sanction for discovery violations. *See* ECF Doc. No. 203. Much of Plaintiffs' Memorandum in Support of their Request for Evidentiary Sanctions, Injunctive Relief, Consumer Redress and Civil Money Penalties appears to focus on the propriety of the imposition of a default judgment. *See* ECF Doc. No. 216 at 8-33 (discussing 12(b)(6) standard and concluding that a claim had been stated) (hereinafter "Plaintiffs' Memo" or "Pls. Mem."). Because the Court has already entered its default judgment[2] against defendants rather than entering a default against Defendants', Defendants solely address damages. *See* ECF Doc. Nos. 203, 211.

Solely for the purposes of preservation for appeal, Defendants note that the

---

[1] Defendants utilize internal page numbering, which differs from header page numbering consistently by four pages.

[2] Defendants have previously argued for various reasons that the entrance of a judgment in favor of Defendants should not occur, *see, e.g.*, ECF Doc. Nos. 18, 198, 205.

entrance of a default judgment on a complaint that fails as a matter of law or fails to state a claim is improper. *See Anderson v. Found. for Advancement, Educ. & Emp't of Am. Indians*, 155 F.3d 500, 506 (4th Cir. 1998) (holding that the district court erred in granting default judgment to the plaintiff where claim fails as matter of law). Here Defendants have previously set forth arguments as to why entering a default judgment on the claims of the Consumer Financial Protection Bureau and state Plaintiffs would be improper and the Court has denied those motions for various reasons.[3] To the extent that the Court has not entered a default judgment but rather only a entered a default against Defendants, Defendants believe that an entrance of a default judgment would be improper for the reasons stated therein. Defendants note this to prevent waiver because a substantial portion of Plaintiff's motion appears to address the propriety of the entrance of a default judgment despite a default judgment apparently already being entered. *See generally* Pls.

---

[3] ECF Doc. No. 18 (arguing that Nexus did not fall under ambit of CFPA because it did not provide financial products and services) was not treated as a 12(b)(6) motion and the Court denied the motion without considering whether or not the complaint stated a claim. *See* ECF Doc. No. 109. ECF Doc. No. 198 (arguing that a judgment could not be entered on pleadings which were the products of unconstitutional funding) was denied as moot. ECF Doc. No. 202.

Were the Court inclined to entertain whether or not a claim has been stated the Plaintiffs would note that the Court has yet to determine (apart from the apparent determination inherent in ECF Doc. No. 203) whether a claim has been stated or whether a court may enter a judgment which financially harms a party where unconstitutional funding has been utilized throughout the litigation process.

Mem.

## <u>RELEVANT FACTS AND PROCEDURAL HISTORY</u>

The Consumer Financial Protection Bureau, New York, Massachusetts, and Virginia brought the instant matter on February 22, 2021. *See* ECF Doc. No. 1 (hereinafter "Compl" or "Complaint"). The allegations set forth that while Libre by Nexus, Inc. ("Libre") did not offer loans or credit—the services Nexus provided were not financial in nature—a reasonable consumer *could* have understood them as being such and because a consumer might have the impression that the transaction was a credit transaction, or alternatively that a consumer could have reasonably understood the transaction to have been a loan transaction. *See id.* at ¶¶ 4, 19, 120.

Certain practices of Nexus were identified that were considered abusive or otherwise violative of the CFPA or state consumer protections laws, *see id.* at ¶¶ 146, 151, 158, 163, 168, 173, 178, 183, 188, 204, 211, 216-221, 227-230, 236, 242-243, 249. Those practices included:

1. Misrepresenting that Libre paid consumers' bonds and that consumers' monthly payments were repayments to Libre;

2. Making false threats of re-arrest, detention, or deportation for failure to make *monthly* payments;

3. Falsely threatening to place GPS devices on co-signers;

4. Falsely threatening debt collection for failure to make monthly payments;

5.  Falsely threatening to sue consumers for failure to make monthly payments;

6.  Misrepresenting availability of free legal representations;

7.  Falsely threatening criminal prosecution for tampering with GPS devices;

8.  Failing to refund collateral payments;

9.  Demanding payments from consumers who had paid monthly payments due to failures in record keeping;

10. Misrepresentations relating to functionality of GPS devices;

11. Falsely threatening to report failures to pay monthly payments to credit reporting agencies;

12. Failing to present contracts in native languages and utilizing complex contracts;

13. Charging fees that were unfair and excessive for its services, including specifically GPS devices;

14. Misrepresenting the functionality of GPS devices; and

15. Failing to refund consumer payments in various circumstances.

*Ibid.*

The Complaint does not allege how many consumers of Nexus were affected by these practices, the number of times such practices occurred, revenue which may have been generated as a result of the practices, or specify what effect if any those practices may have had on Nexus's overall revenues. *See generally Compl.*

The Complaint seeks restitution, disgorgement, statutory penalties, injunctive relief, and costs under both the CFPA and the States' various consumer protection schemes. *Id.* at 46-47.

Finally, the Complaint sets forth the responsibilities of the individual defendants and notes the substantial assistance that individual defendants and Nexus Services, Inc. provided. *Id.* at ¶¶ 121-141.

The Court entered a dispositive sanction after motion significant briefing under FRCP 37(b)(2)(A)(vi) and entered default judgment against Nexus. *See* ECF Doc. Nos. 201-203; *see also* ECF Doc. Nos. 139, 140, 156, 157, 189, 190. No order was entered pursuant to FRCP 37(c) and default was entered rather than evidentiary sanctions. . *See* ECF Doc. Nos. 201-203

Trial was scheduled for February 2023, but that trial date was canceled and never rescheduled. *See* ECF Doc. No. 171. Initially a scheduling order was entered, ECF Doc. No. 66, that was modified at the request of Plaintiffs, ECF Doc. No. 102, 113. The final scheduling order based completion of discovery on the trial date, which was ultimately canceled and never rescheduled.

## ARGUMENT

### I.    GENERAL PRINCIPLES OF DEFAULT JUDGMENTS

By entering a default judgment "liability is established, [but] 'the court must

make an independent determination regarding damages and cannot accept as true factual allegations of damages.'" *Patel v. Patel*, No. 1:15-cv-598, 2017 WL 5198151, at *4 (E.D. Va. July 31, 2017) (quoting *Int'l Painters & Allied Trades Indus. Pension Fund v. Capital Restoration & Painting Co*., 919 F. Supp. 2d 680, 684 (D. Md. 2013)). Thus, normally, as part of its independent duty to determine the appropriate amount of damages, a court may conduct hearings or take other such actions as it deems necessary. *See* Fed. R. Civ. P. 55(b)(2).

A district court need not, and seemingly for purposes of judicial efficiency should not, hold a hearing where evidence on the record establishes the appropriate amount of damages, *see Pope v. United States,* 323 U.S. 1, 123 (1944) ("It is a familiar practice and an exercise of judicial power for a court upon default, by taking evidence when necessary or computation from facts of record, to fix the amount which the plaintiff is lawfully entitled to recover and give judgment accordingly."), or where there exists evidence which is not or cannot be controverted from which a reasonably accurate calculation of damages can be determined. *See Mey v. Phillips*, 71 F.4th 203, 224 (4th Cir. 2023).

Should the Court accept the Plaintiffs' arguments, *see generally* Pls. Mem. at 9-11 (arguing for evidentiary sanctions under Rule 37(b)(2)(A)(ii) or alternatively under Rule 37(c)(1)); *see also id.* at 45 (arguing for sanctions to be based on an speculative one violation per state law per consumer basis), each would

result in mooting the need for a trial: if the Court were to assume that the one-violation per consumer calculation was reasonable, there would be no need for trial; were the Court to impose additional evidentiary sanctions or alternatively disallow the presentation of expert testimony to contest the valuation or calculation of damages based on revenues, there would be no need for a trial; or were the Court to accept that the pleading of a pattern allows for an inference that every consumer was harmed at least once, there would be no need for a trial.[4]

Nexus does not make this point lightly but does so simply to prevent further waste of resources and to expedite what will be an unavoidable appeal: if Plaintiffs are correct and revenue provides an adequate basis for calculating restitution, Defendants will be unable to dispute revenues. If Plaintiffs are right and by simple mathematical calculation the Court can determine that each consumer in each state suffered at least one violation, then Defendants simply cannot contest this. Should facts be treated as established or if evidentiary sanctions are imposed, then there would be no need for a trial on damages, with the exception of the extremely limited issues noted in footnote 4, nor would a full scale damages trial be justified as a matter of judicial efficiency.

---

[4] Presumably the only issues that would be left to resolve in such an instance would be the scienter elements of violations to the extent they might affect damage calculations and considerations of statutory mitigation factors.

*Mey v. Phillips* is telling, in the case, a party pleaded that 25 violative phone calls were received and that a further 77 were received after initiating her complaint. 71 F.4th at 223-24. The Fourth Circuit found that because this evidence was uncontroverted, and effectively could not be disputed, that the district court was correct in determining damages after a default without conducting a hearing: because damages could reasonably be calculated based on the number of calls and the statutory penalties associated with those calls. *Id.* at 224.

The instant case significantly differs from *Mey* in that, the Plaintiff in *Mey* could accurately demonstrate a concrete number of violations and it was clear that such had occurred; however, should the Court take the view of the Plaintiff's and either enter evidentiary sanctions or agree with the inferential calculation of restitution and penalties, then there is simply no need to hold a damages hearing.[5]

Assuming the Court does not believe that damages may simply be

---

[5] The Eastern District of Virginia has recognized how nonsensical it is to allow for a bifurcated proceeding to contest damages if it is in fact impossible for Defendants to contest the damages claims:

> There would be little point in allowing a defendant to contest the amount of damages if the defendant is not permitted adequately to prepare for the hearing on damages. We therefore hold that Rule 26(b)(1) authorizes a defendant who has defaulted to conduct discovery regarding the amount of unliquidated damages in preparation for an inquest on damages under Rule 55(b)(2).

*Brooks Sports, Inc. v. Anta (China) Co., Ltd.*, No. 1:17-cv-1458 (LO/TCB), 2019 WL 13295661, at *3 (E.D.Va. Mar. 8, 2019) (quoting *Clague v. Bednarski*, 105 F.R.D. 552, 552 (E.D.N.Y. 1985)).

determined based on the Plaintiffs' suppositions and that the Court does not decide it appropriate to enter additional sanctions that make contestation of damages impossible, the Court must determine whether or not the Plaintiffs can prove the amounts requested in their brief.

In *Brooks Sports, Inc.*, the district court was faced with a similar situation and allowed limited discovery to enable a defendant to challenge the methodology of a damage calculation. 2019 WL 13295661, at *4. Here Nexus does not seek additional discovery, but rather seeks the opportunity for a meaningful hearing to contest both the methodology and ultimate conclusions reached in Plaintiffs' calculations of damages.

## II.   PLAINTIFF'S CALCULATION OF THE APPROXIMATE UNJUST GAINS NEITHER REPRESENTS A REASONABLE APPROXIMATION OF CONSUMER LOSS, NOR UNJUST GAIN AND IN ANY EVENT IS REBUTTABLE.

Plaintiffs correctly state that the multiple circuits utilize a two-step burden-shifting framework, *see* Pls. Mem. at 37, n. 194-195 (collecting cases), to determine the appropriate amount of restitution. The first step of which is demonstrating an approximate measure of loss or an approximate measure of unjust gain. *See CFPB v. CashCall, Inc.*, 35 F.4th 734 (9th Cir. 2022); *see also CFPB v. CashCall, Inc.*, No. CV15-7522- JFW (RAOx), 2023 WL 2009938, at *8-9 (C.D. Cal. Feb. 10,

2023). The Ninth Circuit has held—as did the Tenth in *Kuykendall*[6]—that in certain cases revenues *might* appropriately be utilized to approximate that consumer loss or gain. *CFPB v. Gordon* 819 F.3d 1179, 1195 (9th Cir. 2016) (holding "district court *may* use a defendant's net revenues as a basis for measuring unjust gains") (emphasis added). In no way do the cases cited hold that a plaintiff can always meet its burden of demonstrating an approximate loss or an approximate unjust gain by making a calculation from gross or net revenues. *See, e.g. id.*; *Cashcall, Inc.*, 35 F.4th at 751. Indeed, it would be highly counter intuitive were this to be a rule of general application, while certainly there exist many situations in which calculations based on gross revenues, or as it might be net revenues may be appropriate, this is not such a case. The "revenue" line of cases seek to provide a reliable measure of consumer losses, which may not always be equivalent to unjust gains.

> In other words, "[a] district court *may* use a defendant's net revenues as a basis for measuring unjust gains." *Id*. Net revenues are "*typically* the amount consumers paid for the product or service minus refunds and chargebacks." *FTC v. Commerce Planet, Inc*., 815 F.3d 593, 603 (9th Cir. 2016), *abrogated on other grounds by AMG Cap. Mgt., LLC v. FTC*, —— U.S. ——, 141 S. Ct. 1341, 209 L.Ed.2d 361 (2021). An award of net revenues differs from an award of net profits, which allows a defendant to "deduct legitimate expenses." *Liu*, 140 S. Ct. at 1950. We have held that "there are instances in which a defendant does not ultimately reap any profits from his wrongful

---

[6] *FTC v. Kuykendall*, 371 F.3d 745, 764-66 (10th Cir. 2004) (applying the same test in FTCA context).

conduct, and others where even though the defendant obtained some profit, the 'loss suffered by the victim is greater than the unjust benefit received by the defendant.'" *CFTC v. Crombie*, 914 F.3d 1208, 1216 (9th Cir. 2019) (quoting *FTC v. Figgie Int'l, Inc.*, 994 F.2d 595, 606 (9th Cir. 1993) (per curiam)); *see also Stefanchik*, 559 F.3d at 931.

*Cashcall, Inc.*, 35 F.4th at 751 (emphasis added).

Often, this burden of meeting the reasonable approximation threshold showing is accomplished by demonstrating that there existed *widespread material* misrepresentation that led to the consumer loss at issue that resulted in the revenues, *i.e.*, the revenues would be a reasonable appropriation of consumer loss, especially where offset by net gains. *Kitco,* 612 F.Supp. 1282, 1293 (D.Minn. 1985) (holding net revenues *may* be a reasonable approximation where "the alleged fraudulent practices were the type of misrepresentation on which a reasonably prudent person would rely, that they were widely disseminated, and that the injured consumers actually purchased the product.")

This makes sense on multiple levels especially, where the misrepresentations have been demonstrated to uniformly affect all consumers and they went to the heart of the decision of the consumer entering a particular transaction. Indeed, considering the oft quoted Restatement, *see, e.g. Great–West Life & Annuity Insurance Co. v. Knudson*, 534 U.S. 204, 212 (2002) (relying on Dobbs restatement quoted below), on remedies and restitution, which undergirds most of the caselaw:

The familiar principle of *damages* law is that the remedy should not provide more than one full compensation. The analogous principle of *restitution* law

is that restitution **should not force disgorgement of more than the unjust enrichment.** If the two remedies are to be combined in one recovery, those limiting principles require that the combined recovery must not exceed the greater of (a) full compensation or (b) full disgorgement. If the combination does not exceed full compensation, or full disgorgement of the unjust enrichment, then it should be permitted.

Dan B. Dobbs, Law of Remedies (2d ed. 1993), § 4.5(b) (boldface added).

Again, where a consumer loses more than a company gains it makes significant sense to base restitution on the net revenues rather than the net profits. That, however, lacks facial credibility in the instant matter.

To begin, the calculation provided by Plaintiffs is based on a blunt subtraction of total payments minus total refunds, *see generally* ECF Doc. No. 216-2, in other words it assumes that every cent of every dollar spent by consumers should be considered a loss that must be returned to the consumer to begin to provide full compensation—again, the purpose of restitution is to make the consumer whole. In the instant case, Nexus contends and believes that its testimony will demonstrate that net revenues not only represent an unreasonable approximation of consumer loss, but would result in a windfall for consumers.[7]

As is noted in the Complaint, Libre provided services to consumers who

---

[7] It does not appear that there has been any attempt to calculate what may be an appropriate amount of unjust gains, so if it was found that the Plaintiff's failed to make a threshold showing of loss based on their chosen method of calculation, no restitution would be justified.

were desperate to escape federal detention. Compl. at ¶¶ 23, 119, 242. These consumers and their families were not only desperate but are unable to afford a bond and as a result typically remained in detention for significant periods of time—in other words there were no alternatives from which the consumers could choose that would have resulted in them gaining release. *See id.* at ¶ 23. As a result of paying a "large" up-front fee, the consumers at issue were able to secure a bonds, and thereby gain access to freedom. *Id.* at ¶¶35-36. There is no contention that as a result of consuming these services and paying this initial non-refundable fee freedom is not obtained. *See generally* Compl. Libre by Nexus provides the very product for which consumers are "desperate," namely payment of the initial fee results in release from detention.

The planned thrust of Nexus's argument and testimony is multifaceted, but aims primarily to demonstrate that: 1, consumers lacked any other meaningful option to secure their freedom from detention and that regardless of any practices, which have as a consequence of the entrance of default been determined to have been violative of the CFPA (and state consumer protection regimes), the vast majority of reasonable consumers would have continued to have consume Nexus's services; 2, that any loss suffered by consumers was *de minimus* and in any event significantly smaller than "unjust gains" that would have resulted from the violative practices; 3, that Nexus' unjust gains attributable to the practices can be calculated

to a definite amount, which represents the appropriate amount of damages; and 4, that the practices which have been found, again by nature of the entrance of a default judgement, far from being prevalent or widespread were rather rare and isolated events which Nexus actively attempted to mitigate.

Given the structure of the transaction, and that there is no question that the main benefit of the service was actually provided to consumers, *i.e.*, consumers are given what they are desperate to obtain, a gross or net revenue calculation fails to reasonably approximate consumer loss. The analysis presented by the Plaintiffs fails to squarely address what consumers seek and what they, indeed do receive: release from federal detention.

Moreover, Nexus contends that significant portions of testimony can be presented that will demonstrate the value of services provided. Much, if not all of this testimony, was neither sought nor would have been relevant given what was sought by Plaintiffs in discovery. *See generally* ECF Doc. No. 115-1 (various discovery requests propounded). For instance, it seems that few if any document requests were aimed at determining the value of services provided by Nexus and the extent to which profits might have been derived from those legitimate services provided. *See, e.g.*, ECF Doc. No. 115-1, at 10, ¶ 5 (requesting description of services provided).

### A. Even Were Net Revenues Found to Reasonably Approximate Unjust Gains Nexus Can Rebut the Showing if Given Opportunity.

As explained above, given opportunity Nexus can and will rebut that net revenues reflects a reasonable representation of unjust gains. The framework adopted by the Ninth Circuit in *Gordon* (and adopted in other circuits) is not robotic, but rather embraces the "broad equity powers" that courts possess "in determining the appropriate measure of equitable relief." *CFPB v. Gordon*, 2013 WL 12116365, at \*5 (C.D. Cal. June 26, 2013), *aff'd in part, vacated in part*, 819 F.3d 1179. It requires plaintiffs to make a showing that their damages calculation at a minimum "reasonably approximates . . . unjust gains"; net revenues in and of themselves are not synonymous with a reasonable approximation. *See Gordon*, 819 F.3d at 1195 ("[D]istrict court *may* use a defendant's net revenues as a basis for measuring unjust gains.") (emphasis added); *Commerce Planet*, 815 F.3d at 603 ("Unjust gains *in a case like this one* are measured by the defendant's net revenues.") (emphasis added).

While Plaintiffs have certainly demonstrated that net revenues in certain cases may be reasonable approximations of consumer loss, this is by no means the end of the tale. *See also FTC v. Zamani*, No. SACV 09–0977–DOC(MLGx), 2011 WL 2222065, at \*13 (C.D.Cal. Jun. 6, 2011) Only *unjust* gains are subject to restitution ....") (emphasis in original). *FTC v. Commerce Planet*, 815 F.3d 593,

603(9th Cir. 2016)). "[I]t is error to simply conclude that the 'total amount paid by consumers' constitutes [a] defendant's unjust enrichment without accounting for refunds and actual services rendered." *Zamani*, 2011 WL 2222065, at *13.

Indeed, caselaw which looks to "revenue-based" restitution calculations is almost invariably set forth in permissive or precatory rather than mandatory terms: "Restitution *may* be measured by the 'full amount lost by consumers rather than limiting damages to a defendant's profits." ' *Gordon*, 819 F.3d at 1195 (emphasis added) (citing *F.T.C. v. Stefanchik*, 559 F.3d 924, 931 (9th Cir. 2009)). There is nothing within *Gordon* that would prevent a court for accounting for both legitimate expenses incurred and legitimate value provided to consumers should a Defendant be able to make a showing that such reduced "unjust gains" in undertaking the second step in the restitution analysis. *See Gordon*, 819 F.3d at 1195. Case law supports the proposition that a defendant's profits should be considered in the second step of the Gordon test. *Id.* Even in the FTC Act context, which typically proceeds under section 13(b) of the FTCA, courts do not ban a consideration of defendant's profits, or other factors, but rather acknowledge that the facts have frequently supported an award that was not limited to profits. *See Stefanchik*, 559 F.3d at 931 ("[B]ecause the FTC Act is designed to protect consumers from economic injuries, *courts have often* awarded the full amount lost by consumers rather than limiting damages to a defendant's profits.") (emphasis added); *cf. FTC v.*

*Bronson Partners, LLC*, 654 F.3d 359, 375 (2d Cir. 2011) ("[W]here the profits from fraud and the defendant's ill-gotten gains diverge, the district court *may* award the larger sum.") (emphasis added); *F.T.C. v. Magui Publishers, Inc.*, 1991 WL 90895, at *12 (C.D. Cal. Mar. 28, 1991) (restitution award equaled gross sales less costs), *aff'd*, 9 F.3d 1551 (9th Cir. 1993).

Here, as long as Nexus is afforded the opportunity to provide analysis or evidence to rebut that a calculation based on net-revenues overstates "unjust gains," there is little question that the same can be done and that the opportunity should be afforded them.

While Nexus no longer can challenge contentions set forth in the Complaint that go directly to liability, it certainly may contest matters which speak to damages. Plaintiffs have not established that *all* revenues derived by Nexus were unjust, nor have the established that every transaction was impossibly tainted by practices that violated the CFPA (and other state-level consumer protection statutes).

Certainly, under the an FTCA two-step, burden-shifting framework a defendant is afforded the opportunity to demonstrate that revenues and profits were not the product of unjust gains and that the plaintiff's approximation overstates unjust gains, here Nexus can and will do so if given the opportunity. *See generally*

*See FTC v. AMG Capital Mgmt., LLC*, 910 F.3d 417, 427-28 (9th Cir. 2018)[8]

(restitution was ordered for net revenue attributable to undisclosed fees, but not for

net revenue attributable to properly disclosed fees).

### III.   RECKLESSNESS, KNOWLEDGE, AND APPROXIMATION OF CONSUMERS AFFECTED.

The CFPA authorizes courts to award civil money penalties[9], 12 U.S.C. §

5565(a)(2)(H), and sets up a framework for calculating the penalty, *id.* § 5565(c).

First, there is a statutory maximum penalty for any person "in violation of a

[Federal consumer financial protection] law," and it is expressed as a dollar

amount "*for each day during which such violation continues*." *Id.* § 5565(c)(2)(A),

(B), (C) (emphasis added). Second, the exact dollar amount varies by scienter. Tier

1 imposes a maximum of $5,000 per day in strict liability. *Id.* § 5565(c)(2)(A).

It is important to note that there is no *per violation* penalty—stating that a

per violation penalty would range in the billions of dollars while true is completely

disconnected from the statutory scheme.

---

[8] Throughout, Nexus does not address that under 13(b) of the FTCA restitution is no longer available; it does not appear as if the relevant two-step process has been affected by the Supreme Court's holding vis-à-vis availability of restitution under that section of the FTCA.

[9] Due to the entrance of a default judgment Defendants do not argue against the application of individual liability for penalties or the imposition of joint and several liability.

Tiers 2 and 3, respectively, allow the CFPB raise the maximum to $25,000 per day by making a showing, by a preponderance of the evidence, that the violator acted "recklessly," and $1,000,000 per day if she acted "knowingly." *Id.* § 5565(c)(2)(B), (C); *CashCall, Inc.*, 2018 WL 485963, at *15 (C.D. Cal. Jan. 19, 2018) (burden of proof).

Third, once the maximum is known, courts must consider five mitigating factors to decide the actual penalty. *Id.* § 5565(c)(3)(A)-(E). Courts frequently award an amount well below the maximum. *See, e.g.*, *CFPB v. Chou Team Realty LLC*, No. 8:20-CV-00043-SB-ADS, 2021 WL 4895741, at *7 (C.D. Cal. Apr. 27, 2021). *Finally*, as with all remedies available under Section 5565, the civil money penalty provision "shall [not] be construed as authorizing . . . exemplary or punitive damages." 12 U.S.C. § 5565(a)(3).

> [A]lthough the CFPA does not define the terms "knowingly" or "recklessly", the FTCA provides some guidance In the context of the FTCA, the term "knowing" means "actual knowledge or knowledge fairly implied ... on the basis of objective circumstances that such act is unfair or deceptive and is prohibited by such rule." 15 U.S.C. § 45(m)(1)(A); *Consumer Fin. Prot. Bureau v. D&D Mktg.*, 2016 WL 8849698, at *12 (C.D. Cal. Nov. 17, 2016). The term recklessness refers to conduct that leads to "an unjustifiably high risk of harm that is either known or so obvious that it should be known." *D&D Mktg.*, 2016 WL 8849698, at *12 n.3 (citing *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 68–69 (2007)).

> *CFPB v. CashCall, Inc.*, 2018 WL 485963, *rev'd for other reasons 35 F.4th 734.*

This was further elucidated by the Ninth Circuit which explained:

In general, "[a] person acts recklessly ... when he consciously disregards a substantial and unjustifiable risk attached to his conduct, in gross deviation from accepted standards." *Borden v. United States*, —— U.S. ——, 141 S. Ct. 1817, 1824, 210 L.Ed.2d 63 (2021) (quotation marks and citations omitted). We have described reckless conduct "as a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger ... that is either known to the [actor] or is so obvious that the actor must have been aware of it." *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1063 (9th Cir. 2000) (quoting *Hollinger v. Titan Cap. Corp.*, 914 F.2d 1564, 1569 (9th Cir. 1990) (en banc)).

*Cashcall, Inc*., 35 F.4th at 748.

In *Cashcall*, a first-tier penalty was imposed and ultimately upheld by the Ninth Circuit, part of this determination appeared to significantly rely on the fact that the defendants sought out the advice of attorneys and there existed no clear law that demonstrated that the structure of the program was illegal. *Id.* Here, the complaint demonstrates that Nexus attempted to comply with law and apparently attempted to alter its contracting practices and business practices in line with knowledge it gained over time. *See* Compl. at ¶¶ 71-77 (noting changes of contracts). Further, as has been broached, in moving papers, Nexus' business practices were novel and it was highly unclear what regulatory regimes it might fall under. *See generally* ECF Doc. No. 18  (noting uncertainty of application of insurance regimes).

Finally, and not insubstantially, the CFPB relies on a novel theory of liability—not one that at this point Nexus can dispute, but regardless novel—:

liability in this case is based on the subjective belief of consumers. *See, e.g.*, Pls.

Mem. at 14. It is proposed, and the Court has apparently accepted, that a company

need not actually be in the business of providing financial products, in the sense of

actually providing those products, but rather that it is sufficient that a consumer

reasonably believe that a party is selling financial products to fall under the ambit of

the CFPA. *See id* at 13, n. 69-70 (citing to 12 U.S.C. § 1581 which does not clearly

apply in such circumstances). Again, given the fact that the Court has already

entered a default judgment and the parties have been ordered to brief damages,

Defendants are at this point unable to contest this theory, but no case cited by the

Plaintiffs—indeed, none are, nor any case which Defendants could find supports

that such would falls under the ambit of the statute.

### A. <u>Defendants' Can Present Significant Evidence Not Admitted Due to Default Which Militates in Favor of Mitigation.</u>

Again, Defendants can present significant testimony that speaks to matters

wholly unrelated to allegations in the Complaint that speak to the availability of

statutory mitigation factors. In no small way, Defendants did in fact help vulnerable

people and improve their lives. Further, and of no small matter, the services

provided by Nexus (and provided by no competitor) represented a significant

savings to the federal government that otherwise would have paid to continue the

detention of consumers. Further, the value of the services provided by Nexus, were

not insubstantial and provided unique opportunities to the consumers—it is

completely ignored that no other alternatives were available to the consumers.

Further, while there were significant revenues, as the Complaint notes, Nexus

attempted various programs which required not insubstantial resources to bring into

being. *See, e.g.*, Compl. at ¶¶ 78-79 (noting the existence of affiliate law firms).

    12 U.S.C. § 5565(c)(3) requires consideration of:

    (A) the size of financial resources and good faith of the person charged;
    (B) the gravity of the violation or failure to pay;
    (C) the severity of the risks to or losses of the consumer, which may take
    into account the number of products or services sold or provided;
    (D) the history of previous violations; and
    (E) such other matters as justice may require.

    Plaintiffs focus entirely the number of consumers who were potentially

subject to certain violations, it does not consider the freedom which was obtained

by close to 46,000 consumers, nor the value of that freedom, both in economic and

noneconomic terms. It does not look towards the fact that despite significant

revenues the vast majority of those funds were never distributed to the shareholders

and the profits of the business were minimal.

    Again, a default judgment has been entered and the Defendants can no

longer contest their ultimate liability, but certainly they may present evidence which

allows for the Court to consider whether or not mitigating factors may reduce the

amount of ultimate penalties.

## B. <u>Nothing in The Complaint Establishes that Any Particular</u>

**Number of Violations Occurred in Any Particular State.**

The Plaintiffs contend that every consumer in every state has suffered a violation of each respective state's consumer protection laws. *See* Pls. Mem. at 45. This is simply not supported by the Complaint. The allegations in the Complaint establish that Nexus has violated the consumer protection laws of the various states, but simply do not establish the number of such violations or that every consumer suffered a violation. Assuming that Plaintiffs continue to bear the burden of establishing damages they have not established either through the Complaint or their speculation that there existed one violation, per consumer, per state.

Indeed, it is wholly unclear how many consumers may have suffered any violations of state consumer protection law.

## IV.   ADDITIONAL SANCTIONS ARE NOT APPROPRIATE.

### A. The Court has Already Entered the Most Severe Sanction at Plaintiffs' Request.

Plaintiffs' have already requested and been granted the most severe sanctions available. *See, e.g.*, ECF Doc. Nos. 201-203. In making their request they did not seek and the Court did not grant evidentiary sanctions under Rule 37(c) in addition to the default sanctions entered by the Court. *See, e.g.*, ECF Doc. No. 189 (arguing strenuously for entrance of default but requesting no evidentiary sanctions under Rule 37(c)). The Court *has* entered an order which *has* resulted in Nexus admitting all traversable allegations contained in the Complaint. *See* ECF Doc.

Nos. 202-203. This resulted in the Court not only defaulting Nexus, but entering judgment against Nexus and ordering the instant trial on damages. *Ibid.*

Any violation of Rule 26(a) and 26(e) would have occurred prior to the motion practice and hearing that ultimately resulted in the entrance of a dispositive discovery sanction. *See generally* ECF Doc. Nos. 66, 102, 171. What Plaintiffs now seek to do is to request further sanction for the conduct which has already been punished by the Court after having had opportunity to argue and brief the same—to the extent that disclosures would have been required other than under the Court's current scheduling order, ECF Doc. No. 211, those would have occurred well before the hearing and supplemental briefing and Plaintiffs final brief on the issue submitted April 3, 2023 (filed significantly after the canceled February 2023 trial date). *See* ECF Doc. No. 189. The Plaintiffs' present *no* argument that there has been any additional violations of discovery or that there has been a failure to provide pretrial disclosures pursuant to the current scheduling order entered by the Court. *See generally* ECF Doc. No. 189. The *only* party that may be to blame for the truncated preparation and disclosure process would be the Plaintiffs who refused later proposed trial dates.

The only 26(a) disclosures that have occurred after the Date hearing have been disclosures pursuant to a joint scheduling order filed by Plaintiffs and Defendants in the wake of the entrance of default and adopted by the Court with

slight modification. ECF Doc. No. 211. Both Defendants and Plaintiffs timely complied with their disclosure obligations under the same order which does not require "final" disclosure of witnesses and evidence until August 8, 2023.

It does not appear as if any case has addressed a party first requesting and being granted a default sanction who then seeks and is granted additional exclusionary sanctions for the self-same conduct which was not requested prior to or with the default sanctions—Defendants have been unable to locate any such case and plaintiffs do not cite to one. Cases do exist where a party in one-fell swoop seeks and obtains both evidentiary and exclusionary sanctions, but again this does not appear to occur on the eve of a damages trial where a party has already obtained a default sanctions. *See, e.g.*, *Qwest Communications International, Inc. v. Oneqwest, LLC*, No. CO2-829R, 2002 U.S. Dist. LEXIS 25469 (W.D. Wash. Nov. 11, 2002).

**B. Assuming Any Violation Occurred, Plaintiffs Waived Their Ability to Move for Additional Sanctions by Failing to Request them Previously.**

Here Nexus was sanctioned for failing to produce. Without having produced, it is nonsensical to assume that supplementations to that production would be required. In essence, to the extent that the Court has found that there was non-production and for that it has already imposed a sanction that was exceedingly severe and Plaintiffs had opportunity to request additional sanctions for the selfsame conduct.

What the Plaintiffs in essence seek is a motion for reconsideration requesting

a yet more severe sanction than the sanction that they were granted.

> Critically here, reconsideration is not meant to re-litigate issues already decided, provide a party the chance to craft new or improved legal positions, highlight previously-available facts, or otherwise award a proverbial "second bite at the apple" to a dissatisfied litigant. It is "inappropriate where it merely reiterates previous arguments." *Univ. of Va. Patent Found. v. Gen. Elec. Co.*, 755 F.Supp.2d 738, 744 (W.D.Va.2011). It is not an occasion "to present a better and more compelling argument that the party could have presented in the original briefs," *Madison River,* 402 F.Supp.2d at 619, or to "introduce evidence that could have been addressed or presented previously." *Regan v. City of Charleston, S.C.*, 40 F.Supp.3d 698, 702 (D.S.C.2014). Aggrieved parties may not "put a finer point on their old arguments and dicker about matters decided adversely to them." *Evans v. Trinity Indus., Inc.*, No. 2:15CV314, 148 F.Supp.3d 542, 546, 2015 WL 8331944, at *3 (E.D.Va. Nov. 25, 2015).In sum, "a party who fails to present his strongest case in the first instance generally has no right to raise new theories or arguments in a motion to reconsider." *Duke Energy*, 218 F.R.D. at 474.
> *Wooten v. Commonwealth of Va.*, 168 F.Supp.3d 890, 893 (W.D.Va. 2016).
> This is by no means a meaningless argument; if Plaintiffs are able to move

for further sanctions based on content they were aware occurred it would

effectively end the and prevent Defendants from contesting allegations of damages.

The Plaintiffs could have made these arguments in their original briefing and

decided not to do so: any disclosures which Defendants failed to make were

failures known well before the ultimate brief submitted on the issue and the

hearing on the issue. It would be fundamentally unfair to allow for exclusionary

sanctions to be imposed at this point, especially given the retention of experts and

the concomitant expense associated with creating expert reports on the exceedingly

tight timetable necessitated by the August trial date.

### C. Plaintiffs' Do Not Address Jurisprudential Factors Which Militate Against Entrance of Additional Sanctions.

The Fourth Circuit, in *Southern States Rack and Fixture, Inc. v. Sherwin*

*Williams Co.* has recognized the broad discretion which courts exercise in

determining whether to impose exclusionary sanctions under Rule 37(c) and

factors that should be considered in exercising that discretion:

> The language of Rule 37(c)(1) provides two exceptions to the general rule excluding evidence that a party seeks to offer but has failed to properly disclose: (1) when the failure to disclose is "substantially justified," and (2) when the nondisclosure is "harmless."
> ...
> [I]n exercising its broad discretion to determine whether a nondisclosure of evidence is substantially justified or harmless for purposes of a Rule 37(c)(1) exclusion analysis, a district court *should be guided by* the following factors: (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the non-disclosing party's explanation for its failure to disclose the evidence.
> 318 F.3d 592, 596–97 (4th Cir. 2003) (emphasis added) (alterations

omitted).

Here, Defendant did not disclose supplemental responses to their discovery

responses because there were no discovery responses to supplement prior to the

entrance of default—although defendants did eventually attempt to comply with

their discovery obligations *per* those requests, such was done immediately prior to

the hearing on default sanctions. As to disclosure of witnesses under the current

schedule, Defendants have complied with it and it can come as little surprise that Defendants intend to provide an expert opinion to contest the opinion proffered by Plaintiffs—the Plaintiffs clearly are relying on calculations to support their conclusion of damages and Defendants plan to do the same. To the extent that surprise needs to be cured, it is clear that the Plaintiffs plan to utilize a particular methodology to support their own preferred calculation of consumer loss, should the Court agree with that style of calculation, there will be no prejudice whatsoever related to the nondisclosure of Defendants' witnesses and exhibits. The disruption to trial if any will be minimal given Defendants' ability to provide an expert report prior to the date of final witness and evidentiary disclosures and to the extent the Plaintiffs would wish more time, or to reopen discovery, the Defendants are completely ready to accede to the same request.

### D. Rule 37, Subsection (c) Is not Truly a Rule of Automatic Implementation.

Subsection (c) of Rule 37 prevents a party from utilizing undisclosed information—specifically information that was required to be disclosed under Federal Rules of Civil Procedure ("FRCP") Rule 26(a) and (e). Rule 26(a) requires initial disclosures, expert disclosures, and for pretrial disclosures. Rule 26(e) provides for continual supplementation of disclosures and information made available during the discovery process. While a failure to disclose may result in

exclusion, such is not mandatory on the Court and courts regularly allow for expert testimony, as well as testimony by lay witnesses, where nondisclosure presents minimal surprise or harm *See, e.g.*, *London v. Wash. Metro. Area Transit Auth.*, 8:21-cv-01497-AAQ, 2023 WL 3727058, at *6-8.

Again, here, the evidence Defendants seek to introduce is of critical importance to the determination of damages and if such is excluded, the damages hearing will be all but moot because the Defendants will be able to present virtually no evidence. Further, while Defendants cannot undo what has occurred in the past, Defendants did not fail to comply with the last scheduling order entered in the case or the currently controlling scheduling order—again, the previous scheduling order required disclosures and the close of discovery to be determined by the trial date, which was cancelled and not rescheduled until a default was entered. While Defendants appreciate that the their presenting a defense as to damages may be inconvenient, it certainly cannot come as a surprise.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants respectfully request the Court determine damages based on proof of damages presented at trial, treating the issue of damages as distinct from its entrance of default judgment on liability.

Dated: July 14, 2023
       Cold Brook, New York.             Respectfully submitted,

/s/Zachary Lawrence
Lawrence Law Firm PLLC
Little Falls, NY 13365
202-468-9486
zach@zlawpllc.com
Pro hac vice (NY Bar No.: 5798202)