IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | | |
|---|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU; COMMONWEALTH OF MASSACHUSETTS; THE PEOPLE OF THE STATE OF NEW YORK, by LETITIA JAMES, ATTORNEY GENERAL OF THE STATE OF NEW YORK; and COMMONWEALTH OF VIRGINIA, *ex rel.* MARK R. HERRING, ATTORNEY GENERAL, | ) ) ) ) ) ) ) ) ) ) | Civil Action No. 5:21-cv-00016<br><br>By: Elizabeth K. Dillon<br>    United States District Judge |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| NEXUS SERVICES, INC.; LIBRE BY NEXUS, INC.; MICHEAL DONOVAN; RICHARD MOORE; and EVAN AJIN, | ) ) ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

In February 2021, the Consumer Financial Protection Bureau ("CFPB"), the

Commonwealth of Massachusetts, the People of the State of New York, and the Commonwealth

of Virginia (collectively, the "plaintiff-states") filed a 17-count complaint against Nexus

Services, Inc. ("Nexus"), Libre by Nexus, Inc. ("Libre") (collectively, "Corporate Defendants"),

Micheal Donovan, Richard Moore, and Evan Ajin (collectively, "Individual Defendants")

(Compl. 1, Dkt. No. 1).  Plaintiffs allege that defendants violated the Consumer Financial

Protection Act ("CFPA"), the Virginia Consumer Protection Act ("VCPA"), and Massachusetts

and New York consumer protection laws in administering "immigration bonds" for indigent

consumers facing deportation.  (Compl. ¶¶ 1–3, 26–47.)  After a series of discovery disputes and

the entry of default against defendants, what is now left to decide are the appropriate remedies. For the following reasons, the court will grant plaintiffs' requested remedies in full.

## I.  BACKGROUND

### A.  Factual Background

Nexus, through its wholly owned subsidiary Libre, operates a nationwide business aimed at immigrants held in federal detention.  (Compl. ¶ 23.)  The business was designed and implemented by Micheal Donovan, Richard Moore, and Evan Ajin.  (*Id.* ¶ 6.)  At the time the suit was originally filed, Donovan was a majority owner, officer, and director of Nexus and the chief executive officer of Libre.  (*Id.* ¶ 20.)  Moore was part owner of Nexus, the chief financial officer of Libre, and the executive vice president of Nexus and Libre.  (*Id.* ¶ 21.)  Ajin was part owner and a director of Nexus and a vice president of Libre.  (*Id.* ¶ 22.)

Libre advertises its services to immigrants who are detained and may be released on bond.  (*Id.* ¶¶ 26, 30.)  In 2018, the average immigration bond was $7,500.  (*Id.*)  A detainee may pay an immigration bond fully in cash or guarantee the bond through a surety company that is certified by the U.S. Treasury.  (*Id.* ¶¶ 26–27.)  Neither Nexus nor Libre is a licensed bail-bond agent or a surety company certified by the U.S. Treasury.  (*Id.* ¶¶ 28, 29.)  Instead, Libre is a service provider that acts as an intermediary between immigration detainees and sureties and their bond agents.  (*Id.* ¶ 37.)

To obtain Libre's services, Libre requires detainees to execute an agreement with certain obligations, and, in exchange, Libre agrees to indemnify the sureties and their bond agents for any losses in connection with the immigration bonds.  (*Id.*)  From about 2014 until 2017, Libre used a multi-part, 21-page, written client agreement ("the Original Agreement").  (*Id.* ¶¶ 34, 69.) The Original Agreement was written in English, except for a single page written in Spanish.

(*Id.*)  The Original Agreement required consumers to make upfront payments in the amount of 20% of the bond, a $420 advance payment, and an activation fee up to $460.  (*Id.* ¶ 47.)  In addition, it required consumers to wear a GPS ankle monitor and make monthly payments of $420 until: (1) the consumer's immigration proceedings are resolved; or (2) the consumer makes supplemental collateral payments that add up to 80% of the amount of the bond, at which time the ankle monitor is removed, and the consumer agrees to pay the remaining 20% over a specified time.  (*Id.* ¶ 48.)  A consumer's monthly payments to Libre are not refundable, but the collateral payments are refundable once a consumer's immigration proceedings are resolved. (*Id.* ¶¶ 49, 50.)

In late 2017 or early 2018, Libre revised its written client agreement (the "New Agreement").  (*Id.* ¶ 71.)  The New Agreement does not require GPS monthly lease payments. Instead, it requires monthly "program fees," which are recurring monthly charges that vary according to the bond amount.  (*Id.* ¶ 72.)  The New Agreement requires consumers to either pay program fees according to a schedule or to pay supplemental bond collateralization payments that add up to the full amount of the bond.  (*Id.*)  After a consumer has paid all of the program fee installments or made bond collateralization payments in the full amount of the bond, the consumer must then pay a monthly maintenance fee of $50 until the bond is cancelled.  (*Id.* ¶ 73.)

According to plaintiffs, Libre falsely told consumers that it paid the full amount of the consumer's bond to Immigration and Customs Enforcement ("ICE").  (Compl. ¶ 114.)  In addition, Libre falsely told consumers that the $420 monthly payments in the Original Agreement were repayments to Libre for the bond Libre paid, but the monthly payments actually went toward leasing the GPS device.  (*Id.* ¶ 115.)  Regarding the New Agreement, Libre

represented to consumers that the monthly payments were payments toward a loan.  (*Id.* ¶ 116.)

Further, consumers told call-center employees that they thought their monthly payments were

going toward paying down their bonds.  (*Id.* ¶ 117.)  Most Libre consumers do not read or speak

English; therefore, they cannot understand the terms in the written agreement and rely on Libre's

oral representations.  (*Id.* ¶ 118.)  Plaintiffs allege that "Libre's misrepresentations lead

consumers to reasonably believe that Libre ha[d] paid cash bonds, that consumers owe[d] a debt

to Libre in the amount of the cash bonds, and that [consumers'] monthly payments pa[id] down

that debt."  (*Id.* ¶ 120.)

## B.  Procedural History

In February 2021, the CFPB, the Commonwealth of Massachusetts, the People of the

State of New York, and the Commonwealth of Virginia filed a complaint against Nexus Libre,

Donovan, Moore, and Ajin, alleging that defendants engaged in deceptive, abusive, and

fraudulent conduct in the course of their business.  (Compl. ¶¶ 1–3, 26–47.)  Counts One through

Ten assert violations of the Consumer Financial Protection Act of 2010 ("CFPA"), 12 U.S.C.

§§ 5481, *et seq*., on behalf of all plaintiffs against different groups of defendants, and Counts

Eleven through Seventeen assert violations of various state consumer protection laws on behalf

of the corresponding individual plaintiff-state.

On May 19, 2021, defendants agreed to provide in discovery their Rule 26(a) individual

disclosures on or before July 22, 2021, which they ultimately did on July 21 (Dkt. No. 222-3).

With respect to disclosure of individuals who were "likely to have discoverable

information . . . that [defendants] may use to support [their] claims or defenses," Fed. R. Civ. P.

26(a)(1)(A)(i), defendants listed nineteen individuals/entities, most of whom were already named

somewhere in the complaint.  (Dkt. No. 222-3 at 2.)  Concerning the disclosure of copies of "all

documents, electronically stored information, and tangible things that [defendants had] in [their]

possession, custody, or control and may use to support [their] claims or defenses," Fed. R. Civ.

P. 26(a)(1)(A)(ii), defendants indicated that they "have no documents, electronically stored

information, and tangible things[] in their possession, custody, or control at this time." (Dkt. No.

222-3 at 3.) To date, defendants have not supplemented those initial disclosures.

On September 13, 2021, the court issued an order scheduling a bench trial for January 30

through February 17, 2023, and setting other key deadlines in this case. Defendants largely

failed to produce documents and electronically stored information responsive to plaintiffs'

discovery requests throughout this litigation. On June 8, 2022, U.S. Magistrate Judge Joel C.

Hoppe ordered defendants to take certain steps to fully respond to plaintiffs' outstanding requests

for production. (Dkt. No. 129.) Defendants did not comply with that order. Consequently, on

July 19, 2022, plaintiffs moved the court to sanction defendants for their noncompliance. (Dkt.

No. 139.)

The deadline for defendants' expert disclosures (August 1, 2022) came and went, and

defendants had not yet disclosed the identity or written report of any expert. Likewise, the

deadline to complete discovery (October 27, 2022) passed, and plaintiffs still had not received

most of their requested discovery. (Dkt. No. 201 at 13.) As a result, on December 1, 2022, the

court canceled the early 2023 bench trial. (Dkt. No. 171.)

On May 11, 2023, the court issued a memorandum opinion and order finding each

defendant in civil contempt and entering default against them pursuant to Federal Rule of Civil

Procedure 37(b)(2)(A)(iv). (Dkt. Nos. 201, 202.) Because the sanctions resolved only the

disposition of plaintiffs' claims and not the extent of the associated relief, the court ordered

further proceedings to determine the appropriate damages and/or other remedies in relation to

those claims.  (Dkt. No. 202 at 2.)  In their briefing on remedies, plaintiffs made a number of requests for additional Rule 37 sanctions against defendants in order to curtail their production of new evidence at the evidentiary hearing not previously produced in discovery.  (Br. in Supp. of Remedies 9–12, Dkt. No. 216.)  Plaintiffs also requested the court "decid[e] all evidentiary disputes relevant to remedies and damages in Plaintiffs' favor . . . ."  (*Id.* at 9.)

The court set the damages/remedies hearing for August 15 and 16, 2023, and ordered the parties to file initial exhibit and witness lists for that hearing on or before June 26, 2023.  (Dkt. No. 211.)  On June 26, defendants filed their initial exhibit and witness lists.  (Dkt. No. 219.) The witness list included two expert witnesses and 11 lay witnesses whom defendants had never before disclosed to plaintiffs.  The only witness on this list whose identity was previously disclosed was Evan Ajin—one of the Individual Defendants.  The exhibit list included a total of 17 documents—two of which were expert reports.  Defendants did not provide copies of any of the documents identified as exhibits in this list to plaintiffs.  (Dkt. No. 222-1 ¶ 3.)  On July 25, 2023, plaintiffs filed objections to the entirety of defendants' proposed exhibit and witness lists. (Dkt. No. 223.)  Also on July 25, 2023, and in advance of the scheduled evidentiary hearing, plaintiffs sent a proposed order to the court and counsel.  Defendants did not comment on the proposed order.  On August 8, 2023, the court issued a memorandum opinion and order sustaining all of plaintiffs' objections regarding defendants' proposed exhibits and all but one of plaintiffs' objections to defendants' expert witnesses, leaving Evan Aijn as defendants' only witness for the evidentiary hearing.  (*See* Mem. Op. on Objs., Dkt. No. 229.)  The day before the hearing was set to take place, the parties entered a stipulation, which provides, in pertinent part, "The parties stipulate that after accounting for refunds that Corporate Defendants already provided to consumers, Corporate Defendants received $230,996,970.84 from consumers

between December 2013 to June 2022, as reflected in Corporate Defendants' Supplemental Responses to the Commonwealth of Virginia's First Interrogatories and the Lightspeed records produced by Defendants in this litigation." (Am. Stipulation 2–3, Dkt. No. 238.) After the parties indicated that there was no need to present any evidence or argument not already before the court, the hearing was canceled with the agreement of all parties. (*See* Dkt. No. 239.)

The entry of the stipulation and cancelation of the hearing effectively resolved plaintiffs' requests for additional Rule 37 sanctions because most of the sanctions sought were already granted when the court sustained the majority of plaintiffs' objections to defendants' witness and exhibit lists, and the court is resolving the issues of remedies in plaintiffs' favor, as detailed below. (*See* Mem. Op. on Objs.) Now, all that is left to decide are the particular remedies in this matter. Defendants have effectively conceded most of plaintiffs' arguments by failing to address these arguments in their response. (*See generally* Br. in Opp'n. to Remedies, Dkt. No. 221.) *See, e.g.*, *Gowen v. Winfield*, No. 7:20-cv-00247, 2022 WL 822172 (W.D. Va. Mar. 18, 2022) ("[P]laintiff has conceded this argument by failing to respond to it . . . "); *Intercarrier Communs., LLC v. Kik Interactive, Inc.*, No. 3:12-cv-771, 2013 WL 4061259, at *1 (E.D. Va. Aug. 9, 2013) (holding that where a party fails to respond to an argument it is "effectively conceding" the argument). Defendants do, however, contest the calculations of restitution and civil penalties.[1] (*See* Br. in Opp'n. to Remedies 10, 21.)

## II. DISCUSSION

### A. Legal Standards

When a defendant defaults, the complaint's well-pleaded allegations relating to the

---

[1] Defendants also continue to argue that the CFPB is unconstitutionally funded. (*See* Br. in Opp'n. 3 n.3.) Defendants made this argument in their untimely motion for judgment on the pleadings, which the court found moot. (Dkt. No. 202). Furthermore, the court declined to reconsider the ruling and noted that even if the issue were not moot, the court would follow the line of cases concluding that the CFPB's funding structure does not violate the Constitution. (Dkt. No. 226.)

defendant's liability are taken as true, with the exception of the allegations relating to the amount of damages. *See Ryan v. Homecomings Fin. Network,* 253 F.3d 778, 780 (4th Cir. 2001); *see also Mey v. Phillips,* 71 F.4th 203, 223 (4th Cir. 2023) (same as to entry of default as a Rule 37 sanction). The court then analyzes "whether or not the face of the pleadings supports the default judgment and the causes of action therein" using a standard of review akin to that applicable to a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). *See Commodity Futures Trading Comm'n v. Dupont*, No. 8:16-cv-02358-TMC, 2018 WL 3148532, at *5 (D.S.C. June 22, 2018). Under the 12(b)(6) standard, the complaint must "contain sufficient factual matter" to "state a claim that is plausible on its face" for which relief can be granted and from which the court can draw the "reasonable inference" that the defendant is "liable for the misconduct alleged." *Paradise Wire & Cable Defined Ben. Pension Plan v. Weil*, 918 F.3d 312, 315 (4th Cir. 2019) (citing *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999). The court should draw "all reasonable factual inferences" in a plaintiff's favor. *Id.* The court must then determine "whether the well-pleaded allegations . . . in [the] complaint support the relief sought" and award relief accordingly. *Ryan*, 253 F.3d at 780.

## B. The Plaintiffs' Well-Pleaded Claims

### 1. Claims against all defendants under the Consumer Financial Protection Act (Counts 1–9)

#### a. *"Covered persons" under the CFPA*

Plaintiffs allege that Libre is a "covered person" under the CFPA and is thus bound to the law's requirements. (Compl. ¶ 19.) The CFPA prohibits "covered person[s]" from engaging in "any unfair, deceptive, or abusive act or practice." 12 U.S.C. § 5536(a)(1)(B). "Covered person[s]" include individuals and corporations that engage "in offering or providing a consumer financial product or service." 12 U.S.C. § 5481(6)(A). A "consumer financial product or

8

service" includes "extending credit and servicing loans."  12 U.S.C. § 5481(5).  Here, Libre

purports to provide extensions of credit to pay for consumers' immigration bonds, which are

"consumer financial products or services" under the CFPA.  (Compl. ¶ 19.)  Plaintiffs therefore

have plausibly alleged that Libre is a "covered person" under the CFPA.

"Covered person[s]" also include "related person[s]."  12 U.S.C. § 5481(25)(B).  A

"related person" is a "director, officer, or employee charged with managerial responsibility for,

or controlling shareholder of" the company or "any shareholder . . . who materially participates

in the conduct of [its] affairs."  12 U.S.C. § 5481(25)(C).  Plaintiffs contend that Individual

Defendants are "related persons" to Libre because they are directors, officers, or employees

charged with managerial responsibility for the company and shareholders and materially

participated in the conduct of Libre's affairs.  (Compl. ¶¶ 20–22.)  Plaintiffs have plausibly

alleged that Individual Defendants are "related persons" and are therefore subject to the CFPA.[2]

### b. "Practice of deception" under the CFPA

Plaintiffs allege that defendants engaged in widespread acts of deception in violation of

the CFPA.  (Br. in Supp. of Remedies 13.)  An act or practice is deceptive under the CFPA if: (1)

"there is a representation, omission, or practice that," (2) "is likely to mislead consumers acting

reasonably under the circumstances," and (3) "the representation, omission, or practice is

material."  *CFPB v. Gordon*, 819 F.3d 1179, 1192–93 (9th Cir. 2016) (internal quotations

omitted).  In the context of the Federal Trade Commission Act, a similar consumer protection

---

[2] Defendants attempt to contest their status as "covered persons" by claiming that Libre was not actually in "the business of providing financial products," but rather the consumers "reasonably believed" it was selling financial products.  (Br. in Opp'n. 3 n.3, 22–23.)  Defendants correctly note that, since the court has already entered default judgment, they cannot contest this theory of liability.  Moreover, as plaintiffs note, defendants are "covered persons" because they "[have] create[d] the *reasonable impression* in consumer's minds that [they are] offering or providing extensions of credit to pay for consumers' immigration bonds[.]"  (Compl. ¶ 19 (emphasis added).)  *See SEC v. Lauer*, 52 F.3d 667 (7th Cir. 1995) ("[It] is the representations made by the [defendants], not their actual conduct, that determine" whether defendants violated a federal securities law analogous to the CFPA.).

law, a representation, omission, or practice is considered material when it "involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding a product." *Fanning v. FTC*, 821 F.3d 164, 172 (1st Cir. 2016) (quoting *Kraft, Inc. v. FTC*, 970 F.2d 311, 322 (7th Cir. 1992)).  Materiality is presumed for "at least four types of claims," including "express" claims and "claims pertaining to a central characteristic of the product about which reasonable consumers would be concerned."  *Id.* at 172–73 (internal quotations omitted).

Plaintiffs allege that Libre engaged in a number of deceptive practices.  Libre deceived consumers regarding the nature of the payments its consumers were making and the functionality and purpose of the GPS devices.  (Compl. ¶¶ 66–67, 81–87, 90–91, 174.)  Libre represented that it paid the full amounts of immigration bonds, which the consumers would pay back through a flat fee and subsequent monthly payments.  (*Id.* ¶¶ 1, 4, 19, 45, 115–16, 120.)  Contrary to these claims, Libre did *not* pay the immigration bonds, and the monthly payments were in actuality "rental fees" for the GPS devices.  (*Id.* ¶¶ 44, 115, 147.)  Plaintiffs argue that consumers reasonably relied on Libre's oral representations that they were paying back the bond amount, particularly since Libre's written agreements were predominately in English while the vast majority of their clients could not read or speak English.  (*Id.* ¶¶ 4, 19.)  Libre also represented that the GPS devices were used to monitor consumers' locations after release when the GPS devices were often non-functional.  (*Id.* ¶¶ 66–67, 81–87, 90–91, 174.)

Plaintiffs further allege that Libre threatened consumers with re-arrest, detention, and deportation by an "Agency"—which consumers likely believed was ICE—if they failed to pay the monthly fees or removed their GPS devices, even though Libre had no such relationship with ICE nor did it have the authority to prosecute its consumers.  (*Id.* ¶¶ 5, 55–58, 103, 151.)  Plaintiffs contend that defendants' call center employees repeatedly threatened consumers that

their accounts would be turned over to debt collectors or reported to credit agencies; Libre never followed through on these threats. (*Id.* ¶¶ 5, 107–09, 158, 163, 168.) Furthermore, Libre represented that collateral payments were refundable once a consumer's proceedings were resolved, yet, according to plaintiffs, Libre often did not provide these refunds. (*Id.* ¶¶ 50–53, 74, 178.) Plaintiffs also contend that Libre promised consumers that it would provide free immigration attorneys to help them with their cases or refer them to pro bono attorneys through affiliated law firms. (*Id.* ¶¶ 78, 183.) However, Libre only provided referrals to independent law firms that often declined to take cases from Libre's consumers. (*Id.* ¶¶ 79, 184.)

Plaintiffs argue that the above express misrepresentations by Libre mischaracterized the central characteristics of its services and materially affected consumers' decisions to do business with Libre. (*Id.* ¶¶ 148, 175.) Plaintiffs have plausibly alleged that Libre committed deceptive acts in violation of the CFPA, and the facts established by default satisfy each of the elements of a CFPA claim. *See Gordon,* 819 F.3d at 1192–93 (setting forth elements of a CFPA claim).

Plaintiffs further allege that Individual Defendants themselves engaged in acts of deception under the CFPA. As the three controlling shareholders of Libre's parent company Nexus, Individual Defendants had the authority and responsibility to approve Libre entering into agreements with consumers and controlled all aspects of Libre's operations, including training employees. (*Id.* ¶¶ 124–26.) Plaintiffs contend that Individual Defendants knew or should have known that employees were misrepresenting the terms of the program to consumers. (*Id.* ¶ 141.) Plaintiffs assert that Individual Defendants violated the CFPA by either directly participating in the deceptive and abusive acts detailed above or by having the authority to control or correct this deceptive conduct. (*Id.* ¶¶ 124–137.) *See CFPB v. CashCall, Inc.*, 35 F.4th 734, 749 (9th Cir. 2022) (finding corporate officer liable under CFPA because he had "authority to control"

company's actions).  Plaintiffs have plausibly alleged that Individual Defendants engaged in acts
of deception in violation of the CFPA.

### 2. Claims against Nexus and Individual Defendants—substantial assistance under the CFPA (Count 10)

Under the CFPA, it is unlawful for any person to knowingly or recklessly provide
substantial assistance to a covered person in violation of the CFPA, and the provider of such
substantial assistance is in violation of that section to the same extent as the person to whom
such assistance is provided.  12 U.S.C. § 5536(a)(3).  Although "relatively few cases have
precisely delineated the elements of substantial assistance under the CFPA, courts have required
(1) a primary violation of the CFPA; (2) the defendant's knowledge or reckless disregard of the
primary violation; and (3) the defendant's substantial assistance in the primary violation."
*Consumer Fin. Prot. Bureau v. Manseth*, No. 22-CV-29-LJV, 2023 WL 5400235, at *16
(W.D.N.Y. Aug. 22, 2023) (citing *Consumer Fin. Prot. Bureau v. RD Legal Funding, LLC*, 332 F.
Supp. 3d 729 (S.D.N.Y. 2018), *vacated on other grounds*, 828 F. App'x 68 (2d Cir. 2020); *CFPB
v. Univ. Debt & Payment Sols., LLC*, No. 1:15-cv-0859-RWS, 2019 WL 1295004, at *15 (N.D.
Ga. Mar. 21, 2019)).

As stated above, plaintiffs have plausibly alleged numerous violations of the CFPA and
that Individual Defendants knew or should have known about these violations.  Plaintiffs contend
that Individual Defendants substantially assisted Libre and its operations by approving Libre's
policies and practices, exercising authority over Libre's call center and field representatives,
reviewing quality assurance reports, overseeing the training of Libre's representatives and their
compensation structure, overseeing the handling of consumer complaints, and approving new
clients.  (Compl. ¶¶ 194–95.)

Plaintiffs additionally argue that Nexus substantially assisted Libre in its violations of the CFPA. Nexus, through the management and control of Individual Defendants, substantially assisted Libre in its deceptive acts "by employing Libre's representatives, entering into contracts related to Libre's use of GPS monitoring devices, and as a party to the GPS Monitoring Agreement signed by Libre's consumers." (Compl. ¶ 195.) Plaintiffs have sufficiently pled that Individual Defendants and Nexus provided substantial assistance to Libre, with knowledge or reckless disregard of Libre's violations of the CFPA.

For all of these reasons, the court finds that plaintiffs have sufficiently pled claims under the CFPA for which relief can be granted.

### 3. Claims under the Virginia Consumer Protection Act (Count 11)

The Commonwealth of Virginia brings claims against Corporate Defendants under the Virginia Consumer Protection Act (VCPA). To state a claim for relief under § 59.1-200 of the VCPA, Virginia must allege the following statutory elements: (1) that Corporate Defendants were "supplier[s]" subject to the prohibitions of § 59.1-200(A); (2) that Corporate Defendants engaged in "consumer transaction[s]" with Virginians; and (3) that Corporate Defendants committed one or more "unlawful" "acts or practices" identified in § 59.1-200(A) in connection with a "consumer transaction[.]"

Virginia contends that Corporate Defendants are "suppliers" under the VCPA because they engaged in "consumer transactions" with Virginia consumers. (Compl. ¶ 203.) Virginia describes a number of Corporate Defendants' alleged unlawful acts or practices. (*Id.* ¶ 204.) Section 59.1-200(A)(3) of the VCPA prohibits suppliers from misrepresenting their "affiliation, connection, or association" with a third party. Virginia points out that Corporate Defendants misrepresented their affiliation with immigration authorities and misled consumers to believe

that they could influence the outcome of their clients' immigration cases based on this supposed affiliation.  (*Id.* ¶ 204(c).)  Similarly, Section 59.1-200(A)(5) prohibits suppliers from misrepresenting that their services have "certain quantities, characteristics, ingredients, uses, or benefits."  Virginia argues that Corporate Defendants misled consumers into believing that a characteristic or benefit of their services was that they were paying for their clients' bonds when they were not actually doing so.  (*Id.* ¶ 204(i).)

Finally, Section 59.1-200(A)(14) generally prohibits Corporate Defendants from using "any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction."  As described in detail above, the complaint describes Corporate Defendants as engaging in a slew of deceptive conduct, including providing non-English speakers program information and agreements only in English, falsely claiming that the GPS devices were functional, not providing refunds, and misrepresenting that monthly payments were going towards the amount of the bond when the payments were actually rental fees for the GPS devices.  (*See* Compl. ¶ 204.)

The court finds that Virginia has sufficiently stated a claim under the VCPA against Corporate Defendants for which relief can be granted.

### 4. Claims under the Massachusetts Consumer Protection Act and the Massachusetts Fair Debt Collection Practices Act (Counts 12–14)

The Commonwealth of Massachusetts contends that defendants engaged in unfair and deceptive conduct in violation of the Massachusetts Consumer Protection Act (MCPA).  The MCPA prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce" that directly or indirectly affect Massachusetts consumers.  Mass. Gen. Laws ch. 93A, § 2.  Conduct is "unfair" within the meaning of the MCPA if it falls "within the penumbra of a common-law, statutory, or other established concept of unfairness; [or is] immoral, unethical,

oppressive or unscrupulous." *Milliken & Co. v. Duro Textiles, LLC*, 887 N.E.2d 244, 259 (Mass. 2008) (citing *Morrison v. Toys "R" Us, Inc.*, 806 N.E.2d 388, 392 (2004)) (internal quotations omitted). Conduct is "deceptive" if it has "the capacity to mislead consumers, acting reasonably under the circumstances." *Aspinall v. Philip Morris Cos.*, 813 N.E.2d 476, 488 (Mass. 2004).

Massachusetts alleges that Libre engaged in numerous instances of unfair and deceptive misconduct when providing services to Massachusetts consumers. (Compl. ¶ 220.) Massachusetts asserts that Libre engaged in unfair conduct when it required consumers to wear GPS devices that frequently malfunctioned and caused physical discomfort, made false threats to consumers regarding noncompliance with Libre's policies, required mostly Spanish-speaking consumers to enter into English-language agreements, among other "oppressive" misconduct. (*Id.*) Massachusetts contends that Libre deceived consumers when it misrepresented that it had paid consumers' bonds, falsified its relationship with federal immigration authorities, gave consumers false information regarding the purposes of fees, failed to provide promised refunds, and otherwise misled consumers. (*Id.* ¶ 211.)

Massachusetts also alleges that Individual Defendants themselves are liable under the MCPA as corporate officers. Under the MCPA, "a corporate officer may be held individually liable for the conduct of a corporation if they: (a) participated in the unlawful misconduct; or (b) had the authority to control the operation of the corporation and knew, or should have known, of the unlawful acts." *See FTC v. Ross*, 743 F.3d 886, 892 (4th Cir. 2014) (setting out standard for individual liability under Federal Trade Commission (FTC) Act, 15 U.S.C. § 41 *et seq.*); *see also Nader v. Citron* 360 N.E.2d 870, 875 (Mass. 1977) (adopting FTC Act standard for Chapter 93A cases), *abrogated on other grounds by Iannacchino v. Ford Motor Co.*, 888 N.E.2d 879 (Mass. 2008). As discussed above, Massachusetts claims that Individual Defendants had control over

Corporate Defendants and knew, or should have known, of the deceptive conduct at issue. (Compl. ¶ 213.)  Massachusetts has plausibly alleged claims against defendants under the MCPA.

Massachusetts also brings claims against defendants under the Massachusetts Fair Debt Collection Practices Act (MFDCPA).  Mass. Gen. Laws ch. 93 § 49.  The MFDCPA applies to creditors who attempt to collect a debt in an unfair, deceptive, or unreasonable manner.  *Id.*  Massachusetts alleges that defendants, as creditors under the MFDCPA, attempted to collect debts from consumers based on incomplete and inaccurate records, failed to respond to consumers' disputes about alleged debts, continued collection activities without validating the existence of debts, and falsely threatened to take action against alleged debtors, all in violation of the MFDCPA.  (Compl. ¶¶ 225–32.)  Massachusetts has plausibly stated claims under the MFDCPA.

### 5.  Claims under the New York Executive Law and the New York General Business Law (Counts 15 and 16)

The State of New York brings claims against defendants under the New York Executive Law (NYEL), alleging that defendants engaged in repeated and persistent fraudulent acts. (Compl. ¶ 236.)  Fraud under the NYEL includes "any device, scheme or artifice to defraud and any deception, misrepresentation, concealment, suppression, false pretense, false promise or unconscionable contractual provisions."  N.Y. Exec. Law § 63(12).  This definition has been "liberally construed to defeat all unsubstantial and visionary schemes . . . whereby the public is fraudulently exploited," and prohibits a broad range of deceptive and abusive behavior.  *People ex rel. Cuomo v. Greenberg*, 946 N.Y.S.2d 1, 8 (App. Div. 1st Dept. 2012) (internal quotations omitted); *People v. Lexington Sixty-First Assocs.*, 345 N.E.2d 307, 313 (N.Y. 1976).  Establishing fraud under the NYEL requires a showing that "the targeted act has the capacity or tendency to

16

deceive, or creates an atmosphere conducive to fraud." *People ex rel. Spitzer v. Gen. Elec. Co.*, 756 N.Y.S.2d 520, 523 (App. Div. 1st Dept. 2003).

As discussed extensively above, New York alleges that defendants have engaged in many acts that have the capacity or tendency to deceive vulnerable consumers, such as mispresenting that Libre paid consumers' bonds, falsely threatening consumers if they failed to make their monthly payments or take off the GPS devices, falsely claiming that Libre would provide consumers free legal counsel, and failing to refund collateral payments. (Compl. ¶ 236.)

New York further argues that defendants violated the NYEL by entering into and enforcing unconscionable contracts. (*Id.* ¶ 243.) For a contract to be found so grossly unreasonable that is deemed unenforceable, it must be both "procedurally and substantively unconscionable." *Gillman v Chase Manhattan Bank*, 534 N.E.2d 824, 828 (N.Y. 1988). Procedural unconscionability is present "if one party lacked meaningful choice in the contract formation and can be demonstrated by establishing, among other factors, that deceptive tactics were used, that the contracts included fine print, or that a disparity in experience, education, or bargaining power existed between the parties." *Id*. Defendants took advantage of unsophisticated, non-English speaking consumers by using lengthy and complicated English-language contracts to sign them up for services. (Compl. ¶ 242.) New York also alleges that defendants threatened consumers with criminal prosecution and did not permit the removal of the GPS devices even for medical reasons. (*Id.* ¶ 243.) New York contends that the contracts were therefore procedurally unconscionable because of the imbalance of knowledge and bargaining power between defendants and consumers. (Br. in Supp. of Remedies 31.)

Substantive unconscionability can be established under the NYEL by demonstrating that a contract's provisions, as enforced, were unreasonably favorable to one side. *Gillman*, 534

17

N.E.2d at 828 (*citing In re State v. Avco Fin. Serv. of New York*, 406 N.E.2d 1075, 1077 (N.Y. 1980)).  New York argues that the contracts here placed significant burdens on vulnerable and often impoverished consumers such as hefty monthly payments, uncomfortable and restrictive GPS monitors, and threats of prosecution and financial ruin.  (Br. in Supp. of Remedies 32.) New York concludes that the contracts here were therefore both procedurally and substantively unconscionable in violation of the NYEL.  (*Id.*)

Finally, under the NYEL, individuals are liable for the fraudulent conduct of a corporate entity if they participated or had actual knowledge of the conduct.  *People v. Apple Health & Sports Clubs, Ltd.*, 599 N.E.2d 683, 686 (N.Y. 1992).  As discussed above, New York alleges that Individual Defendants had knowledge of or participated in the misconduct of Corporate Defendants.  (Compl. ¶ 244.)  New York has therefore plausibly stated claims under the NYEL for which relief can be granted.

New York also brings claims against defendants under the New York General Business Law (NYGBL), which prohibits deceptive acts and practices in the conduct of any business, trade, or commerce or in the furnishing of any service in New York State.  N.Y. Gen. Bus. Law § 349(a).  This prohibition is "intended to be broadly applicable, extending beyond the reach of common law fraud."  *New York v. Feldman*, 210 F. Supp. 2d 294, 301 (S.D.N.Y. 2002).  An act or omission violates the NYGBL if it is "consumer-oriented" and likely to "mislead a reasonable consumer" in a "material way."  *Oswego Laborers Local 214 Pension Fund v. Marine Midland Bank*, 647 N.E.2d 741, 743–44 (N.Y. 1995).  Defendants' acts alleged here were certainly oriented toward consumers and, as discussed extensively above, were likely to materially mislead consumers.  (Compl. ¶ 249.)  Additionally, and similarly to the NYEL, an individual defendant is liable under the New York General Business Law if the defendant "participates in a

18

deceptive scheme or has the authority to control the deceptive content at issue." *New York v. Debt Resolve, Inc.*, 387 F. Supp. 3d 358, 369 (S.D.N.Y. 2019) (internal quotations omitted).  As detailed extensively above, New York alleges that Individual Defendants authorized and controlled Corporate Defendants' deceptive practices.  (Compl. ¶ 250.)  New York has plausibly pled claims under the NYGBL for which relief can be granted.

## C.  The Plaintiffs' Proposed Relief

### 1.  Injunctive relief

#### a.  *Injunctive relief under the CFPA*

The CFPA specifically authorizes the CFPB to seek "equitable relief including a permanent or temporary injunction" and allows courts to place "limits on the activities or functions" of a defendant as a remedy for unfair, deceptive, and abusive acts that contravene the statute.  12 U.S.C. § 5564(a); § 5565(a)(2)(G).  A permanent injunction is justified under the CFPA where there is "some reasonable likelihood of future violations."  *See CFPB v. Chou Team Realty LLC*, No. 8:20-cv-00043-SB-ADS, 2021 WL 4077110, at *5 n.6 (C.D. Cal. Aug. 10, 2021), *aff'd sub nom. CFPB v. Nesheiwat*, No. 21-56052, 2022 WL 17958636 (9th Cir. Dec. 27, 2022).  To obtain a permanent injunction, courts have typically required the CFPB to show:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*Bureau of Consumer Fin. Prot. v. Future Income Payments, LLC*, No. 8:19-2950-BHH-KFM, 2021 WL 672928 (D.S.C. Feb. 22, 2021) (citing *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006)); *see also Christopher Phelps & Assocs., LLC v. Galloway*, 492 F.3d 532, 543 (4th Cir. 2007).

19

The CFPB argues that injunctive relief is warranted to enjoin defendants from continuing to violate the CFPA, and defendants have not offered any arguments in opposition to the requested relief.  (Br. in Supp. of Remedies 34; Reply in Supp. of Remedies 3, Dkt. No. 222.) The court finds that the CFPB has met the standard for injunctive relief under the CFPA.  Here, the CFPB "may not have itself suffered an irreparable injury, but it proceeds . . . on behalf of thousands of . . . individuals who were victimized by the defendants' violations of the law." *Consumer Fin. Prot. Bureau v. Siringoringo*, No. SACV 14-01155 JVS (AJWx), 2016 WL 102435, at *6 (C.D. Cal. Jan. 7, 2016).  Monetary penalties alone are likely insufficient to enjoin defendants' unlawful conduct since, without an injunction, defendants "would be free to return to their old ways."  *Disney Enters., Inc. v. Redbox Automated Retail, LLC*, 336 F. Supp. 3d 1146, 1158 (C.D. Cal. 2018) (citing *FTC v. Affordable Media*, LLC, 179 F.3d 1228, 1237 (9th Cir. 1999)).  Generally, "the balance of hardships weighs in favor of the party seeking injunctive relief when the opposing party has no legal right to continue [their] current course of conduct." *RXD Media, LLC v. IP Application Dev.*, No. 1:18-CV-486, 2019 WL 2569543, at *1 (E.D. Va. June 21, 2019) (citing *Portfolio Recovery Assocs., Inc. v. Portfolio Recovery Grp., LLC*, 2013 WL 5723869, at *10 (E.D. Va. Oct. 18, 2013).  Defendants certainly do not have a legal right to continue their unlawful activity in violation of the CFPA, so the balance of hardships weighs in the CFPB's favor.

Finally, injunctive relief would undoubtedly serve the public interest.  The public interest is served by injunctions that reasonably "fence in" defendants from engaging in behavior related to their previous illegal conduct.  *Future Income Payments*, 2020 WL 6162947, at *6 (citing *Siringoringo*, 2016 WL 102435, at *6).  If defendants were to resume their unlawful activities,

other potential victims could suffer similar harm.  *Id.*  Thus, the CFPB's requested injunctive relief would serve the public interest.

For the above reasons, the court finds that the CFPB's requested injunctive relief is justified and appropriate.  The court will therefore grant the CFPB's requested injunctive relief as detailed in the Final Order.

### b. *Injunctive relief under the state laws*

Injunctive relief is also available under the state statutes, and defendants have not offered any arguments in opposition to the requested relief.  (Reply in Supp. of Remedies 3.)  Injunctive relief may be entered under the Virginia Consumer Protection Act in order "to restrain and prevent violations" of the law.  Va. Code Ann. § 59.1-203(C).  The Massachusetts Consumer Protection Act authorizes injunctive relief when the "attorney general has reason to believe that any person is using or is about to use any method, act, or practice declared by [the Consumer Protection Act] to be unlawful," and that the injunction "would be in the public interest."  Mass. Gen. Laws Ann. ch. 93A § 4.  The New York Executive Law states, "Whenever any person shall engage in repeated fraudulent or illegal acts . . . the attorney general may apply . . . for an order enjoining the continuance of such business activity . . . ."  N.Y. Exec. Law § 63(12).  The New York General Business Law prohibits "[d]eceptive acts or practices in the conduct of any business" and authorizes the attorney general to bring an action to "enjoin such unlawful acts[.]"  N.Y. Gen. Bus. Law § 349(a).

As discussed in detail above, plaintiffs argue that defendants have violated each of these statutes and that injunctive relief is justified in order to avoid future violations.  (Br. in Supp. of Remedies 34.)  For the same reasons discussed in addressing injunctive relief under the CFPA,

the court finds that injunctive relief under the state statutes is an appropriate remedy and will grant the requested relief, as detailed in the Final Order.

### 2. Redress to consumers

The CFPA authorizes the court to grant "any appropriate legal or equitable relief," including a refund of moneys, damages, restitution, or other monetary relief. 12 U.S.C. § 5565(a)(1); § 5565(a)(2). Restitution "serves to ensure that consumers are made whole when they have suffered a violation of the statute." *CashCall, Inc.*, 35 F.4th at 750. Restitution may be measured by the "full amount lost by consumers rather than limiting damages to a defendant's profits." *Gordon*, 819 F.3d at 1192–93. The CFPB is seeking consumer redress here in the form of legal restitution or the refund of moneys for defendants' violations of the CFPA. (Br. in Supp. of Remedies 37.) In calculating consumer redress, the CFPB bears the initial burden of "proving that the amount it seeks in restitution reasonably approximates the defendant's unjust gains." *CashCall*, 35 F.4th at 751 (internal citations omitted). Then, "the burden shifts to [defendants] to demonstrate that the net revenues figure overstates [defendants'] unjust gains." *Id.*; *see also FTC v. Kuykendall*, 371 F.3d 745, 766 (10th Cir. 2004) (en banc). The risk of any uncertainty in this calculation falls on defendants. *Kuykendall*, 371 F.3d at 765.

The CFPB claims it has met its initial burden by establishing that defendants' net revenues, "the amount consumers paid for the product or service minus refunds and chargebacks[,]" are reasonable approximations of defendants' unjust gains. *CashCall*, 35 F.4th at 751. Gross and net revenues are regularly used to approximate consumer loss or gain. *See Gordon*, 819 F.3d at 1195; *Consumer Fin. Prot. Bureau v. Cashcall, Inc.*, No. CV 15-7522-JFW (RAOx), 2023 WL 2009938, at *27 (C.D. Cal. Feb. 10, 2023). The stipulation provides that

defendants' net revenues between December 2013 and June 2022 were $230,996,970.84.  (Am. Stipulation 2.)

Defendants oppose the use of the net revenues to calculate restitution, arguing that a plaintiff cannot *always* meet its burden of approximating losses or gains by calculating from gross or net revenues, though they do not provide any case law illustrating an alternative calculation method.  (Br. in Opp. to Remedies 11.)  Defendants further argue that revenue can typically only be used in calculating unjust gains when there were widespread material misrepresentations that led to the consumer loss that resulted in the revenues.  *FTC v. Kitco of Nevada, Inc.*, 612 F. Supp. 1282, 1293 (D. Minn. 1985).  Defendants claim that their alleged misrepresentations were not widespread but "rather rare and isolated events which Nexus actively attempted to mitigate."  (Br. in Opp'n. of Remedies 15.)  However, once "a pattern or practice of contemptuous conduct [is proven] at the liability stage by clear and convincing evidence, a presumption arises that allows the district court to use all revenue attributable to the contemptuous conduct . . . as a baseline for assessing [restitution]."  *Kuykendall*, 371 F.3d at 766.  As detailed above, plaintiffs have clearly set forth defendants' systemic pattern of unlawful and deceptive conduct against all of their consumers.  (Reply in Supp. of Remedies 23.)  Therefore, the court finds that defendants' revenues are wholly attributable to their pattern of contemptuous conduct and that revenue is an appropriate measure of restitution.

Defendants also contend that the value of the services they provided should offset their net revenue; this was one of the main arguments defendants had planned to make at the evidentiary hearing.  (Br. in Opp'n. to Remedies 13.)  The court ultimately excluded all but one of defendants' witnesses who were going to testify about the value of the services and, with agreement from the parties, ultimately canceled the evidentiary hearing altogether.  (*See* Mem.

23

Op. on Objs.)  The subsequent stipulation did not include any information to allow the court to assess the purported value of the services provided.  The court is therefore unable to deduce what effect the purported value of the services would have had on defendants' net revenues.

The court finds that the CFPB has met its burden of establishing that the amount of restitution it seeks—that is, defendants' net revenues—reasonably approximate defendants' unjust gains.  Defendants have not fulfilled their burden of showing that net revenues overstate their unjust gains.  The court will therefore award the CFPB its requested restitution in the amount of $230,996,970.84 jointly and severally against all defendants.  Plaintiffs note that "redress for harmed consumers in Virginia, Massachusetts, and New York is subsumed into the amount sought" by the CFPB, and the CFPB will distribute restitution to the states as set out in the final order.[3]  (Br. in Supp. of Remedies 41.)

### 3. Civil monetary penalties

#### a. Monetary penalties under the CFPA

Under the CFPA, "[a]ny person [including individuals and entities] that violates, through any act or omission, any provision of Federal consumer financial law shall forfeit and pay a civil penalty."  12 U.S.C. § 5565(a)(2)(H).  The CFPA provides three tiers of penalties, based on the subject's degree of *scienter*: up to $6,813 per day for any violation, up to $34,065 per day for each reckless violation, and up to $1,362,567 per day for each knowing violation.  12 U.S.C. § 5565(c)(2)(A)–(C); 12 C.F.R. § 1083.1.  For violations occurring before November 2, 2015, those amounts were $5,000 for Tier 1 violations, $25,000 for Tier 2 violations, and $1,000,000 for Tier 3 violations.  12 U.S.C. § 5565(c)(2)(A)–(C).

---

[3] Virginia is seeking $14,021,516.13 in restitution, Massachusetts is seeking $3,349,456.08 in restitution, and New York is seeking $13,721,220.07 in restitution.  (Br. in Supp. of Remedies 41.)

The CFPB contends that defendants *at least* acted recklessly.  (Br. in Supp. of Remedies 42.)  Generally, "[a] person acts recklessly . . . when he consciously disregards a substantial and unjustifiable risk attached to his conduct, in gross deviation from accepted standards." *CashCall*, 35 F.4th at 748 (citing *Borden v. United States*, 593 U.S. 420, 427 (2021)).  The CFPB urges the court to find that defendants' violations were reckless and impose Tier Two penalties accordingly, emphasizing that defendants "charged over 46,000 desperate and vulnerable consumers hundreds of millions of dollars over more than a decade using deceptive and abusive tactics, including by making threats to them of deportation or detention while trying to collect payment for the program."  (Br. in Supp. of Remedies 42.)

Defendants assert that their conduct was *not* reckless and cite to *CashCall*, a Ninth Circuit case, in support.  (Br. in Opp'n. of Remedies 21.)  There, the district court, when determining the penalty level under the CFPA, took note of the fact that the defendants sought out the advice of attorneys and experts regarding the legality of their business model.  *Cashcall*, 35 F.4th at 748.  These experts (incorrectly) informed the defendants that the business model *was* lawful because there was no clear case law at the time.  *Id.*  It eventually became clear, however, that the business model *was* in fact unlawful, yet the defendants continued to use the business model even after the experts advised them of its illegality.  *Id.* at 749.  The Ninth Circuit upheld the district court's determination that the defendants did not recklessly violate the CFPA at the time they were relying on these experts, but found that, once the defendants ignored this advice, they began recklessly violating the law.  *Id.*

Defendants here attempt to both analogize and differentiate their conduct from the *CashCall* defendants.  (Br. in Opp'n. of Remedies 21.)  They claim that when they amended their client agreement in late 2017 or early 2018, they were attempting to comply with the law and

altered their contracting and business practices in light of the knowledge they gained over time about the legality of their business model.  (Compl. ¶ 71; Br. in Opp'n. of Remedies 21.) Defendants argue that, like the model in *CashCall*, their business practices were novel and the legality of such practices was not clear.  (Br. in Opp'n. of Remedies 21.)  Unlike in *Cashcall*, defendants here claim that, once they learned about the illegality of their client agreement, they amended the agreement to conform with the law.  (*Id.*)  Defendants contend that, for these reasons, they did not recklessly violate the CFPA.  (*Id.*)

The court finds this argument unavailing.  First, there is no evidence before the court regarding the reasons why the client agreement was changed or that defendants sought expert counsel to advise on the legality of their business model.  Indeed, there is no evidence whatsoever that defendants attempted to comply with the law.  Moreover, just because a business practice is "novel" does not mean that it is exempted from consumer protection laws. Defendants' reliance on *CashCall* is ultimately misplaced.

A far more analogous case regarding the imposition of Tier Two penalties under the CFPA is *Consumer Fin. Prot. Bureau v. Morgan Drexen, Inc.*, No. SACV 13-1267-JLS (JEMx), 2016 WL 6601650 (C.D. Cal. Mar. 16, 2016).  There, the Bureau accused a debt settlement and bankruptcy services provider of violating the CFPA by charging consumers up-front fees for its services.  *Id.* at *1.  Over the course of the litigation, the Bureau requested the defendants produce a series of documents by a particular deadline, but the defendants initially did not comply.  *Consumer Fin. Prot. Bureau v. Morgan Drexen, Inc.*, 101 F. Supp. 3d 856, 862 (C.D. Cal. 2015.)  When they did eventually comply, many of the documents produced were altered or falsified, while others had been destroyed.  *Id.* at 862–63.  The court subsequently entered default judgment against the defendants for their discovery abuses.  *Id.* at 876.  When it came

26

time for the court to impose civil penalties under the CFPA, the court looked to the Bureau's allegations that the defendants made "false and misleading" representations that "constitute[d] deceptive acts or practices" under the CFPA. *Morgan Drexen*, 2016 WL 6601650, at *2. The court found that the defendants, "by way of default, admitted[,]" these allegations. *Id.* The court thereby held that the Bureau's uncontested allegations were sufficient to deem the defendant's conduct as reckless under the CFPA, and the court imposed Tier Two penalties accordingly. *Id.*

The court will follow a similar approach here. Plaintiffs have extensively alleged that each of the defendants "knowingly or recklessly" engaged in "deceptive acts or practices in violation of the CFPA." (Compl. ¶¶ 143, 155.) Defendants admit these allegations by virtue of their default. The allegations here demonstrate that defendants consciously disregarded substantial and unjustifiable risks to their vulnerable consumers–namely the risk of financial harm— in gross deviation from accepted standards set forth by the CFPA and other consumer protection laws. The court finds that defendants recklessly violated the CFPA and will impose Tier Two penalties.

As the CFPA directs, the court must also take into account certain mitigating factors before imposing civil penalties, including "the size of financial resources and good faith of the person charged[,]" "gravity of the violation[,]" "severity of the risks to or losses of the consumer[,]" "the history of previous violations[,]" and "such other matters as justice may require." *See* 12 U.S.C. § 5565(c)(3).

None of these factors would support mitigating defendants' civil penalties. First, the court does not have any evidence before it regarding the size of defendants' financial resources, and there is no evidence to demonstrate that defendants acted in good faith when conducting their business. Defendants' violations of the CFPA were especially grave and caused severe

27

risks and losses to their consumers.  As described in detail above, defendants deceived tens of thousands of vulnerable consumers about the nature of Libre's services and the supposed penalties that would be imposed if consumers did not comply with defendants' terms. Defendants claim that the "value of [] freedom" for their consumers and the fact that their profits were "minimal" should mitigate the amount of their civil penalties, but, again, the court has no evidence before it to assess these claims.  (Br. in Opp'n. to Remedies 23.)  The court struggles to identify any facts in the record that would mitigate the gravity of defendants' violations.

Further still, defendants have a long history of violations.  Libre "previously settled with Washington's attorney general and several states' insurance regulators for unlawful conduct and has faced legal proceedings from its surety company and a class of consumers, both of which resulted in contempt findings."  (Br. in Supp. of Remedies 45 (citing *In re Nexus Services, Inc.*, No. 19-2-22351-1SEA (Wash. Sup. Ct. Aug. 26, 2019); *Vasquez v. Libre by Nexus, Inc.*, No. 17-CV-00755 CW, 2022 WL 4878648 (N.D. Cal. Oct. 3, 2022); *RLI Ins. Co. v. Nexus Servs. Inc.*, 470 F. Supp. 3d 564 (W.D. Va. 2020).)  Rather than *mitigate* the need for damages, defendants' history of violations instead demonstrates the sheer scale of defendants' wrongful acts and the need to deter future violations.  Finally, there are no other matters that justice may require regarding the mitigation of civil penalties.

For the reasons stated above, the court will grant plaintiffs' requested Tier Two penalties under the CFPA.  The court will impose a penalty of $25,000 per day from December 1, 2013, to November 1, 2015, and $34,065 for each day between November 2, 2015, and May 11, 2023 (when default was entered), for a total amount of $111,135,620, for which all defendants will be jointly and severally liable.

      *b.  Calculating civil monetary penalties under the state laws*

State Plaintiffs are each seeking an award of penalties based on a calculation that defendants committed one violation per consumer in their respective states to compensate for defendants' discovery abuses.  (Br. in Supp. of Remedies 45.)  Defendants never produced evidence on *which* consumers in *which* states were harmed by their business practices, though they did previously report estimates of proportionate shares of consumers by state in their Class Action Fairness Act Notice in *Vasquez v. Libre by Nexus, Inc.*  (*Id.*)  Plaintiffs estimate the number of consumers per state based on that information.  (*Id.*)  As discussed above, plaintiffs have alleged that defendants "engaged in pervasive unfair, abusive, and deceptive misconduct that infected virtually every aspect of their relationship with consumers over a period of nearly a decade[,]" making it likely that defendants actually committed *more* than one violation per consumer.  (*Id.* at 46.)  Plaintiffs ask the court to "make a reasonable inference" that the total number of violations per state averages out to one per consumer.  (*Id.*)

The state statutes allow for such an inference.  As to the VCPA, Virginia courts have awarded remedies based on a "pattern and practice of violations" without assessing which particular consumers were harmed.  *See Commonwealth ex rel. Gilmore v. Smoky Mt. Secrets,* 41 Va. Cir. 564, 567 (Cir. Ct. 1997).  Under Massachusetts law, in situations where a defendant's failure to produce information makes the calculation of the exact number of violations impractical or impossible, a court may base an award of civil penalties on an approximate calculation or reasonable estimate.  *See Com. v. AmCan Enterprises, Inc.,* 712 N.E.2d 1205, 1211 (1999).  In New York, "[u]ncertainty as to amount does not preclude recovery.  Mathematical certitude is unnecessary.  A reasonable basis for the computation of approximate result is the only requisite."  *Tobin v. Union News Co.,* 239 N.Y.S.2d 22, 26 (App. Div. 4th Dept. 1963) (internal citations omitted); *see also Matter of People v. Orbital Publ'g Grp*., 148 N.Y.S.3d 67 (App. Div.

29

1st Dept. 2021) (applying this principle to violations under the New York Executive Law and General Business Law).

Defendants contest this method of calculation, arguing that the complaint does not establish the number of violations or that every consumer suffered harm.  (Br. in Opp'n. of Remedies 24.)  While the exact number of violations per customer is indeed unknown, this uncertainty is primarily of defendants' doing.  If defendants had complied with discovery, perhaps the court could have assessed damages in a more particularized manner.  However, the court is now constrained to the information the parties have provided, and defendants present no alternative means of calculating the state penalties.  Therefore, the court will assess state-level penalties based on the number of defendants' consumers per state.[4]

### d.  Civil penalties under the VCPA

The Commonwealth of Virginia is only seeking civil penalties from Corporate Defendants.  (Br. in Supp. of Remedies 46.)  The VCPA permits penalties of up to $2,500 per violation.  Va. Code Ann. § 59.1-206(A).  Plaintiffs represent that defendants had approximately 2,840 consumers in Virginia and request a $7,100,000 civil penalty to be entered jointly and severally against Corporate Defendants.  (Br. in Supp. of Remedies 46.)  The court will grant the requested penalty.

### e.  Civil penalties under the MCPA

The MCPA authorizes courts to award civil penalties of up to $5,000 whenever a person or entity engages in any act or practice that they "knew or should have known" was unfair or deceptive in violation of the statute.  Mass. Gen. Laws Ann. ch. 93A, § 4.  As discussed above, plaintiffs have established that defendants knew or should have known of their violations of the

---

[4] Also, given the dearth of mitigating evidence, the court will impose the maximum penalties allowed under the state laws.

MCPA.  (Compl. ¶ 213.)  Plaintiffs estimate that there are approximately 680 affected consumers in the Commonwealth of Massachusetts and request a civil penalty of $3,400,000 to be entered jointly and severally against all defendants.  (Br. in Supp. of Remedies 49.)  The court will grant the requested penalty.

       *f.  Civil penalties under the NYGBL*

The New York General Business Law provides for civil penalties of up to $5,000 for each violation of the statute.  N.Y. Gen. Bus. Law. § 350-d.  Plaintiffs report that there are 2,778 affected consumers in New York and request a civil penalty in the amount of $13,890,000 to be entered jointly and severally against all defendants.  (Br. in Supp. of Remedies 50.)  The court will grant the requested penalty.

### III.  CONCLUSION

For the foregoing reasons, the court finds that plaintiffs have sufficiently stated claims for which relief can be granted under the CFPA, the VCPA, the MCPA, the MFDCPA, the NYEL, and the NYGBL.  The court will grant plaintiffs' requested injunctive relief, as detailed in the accompanying Final Judgment Order.  The court will also grant $230,996,970.84 in restitution to the CFPB and award civil penalties in the amounts of $111,135,620 to the CFPB, $7,100,000 to the Commonwealth of Virginia, $3,400,000 to the Commonwealth of Massachusetts, and $13,890,000 to the State of New York.

Entered: March 31, 2024.

*/s/ Elizabeth K. Dillon*
Elizabeth K. Dillon
United States District Judge