UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU, *et al.*, <br><br> Plaintiff, <br><br> v. <br><br> NEXUS SERVICES, INC., *et al.*, <br><br> Defendants. | No.: 5:21-cv-00016-EKD-JCH |

### **DECLARATION OF MICHEAL DONOVAN**

MICHEAL DONOVAN, declares as follows pursuant to 28 U.S.C. § 1746:

1. I am the CEO of Nexus Services, Inc. and Libre by Nexus, Inc. (the "Companies"). I have personal knowledge of all averred herein and nothing prevents me from making the instant Declaration.

2. Both myself and Evan Ajin are currently arranging the sale of Nexus Services, Inc. and Libre by Nexus, Inc. This decision, to sell the Companies, was taken in response to an offer made to a representative of the Companies.

3. Once this Court issued its Amended Order and Judgment, and its previous Order and Judgment, it became apparent that it would be impossible to comply with the Court's ordered relief and to survive.

4. The Companies simply lack the solvency to begin to comply with the monetary relief ordered.

5. Moreover, the Companies currently depend on incoming revenues to remain solvent and cannot meet their business obligations, specifically payments to attorneys, administrative services providers, and staff without active incoming revenue.

6. The Companies lack adequate cash reserves or assets to survive even in the short term absent active incoming revenue.

7. Currently, the Companies are only able to survive due to various loan arrangements and services agreements which provided the Companies with the ability to maintain banking relationships and to meet its current legal and operating expenses.

8. These arrangements, came at significant costs, which cannot be covered absent incoming revenue.

9. The Companies will not be able to pay their service provider as agreed.

10. The financial state of the Companies likewise required unusual contractual relationships with the Companies' counsel.

11. The Companies retainer with their current counsel requires partial retainer payments twice per week, to both cover amounts outstanding under previous arrangements and for continued current representation.

12. Annually, legal costs for the three-counsel retained by the Companies comes to approximately $1,000,000, with obligations due twice every week.

13. Payroll-cost for salaried employees comes to approximately $803,000 annually, for 17 employees (with no employee, including principals earning in excess of $100,000), with another 11 persons being paid at hourly rates of between $8.00/hr. and $17.10/hr. This results in a weekly hourly pay obligations of approximately $5,000, weekly salaries of approximately $15,500, and weekly attorneys' fees of approximately $19,000. In other words, wages and attorneys' fees require approximately $40,000 per week to cover operating costs.

14. Beyond the above, there are costs associated with rent and service providers, which totals approximately $17,000 per month, or $4000 weekly. That is in addition to servicing loan agreements and the administrative services agreement which cannibalizes the rest of the Companies revenues.

15. Absent revenue, the Companies[1] run at a loss of approximately $50,000 per week.

16. Immediately prior to the ruling Libre by Nexus was earning approximately $6,000 per week and operating at a small loss, when one considers servicing the cost of attorneys and service providers. It will be impossible to take on additional compliance or legal staff without continued revenue. Indeed, it would

---

[1] At this point, Nexus Services, Inc., is in essence a holding company for a single entity, Libre by Nexus, Inc.

be impossible to take on additional legal or compliance staff under the Companies current practices and structure, and without additional investment.

17. Given all of the above, the decision was made to sell the Companies, in the hope that the Companies could survive while also fulfilling their legal obligations.

18. Pursuant to the planned sale of the Companies, Mr. Ajin and I must cooperate with the buyer and his agents in order to assist them with the due diligence process, the implementation of immediate management changes, restructuring, and transitioning to new management and ownership—while this process will not involve Mr. Ajin and myself running the Companies actively, it will require extensive efforts and time to transition the Companies to new management and ownership.

19. I do not believe that it will be feasible to undertake this process were the Companies required to comply with additional reporting and record-keeping requirements—the task transitioning already presents an almost insuperable challenge—which may require the creation of new centralized systems and greatly reforming record-keeping that was *ad hoc* and suboptimal.

20. Were the sale to not occur or were the transition to new ownership and management not to be successful, the Companies would in all likelihood fail and cease to exist.

21. Because the Companies lack substantial assets—virtually all notable assets of significant value were lost in foreclosure—there would be no assets to cannibalize to retain a skeleton staff to comply with the injunctive portions of the Amended Judgment and Order and no assets to sell that would in any meaningful way satisfy the monetary aspects of the Amended Judgment and Order.

22. The sale represents the only true option that would allow for the Companies to be able to satisfy either the injunctive or monetary aspects of the Amended Judgment and Order.

23. Beyond the above, Mr. Ajin, Mr. Moore, and I lack substantial assets to be able to inject capital into the Companies or re-invest in the Companies. I am familiar with my own, Mr. Ajin, and Mr. Moore's financial positions—through my personal and professional relationships with Mr. Ajin and Moore, I have this knowledge. None of us can come close to satisfying even a tenth of the judgments leveled against us, never mind satisfying judgments which would relieve the Companies of their liability. Beyond this, it is unthinkable that any of us would have the financial wherewithal to invest in the restructuring of the Companies to allow for their continued survival or operation.

24. Were the Companies not to be sold, failure of them is certain and it is highly dubious that former or current clients of the Companies would receive any of

the restitution this Court has ordered, and highly unlikely that the Companies could continue to comply with the injunctive relief ordered.

25. All of the above would result in irreparable harm to both the Companies and the Plaintiffs in this action. A stay, as requested, could provide the time necessary to avoid a disorderly transfer and prevent this now almost certain harm.

Under the terms of 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed this 11th day of April 2024, STAUNTON, VA.

_____

MICHEAL DONOVAN