UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU, *et al.*,<br><br>Plaintiff,<br><br>v.<br><br>NEXUS SERVICES, INC., *et al.*,<br><br>Defendants. | No.: 5:21-cv-00016-EKD-JCH |

## <u>MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR A TEMPORARY STAY PENDING APPEAL</u>

## <u>INTRODUCTION</u>

This Court has issued a comprehensive Amended Order and Judgment which requires significant reporting and record keeping requirements, limitations on receiving payments, requirement for payment of hundreds of millions of dollars on ten-days' time, as well as certain provisions which require complex acts to be taken in an extremely short period. *See generally* ECF Doc. No. 246. Nexus Services, Inc. and Libre by Nexus, Inc (the "Companies") under current management are likely unable to comply with these orders and have in the proven

1

unable to do so. *See generally* Lawrence Decl.; Donovan Decl.[1] The likeliest path to compliance is to allow a third party to acquire the company, while taking on all liabilities and obligations of the companies with a short stay to allow for the acquisition occur and for new management to be put in place. *See generally* Smith Decl. This will allow for both full and concrete compliance to occur and maximize the chances of recovery of the approximately half billion dollars owed by the company to Plaintiffs. *See* ECF Doc. No. 246 (providing for various civil penalties and monetary damages of approximately $500,000,000 to be paid within ten days and requiring individual defendants to pay approximately $100,000,000 in civil penalties on the same timetable).

Currently, Defendants are employing a single law firm, which has relevant expertise to handle complex civil litigation; currently that law firm is operating through a single attorney in this matter and multiple other matters—all involving significant judgments and appellate practice. *See* Lawrence Decl. at ¶¶ 7-10 . The addition of outside capital to allow for meaningful participation in both compliance and appellate practice will be invaluable. *See id.* at ¶ 6; *See also* Smith Decl. at ¶ 7.

---

[1] Historically, the Companies have had difficulty in retaining counsel and complying with discovery demands; this was true in this litigation where the litigation ended following a change in attorneys after a breakdown of a former attorney-client relationship that greatly hindered discovery compliance.

Put simply, given that the Defendants' attorney is currently working well beyond 90 hours per week 7 days per week, additional productivity simply cannot occur without injecting additional legal personnel into the Companies. *See* Lawrence Decl. at ¶¶ 7-9. Although, significant progress has been made on the proposed sale and acquisition of the Companies, until additional legal resources can be onboarded, compliance with additional injunctive requirements will be extremely taxing, considering the sheer volume of litigation in which the Companies are involved in with very limited resources. *See Id.*; *see also* Donovan Decl. at ¶¶ 10-16, 21-22.

Defendants do not currently seek to stay any enforcement of the money judgments, except to the extent that payment provisions of the Order are considered not automatically stayed pursuant to Federal Rule of Civil Procedure 62(a).[2] Nor, do Defendants seek to stay injunctions requiring compliance with state and federal consumer protection law, but rather, Defendants only seek to stay certain injunctive relief which may hamper or distract from the necessary re-organization, familiarization, and restructuring which will be required both to

---

[2] Counsel was only able to find one analogous case which analyzed a similar judgment and order, finding that restitution ordered under the Commodities Exchange Act were money judgments, subject to the automatic stay under Rule 62, that were unenforceable through contempt proceedings as injunctions. *See U.S. Commodity Futures Trading Commission v. Escobio*, 946 F.3d 1242, 1251-54 (11th Cir. 2020).

allow for the acquisition of the Companies and to keep Companies a going concern. *See* Smith Decl. at ¶¶ 7-10; *see also* Lawrence Decl. at ¶¶ 13-18.

Both the buyer and Defendants' current counsel are optimistic that within the 45-day stay period new resources will be brought to bare that will enable more robust compliance, but that such will require a short period of time to ensure an orderly transition. *See Ibid*.

The only manner to avoid "serious irreparable harm—the uncompensated death of [a] business," *Cavel Int'l, Inc. v. Madigan,* 500 F.3d 544, 546 (7th Cir. 2007), is for the Court to allow for an acquisition which will allow for the installation new management and building internal legal and compliance teams required for both compliance with the Amended Judgment and Order and a meaningful chance for the Companies to survive—absent this the Companies will not survive and consumers, plaintiffs, and the public will be no better off. *See generally* Smith Decl.; *see also* Lawrence Decl.; Donovan Decl.

## STATEMENT OF FACTS

Currently the Companies are in a desperate state of affairs. *See* Donovan Decl. ¶¶ 7-23; *see also* Smith Decl at ¶ 9. That said, there does exist an opportunity for the Companies to survive. *See* Smith Decl. Should that happen, the Companies

will be in a position to comply with the Amended Judgment and Order which will benefit all: the Court, the parties, the public generally, and consumers. *See* Smith Decl. at ¶¶9-10; Lawrence Decl. at ¶¶ 15-18. Beyond this opportunity, it seems certain that the Companies will fail causing all parties irreparable harm. *Ibid.*

Defendants seek a short stay to maximize the chances of success of the incipient sale and reorganization, which should prejudice Plaintiffs minimally if at all.

Beyond this, there are substantial issues on appeal which appear to militate in favor of the short stay requested. *See* Lawrence Decl. 3; *see also, infra*, Argument, Section II.

## <u>ARGUMENT</u>

Rule 62(c) and (d)[3] of the Federal Rules of Civil Procedure provide that a district court may grant a stay pending the outcome of an appeal from an interlocutory order or final judgment that grants an injunction. In determining whether to grant a stay, a district court must consider the following: (1) whether the movant has made a showing that it is likely to succeed on the merits; (2)

---

[3] Rule 62(c) excepts injunctions from automatic stays, but explicitly allows the Court to order otherwise, 62(d) sets forth discretion to do so.

whether the movant would be irreparably injured absent a stay; (3) whether issuance of the stay would substantially injure the other parties interested in the proceeding; and (4) whether the public interest favors the issuance of a stay. *Hilton v. Braunskill,* 481 U.S. 770, 776 (1987); *see also WV Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave,* 553 F.3d 292, 298 (4th Cir. 2009).

The strength of the showing required on any one factor depends on the others; for example, the movant need only show a substantial case on the merits if the other factors weigh in favor of a stay. *Hilton,* 481 U.S. at 778. Evaluation of a stay request places the district court "in the odd position of deciding the likelihood that the issuance or scope of the [injunction or order] is somehow improper, even though the court obviously believes that the [injunction or order] is proper." *Cooper v. U.S. Postal Serv.,* 246 F.R.D. 415, 418 (D. Conn. 2007). This Court need not question its injunction decision, however; it need only evaluate the possibility of Defendants succeeding on one or more issues on appeal that would affect the injunction, and recognize that "'[t]he necessary 'level' or 'degree' of possibility of success will vary according to the court's assessment of the other stay factors.'" *Mohammed v. Reno,* 309 F.3d 95, 101 (2d Cir. 2002) (quoting *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.,* 559 F.2d 841, 843 (D.C. Cir.

1977)). This is to be done in a situation which is admittedly extraordinary,[4] and

extraordinary in many ways. First, there was a very substantial default judgment[5]

which resulted in very close to one billion dollars of liability. Moreover, there is

little question that Companies total gross revenue was only approximately

$230,000,000 and their current gross revenue is approximately two to three million

dollars. *See* ECF Doc. No. 247 (applying "net revenues" scheme, which requires a

calculation of damages based on gross income minus *refunds* and does not account

for operating costs or normal business expenses). Put simply, there is no manner

that the Companies, even if they could survive, could ever cover the judgment as

they are today—the businesses without major restructuring or significant cash

infusions simply cannot survive. *See generally* Donovan Decl.; *see also* Smith

Decl.

---

[4] Although, not strictly applicable, case law addressing the issuance of stays of money judgments without bond stress that such should happen in extraordinary circumstances which make the issuance of a bond impractical. *See, e.g.*, *Alexander v. Chesapeake, Potomac, and Tidewater Books, Inc.*, 190 F.R.D. 190, 193 (E.D. Va. 1999) (noting stay without bond can be appropriate both where bond is superfluous because of an obvious lack of prejudice or create irreparable harm because of a lack of ability to post a bond).

[5] Because of a lack of disclosures prior to the trial-date, vacated before the entrance of default and the request for various discovery sanctions, Defendants were unable to present substantive factual evidence or witnesses which may have mitigated the damages ultimately awarded. *See* ECF Doc. No. 229.

Moreover, the Amended Final Order and Judgment apparently prevents Companies from either receiving revenue or retaining capital.[6] Absent acquisition or merger, the Plaintiffs simply do not stand in a position where they will be able to receive even a fraction of the sizeable judgment or to benefit from the injunctive aspects of the Court's Amended Order and Judgment. *See generally* Donovan Decl. at ¶¶ 21-22.

This is only compounded by the fact that absent functioning businesses with at least some operating capital and responsible management the Companies simply will not be able to comply with various record-keeping and reporting requirements. *See Ibid.*

All of the above, is complicated by the fact that the constitutionality of the Consumer Financial Protection Bureau is uncertain, the remedies to be afforded as a result of litigating against an unconstitutionally funded agency remain uncertain, and all of this stands to be decided quite soon by the Supreme Court. *See, e.g.*, Brief of Amici ACA Int'l, *CFPB v. Com. Fin. Services Ass'n.*, —— U.S. ——, 2023 WL 4530264, No. 22-448 (Jul. 10, 2023) (arguing that CFPB's funding mechanism

---

[6] *See* ECF Doc. No. 246 at ¶ 17, enjoining: "Collecting, or attempting to collect, any monies in connection with an agreement with any Corporate Defendant for Nexus Immigration Bond Services between December 1, 2013, and the Effective Date; and [] retaining money owed to consumers."

is unconstitutional but remedy of Fifth Circuit too broad and that Congress should be afforded opportunity to re-write funding mechanism).

The Defendants points above do not necessarily seek to address the issues on appeal, nor the chance of success on appeal, but rather simply to express how unusual this case is and the extraordinary circumstances that exist here—the Supreme Court may issue a mandate that says all actions of the CFPB taken using unconstitutional dollars are *void ab initio*, voidable, or should be stricken; it may hold that matters should be stayed to give congress an opportunity to write a constitutional funding structure. Simply put, no one knows what effect such would have on this case and what may happen. This alone places Defendants in a position where there are substantial issues on appeal and there is a risk of irreparable harm.

Thus, this court may "grant[] a stay pending appeal  [even] where the likelihood of success is not high but the balance of hardships favors the applicant," for "[t]he probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury [movant] will suffer absent the stay. Simply stated, more of one excuses less of the other." *Mohammed,* 309 F.3d at 101 (internal quotation marks omitted).

## I.    <u>IRREPARABLE HARM IS CERTAIN ABSENT STAY.</u>

The aggregate effect of the Amended Judgment and Order devastating: it spells the death of Companies' business, would effectively prevent the chance of Companies' survival for long enough to allow the Companies to be acquired, and for there to be any chance of consumers meaningfully benefiting from the continued existence of the Companies—including the Companies remaining an extant concern with the means to comply with the injunctive provisions of the Amended Judgment and Order or from collecting, in any meaningful way, the substantial monetary judgment meant to provide redress to consumers. *See generally* Donovan Decl. at ¶¶ 6-17; Smith Decl. at ¶¶ 6, 9.

Allowing a short interim stay is the only apparent path which remains open both for the Companies to survive and for there to be the necessary reform, restructuring, and changes in management practices to provide meaningful redress to consumers. *See generally* Donovan Decl.; Smith Decl. This short stay will allow for orderly acquisition and to begin the process of internal restructuring necessary to remain a going concern, comply with the Amended Judgment and Order and put in place management and legal personnel necessary to stabilize the Company. *See* Lawrence Decl. at ¶¶ 5-6, 15.

Defendants position largely would be this: absent drastic action, freed for a short period from certain burdens, no party stands to gain—the Company will fail,

and there will be no entities from which to receive compliance or compensation. *See generally* Donovan Decl. While certainly, the Plaintiffs could pursue enforcement against the individual defendants, they simply do not have the capability of generating revenue that would be meaningful given the size of the judgment and would lack assets to in any meaningful way satisfy the judgment. *See* Donovan Decl. at ¶ 23.

Irreparable harm does exist where a business's failure is near certain. *Cavel,* 500 F.3d at 545-46 (granting stay pending appeal after noting that plaintiff's business would fail if temporarily closed). There is little question that Companies and individual principals of Companies cannot remain solvent and satisfy the judgment, but more importantly there is no way for Companies to survive without new ownership that has the expertise and wherewithal to invest seriously both in Companies business and reform its practices; there simply is no way to recoup the loss of the sale/survival of Companies that may result from further burdening an already very onerous and risky transaction—if the Companies fail because they cannot comply with the injunctive relief ordered and cannot successfully be acquired there simply is no redress, either for the consumers or Defendants and irreparable harm will result. *See Cavel,* 500 F.3d at 546 (granting stay pending appeal noting that plaintiff "could not obtain monetary relief from the defendants" to cover failure of business in the event the trial court's judgment was reversed). A

shutdown of a defendant's business causing unrecoverable financial losses and business detriment is quintessential irreparable injury that ordinarily justifies a stay pending appeal. *See id.* at 546; *Doran v. Salem Inn, Inc.,* 422 U.S. 922, 932 (1975).

This is without regard to the loss of employment to be suffered by tens of employees and further without considering the effect that shuttering the business will have on the Plaintiffs in this action. *See* Donovan Decl. at ¶¶ 13, 24-25.

The least prejudicial path forward not just for the Defendants, but more importantly the Plaintiffs, is to allow for a temporary stay of certain injunctive provisions of the order, to allow for the acquisition to move forward. *See* Lawrence Decl. at ¶¶ 17, 18.

The provisions of the Amended Judgment and Order that Defendants seek to stay are limited to those which do not address forward-looking compliance with consumer protection law. *See* Mot. for Temporary Stay Pending Appeal. Defendants seek a short, forty-five day, stay of certain reporting requirements, and requirements that would prevent Companies from retaining operating capital or that may hinder the reorganization and acquisition process in the immediate term. *Id.* Most importantly, the buyer of Companies does not seek to avoid assuming the obligations *in toto* of Companies under the Amendment and Order, but only to have breathing room in order to begin reforms and set in place plans to proceed

12

with the restructuring and reform of very troubled businesses. *See generally* Smith Decl. In essence, the issuance of a stay will allow for an orderly transition to new management which will benefit Plaintiffs' in the long run and will prevent irrevocable loss for all involved. *Id.*

## II.   <u>THERE ARE SUBSTANTIAL ISSUES ON APPEAL.</u>

Defendants need only to demonstrate that its appeal raises a "substantial legal question" when the other factors support a stay. *Microstrategy, Inc. v. Bus. Objects, S.A.,* 661 F. Supp. 2d 548, 559 (E.D. Va. 2009) (internal quotations omitted). Were the standard higher, "a stay would be warranted only in the unlikely event a movant could persuade the district judge that his or her decision was probably incorrect." *Id.* (internal quotations omitted); *see also Wash. Metro.,* 559 F.2d at 843 ("The court is not required to find that ultimate success by the movant is a mathematical probability, and indeed, as in this case, may grant a stay even though its own approach may be contrary to movant's view of the merits."). Here, Defendants have a strong likelihood of success on appeal, and at a minimum a substantial case on the merits, thus warranting a stay in light of the extreme hardship to Defendants and more importantly third parties will suffer.

### A. THE CONSTITUTIONALITY OF THE CFPB IS IN QUESTION AND THE APPROPRIATE REMEDY OR EFFECT ON THIS MATTER REMAINS UNCLEAR.

The Supreme Court has noted that novelty in structure and lack of historical precedent or tradition is highly suspect and relevant in determining the constitutionality of an agencies structuring as it relates to separation of powers. *See Seila Law*, 591 U.S.---, 140 S.Ct. at 2201("'Perhaps the most telling indication of [a] severe constitutional problem' with an executive entity 'is [a] lack of historical precedent' to support it.") (quoting *Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S 477, 505 (2010)). While it has not addressed the constitutionality of the funding mechanism of the CFPB, it has found fit to grant Certiorari on the question and will likely address the matter shortly. Without rehashing the entirety of the Fifth Circuit's opinions, Defendants would note that the opinions are deeply grounded in an historic exploration of the funding mechanism of previous agencies and noting the "novelty" of the CFPB's "double-insulated" funding structure. *See generally Com. Fin. Servs. Assoc. of Am., Ltd. v. Consumer Financial Protection Bureau,* 51 F.4th 616, 641-42 ("Taken together, the Bureau's express insulation from congressional budgetary review, single Director answerable to the President, and plenary regulatory authority combine to render the Bureau 'an innovation with no foothold in history or tradition.' *Seila Law*, 140 S. Ct. at 2202. It is thus no surprise that the Bureau brought to the forefront the subject of agency self-funding, a topic previously relegated to passing scholarly references rather than front-page news.) (internal citation omitted;

14

cleaned up). There is no temporal limitation over the funding, nor is it subject to continued oversight of the legislature. *Id*. at 638-39. Additionally, the agency wields vast powers of an unusual scope. *Community*, 51 F.4th at 640-41.

While it is unnecessary here to rehash arguments that have been made and remade, it is of note that the constitutionality of the CFPB is dubious. Further, Defendant's would satisfy the "linear nexus" analysis set forth in *Community*, thus, were the holding adopted *in toto*, such would allow them to "set aside" the acts which were unconstitutional and caused them harm under the *Community* framework, *i.e.*, the active litigation . *Community*, 51 F.4th at 642-43.

The point here is not necessarily to argue that there was an obvious infirmity in the Court's holding but rather to demonstrate that there are serious and novel questions on appeal.

**B. THERE EXISTS QUESTION AS TO WHETHER THE ENTRANCE OF DEFAULT WAS PROPER IN THIS MATTER.**

Were the CFPB's funding structure unconstitutional and if that would prevent recovery—again, it remains unclear what remedy may be properly afforded—then very well as a matter of law the CFPB may not be entitled to any remedy whether or through default or not.

A default judgment is simply improper where a claim is legally barred or fails as a matter of law. *Anderson v. Foundation for the Advancement, Educ., and Employment of Am. Indians*, 155 F.3d 500, 504-05 (4th Cir. 1998) (reversing entry of default as sanction where no claim was legally possible on pleading); *accord* 10A Charles Alan Wright & Arthur R. Miller*, Federal Practice and Procedure* § 2688.1 (4th ed., Apr. 2023 update). Although the entrance of a default results in admissions of traversable facts, such does not result automatically in liability; a court must determine whether or not the claim is legally cognizable, *see Ohio Cent. R. Co. v. Central trust Co*., 133 U.S. 83, 91 (1890) ("[A]lthough the defendant may not be allowed, on appeal, to question the want of testimony or the insufficiency or amount of the evidence, he is not precluded from contesting the sufficiency of the bill, or from insisting that the averments contained in it do not justify the decree."), and cannot simply enter a default on a claim that would be legally precluded.

Here it is very possible that recovery was legally precluded and thus default was improper.

## C. THERE EXISTS QUESTION AS TO WHETHER THE SEVENTH CIRCUIT'S CALCULATIONS SHOULD HAVE BEEN UTILIZED.

Again, keeping in mind that the purposes of the instant matter are not to brief an appeal, but simply to explain some of the merits on appeal, Defendants

would note, that there exists question to the propriety of the "net revenue" calculations—the name is something of a term of art in that it more greatly corresponds to gross revenues rather than net revenues. *See generally Consumer Fin. Prot. Bureau v. Consumer First Legal Grp., LLC,* 6 F.4th 694, 710 (7th Cir. 2021) (holding net profits calculation prohibited under Supreme Court precedent and requiring net profits calculation) (citing *Liu v. SEC*, 591 U.S. ---,140 S.Ct. 1936 (2020)); *contra CFPB v. CashCall*, 35 F.4th 734 (9th Cir. 2022) (utilizing "net revenue" calculation used by the Court in this matter).

The Fourth Circuit has not weighed in on the issue and the nature of the calculation of these remedies under the CFPA is unclear—indeed, much around the CFPB is  unclear and it is uncertain what will occur which may bind this Court and the Fourth Circuit.

### D. THERE EXIST QUESTION AS TO WHETHER THE ISSUANCE SANCTIONS EITHER ALONE OR IN AGGREGATE WAS PROPER.

As the Defendants previously argued, both orally where permitted, *see, e.g.*, ECF Doc. No. 209, and in writing where possible, *see, e.g.*, ECF Doc. No. 221 at 24-30, there were cascading sanctions in this matter which resulted in *de jure* liability and then almost guaranteed the issuance of liability of well-nigh a billion

dollars, on top of equitable and injunctive remedies which were severe. *See generally* ECF Doc. No. 247 (describing events and Court's reasoning).

Defendants do not and cannot find *any* similar case where there was a default sanction issued which was followed by a *de facto* complete exclusion of evidence on damages, *see* ECF Doc. No. 221 at 26, never mind one where such occurred in a case dealing with hundreds of millions of dollars of liability. Defendants do not know exactly where courts cross the line of disproportionality, but a discovery sanction (imposed in the first instance) coupled with a failure to provide disclosures, for a vacated trial date, that amounted to liability of close to a billion dollars seems to verge on being disproportionate to the offense—that is only compounded by the very harsh realities of the equitable relief granted.

> At the outset, sanction analysis must encompass proportionality, and sanctions as extreme as witness exclusion must be proportional to the offense. *Cf. Doyle v. Murray,* 938 F.2d 33, 34 (4th Cir.1991) ("[S]anctions [must] be fixed in proportion to the severity of a party's or lawyer's misconduct [.]"). In this case, when the district court excluded Alexander's testimony . . . In short, even had Mr. Scofield's contact with Alexander violated the sequestration order, the district court abused its discretion in imposing the unduly severe sanction of excluding Alexander's testimony in its entirety.

> *U.S. v. Rhynes*, 218 F.3d 310, 321-23 (4th Cir. 2000).

While Defendants will not belabor the point, certainly the Fourth Circuit could find in this matter that "There is no doubt that, under facts like these, the

district court could have imposed a less severe sanction." *Id.* Beyond this, the Fourth Circuit may very well find that the entrance of an exclusionary sanction *after* the entrance of default would satisfy the "harmless" analysis set forth in *Southern States Rack and Fixture, Inc. v. Sherwin Williams Co*., 318 F.3d 592, 596–97 (4th Cir. 2003).

While the Fourth Circuit does not appear to have addressed this question— and certainly not this question in a case with similar liability—there does appear to be a substantive question to present to them.

## E. CONCLUSION.

Defendants seek a limited stay of temporary duration to prevent irreparable harm; moreover, they seek to do so in a matter that has colorable and substantial issues on appeal, at least one of which remains novel and will likely be decided during the pendency of appeal and could very well prove dispositive in this matter.

## III.   The Stay Will Likely Benefit Plaintiffs.

The third *Hilton* factor is whether issuance of the stay would substantially injure the other parties interested in the proceeding. *Hilton,* 481 U.S. at 776.

In this instance, Defendants seek a temporary stay to allow for what is in essence the shoring up of the largest judgment-debtors. *See generally* Smith Decl.;

Lawrence Decl. ; Donovan Decl.If anything, the stay (and the acquisition it facilitates) would appear to benefit all involved. *Ibid.*

In the absolute worst case scenario, the Plaintiffs and those they represent would be in no worse position than where the find themselves today and the *de minimus* delay, at most, would result in a short delay in receiving certain information or investigative information—again, the introduction of new ownership and management would likely speed up such process when it occurs even considering a 45-day stay.

### IV.   **The Public Interest Is Likewise Served.**

Unless the public interest is served by the disorderly death of Companies, which Defendants think unlikely, the public interest seems to be best served by the issuance of a 45-day stay. The stay at a minimum will allow for Companies to receive some investment, and increased legal and compliance staffing, to ensure that the businesses will be able to survive to comply with their obligations under the Amended Judgment and Order. *See* Lawrence Decl. at ¶¶ 5-6 . Put simply, the current owners simply do not have the capital to invest in the business. Moreover, the entrance of a temporary reprieve from certain injunctive relief will make what is already a tense and difficult sale and acquisition more concrete and orderly. *See* Smith Decl. at ¶¶ 6-10. Unfortunately, the Companies are not attractive assets to

acquire; the stay will allow for a party who has evinced an interest in the purchase to do so knowing that they will at least be able to survive for the time necessary to implement required reforms. *See Id*. Under current management such reforms are impossible and failure of the business is almost certain. *See generally* Donovan Decl.

Beyond this, and leaving aside certain past-practices of Defendants, Companies operate in an area which does provide valuable services to impoverished and disadvantaged immigrants. It is not a market in which significant competitors exist and it certainly is a market where the consumers are desperate for such services. Reducing competition within the market cannot be assumed a boon. *See In re Honda Am. Motor Co., Inc. Dealership Rels. Litig*., 168 F.R.D. 535, 539 (D. Md. 1996) (noting "this litigation does not simply involve issues of common law contract and fraud. It involves questions arising under the antitrust laws and central U.S. policy concerning economic regulation and free-market competition.")

The point here is not whether or not Companies have acted badly, but more one of broad policy and whether or not market competition is served by leaving the market with no competitors providing the services which the Companies provide. Without allowing the acquisition to go through by providing a short period of breathing room, Companies will shutter and there will be a virtual monopoly in the

immigration bond services market that cannot seriously be considered in the public interest:

> Policy. A fair, open, and competitive marketplace has long been a cornerstone of the American economy, while excessive market concentration threatens basic economic liberties, democratic accountability, and the welfare of workers, farmers, small businesses, startups, and consumers.

> Promoting Competition in the American Economy, Exec. Order No. 14036,

86 FR 36987, 2021 WL 2942330 (Jul. 9, 2021)

There exists a single, precarious, offer for the purchase of Companies; such will benefit both the broader immigration bond services market, the Plaintiffs, as well as those past-consumers for whom they seek redress. Absent a stay of various injunctive provisions that offer redress would prove illusory and Companies will in all likelihood shutter. Leaving *only* the individual defendants to seek redress from. A well-run, compliant company under new ownership and management will allow for more orderly litigation, compliance with court orders, and a more robust debtor from which to seek collections.

## **CONCLUSION**

This litigation speaks to the need to reform management and the boon that would result from restructuring and reform of corporate defendants. All that is sought here is a temporary stay of various requirements which may interfere with

the acquisition and reorganization process, that will allow for orderly compliance and litigation moving forward. The relief seems to be in everyone's interests and all factors set forth in *Hilton* appear to militate in favor of the issuance of the stay: a stay should issue.

Dated: April 11, 2024                    Respectfully submitted,

Washington, DC                          /s/Zachary Lawrence

                                        Lawrence Law Firm PLLC
                                        166 Five Acres Lane
                                        Cold Brook, NY 13324
                                        202-468-9486
                                        zach@zlawpllc.com
                                        *Pro hac vice* (NY Bar No.: 5798202)
                                        *Attorney for Defendants*