**ASSET PURCHASE AGREEMENT**

**By and Between**
**Nexus Services, Inc. and Libre by Nexus,**
**and**
**Libre Immigration Services, Inc.**

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "**Agreement**") dated as of April 17, 2024, is entered into between Nexus Services, Inc. and Libre by Nexus, Inc., both Delaware corporations (collectively, "**Sellers**" or "**Seller**"), and Libre Immigration Services, Inc., a Pennsylvania corporation ("**Buyer**"). Capitalized terms used in this Agreement have the meanings given to such terms herein.

## RECITALS

**WHEREAS**, Sellers are engaged in the business of immigration services (the "**Business**"); and

**WHEREAS**, Sellers wish to sell and assign to Buyer, and Buyer wishes to purchase and assume from Seller, substantially all the assets and liabilities of the Business, subject to the terms and conditions set forth herein;

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## PURCHASE AND SALE

**Section 1.01   Purchase and Sale of Assets.** Subject to the terms and conditions set forth herein, at the Closing, Seller shall sell, convey, assign, transfer and deliver to Buyer, and Buyer shall purchase from Seller, all of Seller's right, title and interest in, to and under all of the tangible and intangible assets, properties and rights of every kind and nature and wherever located (other than the Excluded Assets), which relate to, or are used or held for use in connection with, the Business (collectively, the "**Purchased Assets**"), including the following:

(a)    All cash, including any cash posted as collateral, or pursuant to court order;

(b)    all accounts receivable of the Business ("**Accounts Receivable**");

(c)    all inventory, finished goods, raw materials, work in progress, packaging, supplies, parts and other inventories of the Business ("**Inventory**");

(d)    all Contracts set forth in the Disclosure Schedules (the "**Assigned Contracts**"). For purposes of this Agreement: (i) "**Contracts**" means all contracts, leases, licenses, instruments, notes, commitments, undertakings, indentures, joint ventures and all other agreements, commitments and legally binding arrangements, whether written or oral; and (ii) "**Disclosure Schedules**" means the disclosure schedules delivered by Seller and Buyer concurrently with the execution and delivery of this Agreement;

(e)    all furniture, fixtures, equipment, machinery, tools, vehicles, office equipment, supplies, computers, telephones and other tangible personal property of the Business (the "**Tangible Personal Property**");

2

(f)      all prepaid expenses, credits, advance payments, security, deposits, charges, sums and fees to the extent related to any Purchased Assets;

(g)      all of Seller's rights under warranties, indemnities and all similar rights against third parties to the extent related to any Purchased Assets;

(h)      all insurance benefits, including rights and proceeds, arising from or relating to the Business, the Purchased Assets, or the Assumed Liabilities;

(i)      originals or, where not available, copies, of all books and records, including books of account, ledgers and general, financial and accounting records, machinery and equipment maintenance files, customer lists, customer purchasing histories, price lists, distribution lists, supplier lists, production data, quality control records and procedures, customer complaints and inquiry files, research and development files, records and data (including all correspondence with any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any arbitrator, court or tribunal of competent jurisdiction (each, a "**Governmental Authority**")), sales material and records, strategic plans and marketing and promotional surveys, material and research (collectively, "**Books and Records**");

(j)      all intellectual property of any kind, including but not limited to, trade names, copyrights, trademarks, websites, content, advertising, customer lists, trade secrets, memoranda, reports, research, patents, and processes;

(k)      all intangible property of any kind, including but not limited to, marketing materials, phone numbers, domain names, digital accounts, social media; and

(l)      all goodwill associated with any of the assets described in the foregoing clauses.

**Section 1.02   Excluded Assets.** Other than the Purchased Assets, Buyer expressly understands and agrees that it is not purchasing or acquiring, and Seller is not selling or assigning, any other assets or properties of Seller, and all such other assets and properties shall be excluded from the Purchased Assets (collectively, the "**Excluded Assets**"). Excluded Assets include the assets, properties and rights specifically set forth on Section 1.02 of the Disclosure Schedules.

**Section 1.03   Assumed Liabilities.**

(a)      Subject to the terms and conditions set forth herein, Buyer shall assume and agree to pay, perform, and discharge only the following Liabilities of Seller (collectively, the "**Assumed Liabilities**"), and no other Liabilities:

(i)      all trade accounts payable of Seller to third parties in connection with the Business that remain unpaid as of the Closing Date;

(ii)      all Liabilities arising under or relating to the Assigned Contracts;

(iii)     all Liabilities for (A) Taxes relating to the Business, the Purchased Assets or the Assumed Liabilities for any taxable period (or any portion thereof) beginning after the Closing Date , or explicitly agreed to herein in Section 6.07, and (B) Taxes for which Buyer is liable pursuant to Section 5.04;

(iv)     all other Liabilities arising out of or relating to Buyer's ownership or operation of the Business and the Purchased Assets on or after the Closing; and

(v)     those Liabilities arising from the Amended Order and Judgment, entered April 1, 2024, and which were required to be transferred pursuant to paragraph 75, in *CFPB, et al. v. Libre by Nexus, Inc., et al.,* No. 5:21-cv-00016 (W.D.Va.) only to the extent required by that Amended Order and Judgment and only to the extent such Liabilities are affirmed by the Fourth Circuit Court of Appeals and the provision of the Amended Order and Judgment requiring transfer of obligations of "applicable provisions of this Order" is affirmed by the Fourth Circuit Court of Appeals.

(vi)     those Liabilities of Seller set forth in the Assumed Liabilities section of the Disclosure Schedules.

For purposes of this Agreement, "**Liabilities**" means liabilities, obligations or commitments of any nature whatsoever, whether asserted or unasserted, known or unknown, absolute or contingent, accrued or unaccrued, matured or unmatured or otherwise.

(a)     Notwithstanding any provision in this Agreement to the contrary, Buyer shall not assume and shall not be responsible to pay, perform, or discharge any Liabilities of Seller or any of its Affiliates of any kind or nature whatsoever other than the Assumed Liabilities (the "**Excluded Liabilities**"). For purposes of this Agreement: (i) "**Affiliate**" of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person; and (ii) the term "**control**" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

**Section 1.04   Purchase Price.** The aggregate purchase price for the Purchased Assets shall be $3.50 (the "**Purchase Price**"), plus the assumption of the Assumed Liabilities, and the value of all other obligations of the Buyer under this Agreement. Buyer shall pay the Purchase Price in cash to Sellers at the time of Closing.

**Section 1.05   Non-Assignable Assets.**

(a)     Notwithstanding anything to the contrary in this Agreement, this Agreement shall not constitute a sale, assignment or transfer of any Purchased Asset if such sale, assignment or transfer: (i) violates applicable Law; or (ii) requires the consent or waiver of a Person who is not a party to this Agreement or an Affiliate of a party to this Agreement and such consent or waiver has not been obtained prior to the Closing.

(b)      Following the Closing, Seller and Buyer shall use commercially reasonable efforts, and shall cooperate with each other, to obtain any such required consent or waiver, or any release, substitution or amendment required to novate all Liabilities under any and all Assigned Contracts or other Liabilities that constitute Assumed Liabilities or to obtain in writing the unconditional release of all parties to such arrangements, so that, in any case, Buyer shall be solely responsible for such Liabilities from and after the Closing Date; *provided, however,* that neither Seller nor Buyer shall be required to pay any consideration therefor. Once such consent, waiver, release, substitution or amendment is obtained, Seller shall sell, assign and transfer to Buyer the relevant Purchased Asset to which such consent, waiver, release, substitution or amendment relates for no additional consideration. Applicable sales, transfer and other similar Taxes in connection with such sale, assignment or transfer shall be paid by Buyer in accordance with Section 5.04.

(c)      To the extent that any Purchased Asset or Assumed Liability cannot be transferred to Buyer pursuant to this Section 1.05, Buyer and Seller shall use commercially reasonable efforts to enter into such arrangements (such as subleasing, sublicensing or subcontracting) to provide to the parties the economic and, to the extent permitted under applicable Law, operational equivalent of the transfer of such Purchased Asset and/or Assumed Liability to Buyer as of the Closing. Buyer shall, as agent or subcontractor for Seller, pay, perform and discharge fully the liabilities and obligations of Seller thereunder from and after the Closing Date. To the extent permitted under applicable Law, Seller shall, at Buyer's expense, hold in trust for and pay to Buyer promptly upon receipt thereof, all income, proceeds and other monies received by Seller from and after the Closing Date, to the extent related to such Purchased Asset in connection with the arrangements under this Section 1.06. Seller shall be permitted to set off against such amounts all direct costs associated with the retention and maintenance of such Purchased Assets.

**Section 1.06   Withholding Taxes.** Buyer shall be entitled to deduct and withhold from amounts otherwise payable pursuant to this Agreement such amounts as are required to be deducted and withheld under applicable law. Buyer shall provide Seller with written notice of its intent to withhold at least ten (10) days prior to the Closing with a written explanation substantiating the requirement to deduct or withhold, and the parties shall use commercially reasonable efforts to cooperate to mitigate or eliminate any such withholding to the maximum extent permitted by law. To the extent that amounts are so withheld and paid over to the appropriate tax authority by the Buyer, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the person in respect of which such deduction and withholding was made.

## ARTICLE II
## CLOSING

**Section 2.01   Closing.** Subject to the terms and conditions of this Agreement, the consummation of the transactions contemplated by this Agreement (the "**Closing**") shall take place at the offices of Nexus Services, Inc., 12 Middlebrook Avenue, Staunton, Virginia, or remotely by exchange of documents and signatures (or their electronic counterparts), at 2:00 PM

EST, on April 17, 2024, simultaneously with the execution of this Agreement, or at such other time or place or in such other manner as Seller and Buyer may mutually agree upon in writing. The date on which the Closing is to occur is herein referred to as the "**Closing Date**."

### Section 2.02   Closing Deliverables.

(a)   At the Closing, Seller shall deliver to Buyer the following:

(i)   a bill of sale in the form of **Exhibit B** attached hereto (the "**Bill of Sale**") and duly executed by Seller, transferring the Tangible Personal Property included in the Purchased Assets to Buyer;

(ii)   an assignment and assumption agreement in the form of **Exhibit C** attached hereto (the "**Assignment and Assumption Agreement**") and duly executed by Seller, effecting the assignment to and assumption by Buyer of the Purchased Assets and the Assumed Liabilities;

(iii)   a certificate of the Secretary (or equivalent officer) of Seller certifying as to (A) the resolutions of the board of directors and the stockholders of Seller, which authorize the execution, delivery and performance of this Agreement, the Bill of Sale, the Assignment and Assumption Agreement, and the other agreements, instruments and documents required to be delivered in connection with this Agreement or at the Closing (collectively, the "**Transaction Documents**") and the consummation of the transactions contemplated hereby and thereby and (B) the names and signatures of the officers of Seller authorized to sign this Agreement and the other Transaction Documents; and

(iv)   such other customary instruments of transfer or assumption, filings or documents, in form and substance reasonably satisfactory to Buyer, as may be required to give effect to the transactions contemplated by this Agreement.


(b)   At the Closing, Buyer shall deliver to Seller the following:

(i)   the Purchase Price in cash;

(ii)   the Assignment and Assumption Agreement duly executed by Buyer; and

(iii)   a certificate of the Secretary (or equivalent officer) of Buyer certifying as to (A) the resolutions of the board of directors of Buyer, which authorize the execution, delivery and performance of this Agreement and the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby and (B) the names and signatures of the officers of Buyer authorized to sign this Agreement and the other Transaction Documents.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF SELLER

Except as set forth in the Disclosure Schedules, Seller represents and warrants to Buyer that the statements contained in this Article III are true and correct as of the date hereof.

**Section 3.01   Organization and Authority of Seller.** Seller is a corporation duly organized, validly existing and in good standing under the Laws of the State of Delaware. Seller has all necessary corporate power and authority to enter into this Agreement and the other Transaction Documents to which Seller is a party, to carry out its obligations hereunder and thereunder, and to consummate the transactions contemplated hereby and thereby. The execution and delivery by Seller of this Agreement and any other Transaction Document to which Seller is a party, the performance by Seller of its obligations hereunder and thereunder, and the consummation by Seller of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action on the part of Seller. This Agreement and the Transaction Documents constitute legal, valid and binding obligations of Seller enforceable against Seller in accordance with their respective terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

**Section 3.02   No Conflicts or Consents.** The execution, delivery, and performance by Seller of this Agreement and the other Transaction Documents to which it is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) violate or conflict with any provision of the certificate of incorporation, by-laws, or other governing documents of Seller; (b) violate or conflict with any provision of any statute, law, ordinance, regulation, rule, code, constitution, treaty, common law, other requirement, or rule of law of any Governmental Authority (collectively, "**Law**") or any order, writ, judgment, injunction, decree, stipulation, determination, penalty, or award entered by or with any Governmental Authority ("**Governmental Order**") applicable to Seller, the Business, or the Purchased Assets, other than the Amended Judgment and Order; (c) require the consent, notice, declaration, or filing with or other action by any individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association, or other entity ("**Person**") or require any permit, license, or Governmental Order; (d) violate or conflict with, result in the acceleration of, or create in any party the right to accelerate, terminate, modify, or cancel any Contract to which Seller is a party or by which Seller or the Business is bound or to which any of the Purchased Assets are subject (including any Assigned Contract); or (e) result in the creation or imposition of any charge, claim, pledge, equitable interest, lien, security interest, restriction of any kind, or other encumbrance ("**Encumbrance**") on the Purchased Assets.

**Section 3.03   Warranties and Representations Specifically Disclaimed.** Sellers are selling a distressed asset. They have made no representation as to its solvency. They have not provided audited financial statements or professionally prepared data. Sellers have made available all documents via electronic mail in the course of negotiations, that were immediately and readily available, but cannot guarantee their accuracy. Buyer is aware of the lack of documentation, reliable information, and incomplete records.

**Section 3.04   No Other Representations and Warranties.** Except for the representations and warranties contained in this Article III (including the related portions of the Disclosure Schedules), neither Seller nor any other Person has made or makes any other express or implied representation or warranty, either written or oral, on behalf of Seller, including any representation or warranty as to the accuracy or completeness of any information, documents or material regarding the Business and the Purchased Assets furnished or made available to Buyer and its Representatives in any form (including any information, documents, or material delivered to Buyer on behalf of Seller for purposes of this Agreement), or as to the future revenue, profitability, or success of the Business, or any representation or warranty arising from statute or otherwise in Law. For purposes of this Agreement, "**Representative**" means, with respect to any Person, any and all directors, officers, employees, consultants, financial advisors, counsel, accountants and other agents of such Person.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller that the statements contained in this Article IV are true and correct as of the date hereof.

**Section 4.01   Organization and Authority of Buyer.** Buyer is a Pennsylvania corporation duly organized, validly existing and in good standing under the Laws of the State Pennsylvania. Buyer has all necessary corporate power and authority to enter into this Agreement and the other Transaction Documents to which Buyer is a party, to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution and delivery by Buyer of this Agreement and any other Transaction Document to which Buyer is a party, the performance by Buyer of its obligations hereunder and thereunder and the consummation by Buyer of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action on the part of Buyer. This Agreement and the Transaction Documents constitute legal, valid and binding obligations of Buyer enforceable against Buyer in accordance with their respective terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

**Section 4.02   No Conflicts; Consents.** The execution, delivery and performance by Buyer of this Agreement and the other Transaction Documents to which it is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) violate or breach any provision of the certificate of incorporation or by-laws of Buyer; (b) violate or breach any provision of any Law or Governmental Order applicable to Buyer; (c), require the consent, notice or other action by any Person under, conflict with, violate or breach, constitute a default under or result in the acceleration of any agreement to which Buyer is a party; or (d) require any consent, permit, Governmental Order, filing or notice from, with or to any Governmental Authority by or with respect to Buyer in connection with the execution and delivery of this Agreement and the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby; except, in the cases of clauses (b) and (c), where the violation, breach, conflict, default, acceleration or failure to obtain consent or give notice would not have a material adverse effect on Buyer's ability to consummate the transactions

contemplated hereby and, in the case of clause (d), where such consent, permit, Governmental Order, filing or notice which, in the aggregate, would not have a material adverse effect on Buyer's ability to consummate the transactions contemplated hereby.

**Section 4.03   Solvency; Sufficiency of Funds.** Immediately after giving effect to the transactions contemplated hereby, Buyer shall be solvent and shall: (a) be able to pay its debts as they become due; (b) own property that has a fair saleable value greater than the amounts required to pay its debts (including a reasonable estimate of the amount of all Liabilities); and (c) have adequate capital to carry on its business. No transfer of property is being made and no obligation is being incurred in connection with the transactions contemplated hereby with the intent to hinder, delay or defraud either present or future creditors of Buyer or Seller. In connection with the transactions contemplated hereby, Buyer has not incurred, nor plans to incur, debts beyond its ability to pay as they become absolute and matured.

**Section 4.04   Independent Investigation.** Buyer has conducted its own independent investigation, review and analysis of the Business and the Purchased Assets, and acknowledges that it has been provided adequate access to the personnel, properties, assets, premises, books and records and other documents and data of Seller for such purpose. Buyer acknowledges and agrees that: (a) in making its decision to enter into this Agreement and to consummate the transactions contemplated hereby, Buyer has relied solely upon its own investigation and the express representations and warranties of Seller set forth in Article III of this Agreement (including related portions of the Disclosure Schedules); and (b) neither Seller nor any other Person has made any representation or warranty as to Seller, the Business, the Purchased Assets or this Agreement, except as expressly set forth in Article III of this Agreement (including the related portions of the Disclosure Schedules).

## ARTICLE V
## COVENANTS

**Section 5.01   Confidentiality.** Buyer acknowledges and agrees that the Confidentiality Agreement, dated as of April 9, 2024, between Buyer and Seller (the "**Confidentiality Agreement**") remains in full force and effect and, in addition, covenants and agrees to keep confidential, in accordance with the provisions of the Confidentiality Agreement, information provided to Buyer pursuant to this Agreement.

**Section 5.02   Public Announcements.** Unless otherwise required by applicable Law, no party to this Agreement shall make any public announcements in respect of this Agreement or the transactions contemplated hereby without the prior written consent of the other party (which consent shall not be unreasonably withheld, conditioned or delayed), and the parties shall cooperate as to the timing and contents of any such announcement.

**Section 5.03   Bulk Sales Laws.** The parties hereby waive compliance with the provisions of any bulk sales, bulk transfer or similar Laws of any jurisdiction that may otherwise be applicable with respect to the sale of any or all of the Purchased Assets to Buyer.

**Section 5.04   Transfer Taxes.** All transfer, sales, use, registration, documentary, stamp, value added and other such Taxes and fees (including any penalties and interest) incurred in

connection with this Agreement and the other Transaction Documents, if any, shall be borne and paid by Buyer when due. Buyer shall, at its own expense, timely file any Tax Return or other document with respect to such Taxes or fees (and Seller shall cooperate with respect thereto as necessary).

**Section 5.05   Further Assurances.** Following the Closing, each of the parties hereto shall, and shall cause their respective Affiliates to, execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement and the other Transaction Documents.

**ARTICLE VI**
**INDEMNIFICATION**

**Section 6.01   Survival.** Subject to the limitations and other provisions of this Agreement, the representations and warranties contained herein shall survive the Closing and shall remain in full force and effect until the date that is seven years from the Closing Date. None of the covenants or other agreements contained in this Agreement shall survive the Closing Date other than those which by their terms contemplate performance after the Closing Date, and each such surviving covenant and agreement shall survive the Closing for the period contemplated by its terms. Notwithstanding the foregoing, any claims asserted in good faith with reasonable specificity (to the extent known at such time) and in writing by notice from the non-breaching party to the breaching party prior to the expiration date of the applicable survival period shall not thereafter be barred by the expiration of such survival period and such claims shall survive until finally resolved.

**Section 6.02   Indemnification by Seller.** Subject to the other terms and conditions of this Article VI, from and after the Closing, Seller shall indemnify Buyer against, and shall hold Buyer harmless from and against, any and all losses, damages, liabilities, deficiencies, Actions, judgments, interest, awards, penalties, fines, costs or expenses of whatever kind, including reasonable attorneys' fees (collectively, "**Losses**"), incurred or sustained by, or imposed upon, Buyer based upon, arising out of, with respect to or by reason of:

(a)     any inaccuracy in or breach of any of the representations or warranties of Seller contained in this Agreement;

(b)     any breach or non-fulfillment of any covenant, agreement or obligation to be performed by Seller pursuant to this Agreement; or

(c)     any Excluded Asset or any Excluded Liability.

**Section 6.03   Indemnification by Buyer.** Subject to the other terms and conditions of this Article VI, from and after the Closing, Buyer shall indemnify Seller against, and shall hold Seller harmless from and against, any and all Losses incurred or sustained by, or imposed upon, Seller based upon, arising out of or with respect to:

(a)      any inaccuracy in or breach of any of the representations or warranties of Buyer contained in this Agreement;

(b)      any breach or non-fulfillment of any covenant, agreement or obligation to be performed by Buyer pursuant to this Agreement; and

(c)      subject to Seller's obligations in Section 6.02, any Assumed Liability.

**Section 6.04    Certain Limitations.** The party making a claim under this Article VI is referred to as the "**Indemnified Part**y," and the party against whom such claims are asserted under this Article VI is referred to as the "**Indemnifying Party**." The indemnification provided for in Section 6.02 and Section 6.03 shall be subject to the following limitations:

(a)      The Indemnifying Party shall not be liable to the Indemnified Party for indemnification under Section 6.02(a) or Section 6.03(a), as the case may be, until the aggregate amount of all Losses in respect of indemnification under Section 6.02(a) or Section 6.03(a) exceeds $1,000,0000 (the "**Deductible**"), in which event the Indemnifying Party shall only be required to pay or be liable for Losses in excess of the Deductible.

(b)      The aggregate amount of all Losses for which an Indemnifying Party shall be liable pursuant to Section 6.02(a) or Section 6.03(a), as the case may be, shall not exceed $7,000,000.

(c)      In no event shall any Indemnifying Party be liable to any Indemnified Party for any punitive, incidental, consequential, special or indirect damages, including loss of future revenue or income, loss of business reputation or opportunity relating to the breach or alleged breach of this Agreement, or diminution of value or any damages based on any type of multiple.

(d)      Seller shall not be liable under this Article VI for any Losses based upon or arising out of any inaccuracy in or breach of any of the representations or warranties of Seller contained in this Agreement if Buyer had knowledge of such inaccuracy or breach prior to the Closing.

**Section 6.05    Indemnification Procedures.** Whenever any claim shall arise for indemnification hereunder, the Indemnified Party shall promptly provide written notice of such claim to the Indemnifying Party. Such notice by the Indemnified Party shall: (a) describe the claim in reasonable detail; (b) include copies of all material written evidence thereof; and (c) indicate the estimated amount, if reasonably practicable, of the Loss that has been or may be sustained by the Indemnified Party. In connection with any claim giving rise to indemnity hereunder resulting from or arising out of any Action by a Person who is not a party to this Agreement, the Indemnifying Party, at its sole cost and expense and upon written notice to the Indemnified Party, may assume the defense of any such Action with counsel reasonably satisfactory to the Indemnified Party. The Indemnified Party shall be entitled to participate in the defense of any such Action, with its counsel and at its own cost and expense, subject to the Indemnifying Party's right to control the defense thereof. If the Indemnifying Party does not assume the defense of any such Action, the Indemnified Party may, but shall not be obligated to,

11

defend against such Action in such manner as it may deem appropriate, including settling such Action, after giving notice of it to the Indemnifying Party, on such terms as the Indemnified Party may deem appropriate and no action taken by the Indemnified Party in accordance with such defense and settlement shall relieve the Indemnifying Party of its indemnification obligations herein provided with respect to any damages resulting therefrom. Seller and Buyer shall cooperate with each other in all reasonable respects in connection with the defense of any claim, including: (i) making available (subject to the provisions of Section 5.01) records relating to such claim; and (ii) furnishing, without expense (other than reimbursement of actual out-of-pocket expenses) to the defending party, management employees of the non-defending party as may be reasonably necessary for the preparation of the defense of such claim. The Indemnifying Party shall not settle any Action without the Indemnified Party's prior written consent (which consent shall not be unreasonably withheld, conditioned or delayed).

**Section 6.06   Continued Defense and Assistance.** Buyer shall provide all current and past shareholders fees of up to $1,000,000 to retain and pay defense counsel, while executing all necessary conflict waivers, relating to any criminal matter arising from or relating to or arising from current or past shareholders management of Sellers. Any amounts paid pursuant to this Section 6.06 shall be paid within 30 days upon demand, with a written confirmation payment thirty days being provided to counsel within 10 days. The amounts shall be paid directly to such defense counsel.  Current and past shareholders shall have sole discretion in determining their chosen defense counsel. Buyer shall provide any chosen defense counsel any documents or information in Buyer's custody and control which is requested by chosen defense counsel or which would be relevant to any pending or incipient criminal or civil matter relating to or arising from current or past shareholders management of Sellers. Buyer shall execute all necessary conflict waivers to allow current civil counsel to continue to represent current or past shareholders in their individual capacity in all matters currently pending against Sellers, in which current or past shareholders are named individually as defendants or contemnors.

**Section 6.07   Past Tax Liabilities.** Buyer is aware of an outstanding tax liability of approximately $2,600,000. Buyer has agreed and shall by October 1, 2024 fully satisfy that liability to be calculated precisely by defense counsel selected pursuant to Section 6.06, in accordance with advice from defense counsel and in a manner as prescribed by that counsel.

**Section 6.08   Tax Treatment of Indemnification Payments.** All indemnification payments made under this Agreement shall be treated by the parties as an adjustment to the Purchase Price for Tax purposes, unless otherwise required by Law.

**Section 6.09   Exclusive Remedies.** The parties acknowledge and agree that from and after the Closing their sole and exclusive remedy with respect to any and all claims for any breach of any representation, warranty, covenant, agreement or obligation set forth herein or otherwise relating to the subject matter of this Agreement shall be pursuant to the indemnification provisions set forth in this Article VI. In furtherance of the foregoing, each party hereby waives, from and after the Closing, to the fullest extent permitted under Law, any and all rights, claims and causes of action for any breach of any representation, warranty, covenant, agreement or obligation set forth herein or otherwise relating to the subject matter of this Agreement it may have against the other parties hereto and their Affiliates and each of their respective Representatives arising under or based upon any Law, except pursuant to the

indemnification provisions set forth in this Article VI. Nothing in this Section 6.09 shall limit any Person's right to seek and obtain any equitable relief to which such Person shall be entitled.

## ARTICLE VII
## MISCELLANEOUS

**Section 7.01   Expenses.** Except as otherwise expressly provided herein (including Section 5.04 hereof), all costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses.

**Section 7.02   Notices.** All notices, claims, demands and other communications hereunder shall be in writing and shall be deemed to have been given: (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by facsimile or email of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next business day if sent after normal business hours of the recipient; or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 7.02):

| | |
|---|---|
| **If to Seller:** | Micheal Donovan<br>47 S. Windsong Ct.<br>Fishersville, Virginia 22939<br>Email: Mikedonovanva@gmail.com<br>Attention: Micheal Donovan |
| with a copy to:<br>(which shall not<br>constitute notice) | CANTAFIO & SONG PLLC<br>1875 Lawrence Street,<br>Suite 730<br>Denver, Colorado 80202<br>Email: msong@fncslaw.com<br>Attention: Michael Song, Managing Partner |
| **If to Buyer:** | Libre Immigration Services, Inc.<br>760 Cumberland Street<br>Lebanon, Pennsylvania 17042<br>ATTN:  Vincent J. Smith, CEO<br>Email:  VSmith@disclegalplan.com |

with a copy to:          Kevin P. Krupnick, Esquire
(which shall not         The Krupnick Firm
constitute notice)       56 Hammond Road
                         Glen Cove, New York 11542
                         Email:  KKrupnick@krupnickfirm.com

**Section 7.03   Interpretation; Headings.** This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

**Section 7.04   Severability.** If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement.

**Section 7.05   Entire Agreement.** This Agreement and the other Transaction Documents constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous representations, warranties, understandings and agreements, both written and oral, with respect to such subject matter. In the event of any inconsistency between the statements in the body of this Agreement and those in the other Transaction Documents, the Exhibits and the Disclosure Schedules (other than an exception expressly set forth as such in the Disclosure Schedules), the statements in the body of this Agreement will control.

**Section 7.06   Successors and Assigns; Assignment.** This Agreement is binding upon and inures to the benefit of the parties hereto and their respective successors and permitted assigns. Neither party may assign any of its rights or obligations hereunder without the prior written consent of the other party, which consent shall not be unreasonably withheld, conditioned or delayed. Any purported assignment in violation of this Section shall be null and void. No assignment shall relieve the assigning party of any of its obligations hereunder.

**Section 7.07   Amendment and Modification; Waiver.** This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No failure to exercise, or delay in exercising, any right or remedy arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right or remedy hereunder preclude any other or further exercise thereof or the exercise of any other right or remedy.

**Section 7.08   Governing Law; Submission to Jurisdiction; Waiver of Jury Trial.**

(a)      Any dispute, controversy, or claim arising out of or related to this Agreement or any breach or termination of this Agreement, including but not limited to the Services you provide to the Company, and any alleged violation of any federal, state, or local statute, regulation, common law, or public policy, whether sounding in contract, tort, or statute, shall be submitted to and decided by binding arbitration. Arbitration shall be administered by the AAA and held in New York, New York before a single arbitrator,

in accordance with the AAA's rules, regulations, and requirements. Any arbitral award determination shall be final and binding upon the Parties. Judgment on the arbitrator's award may be entered in any court of competent jurisdiction.

(b)     All matters arising out of or relating to this Agreement shall be governed by and construed in accordance with the internal laws of the State of New York without giving effect to the conflict of law provisions thereof to the extent such provisions would require or permit the application of the laws of any jurisdiction other than the State of New York.

(c)     In the event that Section 7.08(a) is found unenforceable, and only if such is found unenforceable, then any legal suit, action, proceeding or dispute arising out of or relating to this Agreement, the other Transaction Documents or the transactions contemplated hereby or thereby may be instituted in the federal courts of the United States of America or the courts of the State of New York in each case located in the city of New York and county of New York, and each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action, proceeding or dispute.

(d)     EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT OR THE OTHER TRANSACTION DOCUMENTS IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL ACTION, PROCEEDING, CAUSE OF ACTION OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT, INCLUDING ANY EXHIBITS AND SCHEDULES ATTACHED TO THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT: (I) NO REPRESENTATIVE OF THE OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT THE OTHER PARTY WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF A LEGAL ACTION; (II) EACH PARTY HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER; (III) EACH PARTY MAKES THIS WAIVER KNOWINGLY AND VOLUNTARILY; AND (IV) EACH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

**Section 7.09   Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

**Section 7.10   Non-Recourse.** This Agreement may only be enforced against, and any claim, action, suit or other legal proceeding based upon, arising out of or related to this Agreement, or the negotiation, execution or performance of this Agreement, may only be

brought against the entities that are expressly named as parties hereto and then only with respect to the specific obligations set forth herein with respect to such party. No past, present or future director, officer, employee, incorporator, manager, member, partner, stockholder, Affiliate, agent, attorney or other Representative of any party hereto or of any Affiliate of any party hereto, or any of their successors or permitted assigns, shall have any liability for any obligations or liabilities of any party hereto under this Agreement or for any claim, action, suit or other legal proceeding based on, in respect of or by reason of the transactions contemplated hereby.

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

Sellers:

Libre by Nexus, Inc.

By: Micheal Donovan and Evan Ajin

CEO and Corporate Secretary of Libre by Nexus, Inc.

Nexus Services, Inc.

By: Micheal Donovan and Evan Ajin

CEO and Corporate Secretary of Nexus Services, Inc.

Buyer:

Libre Immigration Services, Inc.

Vincent J. Smith

CEO of Libre Immigration Services, Inc.

16

# **Automobiles**

| Year | Make | Model | VIN Number | Loan With | Owner |
|------|------|-------|------------|-----------|-------|
| 2021 | Chevrolet | Bolt EV | 1G1FY6SO7M4113793 | Ally Financial | Nexus Services |
| 2020 | Kia | Soul | KNDJ23AU9L7062140 | Kia Finance | Nexus Services |
| 2020 | Kia | Soul | KNDJ23AU5L7072017 | Kia Finance | Nexus Services |
| 2020 | Kia | Soul | KNDJ23AU2L7071441 | Kia Finance | Nexus Services |
| 2021 | Kia | Soul | KNDJ63AUXM7768765 | Ally Financial | Nexus Services |
| 2020 | Kia | Soul | KNDJ23AU8L7079740 | Kia Finance | Nexus Services |

# **Intangible Property and Cash**

Cash

Libre Client Accounts
Libre Email List
Libre Text List
Immigration Legal List
VA-Criminal Legal List

Website Names
Domine Names
Logos and Marks - Libre
Logos and Marks - Nexus
Website data
Social Media Accounts
Promotional Materials

Cash posted as Collateral to RLI
Cash posted as Collateral to AIA
Cash posted as Colateral to Bankers
Cash posted as Collateral to FCS
Cash posted as Collateral to American

Accounts Receivable
Merchant Accounts
Payroll Accounts (Paycor)
Payroll Accounts (Upwork)


All other cash and intangible assets owned by Nexus Services, Inc. and Libre by Nexus, Inc.

## Online Accounts

Gsuite - Libre and Nexushelps

Phone.com

Five9

Textbetter

Zoho one

Lightspeed

GoDaddy

Engyte

Canva

Constant Contact

ClickSend

Murf Inc

Upwork

# Phone Numbers

Phone.com Telephone Numbers

(540) 255-9218
(540) 787-1912
(844) 284-7610
(855) 427-6747
(866) 525-1373
(947) 223-2671
(540) 208-5153
(703) 655-3421
(540) 901-9695
(434) 204-5984
(540) 609-4263
(844) 667-3948
(877) 718-3411
(540) 701-9359
(540) 271-2687
(540) 255-7087
(540) 902-0786
(540) 609-4119
(540) 255-6764
(865) 737-6300
(864) 737-6300
(434) 394-3048
(540) 466-1007
 (540) 210-5288
(540) 730-7789
(620) 779-7836
(540) 733-7669
(540) 271-8279


5 Nine Phone Numbers

(201)292-5700
(202)996-7569
(203)204-8648
(205)315-6352

(208)254-4859
(209)260-6143
(210)436-6193
(212)256-9079
(213)320-1457
(215)671-6002
(216)202-6012
(218)610-3794
(220)203-0748
(223)203-8854
(224)704-1612
(225)334-8914
(229)329-7000
(231)331-3335
(234)205-0046
(239)355-5375
(240)735-0665
(248)228-2320
(251)225-6344
(252)513-1293
(253)671-1308
(254)545-2186
(256)530-4062
(260)667-9287
(262)683-7884
(267)281-5687
(269)285-0253
(276)289-1392
(279)202-0459
(281)393-8670
(301)259-5919
(302)549-4077
(304)209-5821
(305)425-9670
(307)219-1735
(309)270-7007
(310)879-8243
(312)967-3031
(313)379-2253
(314)384-5970
(315)239-3026

(317)300-5891
(318)541-8582
(319)237-4318
(320)200-5591
(321)380-1443
(323)332-1620
(325)231-4453
(330)286-6204
(331)256-9839
(334)521-8715
(336)281-2095
(337)516-1069
(339)226-6573
(346)738-0279
(347)315-3986
(351)207-6966
(352)254-5114
(361)454-5882
(364)212-0814
(380)253-0290
(385)498-6187
(386)259-2490
(401)307-3593
(404)857-4169
(405)367-5997
(406)306-0959
(407)490-0470
(408)290-7275
(410)324-3034
(412)763-2794
(413)450-1348
(414)293-1165
(415)854-7001
(417)580-0393
(423)922-8208
(430)837-0158
(432)294-6930
(434)312-0199
(434)394-3056
(434)394-3057
(434)394-3072

(435)243-7939
(440)696-1087
(442)229-5081
(443)383-5010
(445)200-5181
(458)246-3556
(463)888-9114
(469)305-3621
(470)563-1089
(475)208-4679
(478)341-0499
(479)262-0689
(484)823-5450
(501)386-5705

# Assigned Contracts

Employment Contracts
Independent Contractor Agreements

Vendor Contracts including:

|  |  |  |
|---|---|---|
| ULINE | Acct: | 8603186 |
| ULINE | Acct: | 8603186 |
| ULINE | Acct: | 8603186 |
| ACS AUTHORI | Acct: | 59501-45972 |
| Five 9 | Acct: | File 2361 |
| Gmail | Acct: | 6681-8574-6831-7608 |

Service Provider Contracts including:

Subversivo LLC
Breaking Through LLC
Lawerance Law Frim
Law Frim of Amina Manthey-Willard

Oral Agreements including:

Lease-Breaking Through LLC

All other Contracts which Nexus Services, Inc. and Libre by Nexus, Inc. have rights under.

# Furniture and Technology

| Item | Qty |
|------|-----|
| Mircosoft Surfac | 20 |
| Mac Computers | 6 |
| PC Computers | 10 |
| Xerox Color c6( | 1 |
| TV's | 6 |
| File Cabients | 20 |
| Desk Chairs | 30 |
| Conference Tabl | 2 |
| Office Desks | 14 |
| Office Refrigera | 2 |
| Weight Scales | 2 |
| File Cabinets | 40 |
| Jail Cell | 1 |
| Various Office S | 100 |
| Various Marketi | 50 |

## Real Estate

| Property | Description | Status |
|---|---|---|
| 43 S Windsong | 4bd 3ba SFH | Family residence |
| 14 S Windsong | 5bd 3ba SFH | Client residence |
| 143 Lofty Circle | 5bd 3ba SFH | Prize House (part of a home giveaway program) |

# **Included Liabilities**

Accounts Payable

Liabilities under Assigned Contracts

Liabilites required transferred per court order in CFPB, et al. v. Libre by Nexus, Inc., et al., No. 5:21-cv-00016

Tax Liabilities pursuant to Section 1.03(a)(iii)

Debt of $170,000 owed to Zachary Cruz

# Excluded Assets

| | |
|---|---|
| Chevrolet Bolt EV | 1G1FY6SO7M4113793 |
| Kia Soul | KNDJ23AU9L7062140 |
| Kia Soul | KNDJ23AU5L7072017 |
| Kia Soul | KNDJ23AU2L7071441 |
| eajin@nexushelps.com | |
| rmoore@nexushelps.com | |
| mdonovan@nexushelps.com | |
| 43 S Windsong | 4bd 3ba SFH |
| 14 S Windsong | 5bd 3ba SFH |
| 143 Lofty Circle | 5bd 3ba SFH |