IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Harrisonburg Division

CONSUMER FINANCIAL PROTECTION
BUREAU, et al.,

    Plaintiffs,

v.

NEXUS SERVICES, INC., et al.,

    Defendants.

Case No.: 5:21-cv-00016-EKD-JCH

**PLAINTIFFS' REPLY TO DEFENDANTS' AND LIS'S OPPOSITION TO
PLAINTIFFS' MOTION FOR AN ORDER TO SHOW CAUSE**

# TABLE OF CONTENTS

Table of Authorities ................................................................................................ ii

Argument .............................................................................................................. 3

   I.   The Court's Judgment is not ambiguous and clearly precluded the Defendants from selling, and LIS from buying, consumer contracts and data. ........................................... 3

       A.   Defendants and LIS have conceded that they understood that the Judgment precluded selling consumer contracts and data. ...................................................... 6

       B.   Paragraph 19 clearly precludes the sale of consumer contracts and data. .............. 6

       C.   There is no basis to "narrow" the Judgment's plain terms. .................................. 10

   II.   Neither Section 1.05 of the Asset Purchase Agreement, nor the involvement of a contractor or attorney, render the sale consistent with the Court's order....................... 11

       A.   Section 1.05 of the Asset Purchase Agreement does not erase the violation of the Judgment................................................................................................. 12

       B.   No agreements with Subversivo or Nexus's general counsel divest ownership of the contracts from LIS. ................................................................................ 14

   III.   Defendants' and LIS's violations of the Court's order harm Plaintiffs. ......................... 17

Conclusion ........................................................................................................... 19

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*BAE Sys. Ordnance Sys., Inc. v. Fluor Fed. Sols., LLC*,
   2024 WL 382444 (W.D. Va. Jan. 31, 2024) ................................................................ 8

*Baez v. N.Y.C. Hous. Auth.*,
   533 F. Supp. 3d 135 (S.D.N.Y. 2021) ...................................................................... 13

*CFPB v. Future Income Payments, LLC*,
   2020 WL 6162947 (D.S.C. May 21, 2020) ............................................................ 4, 10

*CFPB v. Klopp*,
   957 F.3d 454 (4th Cir. 2020) ......................................................................... 2, 18, 19

*CFPB v. Siringoringo*,
   2016 WL 102435 (C.D. Cal. Jan. 7, 2016) .............................................................. 11

*Corley v. United States*,
   556 U.S. 303 (2009) ...................................................................................................... 7

*Dairy Energy, Inc. v. Hartford Steam Boiler Inspection & Ins. Co.*,
   566 F. Supp. 3d 515 (W.D. Va. 2021) ......................................................................... 7

*FTC v. 1st Guar. Mortg. Corp.*,
   2011 WL 1233207 (S.D. Fla. Mar. 30, 2011) ........................................................... 11

*FTC v. Genius Techs. LLC*,
   2019 WL 12872865 (N.D. Cal. Feb. 20, 2019) ........................................................ 11

*FTC v. Pointbreak Media, LLC*,
   376 F. Supp. 3d 1257 (S.D. Fla. 2019) .................................................................... 11

*FTC v. Pukke*,
   53 F.4th 80 (4th Cir. 2022) ........................................................................................ 17

*FTC v. Ruberoid Co.*,
   343 U.S. 470 (1952) .................................................................................................... 10

*Hicks v. Ferreyra*,
   965 F.3d 302 (4th Cir. 2020) ........................................................................................ 4

*In re Blinds to Go Share Purchase Litig.*,
   443 F.3d 1 (1st Cir. 2006) .......................................................................................... 13

*McComb v. Jacksonville Paper Co.*,
   336 U.S. 187 (1949) ...................................................................................................... 4

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
   566 U.S. 639 (2012) .................................................................................... 8

*Szabo v. U.S. Marine Corp.*,
   819 F.2d 714 (7th Cir. 1987) ..................................................................... 4

*TiVo Inc. v. EchoStar Corp.*,
   646 F.3d 869 (Fed. Cir. 2011) .................................................................... 4

*United States v. Stevens*,
   559 U.S. 460 (2010) .................................................................................... 9

**Rules**

Fed. R. Civ. P. 65(c) ..................................................................................... 19

Fed. R. Civ. P. 65(d)(2)(b) ........................................................................... 19

**Other Authorities**

Consent Order, *In the Matter of Tempoe LLC*, No. 2023-CFPB-0010 (Sep. 11, 2023) ................ 7

Stipulated Final J. and Order, *CFPB v. LendUp Loans, LLC*, No. 3:21-cv-06495 (N.D. Cal. Dec. 30, 2021) ............................................................................................. 7

In exchange for offloading millions of dollars in liabilities, Defendants sold—and Libre Immigration Services (LIS) bought—most of the business of the corporate Defendants (Nexus Services, Inc., and its wholly owned subsidiary, Libre by Nexus, Inc.), including the consumer data and deceptive consumer contracts that Paragraph 19 of this Court's April 1 order unambiguously enjoined Defendants from selling, attempting to sell, or otherwise benefitting from. The sale took place in mid-April, after this Court entered its Amended Final Judgment (Judgment), after Defendants noticed an appeal to the Fourth Circuit, and after Defendants asked for (but before this Court had a chance to consider) a stay so the sale could go through without violating the Judgment. Represented by Defendants' counsel, LIS then asked the Fourth Circuit for permission to intervene in the appeal in part because it had bought the deceptive contracts—which it referred to as the company's most significant asset—and so only it had an interest in appealing the Judgment's prohibition on collecting on those contracts.

Only after Plaintiffs replied that the sale violated the Court's Judgment did Defendants' and LIS's statements regarding the sale change. Now, Defendants and LIS no longer say that they needed a stay of the April 1 order to be able to complete the sale; instead, they argue that the Court's injunction did not actually bar the sale of the contracts in the first place and is too vague to support contempt. They have also done an about-face on their assertion that LIS owns the customer contracts—and instead claim that LIS didn't actually buy the contracts because of a contractual provision that they contend means that if they did anything illegal, it didn't actually happen. They also claim that they didn't actually violate the injunction, or at least that any violation is harmless, because an agent of LIS holds the contracts, or maybe Nexus's general counsel does. Finally, Defendants and LIS argue

that even if they have violated this Court's Judgment, contempt is not warranted because the Plaintiffs have not suffered any harm.

These arguments fail. First, as Defendants have known for months, Paragraph 19 plainly restricts the sale of the customer data and contracts; does not conflict with other portions of the Judgment; and constitutes valid (and routine) fencing-in relief necessitated by Defendants' legal violations. Second, no clause of the contract between Defendants and LIS, nor any temporary arrangement to have an agent of LIS hold the contracts and customer data until whenever LIS says otherwise, harmonizes the sale with the Court's Judgment. Third, Defendants' and LIS's sale has harmed Plaintiffs: It requires them to engage in additional monitoring to protect consumers; burdens their limited resources; and complicates their law enforcement efforts.

Defendants' attempt, in concert with LIS, to duck the injunction just weeks after its entry comes as no surprise given the history of this litigation. Plaintiffs bring this motion to ensure that they can continue to monitor Defendants' compliance with this Court's injunction in order to protect consumers from further deceptive and abusive conduct. If Defendants' and LIS's decision to sell the customer data and contracts that this Court barred from sale is permissible, "[t]he implications . . . would effectively immunize" them "from enforcement of" a key portion of the final Judgment. *See CFPB v. Klopp*, 957 F.3d 454, 466 (4th Cir. 2020). The Court should reject this new effort to evade responsibility and hold Defendants and LIS in contempt.

**ARGUMENT**

**I.     The Court's Judgment is not ambiguous and clearly precluded the Defendants from selling, and LIS from buying, consumer contracts and data.**

Defendants and LIS first argue that they cannot be held in contempt because this Court's Judgment is "impermissibly vague" or otherwise fails to comply with Federal Rule of Civil Procedure 65. They are wrong. To accept this argument, the Court would need to mangle the plain text of its own order and ignore Defendants' and LIS's repeated statements before this Court and the Fourth Circuit indicating that they understood exactly what the Judgment required of them. Defendants and LIS chose to violate those prohibitions anyway, so they cannot rely on a belated cry of ambiguity to save them from contempt. The Court should reject their assertions of ambiguity in the Judgment.

To understand the flaws in Defendants' and LIS's arguments, it's helpful to begin with the context of the Judgment they seek to collaterally challenge in this contempt proceeding. The Court entered the Judgment in this case after holding Defendants in contempt for their failure to comply with multiple court orders regarding discovery and case management. *See* Am. Mem. Op. (Apr. 2, 2024), ECF No. 247 ("Final J. Op."); Am. Final J. Order (Apr. 1, 2024), ECF No. 246 ("Am. J."). In its opinion accompanying the Judgment, the Court concluded that Defendants should be held liable for numerous abusive and deceptive acts or practices under the Consumer Financial Protection Act, as well as violations of Massachusetts, New York, and Virginia consumer laws. Final J. Op. at 8–16. The Court then turned to the appropriate remedies— including the injunctive relief at issue in this proceeding. *See id.* at 19–21. The Court noted that, during briefing on remedies in the summer of 2023, Plaintiffs submitted a proposed order to the Court and defense counsel, but Defendants did not comment on that proposed order (nor did they propose one of their own). *Id.* at 6; *see also* Ex. 1 (email submitting proposed order to the Court).

And, as the Court observed, once it had decided to exclude much of Defendants' evidence from a planned remedies hearing, Defendants "indicated that there was no need to present any . . . argument not already before the court" and agreed to cancel the hearing. Final J. Op. at 7. Looking at the arguments before it at that point, the Court concluded that Defendants had "effectively conceded most" objections to Plaintiffs' requested remedies "by failing to address" them.[1] *Id.*

The Court nevertheless evaluated the propriety of Plaintiffs' proposed injunction on its own and concluded that Plaintiffs' "requested injunctive relief [wa]s justified and appropriate." *Id.* at 21. In particular, the Court emphasized that "[t]he public interest" would be "served by" an injunction "that reasonably 'fence[s] in' defendants from engaging in behavior related to their previous illegal conduct." *Id.* at 20–21 (citing *CFPB v. Future Income Payments, LLC*, No. 8:19-cv-2950-BHH-KFM, 2020 WL 6162947, at *6 (D.S.C. May 21, 2020)).

---

[1] Because Defendants failed to raise any objection to the proposed order, or to the Judgment once entered, the Court could conclude that they have forfeited any objection to the Judgment's terms. Defendants will not be able to prevail on those objections in their pending appeal because, absent "exceptional circumstances" (which are not present here), the Fourth Circuit "does not consider issues raised for the first time on appeal." *Hicks v. Ferreyra*, 965 F.3d 302, 310 (4th Cir. 2020) (cleaned up). And they can't raise those objections now as a defense to contempt because it is well established that, "[i]f a party believes an injunctive order does not satisfy the requirements of Rule 65(d), the time to appeal such an order is when it is handed down, not when the party is later found to be in contempt." 13 Moore's Federal Practice - Civil § 65.60 (2024); *see also Szabo v. U.S. Marine Corp.*, 819 F.2d 714, 718 (7th Cir. 1987), *amended*, (7th Cir. May 27, 1987) (holding that party "cannot argue" that decree "is too vague to be enforced" as defense to contempt); *TiVo Inc. v. EchoStar Corp.*, 646 F.3d 869, 886 (Fed. Cir. 2011) ("[W]here a party has bypassed opportunities to present its asserted vagueness claim on appeal or through a motion to clarify or modify the injunction, the party cannot disregard the injunction and then object to being held in contempt when the courts conclude that the injunction covered the party's conduct."). As the Supreme Court has noted, parties "act[] at their peril" where they fail to ask for a "modification, clarification or construction of the order" but instead "undert[ake] to make their own determination of what the decree mean[s]." *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 192 (1949).

Among the provisions in the accompanying Judgment—as proposed by Plaintiffs and approved by the Court—was Paragraph 19. Paragraph 19 precludes Defendants, and "all other persons in active concert or participation with any of them," from (a) "disclos[ing], us[ing], or benefit[ing] from customer information" and (b) "attempt[ing] to collect, sell, assign, or otherwise transfer any right to collect payment from any consumer who entered into an agreement for Nexus Immigration Bond Services with Defendants." Am. J. ¶ 19. The first subparagraph clearly prohibits the sale of consumer data because such a sale would require Defendants to disclose customer information and allow them to benefit from that consumer information by receiving money for it. And the second subparagraph clearly precludes the sale of the right to collect on a consumer contract—even a contingent one—because it covers the sale of "*any* right to collect." As Plaintiffs explained in their opening motion, to ensure that the consumers that Defendants already deceived and abused are protected from further harm, these provisions of Paragraph 19 make clear that there are certain assets—existing customer data and the right to collect on existing customer contracts—that Defendants cannot offload in a sale. *See* Contempt Mot. at 2.

Defendants and LIS challenge whether that's the clear import of Paragraph 19, but their efforts to sow confusion all fail. Defendants and LIS have each conceded that Paragraph 19 forbids the sale of contracts and data. They have not identified any inconsistency or vagueness in the Judgment that would somehow free them from the conceded restraints of Paragraph 19. And, while they ask the Court to construe the Judgment "narrowly," those arguments ignore the clear propriety of the fencing-in relief the Court ordered here.

### A. Defendants and LIS have conceded that they understood that the Judgment precluded selling consumer contracts and data.

To start, Defendants' and LIS's own prior representations belie their claim that they "did and do[] not see that" paragraph "as preventing a sale of substantially all assets with the buyer bound by the same sanctions." *See* Opp'n at 12.[2] As their own statements to this Court and the Fourth Circuit make clear, Defendants and LIS did, in fact, read Paragraph 19 to restrict a sale, just as Plaintiffs do. When they asked for a partial and temporary stay of the Judgment, Defendants told this Court that they believed Paragraphs 19(a) and 19(b)—which place specific limitations on the handling of consumer contracts and data—"would enjoin a sale of Nexus Companies to a third party." *See* Stay Mot. at 2, ECF No. 249. And in its motion to intervene in the Fourth Circuit, LIS likewise suggested that it had a particular interest in the scope of Paragraph 19 because that provision would "apparently prevent[] any meaningful sale of business and transfer of assets." *See* Intervention Mot. at 4 n.7, *CFPB v. Nexus Services, Inc.*, No. 24-1334 (4th Cir. May 1, 2024), ECF No. 11-1 ("Intervention Mot."); *see also* Lawrence Decl. in Supp. of Intervention Mot. ¶ 17, *CFPB v. Nexus Services, Inc.*, No. 24-1334 (4th Cir. May 1, 2024), ECF No. 11-3 ("Lawrence Intervention Decl.") ("Paragraph 19 appears to restrict a traditional sale of substantially all assets[.]"). Defendants and LIS should not be able to plead confusion because it suits them now, when they previously made clear that they understood Paragraph 19 to forbid their contemplated sale.

### B. Paragraph 19 clearly precludes the sale of consumer contracts and data.

Even setting aside these concessions, Defendants and LIS do not persuasively explain why Paragraph 19 would not preclude the type of sale of contracts and data at issue here.

---

[2] Plaintiffs read ECF 269, filed by Defendants' and LIS's shared counsel, to state that LIS joins Defendants' opposition in full.

Defendants and LIS primarily argue that Paragraph 19 cannot bear its plain meaning because it conflicts with Paragraph 75 of the Judgment, which puts guardrails in place "[s]hould Defendants seek to transfer or assign all or part of their operations," Am. J. ¶ 75. *See* Opp'n at 18. In their view, because the Judgment contemplates a sale of "all or part of their operations," they could not be precluded from including particular assets—like customer data or contracts— in any asset sale. *See id.* at 11. The Court should reject this argument.[3]

Paragraph 75 is not an authorization to sell "all" of the company, notwithstanding the prohibitions in Paragraph 19. Rather, it appears in a section of the Judgment outlining compliance requirements, and, by its plain terms, sets out only what Defendants and any potential transferees or assignees must do *in the event of* a sale. Those requirements for completing a sale do not speak to what kind of sale is allowed.

And even if the Court were to find some conflict between Paragraphs 19 and 75, harmonizing those provisions would not lead to the result Defendants and LIS want: a full release from Paragraph 19's clear restrictions on transfer. That's because, when interpreting the Judgment, the Court must endeavor to give every provision effect. *See Corley v. United States*, 556 U.S. 303, 314 (2009) (outlining as a "basic interpretive canon[]" that a statute "should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant"); *Dairy Energy, Inc. v. Hartford Steam Boiler Inspection &*

---

[3] Paragraphs 19 and 75 are standard provisions that the Bureau regularly uses in conjunction with one another in enforcement orders. *See, e.g.*, Consent Order ¶¶ 57, 94, *In the Matter of Tempoe LLC*, No. 2023-CFPB-0010 (Sep. 11, 2023), *available at* https://files.consumerfinance.gov/f/documents/cfpb_tempoe_llc_consent_order_0010_2023-09.pdf.; Stipulated Final J. and Order ¶¶ 11, 50, *CFPB v. LendUp Loans, LLC*, No. 3:21-cv-06495 (N.D. Cal. Dec. 30, 2021), ECF No. 18, *available at* https://files.consumerfinance.gov/f/documents/cfpb_lendup_stip-final-jdmt-and-order_2022-01.pdf.

*Ins. Co.*, 566 F. Supp. 3d 515, 523 (W.D. Va. 2021) (applying same principle to contractual interpretation). The appropriate way to resolve any conflict, then, would be to read Paragraph 19 according to its plain terms as barring the transfer of customer data and contracts, and to read Paragraph 75 to impose conditions on the sale of the parts of the business that can permissibly be transferred (that is, those not covered by Paragraph 19).[4]

Another canon—that the specific controls the general—confirms that approach. *See BAE Sys. Ordnance Sys., Inc. v. Fluor Fed. Sols., LLC*, No. 7:20-cv-587, 2024 WL 382444, at *5 (W.D. Va. Jan. 31, 2024) (applying canon to contracts); *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (applying it to statutes); *see also* Opp'n at 11 (recognizing canon). Paragraph 19 specifically deals with how Defendants and those acting in concert with them must treat customer data and contracts, while Paragraph 75 offers more general guidance on how to handle sales and transfers. Paragraph 19 therefore must control the question of what Defendants and LIS could do with customer data and contracts.[5]

---

[4] To be clear, the Judgment neither precludes Defendants from injecting new capital into the companies nor prevents new shareholders from buying the corporate entity Defendants outright (rather than merely buying their assets). In such transactions, the customer data and contracts would remain with the same entities, and the companies would just have new owners. Indeed, it seems the parties to the sale here considered just such a transaction—with Nexus, Libre's parent company, originally proposing to sell all of its shares to LIS, such that Nexus would have become an LIS subsidiary. *See* Donovan Decl. in Supp. of Opp'n ¶ 3, ECF No. 265-1. Defendants apparently could not get LIS to agree to such a deal. *See id.*

[5] Defendants and LIS also suggest in passing that it would be impossible for LIS to comply with Paragraph 75, which requires an assignee in a sale "to comply with all applicable provisions of this Order," unless the sale included a transfer of consumer data. *See* Opp'n at 19. They note that the Judgment includes some provisions related to handling of pre-existing consumer information—including record-keeping requirements and an obligation to assist Plaintiffs in locating affected consumers for redress. But many aspects of the record-keeping requirements are forward-looking, and there is no reason LIS would not be able to comply with those obligations only with respect to its handling of new customer data. *See, e.g.*, Am. J. ¶ 64 (covering copies of sales scripts, training, and advertisements; accounting records; consumer complaints; and employee information). To the extent Defendants and LIS have identified

Defendants and LIS also contend that Paragraph 19(a), even standing alone, cannot be read to forbid all disclosure of consumer data. In particular, they suggest that Paragraph 19(a) should be read under *noscitur a sociis* principles to bar them only "from disclosing information that would allow access to a customer's financial accounts," rather than *any* information about the consumers they've harmed. *See* Opp'n at 13. But that's not what Paragraph 19(a) says: It prohibits Defendants from disclosing or benefiting from "customer information, including names, addresses, telephone numbers, email addresses, social security numbers, other identifying information, or any data that enables access to a customer's account (including a credit card, bank account, or other financial account)," that Defendants obtained in a particular way. *See* Am. J. ¶ 19(a). Paragraph 19(a)'s "including" clause is straightforwardly read as a non-exclusive list of the types of customer information that could conceivably be in Defendants' possession, none of which can be disclosed or benefited from under the terms of the Judgment.

*Noscitur a sociis* principles cannot be used to avoid that plain reading. That canon recognizes that "an ambiguous term may be given more precise content by the neighboring words with which it is associated." *United States v. Stevens*, 559 U.S. 460, 474 (2010) (cleaned up). But there is nothing ambiguous about the Judgment's reference to "names, addresses, telephone numbers," or any of the other types of consumer data listed. There is thus no basis to read those words narrowly to cover that kind of identifying information only in certain circumstances. Besides, it's not clear that Defendants' reading would get them that far; as discussed below, *see infra* at pp. 12–14, Defendants did sell, and LIS did buy, consumer data that

provisions in the Judgment that deal with pre-existing customer data, Paragraph 19's bar on transfer of that information simply means those provisions are not "applicable" obligations that Paragraph 75 would require a buyer to take on in a permissible sale. Rather than identifying some fatal flaw in Paragraph 75, then, all Defendants and LIS have done is demonstrate why that provision includes a caveated reference to "applicable provisions."

even they concede would allow access to customer accounts. *See* Opp'n at 13 (conceding that basic consumer data, like names and contact information, are covered).

### C. There is no basis to "narrow" the Judgment's plain terms.

Finally, Defendants and LIS repeatedly propose that the Court construe the Judgment "narrowly." But even if they had identified some ambiguous language susceptible to a narrowing construction, neither of their justifications for such a narrowing hold up to scrutiny.

Defendants and LIS first claim that the Court's Judgment must be read narrowly because it contains terms that Plaintiffs didn't specifically request. Opp'n at 14–15, 17. Plaintiffs, however, *did* request all these provisions in a proposed order submitted to the Court (and transmitted to defense counsel) via email on July 25, in accordance with this chamber's practices. *See* Ex. 1. Defendants chose not to argue against the propriety of that proposed order. *See* Mem. Op. Denying Stay at 7–8 (June 28, 2024), ECF No. 247 ("Nexus had ample opportunity to voice its objections to plaintiffs' proposed order but ultimately chose not to.").

Defendants and LIS next contend that the Judgment's provisions must be construed narrowly to avoid going beyond what is "necessary to provide full relief." *See* Opp'n at 17–19. But the provisions they object to that are relevant to this contempt proceeding—restrictions on the transfer of the data and accounts of consumers Defendants have already harmed—are common and appropriately tethered to the relevant misconduct. It is well established that, in consumer protection enforcement actions, courts may order fencing-in relief that "effectively . . . close[s] all roads to the prohibited goal," to prevent defendants from "by-pass[ing]" the order "with impunity." *FTC v. Ruberoid Co.*, 343 U.S. 470, 473 (1952); *see also Future Income Payments*, 2020 WL 6162947, at *6 (explaining that the public interest is "served by injunctions that reasonably 'fence in' the defendants from engaging in behavior related to their previous illegal conduct"). Courts will impose such "'fencing-in' provisions, which extend beyond the

specific violations at issue, . . . so long as they bear a reasonable relation to the unlawful practices found to exist." *FTC v. Pointbreak Media, LLC*, 376 F. Supp. 3d 1257, 1288–89 (S.D. Fla. 2019).

Federal courts have thus regularly restricted the use and sale of consumer data and contracts in consumer protection enforcement actions. *See, e.g.*, *CFPB v. Siringoringo*, No. 8:14-cv-01155-JVS-AJW, 2016 WL 102435, at *6 (C.D. Cal. Jan. 7, 2016) (entering injunction restricting defendants and their agents from "using, disclosing, or benefitting from customer information"); *FTC v. Genius Techs. LLC*, No. 18-cv-03654-LB, 2019 WL 12872865, at *10 (N.D. Cal. Feb. 20, 2019), *report and recommendation adopted*, No. 18-CV-03654-JST, 2019 WL 12872782 (N.D. Cal. Mar. 14, 2019) (approving "ban on disclosing customer information" as "reasonably related" to the wrongdoing and consistent with provisions imposed by other courts); *FTC v. 1st Guar. Mortg. Corp.*, No. 09-CV-61840, 2011 WL 1233207, at *21 (S.D. Fla. Mar. 30, 2011) (approving order preventing defendants "from using customer information they obtained in connection with the deceptive practices of the corporate defendants to prevent them from profiting from information they obtained through deception"). The Court has already found such relief appropriate in this case, *see* Final J. Op. at 20–21, so there is no reason for it to narrow the clear import of those provisions now.

## II.      Neither Section 1.05 of the Asset Purchase Agreement, nor the involvement of a contractor or attorney, render the sale consistent with the Court's order.

Defendants and LIS plainly violated the Judgment. They claim otherwise for two reasons: (1) because a clause in their sales agreement automatically operates to reverse any illegal actions they may have taken, and (2) because an agent—or maybe counsel for Nexus (Defendants provide conflicting accounts)—currently possesses the contracts and data and has not transferred them to LIS. These arguments do not hold water. Whatever LIS and

Defendants may be trying to achieve with the contractual clause they invoke, and whichever agent may be in current physical possession of the consumer contracts and data at issue in this proceeding, Defendants' and LIS's own statements and contract establish that Defendants, working with LIS, benefited from a sale of consumer data and, at a minimum, attempted to sell to LIS some right to collect on consumer contracts.

A. **Section 1.05 of the Asset Purchase Agreement does not erase the violation of the Judgment.**

Contrary to Defendants' and LIS's contentions (*see, e.g.*, Lawrence Decl. in Supp. of Opp'n ¶ 7), what they call a "savings clause" in their purchase agreement does not immunize them from contempt. According to Defendants and LIS, Section 1.05 of the agreement guarantees that they did not violate the April 1 order because it provides that the agreement does not effectuate a sale of anything that is unlawful to sell. The clause states in relevant part:

> "(a) Notwithstanding anything to the contrary in this Agreement, this Agreement shall not constitute a sale, assignment or transfer of any Purchased Asset if such sale, assignment or transfer . . . violates applicable Law[.]"

Asset Purchase Agreement § 1.05. That provision does not actually give Defendants a free pass to violate the law.

For starters, Section 1.05 by its terms doesn't even apply to violations of court orders. After providing that the agreement does not effectuate a sale that violates "applicable Law," the Asset Purchase Agreement elsewhere defines the capitalized "Law" as "any statute, law, ordinance, regulation, rule, code, constitution, treaty, common law, other requirement, or rule of law of any Governmental Authority (collectively, 'Law')." Asset Purchase Agreement § 3.02. And it identifies a separate category of authorities—"Governmental Order[s]"— which it defines as "any order, writ, judgment, injunction, decree, stipulation, determination,

12

penalty, or award entered by or with any Governmental Authority." *Id.* Under these categories, this Court's Judgment is a "Governmental Order," not a "Law"—and "[w]here the parties to a contract take pains to define a key term specially, their dealings under the contract are governed by that definition." *In re Blinds to Go Share Purchase Litig.*, 443 F.3d 1, 7 (1st Cir. 2006); *cf. also Baez v. N.Y.C. Hous. Auth.*, 533 F. Supp. 3d 135, 144 (S.D.N.Y. 2021) (holding that a term highly similar to another defined term in a different paragraph should be "interpreted consistently" because it "cannot be wrenched out of context and read in isolation"). That means Section 1.05 would only be triggered if the sales agreement violated some law *other* than a court's order.

In any event, even if "Law" included this Court's Judgment, Defendants' and LIS's position that this term operates to automatically undo any illegal action they have taken, Opp'n at 2–3, is unavailing. Parties cannot shield an unlawful sale by including a contract provision that effectively provides that, if they get caught, the sale never actually happened.

And there can be no serious question that, notwithstanding this provision, Defendants sold and LIS bought the consumer contracts and data whose transfer Paragraph 19 prohibited. They have repeatedly represented that Nexus sold the contracts to LIS. *See, e.g.*, Contempt Mot. at 4 n.19. In LIS's bid for intervention in the Fourth Circuit, LIS (represented by the same counsel as Defendants, Mr. Lawrence) stated that it "was assigned rights to corporate appellants' contracts." Intervention Mot. at 4. In that same proceeding, Mr. Lawrence also attested that LIS had "purchased assets"—*i.e.*, the contracts—that were "subject to debilitating injunctive relief." Lawrence Intervention Decl. ¶ 25; *see also id.* ¶ 18 (explaining that reversing Paragraph 19 was "of critical importance" to LIS). Representing Defendants in the stay hearing before this Court on May 28, Mr. Lawrence once again said

that the sale for "substantially all" of Nexus's assets was completed. Stay Hearing Tr. at 8:20–21 (May 28, 2024), ECF No. 264.

Indeed, the main point of the contract from LIS's perspective, and the reason it took on significant liabilities, was to acquire the contracts that LIS saw as Nexus's most significant asset. Before the Fourth Circuit, LIS acknowledged that any "meaningful sale" of Nexus's business would have to include the sale of customer data and contracts. Intervention Mot. at 4 n.7 (describing Paragraph 19 as "apparently preventing any meaningful sale of business and transfer of assets"). And Mr. Lawrence similarly referred to the contracts as "substantially all assets" of Nexus. Lawrence Intervention Decl. ¶ 17 (describing Paragraph 19—which relates to customer data and contracts entered into prior to the Effective Date of the Judgment—as a ban on a sale of "substantially all assets" of Nexus).

It was only after Plaintiffs responded that the sale violated this Court's order that Defendants and LIS began hedging that the sale of customer data may *not* have gone through because of Section 1.05 of the Asset Purchase Agreement. But Defendants and LIS have represented, in a hearing, in briefing, and in affidavits filed in multiple fora, that LIS now owns most of the assets of the corporate Defendants, the most "meaningful" of which (according to LIS) are rights to Nexus's old contracts—contracts that this Court permanently enjoined Defendants from collecting on, Am. J. ¶ 19. Section 1.05 of the Asset Purchase Agreement does not, as Defendants would have it, automatically undo that sale or provide that it never actually happened in the first place.

> **B.**     **No agreements with Subversivo or Nexus's general counsel divest ownership of the contracts from LIS.**

Defendants and LIS take another tack to argue that LIS doesn't *really* own the contracts or data pursuant to the sales agreement, either because third-party Subversivo has

them or because Nexus's "general counsel" (an unnamed person who may be Mr. Lawrence, who also happens to be LIS's lawyer) is holding client records "in trust" for LIS. Opp'n at 4–5, 25; Donovan Decl. in Supp. of Opp'n ¶¶ 8–9. These arguments ignore the plain text of the Court's Judgment at Paragraph 19, which (a) bans disclosing, using, or benefiting from customer data collected before the effective date, and (b) bans even an *attempt* to sell or transfer *any* right to collect payment from a consumer who entered into an agreement with Nexus Bond Services. Am. J. ¶ 19 (emphasis added). The Asset Purchase Agreement (at § 1.01(d), PDF 25) confirms that LIS and Defendants contracted to sell all of Nexus's customer contracts to LIS, and LIS inherited their contract with Subversivo as well. In exchange, Nexus offloaded significant liabilities to LIS, including approximately $2.6 million in taxes owed. Asset Purchase Agreement § 6.07. That was an agreement by Defendants to benefit from customer data and to transfer some right to collect payment from Nexus's deceived customers, and LIS acted in concert with Defendants in carrying that out. In other words, that was contempt.

Defendants and LIS appear to claim that they are not in contempt because of a contract and a loan agreement between Nexus and a contractor, Subversivo, under which Nexus sent Subversivo the data and assigned it the right to collect on Nexus's customer contracts so that Subversivo could collect payments for Nexus's benefit. Opp'n at 5, 25. Nexus apparently means to suggest that it could not have violated the Judgment because the data or contracts had already been given to Subversivo. Opp'n at 5. Assuming that the Subversivo contract is not itself a fraud (*but see* Contempt Mot. at 5), there are a few problems with that. For one, Nexus very clearly purported to sell those contracts and data to LIS. If it did not actually have them to sell, Nexus's fraudulent attempt to sell an asset it

didn't own would still violate Paragraph 19 because Nexus still would have "attempt[ed]" to sell or transfer the contracts.

Second, no evidence actually supports Defendants' intimation that Nexus had no contracts to sell. Instead, Nexus retained ownership of the contracts and hired Subversivo to perform various functions on Nexus's behalf, including collecting on the contracts through Subversivo's payment platforms—and to facilitate that, it permitted Subversivo to collect on the contracts. In exercising that right to collect, Subversivo acted on Nexus's behalf and for Nexus's benefit. *See* Subversivo Agreement, Ex. in Supp. of Intervention Reply at 1–2, *CFPB v. Nexus Services, Inc.*, No. 24-1334 (4th Cir. May 20, 2024), ECF No. 22-3 ("Sub. Agreement").

Finally, Defendants and LIS argue that because Subversivo loaned Nexus monies, and entered into an agreement permitting Subversivo to collect on the loan by retaining payments it collected from Nexus's consumers, LIS cannot violate the order because it cannot at present collect on the contracts. Opp'n at 5 (citing declarations). Even if the terms of the loan are legitimate and ongoing, the sale still straightforwardly violates Paragraph 19's bar on benefiting from customer data and attempting to sell or transfer any right to collect payment on the customer contracts. Nexus still benefited from the data by obtaining value in exchange for it in a sale. And Nexus still sold or attempted to sell the right to collect payment on the contracts. A loan agreement does not divest LIS of ownership of the contracts and data. Indeed, under the terms of the service agreement, LIS may copy customer data at any time. *See* Sub. Agreement at 2.[6]

---

[6] Subversivo is also bound by the Court's order. *See* Fed. R. Civ. P. 65(d)(2)(b), (c) (binding in relevant part the parties' agents and those in active concert or participation with the parties or

Nor does an informal directive by LIS to Nexus's general counsel to keep the contracts and data "in trust" solve the problem. Opp'n at 4. Setting aside this argument's tension with Defendants' previous claim that Subversivo holds the contracts and data at present, *see* Opp'n at 5; Smith Decl. in Supp. of Opp'n ¶ 5; Intervention Reply at 2, *CFPB v. Nexus Services, Inc.*, No. 24-1334 (4th Cir. May 20, 2024), ECF No. 22, Nexus still impermissibly sold the contracts and data to LIS and Nexus still impermissibly benefitted from the data by conveying ownership of it in exchange for LIS taking on substantial liabilities. And to the extent Defendants and LIS are claiming no harm, no foul because keeping the contracts and data "in trust" ensures that no one is attempting to use the data or collect on the contracts yet, that is not a defense. Among other reasons, nothing but Nexus's and LIS's word prevents LIS from revoking its directive to Nexus at any time. And as the fencing-in relief granted by the Court in this case reflects, that is not enough to protect harmed consumers.

## III.    Defendants' and LIS's violations of the Court's order harm Plaintiffs.

Defendants and LIS finally appear to argue (at 24–25) that Plaintiffs cannot establish the final element of civil contempt: that they have "suffered harm as a result" of Defendants' and LIS's violation of the Judgment. *See FTC v. Pukke*, 53 F.4th 80, 101 (4th Cir. 2022). Not so. Plaintiffs suffer harm from Defendants' sale of unsellable assets to LIS. *See supra* pp. 12–14. The reason the customer data and contracts can't be sold under the order is because they were acquired unlawfully—and further using those data and contracts could further

---

their agents); Am. J. ¶ 19 (binding "Defendants, and their officers, agents, servants, employees, attorneys, and all other persons in active concert or participation with any of them."). Accordingly, no attorney's attempt at a workaround (*see, e.g.*, Opp'n at 25–26) would enable the Defendants, Subversivo, or LIS to use, disclose, or benefit from consumer data, nor to continue to collect on the illegal contracts, after the Effective Date.

harm already-injured customers. When Defendants sold those unsellable assets—assets that cannot lawfully be used (and that no one should therefore have any legitimate interest in buying)—it made it harder for Plaintiffs to ensure that their consumers are being protected. Now Plaintiffs must monitor both Nexus and LIS—and anyone else to whom LIS might attempt to pass the data and contracts along in the future—to ensure they are not using the data or collecting on the contracts in violation of the order. That additional monitoring burdens Plaintiffs' limited resources and complicates their law enforcement efforts.

Beyond that, the convoluted way that Defendants and LIS carried out the sale makes Plaintiffs' harm even more stark. Plaintiffs now lack critical information about the status of the consumer data and contracts, and that harm alone suffices to establish that Plaintiffs were harmed for purposes of civil contempt. *CFPB v. Klopp*, 957 F.3d 454, 466 (4th Cir. 2020) (finding defendant's failure to notify regulators of new address, and setting up new business there without notice, sufficient informational harm for civil contempt). Plaintiffs' interest in the location of customer data and the defunct consumer contracts isn't "academic," Opp'n at 16; consistent with the purposes of the fencing-in relief ordered here, it's to ensure that consumers are no longer being harmed by Defendants or others acting with them. As if the sale to a new entity weren't enough, Defendants and LIS have in this litigation deepened confusion about the location of the consumer data and contracts. According to the Defendants and LIS, the customer data and contracts are with LIS, unless they're with Subversivo, unless they're being held "in trust" by Nexus's general counsel. *See supra* pp. 15–17. Defendants and LIS have even argued that Subversivo is under no obligation to comply with this Court's order. Opp'n at 25. If the increased confusion and burden caused by these actions do not constitute harm for purposes of contempt, "[t]he implications . . . would

effectively immunize" Defendants and LIS "from enforcement of this provision." *Klopp*, 957 F.3d at 466.

CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court issue an order to show cause why Defendants and Libre Immigration Services, Inc., should not be held in contempt.

Respectfully submitted,

*Attorneys for the Consumer Financial Protection Bureau*

Eric Halperin
    *Enforcement Director*
Alusheyi J. Wheeler
    *Deputy Enforcement Director*
Kara K. Miller
    *Assistant Litigation Deputy*

**Stephanie B. Garlock**
D.C. Bar Number: 1779629
Larkin Turner
Virginia Bar Number: 93822
Leanne E. Hartmann
California Bar Number: 264787
Hai Binh T. Nguyen
California Bar Number: 313503
Lee I. Sherman
California Bar Number: 272271
Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552
Telephone (Garlock): (202) 695-4908
Telephone (Turner): (202) 435-5276
Telephone (Hartmann): (415) 844-9787
Telephone (Nguyen): (202) 435-7251
Telephone (Sherman): (202) 374-4575
Email: stephanie.garlock@cfpb.gov
Email: larkin.turner@cfpb.gov

Email: leanne.hartmann@cfpb.gov
Email: haibinh.nguyen@cfpb.gov
Email: lee.sherman@cfpb.gov


*Attorneys for the Commonwealth of Virginia, ex rel.*
*Jason S. Miyares, Attorney General*

Jason S. Miyares
    *Attorney General*
Steven G. Popps
    *Chief Deputy Attorney General*
Thomas J. Sanford
    *Deputy Attorney General*
Richard S. Schweiker, Jr.
    *Chief and Senior Assistant Attorney General*

**James E. Scott**
Senior Assistant Attorney General
Virginia Bar Number: 88882
Office of the Attorney General
Consumer Protection Section
202 North Ninth Street
Richmond, VA 23219
Telephone: (804) 225-4778
Fax: (804) 786-0122
Email: jscott@oag.state.va.us


*Attorneys for the Commonwealth of Massachusetts*

Andrea Campbell
    *Attorney General*

**Jon Burke**
Massachusetts Bar Number: 673472
Assistant Attorney General
Office of the Attorney General
10 Mechanic Street
Worcester, MA 01608
Telephone: (774) 214-4416
Fax: (508) 795-1991
Email: Jonathan.burke@mass.gov

*Attorneys for the People of the State of New York*

LETITIA JAMES
    *Attorney General*

Jane Azia (New York Bar Number: 1539600)
    *Bureau Chief for the Bureau of Consumer*
    *Frauds and Protection*
Laura Levine (New York Bar Number: 2337368)
    *Deputy Bureau Chief for the Bureau of*
    *Consumer Frauds and Protection*

**Franklin H. Romeo**
New York Bar Number: 4422051
Assistant Attorney General
Office of the Attorney General
28 Liberty Street
New York, NY 10005
Telephone: (212) 416-8320
Fax: (212) 416-6003
Email: franklin.romeo@ag.ny.gov

## CERTIFICATE OF SERVICE

I hereby certify that on June 28, 2024, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system, which will send a notification of such filing to

all counsel of record for the parties.

*/s/ Stephanie B. Garlock*
Stephanie B. Garlock
