IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | | |
|---|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU; COMMONWEALTH OF MASSACHUSETTS; THE PEOPLE OF THE STATE OF NEW YORK, *by* LETITIA JAMES, ATTORNEY GENERAL OF THE STATE OF NEW YORK; *and* COMMONWEALTH OF VIRGINIA, *ex rel.* JAY JONES, ATTORNEY GENERAL, | ) ) ) ) ) ) ) ) ) ) | |
| *Plaintiffs,* | ) ) | |
| *v.* | ) ) | Civil Action No. 5:21-cv-00016 |
| NEXUS SERVICES, INC.; LIBRE BY NEXUS, INC.; MICHEAL DONOVAN; RICHARD MOORE; *and* EVAN AJIN, | ) ) ) ) ) | By: Elizabeth K. Dillon<br>      Chief United States District Judge |
| *Defendants.* | ) | |

CLERKS OFFICE US DISTRICT COURT
AT HARRISONBURG, VA
FILED
03/30/2026
LAURA A. AUSTIN, CLERK
BY: **/s/ Amy Fansler**
DEPUTY CLERK

**MEMORANDUM OPINION**

Plaintiffs move to hold defendants and nondefendant Libre Immigration Services, Inc., in civil contempt for violating the amended final judgment order in this case. (Dkt. No. 260.) The court has fully considered the parties' briefs. (Dkt. Nos. 260, 265, 276.) The court will grant plaintiffs' motion as to defendants Nexus Services, Inc., Libre by Nexus, Inc., Micheal Donovan, and Evan Ajin and as to nondefendant Libre Immigration Services, will deny it as to defendant Richard Moore, and will order remedies for the violative provisions of the sale of Nexus Services's and Libre by Nexus's assets to Libre Immigration Services.

I.  BACKGROUND

Following years of noncompliance with court orders in this consumer-protection case, the court held in contempt and entered default judgment against all defendants on May 11, 2023.

(Dkt. Nos. 201–03.)  Taking them all to admit to a nationwide scheme to prey on vulnerable

immigration detainees, the court then entered final judgment and an amended final judgment on

April 1, 2024.  (Dkt. Nos. 244–47.)  In addition to a monetary award totaling about

$811,000,000, the amended final judgment provided,

> 19.  Defendants, and their officers, agents, servants, employees, attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, may not:
>
>   a.  disclose, use, or benefit from customer information, including names, addresses, telephone numbers, email addresses, social security numbers, other identifying information, or any data that enables access to a customer's account (including a credit card, bank account, or other financial account), that Defendants obtained before the Effective Date in connection with the offering and provision of Nexus Immigration Bond Services; and
>
>   b.  attempt to collect, sell, assign, or otherwise transfer any right to collect payment from any consumer who entered into an agreement for Nexus Immigration Bond Services with Defendants.
>
>   *However*, customer information may be disclosed if requested by a government agency or required by law, regulation, or court order.
>
>         . . . .
>
> 75.  Should Defendants seek to transfer or assign all or part of their operations that are subject to this Order, Defendants must, as a condition of sale, obtain the written agreement of the transferee or assignee to comply with all applicable provisions of this Order.

(Dkt. No. 246 at 10, 25); *see also* Fed. R. Civ. P. 65(d)(2) (binding parties; their officers, agents,

servants, employees, and attorneys; and other persons in active concert or participation).  The

"Effective Date" was "the date on which the Order [wa]s entered by the Court," April 1, 2024.

(Am. Final J. Order 6, Dkt. No. 246.)  The instant motion concerns a sale executed during the following weeks.

On April 11, 2024, defendants noticed their appeal (Dkt. No. 248) and moved for a forty-five-day stay, pending appeal, of the enforcement of, among other things, the "[i]njunctive provisions of paragraph 19(a) and (b) [of the amended final judgment] to the extent that they would enjoin a sale of Nexus Companies to a third party" in order to "allow for the sale and reorganization of Nexus Companies" (Dkt. No. 249 at 2).  They argued that the corporate defendants "under current management are likely unable to comply with these orders and have in the [sic] proven unable to do so.  The likeliest path to compliance is to allow a third party to acquire the company, while taking on all liabilities and obligations of the companies with a short stay to allow for the acquisition [sic] occur and for new management to be put in place."  (Dkt. No. 250 at 1–2 (citations omitted).)  On April 15, the clerk transmitted their notice to the Fourth Circuit.  (Dkt. No. 252.)

On April 17, 2024, before plaintiffs could oppose or the court could rule on the motion to stay pending appeal, and before the Fourth Circuit could open its case, defendants filed a declaration of one nondefendant Mr. Vincent J. Smith, stating,

> 1.  I am the CEO of Libre Immigration Services, Inc., have personal knowledge of all I aver herein, and nothing prevents me from making this declaration.
>
> 2.  On April 17, 2024, at approximately 6:30 PM EST, I executed an Asset Purchase Agreement to purchase substantial assets from Libre by Nexus, Inc. and Nexus Services, Inc.  A copy of the same is attached hereto as Exhibit A
>
> 3.  I have reviewed the Court's Amended Judgment and Order and hereby [sic] to comply with all applicable provisions of that Order, pursuant to paragraph 75 of that Amended Judgment and Order.

(Dkt. No. 253 at 1.)  Defendants attached an "Asset Purchase Agreement By and Between Nexus

Services, Inc. and Libre by Nexus, and Libre Immigration Services, Inc.," purporting to sell,

among other things, "all accounts receivable" (Dkt. No. 253-1 at 2, § 1.01(b)); "Employment

Contracts," "Independent Contractor Agreements," several "Vendor Contracts" and "Service

Provider Contracts," including one with Subversivo LLC, an "Oral Agreement," and "[a]ll other

Contracts which Nexus Services, Inc. and Libre by Nexus, Inc. have rights under" (*id.* at 2,

§ 1.01(d), 25); "all books and records," including "customer lists, customer purchasing," and

"customer complaints and inquiry files" (*id.* at 2, § 1.01(i)); and "Libre Client Accounts," "Libre

Email List," "Libre Text List," "Immigration Legal List," "VA-Criminal Legal List," and all

other "intangible assets owned by Nexus Services, Inc. and Libre by Nexus, Inc." (*id.* at 19).

The "aggregate purchase price" was $3.50 "plus the assumption of the Assumed Liabilities" (*id.*

at 4, § 1.04), including

> those Liabilities arising from the Amended Order and Judgment,
> entered April 1, 2024, and which were required to be transferred
> pursuant to paragraph 75, in *CFPB, et al. v. Libre by Nexus, Inc., et
> al.*, No. 5:21-cv-00016 (W.D.Va.) only to the extent required by
> that Amended Order and Judgment and only to the extent such
> Liabilities are affirmed by the Fourth Circuit Court of Appeals and
> the provision of the Amended Order and Judgment requiring
> transfer of obligations of "applicable provisions of this Order" is
> affirmed by the Fourth Circuit Court of Appeals.

(*Id.* at 4, § 1.03(a)(v).)  The agreement further stated,

> Notwithstanding anything to the contrary in this Agreement, this
> Agreement shall not constitute a sale, assignment or transfer of any
> Purchased Asset if such sale, assignment or transfer: (i) violates
> applicable Law; or (ii) requires the consent or waiver of a Person
> who is not a party to this Agreement or an Affiliate of a party to
> this Agreement and such consent or waiver has not been obtained
> prior to the Closing.

(*Id.* at 4, § 1.05(a).)  The agreement bore the signatures of "Micheal Donovan and Evan Ajin," "CEO and Corporate Secretary" of "Libre by Nexus, Inc.," and "Nexus Services, Inc.," and the signature of "Vincent J. Smith," "CEO of Libre Immigration Services, Inc."  (*Id.* at 16.)

Plaintiffs opposed defendants' motion to stay on April 25, and defendants replied on May 2.  (Dkt. Nos. 255, 256.)  The court heard argument on May 28 (Dkt. No. 259) and ultimately denied the motion on June 28 (Dkt. Nos. 274–75).  The court observed that it had been "well within its discretion to impose sanctions for Nexus's egregious misconduct over the course of this litigation," that Nexus had "chose[n] not to" object to the injunctive relief awarded by the amended final judgment, that Nexus had provided "no evidence that a stay would somehow facilitate the reorganization of the companies or prevent the companies' failure," and that the court had previously "found that plaintiffs' requested injunctive relief would 'undoubtedly serve the public interest' because the injunctions would 'fence in' Nexus from engaging in behavior related to their previous illegal conduct and '[i]f defendants were to resume their unlawful activities, other potential victims could suffer similar harm.'"  (*Id.* at 7–11 (quoting Am. Mem. Op. 20–21, Dkt. No. 247).)

Meanwhile, the Fourth Circuit opened its case on April 18, 2024.  (Dkt. No. 254.)  On May 1, Libre Immigration Services moved to intervene there, attaching the purchase agreement and stating, "As part of the asset purchase agreement, Intervenor was assigned rights to Corporate Appellants' contracts, assumed liabilities and obligations under the judgment and order, and obtained virtually all assets of Corporate Appellants."  Mot. to Intervene 4, *CFPB v. Nexus Servs., Inc.*, No. 24-1334 (4th Cir. May 1, 2024), App. Dkt. No. 11-1.  "[O]*nly* LIS has an operating concern that interreacts with clients, . . . *only* LIS has accounts receivable which may be subject to injunctive provisions of the order, . . . .  While Corporate Appellants *could* prior to

the acquisition have made those arguments, they are no longer available to them because they have now transferred the assets to LIS." *Id.* at 17 (citation omitted).  Libre Immigration Services also attached a "Bill of Sale" that had been "entered into as of April 19, 2024 by Nexus Services, Inc. and Libre by Nexus, Inc. . . . and Libre Immigration Services, Inc.,'" pursuant to the asset purchase agreement, App. Dkt. No. 11-5 at 1, and an "Assignment and Assumption Agreement," also among the same parties and "effective as of April 19, 2024," purporting to assign the agreed contracts, App. Dkt. No. 11-6 at 1.  These both bore the same signatures as the purchase agreement.

After full briefing, the Fourth Circuit denied the motion on June 6, 2024, App. Dkt. No. 23, and ultimately affirmed this court's amended final judgment on October 15, 2025, 156 F.4th 443, holding "there was simply no error in the district court's entry of default judgment," *id.* at 456.  Its discussion of the amended final judgment's injunctive remedies is particularly relevant here:

> [T]he district court did not abuse its discretion in entering its well-supported, specific, and detailed permanent injunction.  . . . [W]e are satisfied to simply reject the defendants' arguments regarding the propriety of the court's permanent injunction because they abjectly fail, even under an abuse-of-discretion standard of review.
>
> With respect to the Nexus defendants' primary substantive challenge to the permanent injunction, we are satisfied that the "fencing-in" relief afforded by the injunction—which faced *no objection* by the defendants' [sic] in the underlying proceedings—is appropriately tailored to account for the defendants' various and several violations of federal and state consumer protection laws. And such relief was otherwise necessary to prevent further evasion by the defendants.  . . .

6

Procedurally, the district court's permanent injunction—which includes very detailed factual findings and thorough definitions of relevant terms—clearly describes the acts restrained and required, and thus complies with Federal Rule of Civil Procedure 65(d).   That is, the injunction states "its terms specifically" and it "describe[s] in reasonable detail—and not by referring to the complaint or other document—the act or acts to be restrained or required."   *See* Fed. R. Civ. P. 65(d)(1)(B)–(C). Those mandatory requirements, the Supreme Court has observed, serve to ensure "that those who must obey [an injunction] will know what the court intends to require and what it means to forbid."   *See Int'l Longshoremen's Ass'n, Loc. 1291 v. Phila. Marine Trade Ass'n*, 389 U.S. 64, 76, 88 S.Ct. 201, 19 L.Ed.2d 236 (1967).   To reiterate, Rule 65(d) has been adhered to, and we therefore reject the defendants' belated attempts to undermine the procedural propriety of the permanent injunction.

*Id.* at 458.  The Fourth Circuit's mandate issued on December 8, 2025.  (Dkt. No. 292.)

While defendants' motion to stay enforcement of the judgment was pending before this court and their appeal was pending before the Fourth Circuit, plaintiffs filed the instant motion to show cause on May 30, 2024, arguing that the sale of Nexus Services's and Libre by Nexus's assets to Libre Immigration Services violated paragraph 19 of the court's amended final judgment.  (Dkt. No. 260.)  On June 5, plaintiff CFPB filed a certificate of service on Libre Immigration Services through its attorney, who also represents each defendant.  (Dkt. No. 263.) Defendants filed their brief in opposition on June 12.  (Dkt. No. 265.)  Libre Immigration Services formally appeared on June 13 (Dkt. Nos. 266–68) and joined in defendants' opposition "on the same factual and legal bases" on June 17 (Dkt. No. 269 ¶ 4).  Plaintiffs replied on June 28.  (Dkt. No. 276.)  Excepting the motions to withdraw by all of defendants' and Libre Immigration Services' attorneys, this is the only motion still pending in this case.  At a status conference before U.S. Magistrate Judge Joel C. Hoppe on January 6, 2026, plaintiffs indicated that they would still like the court to rule on their motion, and no party requested a hearing. (Dkt. No. 296.)

7

## II.  LEGAL STANDARD

To establish civil contempt, a movant must "prove by clear and convincing evidence '(1) the existence of a valid decree of which the alleged contemnor had actual or constructive knowledge; (2) that the decree was in the movant's favor; (3) that the alleged contemnor by its conduct violated the terms of the decree, and had knowledge (at least constructive knowledge) of such violations; and (4) that the movant suffered harm as a result.'"  *FTC v. Pukke*, 53 F.4th 80, 101 (4th Cir. 2022) (quoting *De Simone v. VSL Pharms., Inc.*, 36 F.4th 518, 529 (4th Cir. 2022)). "Once the [movant] establishes that the [alleged contemnor] violated the [decree], the burden shifts to the [alleged contemnor] . . . to demonstrate that she made in good faith all reasonable efforts to comply with the [decree]."  *De Simone*, 36 F.4th at 529 (alterations and omission in original) (quoting *United v. Ali*, 874 F.3d 825, 831 (4th Cir. 2017)); *accord CFPB v. Klopp*, 957 F.3d 454, 461–62 (4th Cir. 2020).

## III.  ANALYSIS

The very terms of the sale documents, signed by Donovan and Ajin and purporting to effect the sale of Nexus Services's and Libre by Nexus's assets to Libre Immigration Services, are clear and convincing evidence that the sale violated the court's amended final judgment order.  And defendants' and Libre Immigration Services's surrounding representations and conduct only confirm that they should be held in civil contempt.

As a threshold matter, the court considers the identities of the alleged contemnors.  The challenged sale was between two corporate defendants, Nexus Services and its wholly owned subsidiary Libre by Nexus, and a corporate nondefendant, Libre Immigration Services, which made an appearance to oppose plaintiffs' motion.  These corporations effected the sale through the signatures of their respective officers, defendants Donovan and Ajin and nondefendant Smith.

8

Plaintiffs move to hold in contempt all these entities but Smith, who has never been served nor appeared in this case.  Plaintiffs also move to hold in contempt defendant Richard Moore.  Accordingly, the proper respondents to plaintiffs' motion are corporate defendants Nexus Services and Libre by Nexus, corporate nondefendant Libre Immigration Services, and personal defendants Donovan, Ajin, and Moore; personal nondefendant Smith's conduct is only relevant insofar as it bears on the others' alleged contempt.

And, at the outset, the court concludes that plaintiffs have not shown anything clear and convincing about Moore's involvement in the challenged sale.  Their own theory against him runs, "It is *not clear* what level of involvement Defendant Moore has in [Nexus Services and Libre by Nexus] generally or the sale specifically; given the ambiguity, Defendant Moore should similarly show cause as to why he should not be held in contempt for violating the Court's Judgment."  (Mot. for Order to Show Cause 1 n.2, Dkt. No. 260 (emphasis added).)  Thus, plaintiffs' motion will be denied as to Moore.

The court concludes that the remaining respondents, all for the same reasons, should indeed be held in contempt.  For ease of comprehension, the court hereinafter refers to them—Nexus Services, Libre by Nexus, Libre Immigration Services, Donovan, and Ajin—as contemnors.

**A.  Contemnors all had actual knowledge of the amended final judgment order.**

The amended final judgment order was entered against defendant contemnors in a case in which they had been properly named as parties and had duly made general appearances, and they understood that they needed the court's leave to stay the judgment's enforcement to execute the purchase agreement.  (*See* Mot. to Stay, Dkt. No. 249.)  Their and their counsel's own affidavits confirm their contemporaneous, actual knowledge of the judgment's provisions.  (Dkt. Nos.

9

249-3, 249-4, 265-1, 265-3.)  As for Libre Immigration Services, it was a new corporation that Smith, its president and CEO, created "in order to purchase virtually all assets of Nexus Services, Inc. and Libre by Nexus, Inc." (Dkt. No. 265-2 ¶ 2; *see* Dkt. No. 253 ¶ 1); https://file.dos.pa.gov/search/business (search "Libre Immigration Services") (last visited Mar. 30, 2026) (listing initial filing date as April 18, 2024, and Smith as sole officer), so Smith's affidavits of his own actual knowledge of the judgment's provisions may establish Libre Immigration Services's knowledge of them (Dkt. No. 249-1 ¶¶ 1, 6, 10; Dkt. No. 253 ¶¶ 7, 8, 13, 14, 16).  And the Fourth Circuit's affirmance was conclusive of the judgment's validity.  156 F.4th 443.

**B.  The amended final judgment was in plaintiffs' favor.**

Plaintiffs sued to vindicate their official interests in enforcing the consumer-protection laws that defendants violated.  Plaintiffs proceeded "on behalf of thousands of . . . individuals" whom defendants victimized.  (Am. Mem. Op. 20, Dkt. No. 247 (omission in original) (quoting *CFPB v. Siringoringo*, No. 14-cv-01155, 2016 WL 102435, at *6 (C.D. Cal. Jan. 7, 2016)).)  The court entered the judgment's injunctive terms as plaintiffs proposed them, without objection from defendants, because "without an injunction, defendants 'would be free to return to their old ways'" (*id.* (quoting *Disney Enters., Inc. v. Redbox Automated Retail, LLC*, 336 F. Supp. 3d 1146, 1158 (C.D. Cal. 2018))), and because "[t]he public interest is served by injunctions that reasonably 'fence in' defendants from engaging in behavior related to their previous illegal conduct.  If defendants were to resume their unlawful activities, other potential victims could suffer similar harm."  (*Id.* at 20–21 (citation omitted) (quoting *CFPB v. Future Income Payments, LLC*, No. 8:19-cv-02950, 2020 WL 6162947, at *6 (D.S.C. May 21, 2020), *report and recommendation adopted*, No. 6:19-cv-02950, 2021 WL 672928 (D.S.C. Feb. 22, 2021)).)

Plaintiffs now move to enforce this very relief.  (Reply 2, 4–5, 10–11, 17–18, Dkt. No. 276.)  The judgment was in their favor.

### C.  Contemnors' sale knowingly violated the terms of the amended final judgment.

The amended final judgment stated,

> 19.    Defendants, and their officers, . . . and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, may not:
>
> a.    . . . benefit from customer information, including names, addresses, telephone numbers, email addresses, social security numbers, other identifying information, or any data that enables access to a customer's account (including a credit card, bank account, or other financial account), that Defendants obtained before [April 1, 2024,] in connection with the offering and provision of Nexus Immigration Bond Services; and
>
> b.    attempt to . . . sell, assign, or otherwise transfer any right to collect payment from any consumer who entered into an agreement for Nexus Immigration Bond Services with Defendants.

(Dkt. No. 246 at 10.)

The sale documents and the affidavits of contemnors and their officers and attorneys establish that they all had actual knowledge of the judgment, as discussed above, and were "in active concert or participation with" one another to effect the sale.  (*Id.*); *see* Fed. R. Civ. P. 65(d)(2).  So, paragraph 19 of the judgment applied to them all.

And the sale was of, among other things, Nexus Services's and Libre by Nexus's "accounts receivable" (Purchase Agreement 2, § 1.01(b), Dkt. No. 253-1); "Employment Contracts," "Independent Contractor Agreements," several "Vendor Contracts" and "Service Provider Contracts," including one with Subversivo, an "Oral Agreement," and "[a]ll other Contracts which Nexus Services, Inc. and Libre by Nexus, Inc. have rights under" (*id.* at 2,

§ 1.01(d), 25); "all books and records," including "customer lists, customer purchasing," and "customer complaints and inquiry files" (*id.* at 2, § 1.01(i)); and "Libre Client Accounts," "Libre Email List," "Libre Text List," "Immigration Legal List," "VA-Criminal Legal List," and all other "intangible assets owned by Nexus Services, Inc. and Libre by Nexus, Inc." (*id.* at 19). Contemnors and their officers and attorneys concede this was "virtually all" of Nexus Services's and Libre by Nexus's assets. (Dkt. No. 265-2 ¶ 2); Mot. to Intervene 2, 4, *Nexus Servs.*, No. 24-1334, App. Dkt. No. 11-1; (*see* Purchase Agreement 2, Dkt. No. 253-1 ("Sellers wish to sell and assign to Buyer, and Buyer wishes to purchase and assume from Seller, substantially all the assets and liabilities of the Business . . . ."); *see also* Dkt. Nos. 249-1, 249-3, 249-4, 265 at 11–12, 265-1).

These assets clearly included the customer information, and assets closely derived from it, contemplated at paragraph 19 of the amended judgment. Nexus Services's and Libre by Nexus's entire businesses were "in connection with the offering and provision of Nexus Immigration Bond Services" before April 1, 2024. (Am. Final J. Order 10, ¶ 19(a), Dkt. No. 246); *see* Mot. to Intervene 4 n.7, *Nexus Servs.*, No. 24-1334, App. Dkt. No. 11-1 (characterizing paragraph 19 as "apparently preventing any meaningful sale of business and transfer of assets"). The court need not parse each of their individual assets to conclude that "all accounts receivable" (Purchase Agreement 2, § 1.01(b), Dkt. No. 253-1), "[a]ll . . . Contracts which Nexus Services, Inc. and Libre by Nexus, Inc. have rights under" (*id.* at 2, § 1.01(d), 25), "all books and records," including "customer lists, customer purchasing," and "customer complaints and inquiry files" (*id.* at 2, § 1.01(i)), "Libre Client Accounts," and all other "intangible assets owned by Nexus Services, Inc. and Libre by Nexus, Inc." (*id.* at 19)—that is, "virtually all" of their assets (Dkt. No. 265-2 ¶ 2); Mot. to Intervene 2, 4, *Nexus Servs.*, No. 24-1334, App. Dkt. No. 11-1; (*see*

12

Purchase Agreement 2, Dkt. No. 253-1 ("substantially all"))—included their customers' information and assets closely conveying the benefit of that information. And, as each contemnor here was either party to, or a signatory officer of a closely held corporate party to, the sale, whose validity has not otherwise been challenged, the court may take each to have benefitted from the information by the sale's terms. (Purchase Agreement 1, Dkt. No. 253-1 (acknowledging sufficiency of consideration); Bill of Sale 1, § 1, App. Dkt. No. 11-5 (same); Assignment & Assumption Agreement 1, App. Dkt. No. 11-6 (same).) Their and their officers' and attorneys' affidavits only strengthen the conclusion that contemnors all stood to benefit from the information's sale. (*See* Donovan Decl. ¶ 2, June 12, 2024, Dkt. No. 265-1 ("[G]iven the existence of the Amended Judgment and Order, any sale at any price of Nexus presented an opportunity which was attractive."); Dkt. Nos. 249-1, 249-3, 249-4, 265-3.)

And the sale was an "attempt to . . . sell, assign, or otherwise transfer any right to collect payment from any consumer who entered into an agreement for Nexus Immigration Bond Services with Defendants." (Am. Final J. Order 10, ¶ 19(b), Dkt. No. 246.) Again, collecting payments from immigration-bond consumers was defendants' core business, *see* Mot. to Intervene 4 n.7, *Nexus Servs.*, No. 24-1334, App. Dkt. No. 11-1, so their sale of "all accounts receivable" (Purchase Agreement 2, § 1.01(b), Dkt. No. 253-1), all "Contracts which Nexus Services, Inc. and Libre by Nexus, Inc. have rights under" (*id.* at 2, § 1.01(d), 25), including the "Service Provider Contract[]" with Subversivo (*id.*), all other "intangible assets owned by Nexus Services, Inc. and Libre by Nexus, Inc." (*id.* at 19)—again, "virtually all" of their assets (Dkt. No. 265-2 ¶ 2); Mot. to Intervene 2, 4, *Nexus Servs.*, No. 24-1334, App. Dkt. No. 11-1; (*see* Purchase Agreement 2, Dkt. No. 253-1)—surely included the "right to collect payment from" these consumers (Am. Final J. Order 10, ¶ 19(b), Dkt. No. 246).

13

No one suggests that any disclosure here was "requested by a government agency or required by law, regulation, or court order." (*Id.* ¶ 19.) Thus, contemnors' sale clearly violated the plain terms of paragraph 19 of the amended judgment.

And their violation was knowing. Before executing the purchase agreement, defendants moved to stay enforcement of the amended judgment because they understood that, "read literally," some of its injunctive provisions, like paragraph 19, would prohibit the sale. (Donovan Decl. ¶ 3, Dkt. No. 256-1; *see* Dkt. Nos. 249 at 2, 256 at 6.) Their theory was that "Nexus Services, Inc. and Libre by Nexus, Inc . . . under current management"—that is, they, the defendants themselves—"are likely unable to comply with these orders and have in the [sic] proven unable to do so. The likeliest path to compliance is to allow a third party to acquire the company . . . ." (Dkt. No. 250 at 1–2.) Six days later, without waiting to learn whether the court would grant their motion, they simply sold the assets, apparently on their counsel's advice "that the Order was ambiguous, likely overly broad, and likely so vague as to not be proper under Rule 65"; "that Corporate Defendants would be selling/assigning as much as would be legal to sell/assign and that such could not necessarily be known at the time of the sale because of the lack of clarity of the Order"; in order "to divest themselves entirely of their interests in Corporate Defendants. There were multiple reasons for this, but primarily this was to avoid injunctive obligations under the order." (Lawrence Decl. ¶¶ 3, 5, 6, Dkt. No. 265-3.) Libre Immigration Services, on the same advice, acted with the same knowledge. (Smith Decl., Dkt. No. 265-2.) Of course, the court ultimately denied the stay (Dkt. Nos. 274–75), and the Fourth Circuit held, "Rule 65(d) has been adhered to," 156 F.4th at 458.

Contemnors gambled that the court's judgment should not be "read literally." (Donovan Decl. ¶ 3, Dkt. No. 256-1; *see* Dkt. Nos. 249 at 2, 256 at 6.) But, so read, its paragraph 19

14

plainly prohibited the sale here.  And, having made the gamble, contemnors cannot complain that they did not understand the risks.  *See McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 192 (1949) ("They undertook to make their own determination of what the decree meant.  They knew they acted at their peril.").  Contemnors' violation was knowing.

The court has considered contemnors' contrary arguments and finds them all meritless.  It particularly addresses the four most salient ones.  First, contemnors say that a "savings clause" of their purchase agreement kept the sale in compliance with the judgment.  It stated,

> Notwithstanding anything to the contrary in this Agreement, this Agreement shall not constitute a sale, assignment or transfer of any Purchased Asset if such sale, assignment or transfer: (i) violates applicable Law; or (ii) requires the consent or waiver of a Person who is not a party to this Agreement or an Affiliate of a party to this Agreement and such consent or waiver has not been obtained prior to the Closing.

(Purchase Agreement 4, § 1.05(a), Dkt. No. 253-1.)  But the agreement's own definition of "Law" would not embrace the amended final judgment order (*id.* at 7, § 3.02), and reading this clause to exclude the sale's violative provisions would render the sale meaningless, *see* Mot. to Intervene 4 n.7, *Nexus Servs.*, No. 24-1334, App. Dkt. No. 11-1.  In any event, the court would hesitate to recognize such a clause as a defense to the very contemptibility of the contract containing it.  Their "savings clause" cannot save contemnors.

Second, contemnors insist that the amended final judgment was too vague or ambiguous to support a finding of contempt.  The Fourth Circuit's Rule 65(d) holding broadly forecloses this argument.  156 F.4th at 458.  Contemnors particularly belabor an asserted tension created by paragraph 75 of the judgment:

15

75.    Should Defendants seek to transfer or assign all or part of their operations that are subject to this Order, Defendants must, as a condition of sale, obtain the written agreement of the transferee or assignee to comply with all applicable provisions of this Order.

(Dkt. No. 246 at 25.)  But the terms of this paragraph did not positively authorize any sale; they only placed a condition on any sale.  The way to resolve any confusion here would have been to object to the language before the court adopted it, which defendants did not do, or to move for clarification, modification, or a stay *and to wait for the court's ruling*, which defendants also did not do.  *See McComb*, 336 U.S. at 192.  Contemnors invoke general interpretive canons to resolve points like this in their favor.  (*See* Mem. Opp'n Mot. for Order to Show Cause 9–16, Dkt. No. 256 (urging, among other canons, *noscitur a sociis*).)  But these devices cannot overcome the natural meaning of the judgment's text and structure, which plainly prohibited the sale here.  *Cf. Klopp*, 957 F.3d at 462–65 (employing "traditional rules of contract interpretation" to interpret consent order (quoting *Thompson v. U.S. Dep't of Hous. & Urb. Dev.*, 404 F.3d 821, 832 n.6 (4th Cir. 2005))).

Third, contemnors argue that, by the time of the sale, they had already assigned their bond-collection rights to nonparty Subversivo, so they could not have meant to include them in the sale.  For context, a special master in another case has previously reported to the court,

1.    The contractual arrangement between Nexus and Subversivo is little more than a badge of fraud.  The contractual arrangement between Nexus and Subversivo is a fraudulent conveyance by a cynical debtor determined to conceal its assets and financial records from its creditor.

2.    Nexus's statements through counsel that the debtor is unable to retrieve data and documents from Subversivo are not credible.

16

*RLI Ins. Co. v. Nexus Servs., Inc.*, No. 5:18-cv-00066, 2024 WL 2237678, at *4 (W.D. Va. May 17, 2024) (quoting Special Master Report).  And, in his criminal case, Moore stipulated that he "caused Nexus to open bank accounts in the name of Subversivo, a company owned by a former Nexus employee," "used the Subversivo bank accounts as nominee accounts for Nexus," and "chose to open bank accounts in the name of Subversivo to disguise his continued control over the accounts."  Statement of Facts 7, ¶ 24, *United States v. Moore*, No. 5:21-cr-00023 (W.D. Va. Jan. 7, 2025), Dkt. No. 208.  And, even if Subversivo really were at arm's length, Libre by Nexus, Nexus Service's subsidiary, retained both an "absolute right to inspect, make copies of, or otherwise review" Subversivo's "financial and program records," Admin. Servs. Agreement 2, *Nexus Servs.*, No. 24-1334 (4th Cir. May 20, 2024), App. Dkt. No. 22-3, and a right to resume collecting bond payments upon full repayment of a loan from Subversivo, Loan Repayment Agreement 5–6, *Nexus Servs.*, No. 24-1334 (4th Cir. May 20, 2024), App. Dkt. No. 22-3.  The sale attempted to transfer these rights, in exchange for valuable consideration, to Libre Immigration Services, whose CEO intended to then cut Subversivo out of the arrangement "as soon as humanly possible."  Smith Decl. 3, ¶ 13, May 20, 2024, *Nexus Servs.*, No. 24-1334 (4th Cir. May 20, 2024), App. Dkt. No. 22-2; (*accord* Smith Decl. ¶ 6, June 10, 2024, Dkt. No. 265-2).  Subversivo's role only made contemnors' violation of the judgment's plain terms more elaborate.

Finally, contemnors stress that no practical access to customer information was actually transferred by the sale.

> LIS has not received any client information of any sort, and Nexus has been directed to keep all records in trust. After consultation with multiple attorneys, it remains unclear what must be done, and thus, Nexus has simply "tagged" new clients—those whose information it is clearly legal to disclose—while directing Subversivo, LLC, to provide a copy of client records to Nexus' general counsel, to keep in trust for LIS.

(Donovan Decl. ¶ 8, June 12, 2024, Dkt. No. 265-1.)

> LIS has not received any client information of any sort, nor does LIS plan to take possession of or review Defendants' historic client information unless a future court order allows LIS to derive revenue therefrom or such is necessary to comply with applicable provisions of 3 the Court's Amended Judgment and Order . . . .

(Smith Decl. ¶ 7, June 10, 2024, Dkt. No. 265-2.) But the amended judgment did not only prohibit actual transfers of the information: It prohibited benefitting from the information and attempting to sell, assign, or otherwise transfer any collection right. (Am. Final J. Order 10, ¶ 19, Dkt. No. 246.) For the reasons already stated, contemnors all violated this prohibition whether or not any information changed hands in the sense of actual access to its content.

Summing up, contemnors' sale violated the plain terms of the amended final judgment, their violation was knowing, and their contrary arguments are unavailing.

## D. Contemnors' sale harmed plaintiffs.

As the court describes above, plaintiffs move to enforce the fencing-in relief awarded them to vindicate their statutory interests in protecting consumers. (*See* Am. Mem. Op. 20–21, Dkt. No. 247.) Plaintiffs explain that the sale here

> made it harder for Plaintiffs to ensure that their consumers are being protected. Now Plaintiffs must monitor both Nexus and LIS—and anyone else to whom LIS might attempt to pass the data and contracts along in the future—to ensure they are not using the data or collecting on the contracts in violation of the order. That additional monitoring burdens Plaintiffs' limited resources and complicates their law enforcement efforts.

18

Beyond that, the convoluted way that Defendants and LIS carried out the sale makes Plaintiffs' harm even more stark. Plaintiffs now lack critical information about the status of the consumer data and contracts, and that harm alone suffices to establish that Plaintiffs were harmed for purposes of civil contempt. Plaintiffs' interest in the location of customer data and the defunct consumer contracts isn't "academic"; consistent with the purposes of the fencing-in relief ordered here, it's to ensure that consumers are no longer being harmed by Defendants or others acting with them. As if the sale to a new entity weren't enough, Defendants and LIS have in this litigation deepened confusion about the location of the consumer data and contracts. According to the Defendants and LIS, the customer data and contracts are with LIS, unless they're with Subversivo, unless they're being held "in trust" by Nexus's general counsel. Defendants and LIS have even argued that Subversivo is under no obligation to comply with this Court's order. If the increased confusion and burden caused by these actions do not constitute harm for purposes of contempt, "[t]he implications . . . would effectively immunize" Defendants and LIS "from enforcement of this provision."

(Reply 22, Dkt. No. 276 (citations and some quotation marks omitted) (quoting *Klopp*, 957 F.3d at 466); *see also* Mot. for Order to Show Cause 6, Dkt. No. 260 (observing sale also undermined judgment's other provisions).) The court agrees. The fact that contemnors abstained from violating the judgment even more harmfully—for example, by actually transferring practical access to the information—did not allay the harms they did inflict.

Accordingly, the court concludes that plaintiffs have established by clear and convincing evidence that Nexus Services, Libre by Nexus, Libre Immigration Services, Donovan, and Ajin violated the amended final judgment order in this case. *See Pukke*, 53 F.4th at 101.

### E. Contemnors did not make in good faith all reasonable efforts to comply with the amended final judgment order.

The burden shifts to contemnors "to demonstrate that [they] made in good faith all reasonable efforts to comply with the" amended final judgment order, but they cannot meet it. *De Simone*, 36 F.4th at 529. A reasonable effort would have been to simply not make this sale;

19

nothing reasonably required it to go forward.  The court appreciates that contemnors had their subjective reasons, as most contemnors do, and some of these can be made to sound sensible. On entry of an $811,000,000 judgment against them, defendants belatedly realized they were in over their heads, and Mr. Smith said he could shoulder the liability, save the business, bring it into compliance, and, eventually, satisfy the judgment.  (*See* Mem. Supp. Mot. to Stay, Dkt. No. 250.)  This would only require violating a few of the judgment's terms, which their lawyer thought were unenforceable anyway, and a savings clause and trust arrangement could mitigate the violation.  (*See* Mem. Opp'n Mot. for Order to Show Cause, Dkt. No. 256.)  But, however comprehensible their motives might have been, contemnors ignored that this was just the sort of unilateral decision that the court's judgment now closed to them.  Choosing to violate the judgment—even for reasons they considered attractive and inoffensive—was objectively unreasonable.  *See Taggart v. Lorenzen*, 587 U.S. 554, 561–62 (2019).  And their own perceptions of the judgment's onerousness or the situation's urgency, without any substantiation of objective exigency, could not make it otherwise.  (*See* Mot. to Stay, Dkt. No. 249 (relying on indefinite, speculative affidavits).)  Again, these were the sorts of things contemnors might reasonably have litigated, but they failed even to object to the judgment's injunctive provisions, and they refused to wait even a week for the court to rule on their stay motion before violating the judgment.  (*See* Smith Decl., Apr. 17, 2024, Dkt. No. 253); *McComb*, 336 U.S. at 192.

Contemnors stress how needless the instant motion was in light of their openness surrounding the sale.  But if trust has been lacking in this case, it has not been plaintiffs' fault, and the court cannot blame them for running to enforce their judgment.  And contemnors maintain that all they did was on counsel's advice.  But advice of counsel is not ordinarily a defense to civil contempt, and any relevance it bears on contemnors' good faith here is

overwhelmed by contrary indicia of objective unreasonableness.  *See Sugar v. Burnett*, 130 F.4th 358, 377–78 (4th Cir. 2025); *Beckhart v. NewRez LLC*, 31 F.4th 274, 278 n.\* (4th Cir. 2022).

Contemnors have failed to show that they "made in good faith all reasonable efforts to comply with the" amended final judgment order.  *De Simone*, 36 F.4th at 529.  Nexus Services, Libre by Nexus, Libre Immigration Services, Donovan, and Ajin will be held in civil contempt.

**F. Violative provisions of the sale are void and contemnors must unwind their performance.**

Sanctions for civil contempt are "remedial and intended to coerce the contemnor into compliance with court orders or to compensate the complainant for losses sustained."  *Buffington v. Baltimore Cnty.*, 913 F.2d 113, 133 (4th Cir. 1990).  The court's discretion to fashion these remedies is "broad."  *In re Gen. Motors Corp.*, 61 F.3d 256, 259 (4th Cir. 1995).

The following is proper to remedy the instant contempt.  The court will declare void, and will order contemnors to unwind any performance of, those provisions of the April 2024 sale of Nexus Services's and Libre by Nexus's assets to Libre Immigration Services that violated paragraph 19 of the amended final judgment order, including all provisions purporting to sell covered customer information or contract-collection rights.  Contemnors or their representatives must all, jointly or otherwise, swear out affidavits either acquiescing to rescission of the entire sale or identifying, for the court's review, exactly which provisions they contend survive; conferral with plaintiffs will be encouraged.  The court will further order Libre Immigration Services to destroy any covered information or contracts that it possesses or to which it has access, to cease collecting on any covered contracts, and to disclose, account for, and disgorge to consumers any money collected on the covered contracts.  It or its representative must also swear out an affidavit that this is done, including the date of compliance.  Proof of compliance with all

these orders will be due by Friday, April 17, 2026, after which the court may impose additional appropriate sanctions, including daily fines, to secure compliance.

Upon complying, each contemnor's civil contempt will be held purged by separate order.

## IV.  CONCLUSION

For the foregoing reasons, plaintiffs' motion to show cause (Dkt. No. 260) will be denied in part as to Moore and granted in part as to Nexus Services, Libre by Nexus, Libre Immigration Services, Donovan, and Ajin, who will all be held in civil contempt until they comply with the court's remedial orders.  A consistent order will be issued.

Entered: March 30, 2026.

*/s/ Elizabeth K. Dillon*
Elizabeth K. Dillon
Chief United States District Judge